**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| SONDER HOLDINGS INC., | Case No. 25-12040 (KBO) |
| Debtor. | |
| In re: | Chapter 7 |
| SONDER GERMANY GMBH, | Case No. 25-12041 (KBO) |
| Debtor. | |
| In re: | Chapter 7 |
| SONDER GROUP HOLDINGS LLC, | Case No. 25-12042 (KBO) |
| Debtor. | |
| In re: | Chapter 7 |
| SONDER GUEST SERVICES LLC, | Case No. 25-12043 (KBO) |
| Debtor. | |
| In re: | Chapter 7 |
| SONDER HOLDINGS LLC, | Case No. 25-12044 (KBO) |
| Debtor. | |

| | |
|---|---|
| In re:<br><br>SONDER HOSPITALITY HOLDINGS LLC,<br><br><div align="center">Debtor.</div> | Chapter 7<br><br>Case No. 25-12045 (KBO) |
| In re:<br><br>SONDER HOSPITALITY USA INC.,<br><br><div align="center">Debtor.</div> | Chapter 7<br><br>Case No. 25-12046 (KBO) |
| In re:<br><br>SONDER PARTNER CO.,<br><br><div align="center">Debtor.</div> | Chapter 7<br><br>Case No. 25-12047 (KBO) |
| In re:<br><br>SONDER TECHNOLOGY INC.,<br><br><div align="center">Debtor.</div> | Chapter 7<br><br>Case No. 25-12048 (KBO) |
| In re:<br><br>SONDER USA INC.,<br><br><div align="center">Debtor.</div> | Chapter 7<br><br>Case No. 25-12049 (KBO) |

**EMERGENCY MOTION BY MARRIOTT INTERNATIONAL, INC. FOR ENTRY OF AN ORDER (1) DETERMINING EMERGENCY MEASURES TO PROTECT GUESTS DO NOT VIOLATE THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, (2) GRANTING RELIEF FROM THE AUTOMATIC STAY <u>RETROACTIVE TO THE PETITION DATE PURSUANT TO 11 U.S.C. § 362(d)</u>**

Marriott International, Inc. ("***Marriott***") moves for entry of an Order (1) determining that Emergency Measures (as defined below) undertaken by Marriott and certain third parties do not violate the automatic stay under 11 U.S.C. § 362(a) or, alternatively, (2) granting relief from the automatic stay, pursuant to 11 U.S.C. § 362(d) and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), retroactive to the Petition Date (as defined below) to permit Marriott and certain third parties to undertake the Emergency Measures.[1]

In further support of this Motion (the "***Motion***"), Marriott respectfully states as follows:

## I.    INTRODUCTION

1.      Marriott terminated its license agreement with Sonder before the filing of Sonder's voluntary petition under chapter 7 of the Bankruptcy Code because Sonder informed Marriott that Sonder was headed for an imminent free-fall liquidation and was about to abandon thousands of hotel guests across three continents. As a result, Marriott had no choice but to terminate the agreement to facilitate communication with Sonder's guests, whose safety, security, and welfare would be impacted by Sonder's sudden liquidation.

2.      Sonder was forced into free-fall liquidation by a series of decisions it took well before termination of the Marriott license agreement.  Among other things, Sonder collected tens of millions of dollars in advance payments for reservations it now admits it will never honor, spent weeks on a failed restructuring without any contingency plan, and failed to reserve sufficient liquidity to support an orderly wind-down.  Sonder then attempted to leverage guest safety as a bargaining chip—threatening that, unless Marriott financed its wind-down, it would shut down hotel systems and leave thousands of guests locked out of their rooms mid-stay, without regard to

---

[1] By filing this Motion and taking other actions to assist guests who stayed in or booked to stay in Sonder properties, Marriott does not agree to assume any of Sonder's obligations to any of its creditors.

whether those rooms contained medication, passports, personal effects, or other essentials and without regard to whether those guests would be left with no place to sleep.

3.      Although Marriott never operated Sonder's properties and never collected or received payments for stays at those properties—even stays booked on Marriott's channels prior to termination of the license agreement—Marriott acted to protect the safety, security, and welfare—and, frankly, basic dignity—of thousands of guests abandoned by Sonder.  Marriott files this Motion to preempt any concern that its continued acts to communicate with, rebook, and take similar actions relating to Sonder's former guests might violate the automatic stay.

## II.    SUMMARY OF RELIEF REQUESTED AND BASIS THEREFOR

4.      Sonder Holdings Inc. ("***Sonder Holdings***"), the other above-captioned debtors (together with Sonder Holdings, the "***Debtors***"), and Sonder Holdings' non-Debtor subsidiaries (collectively with the Debtors, "***Sonder***" or the "***Company***") operated a hospitality company that managed approximately 7,500 furnished apartments and hotel rooms for short- and long-term stays in 37 cities across nine countries.

5.      In 2024, Sonder entered into a License Agreement (as defined below) with Marriott, a global hospitality company that itself operates, franchises, and licenses more than 9,000 properties worldwide.  Under the License Agreement, Sonder remained the manager of all its units, but contracted to take advantage of Marriott's global booking platform and loyalty program, with Sonder's inventory to be marketed as "Sonder by Marriott Bonvoy."  By June 2025, all of Sonder's properties were marketed through Marriott's direct channels, and Sonder sourced demand from Marriott's digital platforms and industry-leading Marriott Bonvoy loyalty program with more than 200 million members.  Sonder remained the sole operator of all its inventory.  Sonder also received

the deposits and advance payments for bookings at Sonder properties, even when guests booked Sonder properties through Marriott's direct channels.

6.     For reasons more fully explained below, after a series of failed restructuring initiatives, by Friday, November 7, 2025, it became clear that the Company's liquidity situation was so dire that Sonder effectively had little to no cash.  Further, Sonder notified Marriott that it was likely to abruptly terminate operations over the weekend (November 8–9, 2025), including laying off all its employees and shutting down critical systems, including electronic lock systems—while thousands of guests were in residence at Sonder properties across three continents. The Company specifically threatened to file a free-fall chapter 7 case, which it told Marriott would leave guests abruptly locked out of their rooms.

7.     The threat of an abrupt termination of Sonder's operations coupled with the lack of any liquidity to pay essential operating costs—such as payroll or mission critical vendors— created an immediate risk to the health, safety, and welfare of thousands of guests.  For example, abrupt termination of Sonder's operations could have prevented guests who were occupying Sonder properties from retrieving medication, passports, personal effects, or other essentials. Some guests might arrive for stays only to find their units locked and unsecured, while others might be left occupying rooms in buildings where no management company was available to provide attention, oversight, or assistance.

8.     Faced with this escalating crisis, Marriott's immediate priority was to communicate with guests staying at Sonder-operated properties, given the potentially unsafe operating conditions.  In order to allow Marriott to invoke post-termination rights and undertake actions reasonably necessary for guest safety and security, on November 7, 2025, Marriott terminated the License Agreement and thereafter immediately activated Emergency Measures (as

defined below) to, among other things, assist thousands of guests currently staying at Sonder's properties in relocating their stays, and to address reservations held by guests with future plans to stay at Sonder's properties.

9.      Marriott continued to implement the Emergency Measures over the weekend of November 8-9, 2025, and throughout this week to minimize the impact to guests of Sonder's failure.  On Friday, November 14, 2025 (the "**Petition Date**"), the Debtors each filed a voluntary petition under chapter 7 of the Bankruptcy Code, thereby commencing these chapter 7 cases (the "**Chapter 7 Cases**") and triggering the imposition of the automatic stay under section 362(a) of the Bankruptcy Code.  To the extent that any of the Emergency Measures may be considered acts to exercise control over property of the Debtors' estates in violation of the automatic stay, Marriott has had no choice other than to continue to implement the Emergency Measures because of the immediate risks to the health, safety, and welfare of guests, including those who had booked through Marriott channels.

10.      Section 362(a)(3) imposes the automatic stay against acts to exercise control over property of the estate.  Section 362(d)(1) of the Bankruptcy Code requires that the Court grant relief from stay, "such as by terminating, annulling, modifying, or conditioning such stay for cause, including the lack of adequate protection[.]"  For the reasons that follow, the Emergency Measures do not violate the stay imposed by section 362(a)(3) or, in the alternative, "cause" exists under section 362(d)(1) to lift the stay effective as of the Petition Date to permit Marriott to continue to implement the Emergency Measures.

### III.    BACKGROUND[2]

**A.    The Debtors' Business Operations.**

11.    Sonder was a hospitality company that just prior to the Petition Date managed approximately 7,500 furnished apartments and hotel rooms for short- and long-term stays in 37 cities across nine countries.  Founded in 2012, Sonder expanded rapidly and became publicly traded on NASDAQ in January 2022 through a merger with the special-purpose acquisition company Gores Metropoulos II, Inc.  Before its bankruptcy, Sonder served roughly 500,000 guests annually.  Its portfolio of apartment and hotel rooms were leased from third-party real estate owners, with many units located in commercial or mixed-use developments.

12.    Sonder's business model involved leasing properties from real estate owners, furnishing them, and making them available for booking.  *See* Sonder Holdings Inc., Form 10-K at 8, 18-19, SEC File No. 1-39907 (2025) (the "***Sonder 2024 10-K***").  Sonder generated all its revenue from payments made by guests who would book its rental units.  *See id*. at 7, 89.  Sonder then used those customer payments as working capital to operate its business.

13.    Most of Sonder's reservations were prepaid, with guests either paying in full or paying a significant deposit in advance of their stay.  *See* Marriott Bonvoy, *For Marriott customers with Sonder reservations* (last accessed Nov. 10, 2025), https://www.marriott.com/en-us/marriott-brands/portfolio/sonderfaqs.mi.  Sonder did not hold those deposits and advance payments in escrow; rather, Sonder used the guests' advance payments and deposits to fund Sonder's own operating expenses.

---

[2]    Unless otherwise noted, the factual statements contained in this Background section are based on information provided by Sonder or are made upon information and belief.  Sonder is a publicly traded company, and its annual reports and other SEC filings can be found at https://investors.sonder.com/

14.     In the period just before the Petition Date, Sonder employed approximately 1,150 individuals, with approximately 500 based in the U.S. and 650 internationally. The Company operated remotely, with most employees working across various locations rather than in centralized offices. Most employees were full-time and worked across functions such as building operations, real estate development and openings, accounting and finance, tax, sales, marketing, communications, legal, information technology, software engineering, product development, and human resources.

15.     Sonder provided guest services through Sonder's app, which enabled check-in and check-out for all guests, regardless of their booking channel. The app also offered ongoing support during guests' stays, including access to mid-stay cleanings and amenities.

**B.     Marriott Licensing Agreement.**

16.     For fiscal year 2023, Sonder reported a "negative cash flow from operating activities of . . . $110.9 million." Sonder 2024 10-K at 18. In an effort to reverse its fortunes, Sonder sought a licensing relationship with Marriott to capitalize on Marriott's digital platforms, loyal customer base, and superior systems. In August 2024, Marriott and Global Hospitality Licensing S.à r.l. (together with Marriott, the "***Marriott Licensing Parties***") and Sonder Holdings entered into that certain License Agreement dated as of August 13, 2024 (as amended pursuant to the First Amendment to the License Agreement, dated October 30, 2024, the Second Amendment to the License Agreement, dated April 16, 2025, and the Third Amendment to the License Agreement, dated August 5, 2025, and as such agreement may be further supplemented, or otherwise modified from time to time, the "***License Agreement***"), to launch "Sonder by Marriott Bonvoy" for a 20-year initial term subject to renewal as provided therein.

17.     In the License Agreement, the Marriott Licensing Parties did not agree to—and do not agree to—operate any of Sonder's properties. Instead, each of Sonder's properties

continued to "be operated by (i) Sonder (or an Affiliate of Sonder), or (ii) solely with respect to [new properties], a [third-party] Management Company reasonably approved in writing by Marriott."  License Agreement § 8.1.

18.     Under the License Agreement, Marriott provided Sonder with $15 million in "key money," and granted Sonder a limited license to use Marriott's reservation system and certain intellectual property, in exchange for Sonder paying royalties and other fees and a limited license from Sonder to use certain of its intellectual property.  *See id.* at §§ 1, 4.  Following a period of technical integration, Sonder's properties became available for reservations through Marriott's channels and began participating in the Marriott Bonvoy loyalty program.

19.     As of June 2025, guests were able to book all Sonder-managed properties both through Marriott channels, including Marriott.com and Marriott's mobile application, as well as third-party online travel agencies, such as Expedia and Booking.com.  However, even for direct bookings on Marriott channels, no guest payments were made to Marriott.  Rather, payment was delivered directly to Sonder via a payment processor, bypassing Marriott entirely, and Marriott did not even possess information about who paid deposits, how much they paid, or for which bookings at Sonder properties.  Under the License Agreement, Sonder was to pay Marriott a monthly royalty fee plus a fixed percentage of Sonder's gross bookings revenue and other fees.  *See id.* at § 4.2, Ex. A.

20.     As of the Petition Date, Debtor Sonder Holdings was indebted to the Marriott Licensing Parties pursuant to the License Agreement in the approximate aggregate principal amount of not less than $17,678,766.00 on account of (a) Unamortized Key Money (as defined in the License Agreement) in the amount of not less than $14,431,407.00, and (b) fees, costs and expenses for Mandatory Services, Optional Services, Travel Costs, Trigger Fees (each

as defined in the License Agreement), and other Fees, Charges and Costs under Section 4.5 of the License Agreement, in the amount of not less than $3,247,359.00, plus accrued and unpaid interest with respect thereto and any additional amounts owed under or in connection with the License Agreement (the "***Marriott Licensing Fee***").

**C.      Events Leading to the Chapter 7 Cases.**

21.      Unfortunately, the Company was unable to achieve sustainable growth or profitability.  In the 2024 10-K, Sonder acknowledged that there was "substantial doubt about [its] ability to continue as a going concern."  Sonder 2024 10-K at 45; *see also id.* at 13-14, 16, 51-54, 91-92.

22.      In the months prior to filing the Chapter 7 Cases, Sonder attempted to address liquidity pressures and other challenges.  On April 11, 2025, the Company raised approximately $18 million through the issuance of additional preferred equity to certain investors.  On August 5, 2025, Sonder raised approximately $24.5 million in incremental liquidity from certain of its preferred investors in the form of new senior secured debt (the "***Investor Debt***") that primed the then-senior secured notes facility.  Sonder simultaneously executed an agreement (the "***Marriott Loan Agreement***") with Marriott to roll up certain unpaid License Agreement fees into a senior secured debt facility (the "***Marriott Debt***") that ranks *pari passu* with the Investor Debt.  In the Marriott Loan Agreement, Sonder expressly represented to Marriott that "[i]mmediately after giving effect to the transactions contemplated by this Agreement, Sonder Holdings and its Subsidiaries, on a Consolidated basis, are Solvent."  Loan Agreement § 2(q).

23.      In early November 2025, the Company's liquidity dried up.  On November 5, 2025, Marriott and Sonder executed an agreement to amend and upsize the Marriott Debt and provide new money to reimburse the Company approximately $1,513,555.69 in funding for one week of Sonder's U.S. payroll and payroll taxes.  Marriott's decision to provide this additional

funding was driven by a desire to support the continued pursuit of outcomes that would facilitate continued orderly operations of properties housing thousands of current guests and future reservations.

24.    However, by no later than November 7, 2025, Sonder informed Marriott that all potential indications of interest for a strategic restructuring transaction with the Company had been exhausted, and no further sources of liquidity were available to the Company.  Further, by no later than November 7, 2025, Sonder confirmed that it was unable to pay its debts as they became due, lacked sufficient resources to commence an orderly wind down of its business, and anticipated an abrupt shutdown of its operations with immediate impact to guests.

**D.    Marriott's Emergency Actions to Support Affected Customers.**

25.    Sonder advised Marriott that its bankruptcy could result in current guests losing access to their accommodation and being left without any form of support.  Guests who were occupying Sonder-managed properties might be prevented from retrieving their personal belongings, including medication, passports, personal effects, or other essentials.  And even if they could still access their rooms, guests would be left occupying rooms in buildings where no management company was available to provide attention, oversight, or assistance.  Given the immediate and significant risks to the health, welfare, and safety of affected guests, Marriott acted decisively.

26.    First, on November 7, 2025, Marriott terminated the License Agreement and suspended Sonder's access to the Reservation System (as defined in the License Agreement).[3] Sonder has no right to cure its default under the License Agreement.  By terminating the License

---

[3]    A true and correct copy of the Notice of Termination is attached as ***Exhibit "A"*** to this Motion (the "***Termination Notice***").

Agreement, Marriott availed itself of certain post-termination rights that permit it to undertake any act related to customers or third parties reasonably necessary due to the termination of the License Agreement (collectively, all such actions undertaken by Marriott to assist affected customers, the "***Emergency Measures***").

27.     After terminating the License Agreement, Marriott immediately activated the Emergency Measures to assist guests affected by Sonder's threatened shutdown, particularly those still occupying Sonder properties.  The Emergency Measures include but are not limited to:

- notifying current and upcoming guests regarding the discontinuation of Sonder by Marriott Bonvoy;

- establishing and maintaining direct channels for guests to obtain information and support from Marriott;

- rebooking guests to other properties;

- restricting Marriott Bonvoy users from booking new reservations at Sonder properties;

- exercising Marriott's post-termination rights under the License Agreement, including but not limited to Sections 19.2, 19.3, and 19.4;

- maintaining ongoing access for Marriott to electronic systems and any technology required to facilitate transition or support customers, accounts, or relationships, including guest folios and related systems, regardless of whether they are owned, managed or controlled by Marriott, Sonder or other third parties, and removing Sonder's access —including the access of all current and former Sonder employees—to any such electronic systems once transition activities are complete; and

- continuing Marriott's general customer support and any related actions necessary to facilitate guest services.

28.     The Emergency Measures have become increasingly necessary since Sonder abandoned its own customer support channels and redirected affected customers to Marriott for information and support.  Marriott has specifically requested Sonder provide contact information for individuals responsible for operations and transitioning technology and related

systems, but Sonder has failed to provide this information or engage Marriott in addressing customer needs.

29.    Adding to the urgency, over the weekend of November 8-9, Sonder effectively disclaimed its obligations by notifying customers via email that it would no longer honor its commitments and instructed them to contact Marriott for assistance even though many of the reservations were made through third party online travel agencies and not through Marriott's reservation channels.  These emails quoted and linked to Marriott's press release and provided direct contact information for Marriott.  Sonder's own customer service phone line was replaced with a recorded message directing customers to Marriott's customer service channels.

30.    After activating the Emergency Measures ensuring that programs were in place to inform guests still occupying Sonder properties, Marriott sent Sonder a Notice of Acceleration of the Marriott Debt.[4]  This notice informed Sonder that an Event of Default under the Loan Agreement had occurred and was continuing due to the termination of the License Agreement, and that Marriott was accelerating payment of the Marriott Debt and applying the default interest rate to the same.  As with the License Agreement, Sonder has no right to cure its default under the Loan Agreement.

E.    **Sonder's Free Fall into the Chapter 7 Cases.**

31.    The ink was barely dry on the loan documentation under which Marriott funded more than $1.5 million for one week of the Company's U.S. payroll when, on November 6, 2025, Sonder sent Marriott a draft term sheet proposing Marriott fund the entirety of Sonder's wind-down costs.  The draft proposal started with a request for $50 million in additional new money funding, with numerous bracketed amounts and blanks, including an extraordinary request

---

[4]       A true and correct copy of the Notice of Acceleration is attached as ***Exhibit "B"*** to this Motion.

for Marriott to assume Sonder's liabilities, including the potential liabilities of its directors and officers. Later that day, Sonder requested an urgent call with Marriott; during that call Sonder stressed the Company's dire cash position and noted that all interest in a potential "363 sale" under chapter 11 and other restructuring transactions had failed to materialize. Sonder attempted to convince Marriott to pay the Company's enormous wind-down expenses. Although Marriott agreed to review any actionable proposals provided to it, Marriott reiterated that it had no obligation to provide Sonder any additional or further funding, much less the considerable and unspecified funding previously requested.

32.     Later, on November 7, 2025, Sonder sent Marriott a proposed wind-down budget of $28 million to cover all expenses, including advisor fees and insolvency proceedings, for its operations through November 14, 2025. The next day, Marriott rejected the $28 million proposal and reiterated to Sonder that it would not fund the Company's wind-down costs. Following the call, Sonder sent Marriott a revised proposal for $14.3 million in funding, which Marriott again declined. Marriott emphasized its expectation that, should Sonder take steps to shut down operations, it should do so in a manner to protect guests, but Sonder ignored these requests. As noted above, Marriott specifically requested contact information for individuals responsible for operations and transitioning technology and related systems, but Sonder failed to take even this simple step to protect its own guests.

33.     Subsequently, Sonder asserted that $5.5 million of the $14.3 million it was requesting reflected a purported prior commitment by Marriott, *even though no such agreement or obligation exists*. Marriott has *never* made any written or oral commitments outside executed licensing and loan agreements. Sonder's Board and management continued pressing Marriott for

additional funding, indicating that Sonder had failed to reserve sufficient liquidity for an orderly wind down.

34. On November 10, 2025, Sonder released a statement announcing the immediate wind-down of its operations and its intention to liquidate under chapter 7. The release indicated that further details would be provided through either the chapter 7 trustee or Sonder Holdings' international subsidiaries. Sonder did not provide any information regarding protection, support, or contact methods for customers in the announcement, other than to direct guests to Marriott's customer service.

## IV.    RELIEF REQUESTED

35. Marriott requests entry of an Order (1) determining that the Emergency Measures do not violate the automatic stay under 11 U.S.C. § 362(a) or, alternatively, (2) granting relief from the automatic stay, pursuant to section 362(d) of the Bankruptcy Code, Bankruptcy Rule 4001(a), and Local Rule 4001-1, retroactive to the Petition Date, to permit Marriott, and certain third party vendors whose assistance Marriott may require, to continue the Emergency Measures.

## V.    BASIS FOR RELIEF

**A.    The Automatic Stay Does Not Apply Because the Debtor Has No Rights in the License Agreement or Marriott Systems as a Result of the Termination of the License Agreement and Sonder's Prepetition Actions.**

36. As a result of the Termination Notice, it is clear that the License Agreement terminated before the Petition Date, and the Debtors have no right to use Marriott's systems or intellectual property. Under well-established law, where a contract is terminated before the petition date with no right to cure, the debtor has no rights under the contract except those that expressly survive termination. *See In re PSA, Inc.*, 335 B.R. 580, 588 (Bankr. D. Del. 2005) ("the

filing of a bankruptcy petition does not permit a debtor in possession to enjoy greater contract or property rights than it possessed outside of bankruptcy case."); *see also In re ClearPoint Business Resources, Inc.*, 442 B.R. 292, 296 (holding that a bankruptcy petition does not expand a debtor's rights under agreements that "terminated by their terms during the course of the [d]ebtor's bankruptcy").

37.     Moreover, where a license agreement is terminated prepetition, the debtor has no property interest in the licensed property. *Cf. In re Tornado Pizza, LLC*, 431 B.R. 503, 510-11 (Bankr. D. Kan. 2010) (where the franchisor gives the franchisee notice of termination of the franchise agreement prepetition "and the termination process is complete with no right to cure when the petition is filed, the debtor does not have a property interest in the franchise on the date of the filing" as "[t]he bankruptcy filing does not resuscitate the terminated rights").

38.     The Chapter 7 Cases do not expand the interests in property of the Debtors under the License Agreement and do not give the Debtors any opportunities to cure their defaults under the License Agreement. *See In re ClearPoint Business Resources, Inc.*, 442 B.R. at 296 ("Once a contract ends, a debtor's rights … ends as well."); *see also Moody*, 734 F.2d at 1212-14 (holding that where a notice of termination of a contract is delivered prepetition and the effective date of the termination is postpetition, such a contract cannot be assumed, is not subject to a debtor's right to cure defaults under section 365 of the Bankruptcy Code and that "whatever rights a debtor has in property at the commencement of the case continue in bankruptcy — no more, no less").

39.     Here, because the Debtors have no interest in property in Marriott's systems or intellectual property, and because Sonder abruptly shut down its operations, directed its guests to urgently vacate the Company's rooms, and pointed its guests to Marriott for further

communications and support, the Emergency Measures do not interfere with nor exercise control over any property of the Debtors' estates.

**B.      In the Alternative, Cause Exists for Relief from Stay to Permit Marriott to Continue the Emergency Measures and to Grant Such Relief Effective as of the Petition Date.**

40.     Section 362(a)(3) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay applicable to all entities of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"  11 U.S.C. § 362(a)(3).  If the Court determines the Debtors' or their estates have some residual interest in property relating to guests, then the continuation of the Emergency Measures may involve acts that exercise control over property of the Debtors' estates.

41.     The imposition of the automatic stay affords one of the most fundamental debtor protections provided by the Bankruptcy Code.  *Midatlantic Nat'l Bank v. New Jersey Dep't of Envntl. Protection*, 474 U.S. 494, 503 (1986).  However, "the stay is not meant to be indefinite or absolute, and in appropriate instances, relief may be granted." *In re Rexene Products Co.*, 141 B..R. 574, 576 (Bankr. D. Del. 1992).

42.     In this regard, section 362(d)(1) of the Bankruptcy Code provides that "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).  Upon a showing of "cause," relief from stay is mandatory.  *Id.*  To assess the existence of cause (other than for lack of adequate protection), this Court has adopted a three-prong balancing test evaluating "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay; (2) whether the hardship to the non-bankrupt party by the maintenance of the stay considerably outweighs the hardship to the

debtor if the stay is lifted; and (3) whether it is probable that the creditor will prevail on the merits of its case against the debtor." *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010); *see also Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

43.    Bankruptcy courts have "wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from stay." *In re Schwartz*, 954 F.2d 569, 572 (9th Cir. 1992).  The Third Circuit and other courts around the country have long recognized that the statute's inclusion of the word "annulling" indicates a legislative intent "to apply certain types of relief retroactively and validate proceedings that would otherwise be void *ab initio*." *In re Siciliano*, 13 F.3d 748, 751 (3d Cir. 1994) (citing *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178 (5th Cir. 1989); *In re Schwartz*, 954 F.2d at 572).  In assessing whether bankruptcy courts may retroactively annul the automatic stay under Section 362(d)(1) of the Bankruptcy Code, the Third Circuit has joined other courts in holding that "balancing the equities is the appropriate test" for such inquiries.  *In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007) (citing *In re Nat'l Env't Waste Corp.*, 129 F.3d 1052, 1055 (9th Cir. 1997)).

44.    For the reasons that follow, cause exists to grant relief from stay to permit the Emergency Measures, and the balance of equities support granting such relief retroactive to the Petition Date.

**C.    Cause for Relief from Stay Exists Because the Public's Safety and Marriott's Reputation with the Public Cannot Be Adequately Protected.**

45.    Because the License Agreement has now terminated, the Debtors no longer have any rights under the License Agreement to use Marriott's systems or intellectual property, and the Debtors have no ability to comply with their post-termination obligations or to provide for the health, safety, and welfare of their customers; accordingly, the Debtors cannot provide adequate protection to Marriott.  As set forth above, the Court must grant relief from the automatic

18

stay, "for cause, ***including the lack of adequate protection of an interest in property*** . . . ." 11 U.S.C. § 362(d)(1) (emphasis added).  "Adequate protection is meant to preserve the status quo of the entity with an interest in the debtor's property."  *In re Tudor Motor Lodge Associates Ltd. Partnership*, 102 B.R. 936, 954 (Bankr. D.N.J. 1989) (citing *In re Chevy Devco*, 78 B.R. 585, 588 (Bankr. C.D. Calif. 1987)).  It is impossible, however, for a debtor to provide adequate protection to a licensor for the continued use of licensed rights following the termination of the license agreement.  *Cf. In re Tudor Motor Lodge*, 102 B.R. at 954-55; *In re B-K of Kansas, Inc.*, 69 B.R. 812, 815 (Bankr. D. Kan. 1987) ("[T]he use of trademarks and service marks, is of such a type that money may never adequately protect the franchisor.").

46.     At stake is the health, safety, and welfare of Marriott's customers and Marriott's reputation with the general public.  The risk of harm to the public and of damage to Marriott's reputation cannot be compensated through any form of adequate protection.  *See In re Tornado Pizza, LLC*, 431 B.R. 503, 519 (Bankr. D. Kan. 2010) (where a license agreement has terminated by its terms, there is no adequate protection that would be appropriate under the circumstances to allow the debtor to continue to use the licensor's marks); *In re B-K of Kansas*, 69 B.R. at 815 (finding that "money may never adequately protect the [licensor]" when "[t]he [licensor]'s reputation to the general public is at stake."); *In re Tudor Motor Lodge*, 102 B.R. at 956-57 (holding that payments of postpetition obligations, with payment on prepetition liabilities upon successful completion of the debtor's reorganization plan, are not adequate to protect a licensor from continued non-compliance with brand standards by a debtor).

47.     Because it is impossible for the Debtors to provide adequate protection, the Court need not engage in the three-part balancing exercise adopted by courts in this District.  *See, e.g., In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304–07 (Bankr. D. Del. 2011)

(granting stay relief under Bankruptcy Code § 362(d)(1) without conducting the three-part balancing test because the debtor cannot provide adequate protection to the creditor).

**D.   In the Alternative, Cause for Relief From Stay Exists Under the Three-Factor Test.**

48.   In order to show "cause" for relief from stay, "the movant has the initial burden of proof to put forth a prima facie case for cause before the debtor must then rebut the case." *In re Scarborough St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *In re Rexene Prods. Co.*, at 577). Here, a prima facie case exists for each element of the three-part test.

1.   <u>Relief from the Stay to Permit Marriott to Complete the Emergency Measures Will Not Result in Any Great Prejudice to the Bankrupt Estates or the Debtors.</u>

49.   In analyzing whether any great prejudice would result to the bankrupt estates or to the Debtors from lifting the automatic stay, it is useful to consider the purposes of the automatic stay in the first place. The *In re Rexene Prods.* court notes that these purposes are threefold: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 127 (Bankr. D. Del. 2009) (quoting *In re Rexene Prods. Co.*, at 576).

50.   Each of these purposes favors relief from stay. *First*, in seeking to continue the Emergency Measures, Marriott is not seeking a preference for the Marriott Licensing Fees or the Marriott Debt, but rather to safeguard customers and protect Marriott's relationship with the public. *Second*, permitting the Emergency Measures to proceed will not deplete the Debtors' assets; instead, it will preserve their estates by minimizing potential administrative expenses. *Third*, continuing the Emergency Measures will not interfere with an orderly liquidation of the

Debtors; to the contrary, it will positively contribute to the efficient administration of the Chapter 7 Cases.

51.     Accordingly, relief from stay to continue the Emergency Measures would not contravene any of the purposes of the automatic stay, and doing so would not prejudice the Debtors or their estates.

2.     <u>Maintenance of the Stay Would Result in Hardship to Customers and Marriott Considerably Outweighing any Hardship that Would Result to the Debtors Should the Stay be Lifted</u>

52.     By its terms, the second prong of the test requires only that Marriott show it will experience hardship should the stay be maintained that considerably outweighs any hardship to the Debtors should the stay be lifted.  It need not demonstrate that any prospective hardship would meet some objective standard or threshold, only that the balance of harms as between itself and the Debtors weigh in its favor.

53.     The License Agreement having been terminated before the Petition Date and Sonder having abandoned its customer service channels and directed its customers to contact Marriott, continuing the Emergency Measures would not impose any hardship on the Debtors.  By contrast, staying the Emergency Measures would impose a significant hardship on the customers and Marriott because customers would be left without any support or assistance whatsoever, and Marriott would be at risk of significant reputational harm.

54.     Accordingly, the hardship to customers and to Marriott imposed by the stay would considerably outweigh any hardship to the Debtors by relief from stay.

3.     <u>Marriott Has at Least Some Probability of Success on the Merits</u>

55.     For the purposes of showing of cause under the third prong of the balancing test, "even a slight probability of success on the merits may be sufficient to support lifting an automatic stay." *In re Continental Airlines, Inc.*, 152 B.R. 420, 426 (Bankr. D. Del. 1993).  With

the License Agreement having been terminated before the Petition Date, the License Agreement having granted Marriott the right and authority to conduct the Emergency Measures, and Sonder having directed its customers to contact Marriott regarding their reservations, Marriott has at least some probability of success on the merits that it is entitled to conduct the Emergency Measures under applicable non-bankruptcy law.

**E.    The Balancing of the Equities Also Weighs in Favor of Granting Retroactive Relief.**

56.    Courts in this Circuit apply a "balancing the equities" test to assess whether retroactive relief to the automatic stay is warranted.  The Third Circuit has explained that the "most important factors in making this determination are (1) whether the creditor was aware of the filing or encouraged the violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced."  *In re Myers*, 491 F.3d at 129 (citing *Nat'l Envt'l Waste Corp.*, 129 F.3d. at 1055).  However, those factors are not the only relevant inquiries, and the Court may consider additional factors.  *See In re Rupari Holdings*, 573 B.R. 111, 120 (Bankr. D. Del. 2017) (granting retroactive stay annulment after considering, in addition to the Third Circuit's *Myers* factors, whether the case was filed in bad faith and whether independent cause existed to support relief from the stay).

57.    In this instance, a balancing of the equities weighs in favor of retroactively annulling the stay to the Petition Date.  All three of the factors in *Myers* support Marriott's request for retroactive relief.  *First*, Sonder informed Marriott and the general public through press releases of the impending chapter 7 several days in advance.  Indeed, Marriott's communication with Sonder and its filing of this Motion soon after the Petition Date demonstrates Marriott's commitment to comply with its obligations as a creditor in the bankruptcy process.  *Second*, the emergency circumstances arose from Sonder's abrupt, unreasonable shut down, which threatened

harms to both guests and Marriott that required immediate intervention. *Third*, as explained above, denying retroactive annulment of the stay would significantly prejudice Marriott, as well as guests' health, safety, and welfare. Beyond the *Myers* factors, Marriott has demonstrated that independent "cause" exists and warrants relief from the automatic stay.

58.    Accordingly, the facts of this case overwhelmingly support granting retroactive annulment of the stay.

## VI.    REQUEST FOR WAIVER OF STAY OF ORDERS

59.    Marriott seeks a waiver of any stay of the effectiveness of an order approving this Motion. Pursuant to Bankruptcy Rule 4001(a)(4), unless otherwise ordered "[a]n order granting a motion for relief from an automatic stay" under Rule 4001(a)(1) "is stayed for 14 days after it is entered." Marriott requests that any order entered granting this Motion be effective immediately so that Marriott and certain third-party vendors working with Marriott may proceed immediately with the Emergency Measures. Given the lack of any interest of the Debtors' estates in the License Agreement, the Debtors' inability to operate, and the harm caused by any delay in the Emergency Measures, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(4).

## VII.    RESERVATION OF RIGHTS

60.    Marriott reserves its right to amend and supplement the issues raised in this Motion in connection with any final evidentiary hearing on the Motion, including through the assertion of additional or more detailed grounds for the granting of the relief being requested under this Motion. Marriott also reserves its right to seek further relief from this Court, including injunctive relief. Further, Marriott expressly reserves its right to assert claims against the Debtors'

estates, including administrative expenses, and other parties in interest for all damages and other amounts incurred by Marriott in connection with Sonder's shutdown or the Emergency Measures.

## VIII.    CONCLUSION

61.    For all the foregoing reasons, the Motion should be granted.

Dated: November 14, 2025
Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
       mnestor@ycst.com

-and-

**BAKER & McKENZIE LLP**
Paul J. Keenan Jr. *(pro hac vice motion pending)*
John R. Dodd *(pro hac vice motion pending)*
William Roppolo *(pro hac vice motion pending)*
830 Brickell Plaza, Suite 3100
Miami, FL 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953
Email: paul.keenan@bakermckenzie.com
       john.dodd@bakermckenzie.com
       william.roppolo@bakermckenzie.com

-and-

**JENNER & BLOCK LLP**
Lindsay C. Harrison *(pro hac vice motion pending)*
1099 New York Ave NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Email: lharrison@jenner.com

*Counsel for Marriott International, Inc.*