# EXHIBIT C

**Sean P. Williams**

| | |
|---|---|
| **From:** | Deanne M. Ruiz |
| **Sent:** | Monday, November 17, 2025 4:35 PM |
| **To:** | jnimeroff@brownnimeroff.com |
| **Cc:** | Harold D. Israel; jcunningham@marqnet.com; mfalconio@marqnet.com; dklauder@bk-legal.com |
| **Subject:** | 1436 Loft Offices, LLC ("Landlord")/Sonder Hospitality USA, Inc. ("Tenant") [LP-ACTIVE.38276.38276.112278.018.FID914203] |
| **Attachments:** | 2025.11.17 Letter to chapter 7 trustee (1436 Loft).pdf |

On behalf of Harold Israel, counsel for 1436 Loft Offices, LLC ("Landlord"), please see the attached correspondence relating to the above.  Thank you.



**Levenfeld Pearlstein, LLC**
120 S Riverside Plaza, Suite 1800
Chicago, IL 60606 USA
lplegal.com

**Harold D. Israel**
hisrael@lplegal.com
T +1 (312) 476-7573

November 17, 2025

<u>**VIA EMAIL**</u>
Ms. Jami Nimeroff
Chapter 7 Trustee for
Sonder Hospitality USA Inc.
Brown Nimeroff LLC
919 Market Street, Suite 420
Wilmington, DE 19801
***Via Email:*** jnimeroff@brownnimeroff.com

**Re:    Lease Agreement dated March 31, 2021, as amended by that certain First Amendment dated March 2, 2022, that certain Second Amendment dated September 6, 2022 and that certain Third Amendment dated September 9, 2024 (collectively, the "Lease") between 1436 LOFT OFFICES, LLC ("Landlord") and SONDER HOSPITALITY USA, INC. ("Tenant") for the property described as 49 units at 1436 W. Randolph Street, Chicago, Illinois (the "Premises")**

Dear Ms. Nimeroff:

We represent Landlord with respect to the above-referenced Lease. We understand that on November 14, 2025 (the "Petition Date"), Tenant filed for relief under chapter 7 of title 11 of the United States Code in the United States Bankruptcy Coury for the District of Delaware, case no 25-12046, and that you have been appointed in the chapter 7 bankruptcy trustee for the Tenant.

As set forth on Group Exhibit A, on November 10 and November 11, 2025, Landlord terminated the Lease, a copy of which is attached hereto as Exhibit B. We are writing to request that you either confirm: (i) that the bankruptcy estate has no legal or equitable interest in the Lease that was terminated before the Petition Date; or (ii) that you have no objection to Landlord filing a motion (y) confirming the automatic stay does not apply or (z) granting relief from the automatic stay on shortened (7 day) notice.

Please let us know your response before the close of business on November 20, 2025. Thank you in advance.

All rights and remedies are hereby reserved.

Sincerely,

Harold D. Israel

cc:    Jim Cunningham
       Marissa Falconio
       David Klauder

# EXHIBIT A



**Levenfeld Pearlstein, LLC**
120 S Riverside Plaza, Suite 1800
Chicago, IL 60606 USA
lplegal.com

**Jamie L. Burns**
Senior Counsel
jburns@lplegal.com
T +1 (312) 476-7601

November 10, 2025

<u>**VIA FEDEX OVERNIGHT DELIVERY**</u>

Sonder Hospitality USA Inc.
ATTN: General Manager
1415 N. Dayton Street, Suite 117
Chicago, Illinois 60642

*With a Copy to:*

Sonder Hospitality USA Inc.
ATTN: Office of the General Counsel
101 15th Street
San Francisco, CA 94103

*Via Email:* relegalnotices@sonder.com

**Re:    Lease Agreement dated March 31, 2021, as amended by that certain First Amendment dated March 2, 2022, that certain Second Amendment dated September 6, 2022 and that certain Third Amendment dated September 9, 2024 (collectively, the "Lease") between 1436 LOFT OFFICES, LLC ("Landlord") and SONDER HOSPITALITY USA, INC. ("Tenant") for the property described as 49 units at 1436 W. Randolph Street, Chicago, Illinois (the "Premises")**

Dear Tenant:

As you are aware, this office represents Landlord with respect to the above-referenced Lease. Please be advised that Tenant is in default under the terms of the Lease, including, but not limited to, for its failure to pay rent and other charges thereunder. Tenant was sent a notice on October 27, 2025 regarding its failure to pay, which was not cured.

Additionally, Tenant has been sent more than three (3) notices over a twelve (12) month period which is an Event of Default under section 20.1.4 of the Lease for which there is no cure. Accordingly, Tenant's possession of the Premises, including all buildings, storage areas, recreational facilities, parking spaces, and garages, if any, used in connection therewith is hereby terminated effective immediately.

Sonder Hospitality USA Inc.
November 10, 2025
Page 2


Tenant is hereby instructed to deliver up possession of the Premises to Landlord immediately.

No further demand shall be necessary before bringing legal proceedings to recover the Premises. All other rights and remedies under the Lease and applicable law are hereby reserved.


Sincerely,

Jamie L. Burns

cc:     Jim Cunningham
        Marissa Falconio
        Blake Schulman
        Robin P. Black



**Levenfeld Pearlstein, LLC**
120 S Riverside Plaza, Suite 1800
Chicago, IL 60606 USA
lplegal.com

**Jamie L. Burns**
Senior Counsel
jburns@lplegal.com
T +1 (312) 476-7601

November 11, 2025

<u>**VIA FEDEX OVERNIGHT DELIVERY**</u>
Sonder Hospitality USA Inc.
ATTN: General Manager
1415 N. Dayton Street, Suite 117
Chicago, Illinois 60642

*With a Copy to:*
Sonder Hospitality USA Inc.
ATTN: Office of the General Counsel
101 15th Street
San Francisco, CA 94103
*Via Email:* relegalnotices@sonder.com

Re:    **Lease Agreement dated March 31, 2021, as amended by that certain First Amendment dated March 2, 2022, that certain Second Amendment dated September 6, 2022 and that certain Third Amendment dated September 9, 2024 (collectively, the "Lease") between 1436 LOFT OFFICES, LLC ("Landlord") and SONDER HOSPITALITY USA, INC. ("Tenant") for the property described as 49 units at 1436 W. Randolph Street, Chicago, Illinois (the "Premises")**

Dear Tenant:

As you are aware, this office represents Landlord with respect to the above-referenced Lease. As you have already been advised Tenant is in default under the terms of the Lease, and possession of the Premises was terminated.

Tenant is hereby put on notice that the Lease is also terminated effectively immediately pursuant to Section 21.1.1 of the Lease.

All rights and remedies are hereby reserved.

Sincerely,

Jamie L. Burns

cc:    Jim Cunningham
       Marissa Falconio
       Blake Schulman
       Robin P. Black

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made as of March 31, 2021 (the "**Effective Date**"), by and between 1436 LOFT OFFICES, LLC, an Illinois limited liability company ("**Landlord**"), and SONDER HOSPITALITY USA INC., a Delaware corporation ("**Tenant**").

WHEREAS, Landlord is the fee owner of the Project (defined below), and Tenant and Landlord have agreed that Landlord shall lease to, and Tenant shall lease from Landlord, that certain portion of the Project specified herein, which shall be licensed or subleased by Tenant to its guests for the Permitted Use (defined below), all pursuant to the terms, provisions and conditions more specifically set forth in this Lease.

NOW, THEREFORE, for and in consideration of the rent hereinafter reserved and the terms, covenants and obligations contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

# BASIC LEASE INFORMATION

The following is a summary of the basic Lease information ("**Basic Lease Information**"), which is incorporated into this Lease.  The Basic Lease Information contains specific business terms, each of which shall be expanded upon in the Lease; however, if the terms set forth in this Lease conflict with the terms and definitions in the Basic Lease Information, then the Basic Lease Information shall prevail:

**Landlord's Notice Address**:

1436 Loft Offices, LLC
135 Water Street
4th Floor
Naperville, Illinois 60540
Attn: Darren Sloniger

With a copy to:

Thomas G. Jaros
Levenfeld Pearlstein, LLC
2 North LaSalle, Suite 1300
Chicago, Illinois 60602

A.  **Tenant's Notice Address**:

Sonder Hospitality USA Inc.
1415 N. Dayton Street, Suite 117
Chicago, Illinois 60642
Attention:  General Manager

With a copy to:

1

Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

With a copy to:

Email: relegalnotices@sonder.com

With a copy of any default notice to a lender, if any, pursuant to Section 9.3.

B. **Building**:  The building that is part of the Project commonly known by the street address of 1436 W Randolph Street, Chicago, Illinois 60607.

C. **Premises**:  All of the units at the Project, consisting of a total of 49 Unit(s) comprised of 45 studio-one bathroom Units, and 4 one bedroom-one bathroom Units, located on floors 2 to 5 of the Building (including any and all fixtures, improvements and personal property owned by Landlord and located thereon at any time during the Term), along with a storage space on the 1st floor, a storage area on the 3rd floor and an employee office space on the 4th floor. No other portion of the Project shall be included within the Premises, including without limitation, (i) retail/restaurant/bar space located on the ground floor of the Building, the Common Areas, and the Amenities (collectively, the "**Excluded Premises**"), (ii) exterior walls and areas above the drywall ceiling of the Premises, (iii) the areas beneath the floor of the Premises, and (iv) the areas behind the interior drywall walls of the Premises. The Premises and the Excluded Premises are identified as such on **Exhibit A-2** attached hereto.

D. **Scheduled Final Completion Date**:  Eighteen (18) months after the Effective Date (subject to any delays actually caused by Force Majeure Event, Tenant Delay and any delay in Landlord obtaining possession of the Premises from any existing tenants).

E. **Outside Completion Date**: Six (6) months after the Scheduled Final Completion Date.

F. **Commencement Date**:  The date that is the later of: (a) the day after the expiration of the Onboarding Access Period, and (b) the date there is no outstanding Punchlist Items in, on or about the Premises and/or the Common Areas.

G. **Expiration Date**:  The date that is the last day of the calendar month occurring five (5) years after the Commencement Date, subject to Tenant's Renewal Options as herein provided.

H. **Initial Term**:  Five (5) years.

2

I.   **Renewal Option(s)**:  Two (2) options to renew for five (5) years each, exercisable at Tenant's sole and absolute discretion, subject to Section 2.2 hereof.

J.   **Base Rent (Initial Term)**: Initially $1,475.00 per month per Unit for studio Units, and $1,950.00 per month per Unit for one-bedroom Units, as may be adjusted as set forth in this Lease (total initial monthly Base Rent is estimated to be $74,175.00 per month).

K.   **Rent Escalation Percent**: 2.5%, compounding annually.

L.   **Rent Abatement Period**:  Two (2) months of rent abatement for the Initial Term which shall be applied to the third (3rd) and fourth (4th) full months following the Commencement Date, and one (1) month of rent abatement for any Renewal Term commencing on the first day of the first month of the applicable Renewal Term (all subject to Section 3.1 hereof).

M.   **Security Deposit Amount**:   One (1) month of Base Rent (calculated as of the Commencement Date (defined below)).

N.   **Onboarding Access Period**:  Thirty (30) day period following the date Landlord delivers the Premises to Tenant with all of the Final Completion Conditions satisfied.

O.   **FF&E Capital Amount**:  $540,619.00.

Whenever used in this Lease, all defined words and phrases, unless the context otherwise requires, shall have the meanings assigned to each as set forth and described in this Lease (including, without limitation, Appendix A attached hereto).

## LEASE

### Article 1.    PREMISES; FINAL COMPLETION CONDITION

1.1    Premises; Common Areas; Amenities. Subject to all of the terms and conditions hereinafter set forth, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord, the Premises.  In addition to the lease of the Premises, subject to all of the terms and conditions hereinafter set forth, Landlord grants to Tenant and all Authorized Parties during the Term an irrevocable non-exclusive license to use all Common Areas, and an irrevocable exclusive license to use the Amenities, the elevator and the hallways located on floors 2-5 of the Building.  Subject to the terms and conditions of this Lease and applicable Laws, Tenant and Authorized Parties shall have access to and use of the Premises, the Amenities, and all Common Areas 24 hours per day, 7 days per week.

1.2    Final Completion Condition.  Landlord shall deliver the Premises and the Common Areas in the Final Completion Condition and pursuant to **Exhibit C** attached hereto and made a part hereof.

### Article 2.    TERM; RENEWAL TERM; ONBOARDING ACCESS PERIOD

3

2.1    <u>Term</u>.  The Initial Term shall commence on the Commencement Date and end on the Expiration Date, unless extended or earlier terminated as provided herein.  Promptly following the Commencement Date, Landlord and Tenant shall memorialize the Commencement Date and the Expiration Date in a certificate in the form attached hereto as **Exhibit D** (the "**Commencement Date Certificate**"), provided, however, that failure to execute and deliver the Commencement Date Certificate shall not affect the Commencement Date or the Expiration Date. Landlord shall deliver the Premises to Tenant with all of the Final Completion Conditions satisfied on or before the Scheduled Final Completion Date, subject and pursuant to the terms and conditions set forth in **Exhibit C** attached hereto.  Notwithstanding anything to the contrary set forth in this Lease, should Tenant commence operation of its business and accept guests into the Premises prior to expiration of the Onboarding Access Period, then the Commencement Date shall occur on such earlier date Tenant accepts its guests into the Premises.

2.2    <u>Renewal Term</u>. Landlord hereby grants Tenant the Renewal Options, exercisable at Tenant's sole and absolute discretion.  If Tenant delivers a notice of its exercise of a Renewal Option to Landlord, which notice shall be an irrevocable and unconditional written notice, at least one hundred eighty (180) days before the expiration of the then current Term ("**Renewal Notice**"), this Lease shall be automatically extended commencing on the day following the then effective Expiration Date and shall end at midnight on the expiration date of the then applicable Expiration Date. Tenant may not exercise a Renewal Option if there is a monetary or material non-monetary Event of Default under the Lease either at the date of the Renewal Notice or at the commencement of the Renewal Term at issue.   All of the terms, covenants and conditions of this Lease shall continue in full force and effect during the applicable Renewal Term, except that either party shall have the right to request an adjustment to the Base Rent payable during the Renewal Term to the Prevailing Market Rate as described in Section 3.2.  Tenant must timely exercise the Renewal Options, or the Renewal Options shall terminate.  Tenant's exercise of the Renewal Option shall not operate to cure any default by Tenant of any of the terms or provisions in the Lease, nor to extinguish or impair any rights or remedies of Landlord arising by virtue of such default.  If this Lease or Tenant's right to possession of the Premises shall terminate in any manner whatsoever before Tenant shall exercise the Renewal Option, or if Tenant shall have subleased more than twenty five percent (25%) of the Premises, then immediately upon such termination or sublease, the Renewal Options shall simultaneously terminate and become null and void.  The Renewal Options are personal to Tenant and Affiliates.

2.3    <u>Visual Inspection; Onboarding Access Period</u>. From and after the date that is one hundred twenty (120) days prior to the Scheduled Final Completion Date, Tenant shall have the right to enter the Premises for the purposes of conducting visual inspections, creating digital floor plans, and taking photographs and videos, provided that Tenant uses commercially reasonable efforts at all times not to interfere with Landlord's Work.  Commencing on the Final Completion Date and continuing for the Onboarding Access Period, Tenant may perform the Onboarding Work.  During the Onboarding Access Period, Landlord shall, at no additional cost to Tenant, (a) make the elevator available to Tenant for Tenant's use on an non-exclusive basis at all hours (such access to be coordinated between Landlord and Tenant until Landlord's completion of outstanding Punchlist Items), and (b) supply temporary power (at Tenant's cost if Tenant has sole possession of the Premises), a material staging area at a location reasonably acceptable to Landlord,

4

and restroom facilities within the Premises or Amenities. The Onboarding Access Period shall be extended on a day-for-day basis for any delays actually caused by Landlord and/or Landlord Parties or to the extent the elevator becomes not available for Tenant's use for more than four (4) consecutive hours during normal business hours during the Onboarding Access Period.

### Article 3.    RENT; TAXES; SECURITY DEPOSIT; FF&E CAPITAL

3.1    <u>Rent</u>.    Commencing on the Rent Commencement Date, Tenant shall pay Landlord the Base Rent, without notice, deduction or offset, except to the extent otherwise provided in this Lease (including during the Rent Abatement Period), in lawful money of the United States of America, by ACH transfer, pursuant to the deposit information provided by Landlord to Tenant in accordance with this Section 3.1.  Landlord acknowledges and agrees that, following Landlord's receipt of a written request therefor from Tenant which is received at least sixty (60) days prior to the Commencement Date, Landlord shall complete Tenant's New Landlord Set Up Form[1] electronically at least thirty (30) days following receipt of the request therefor and, that no payment of Rent shall be considered late if Landlord does not timely and accurately complete such form.  Base Rent shall be paid in equal monthly installments, in advance, on the first business day of each calendar month during the Term.  If the Rent Commencement Date is not the first day of a month, the Base Rent for the month in which the Rent Commencement Date occurs shall be prorated according to the number of days remaining in that month.  For the Initial Term, on the first anniversary of the Rent Commencement Date and each anniversary thereafter, annual Base Rent shall increase by the Rent Escalation Percent.  Notwithstanding anything contained in this Lease to the contrary, Tenant shall not be entitled to any abatement of any Base Rent during any Rent Abatement Period while there is any outstanding unpaid Base Rent or Additional Rent, or while an Event of Default by Tenant under this Lease exists, provided that if the Event of Default is subsequently cured by Tenant within any applicable cure period, then the Rent Abatement Period shall resume.

Tenant shall pay to Landlord, concurrently with its payment of Base Rent, additional rent in the amount of $11,092.00 per month (the "**Additional Rent**").  Payments by Tenant of Additional Rent shall commence on the Rent Commencement Date and end on the Expiration Date of the Lease for the Initial Term; provided however that Tenant shall have the right to pay the Additional Rent in the Full Payment Amount remaining at the time of such payment as set forth in **<u>Exhibit H</u>** at any time without penalty and such payment shall satisfy Tenant's obligation to pay Additional Rent for the remainder of the Term, and no additional installment of Additional Rent shall be due thereafter. In the event of any termination of this Lease for any reason prior to the expiration of the Initial Term, Tenant shall be required to pay to Landlord the Additional Rent in the Full Payment Amount remaining at the time of such termination as set forth in **<u>Exhibit H</u>**. The provisions of this paragraph will survive the expiration or earlier termination of this Lease.

---

[1] Form can be found here:
https://docs.google.com/forms/d/e/1FAIpQLSdghRCoK4rLugK4N_flBtHDe9sWZ7t0YM_zhnT7p24uwe4caA/viewform

   3.2 <u>Renewal Rent</u>.  At the expiration of the Initial Term and/or the Renewal Term (if Tenant has exercised the applicable Renewal Option), as applicable (each a "**Rent Adjustment Date**"), following delivery of Tenant's notice of its exercise of a Renewal Option to Landlord pursuant to Section 2.2, either party shall have the right, by providing written notice to the other party no later than thirty (30) days following Tenant's delivery of the Renewal Notice, to request an adjustment of the Base Rent to the Prevailing Market Rate (a "**Rent Adjustment Notice**").

   3.2.1 If either party sends a Rent Adjustment Notice to the other party, then Landlord and Tenant shall use diligent and good faith efforts to agree upon the Prevailing Market Rate within thirty (30) days following the date of the Rent Adjustment Notice.  If the parties are unable to agree at the end of such 30-day period, then Landlord and Tenant, within ten (10) days after the end of such 30-day period, shall each simultaneously submit to the other, in a sealed envelope, its good faith estimate of the Prevailing Market Rate (collectively referred to as the "Estimates").  If the higher of such Estimates is not more than one hundred five percent (105%) of the lower of such Estimates, then Prevailing Market Rate shall be the average of the two Estimates. If the Prevailing Rental Rate is not resolved by the exchange of Estimates, Landlord and Tenant, within seven (7) days after the exchange of Estimates, shall each select an appraiser to determine which of the two Estimates most closely reflects the Prevailing Rental Rate.  Each appraiser so selected shall be certified as an MAI appraiser and shall have had at least five (5) years' experience within the previous ten (10) years as a real estate appraiser working in the Chicago downtown market, with working knowledge of current hotel rental rates and practices.  For purposes of this Lease, an "MAI" appraiser means an individual who holds an MAI designation conferred by, and is an independent member of, the American Institute of Real Estate Appraisers (or its successor organization, or in the event there is no successor organization, the organization and designation most similar).  Upon selection, Landlord's and Tenant's appraisers shall work together in good faith to agree upon which of the two Estimates most closely reflects the Prevailing Market Rate.  The Estimate chosen by such appraisers shall be binding on both Landlord and Tenant as the Prevailing Rental Rate.  If either Landlord or Tenant fails to appoint an appraiser within the seven day period referred to above, the appraiser appointed by the other party shall be the sole appraiser for the purposes hereof. If the two appraisers cannot agree upon which of the two Estimates most closely reflects the Prevailing Rental Rate within the twenty (20) days after their appointment, then, within ten (10) days after the expiration of such twenty (20) day period, the two (2) appraisers shall select a third appraiser meeting the aforementioned criteria.  Once the third appraiser has been selected as provided for above, then, as soon thereafter as practicable but in any case within fourteen (14) days, the appraiser shall make his determination of which of the two Estimates most closely reflects the Prevailing Market Rate and such Estimate shall be binding on both Landlord and Tenant as the Prevailing Market Rate.   The parties shall share equally in the costs of the third appraiser.  Any fees of any appraiser, counsel or experts engaged directly by Landlord or Tenant, however, shall be borne by the party retaining such appraiser, counsel or expert.  In the event that the Prevailing Market Rate has not been determined by the commencement date of the renewal term at issue, Tenant shall pay the most recent Base Rent set forth in the Lease until such time as the Prevailing Market Rate has been determined.  Upon such determination, Base Rent shall be retroactively adjusted.  If such adjustment results in an underpayment of Base Rent by Tenant, Tenant shall pay Landlord the amount of such underpayment within thirty (30) days after the determination thereof.

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-883A-D891FE4633B2

If such adjustment results in an overpayment of Base Rent by Tenant, Landlord shall credit such overpayment against the next installment of Base Rent due under the Lease and, to the extent necessary, any subsequent installments until the entire amount of such overpayment has been credited against Base Rent.

        3.2.2   In no event shall the new Base Rent calculated pursuant to this Section 3.2 for the applicable period following a Rent Adjustment Date be less than the Base Rent for the immediately preceding year.

        3.2.3   In the event no Rent Adjustment Notice is timely provided, then Base Rent shall continue to be adjusted throughout the applicable Renewal Term annually by the Rent Escalation Percent.

        3.2.4   If the Base Rent for the first (1st) Lease Year of the applicable Renewal Term is adjusted pursuant this Section 3.2, then such Base Rent shall be further adjusted beginning on the first day of the second (2nd) Lease Year of the applicable Renewal Term annually by the Rent Escalation Percent.

        3.3   <u>Delinquent Rent</u>. If any installment of Rent is delinquent, and Tenant fails to cure such delinquency within five (5) business days after Tenant's receipt of written notice thereof from Landlord, then (a) Tenant shall pay to Landlord an administration fee equal to five percent (5%) of the past due Rent, and (b) in addition, such delinquent Rent amount shall bear interest commencing on the day such Rent was payable (the first of the applicable month) until paid at a rate equal to the lesser of (i) four (4%) percent above the prime rate of interest announced from time to time by the Wall Street Journal, or (ii) the maximum rate allowed by applicable Laws ("**Default Interest Rate**").  Landlord's acceptance of any administration fee and interest shall not constitute a waiver or relinquishment of any of the other rights or remedies of Landlord.

        3.4   <u>Taxes</u>. Landlord shall pay, at its sole cost and expense, (a) all real property taxes and assessments on the Project, (b) all personal property taxes for personal property that is owned by Landlord and located on the Project or used in connection with the operation, maintenance and repair of the Project, and (c) all costs and fees incurred in connection with seeking reductions in any tax liabilities described in (a) and (b), including, without limitation, any costs incurred by Landlord for compliance, review and appeal of tax liabilities.  From and after the Commencement Date, Tenant shall pay (a) all business taxes, transient occupancy tax (TOT) licenses, and fees levied or imposed by the Governmental Authority upon Tenant's business operations and activities at the Premises, including, without limitation, taxes and fees related to the operation of the Permitted Use, and (b) all personal property taxes for personal property that is owned by Tenant and located on the Premises or used in connection with the operation, maintenance and repair of the Premises by Tenant. In addition, Tenant shall collect and pay all applicable accommodation taxes with respect to the Premises.  For the avoidance of doubt, Tenant shall not be responsible for any franchise, transfer, gains, inheritance, estate, gift, financing, mortgage recording and/or income taxes imposed on Landlord or the Project.

3.5     Security Deposit.        On or before the Commencement Date, Tenant shall deliver to Landlord a cash security deposit in the Security Deposit Amount (the "**Security Deposit**"), which shall be held by Landlord as security for the payment of the Rent and for the faithful performance by Tenant of all the other obligations of Tenant under this Lease. Except as required by applicable Laws, Landlord shall not be obligated to hold the security deposit in a separate account or pay any interest thereon to Tenant. Without limitation of any other remedy, in the event of Tenant's Event of Default, the Security Deposit or any part thereof may be applied toward payment of any accrued and unpaid Rent and any other amount Landlord reasonably incurs by reason of such Event of Default by Tenant. In such event, within ten (10) business days after written notice from Landlord, Tenant will deposit with the Landlord cash sufficient to restore the Security Deposit to the full Security Deposit Amount. If there is no uncured Event of Default by Tenant, the Security Deposit (or any remaining amount thereof) shall be returned to Tenant within thirty (30) days following the expiration or earlier termination of this Lease.

3.6     Rent Relief.    Notwithstanding anything to the contrary set forth in this Lease, if at any time after the Effective Date, there are two (2) consecutive quarters of negative Real Gross Domestic Product growth in either (i) the United States, or (ii) Illinois (as initially reported by the US Federal Reserve System, US Bureau of Economic Analysis or other official government source, disregarding any later revisions), then Tenant shall have the right to receive one (1) month of rent abatement to be applied at Tenant's election, and the next scheduled increase in Base Rent by the Rent Escalation Percent shall be stayed for the following six (6) month period, provided that the Base Rent shall be increased by the Rent Escalation Percent after the expiration of such six (6) month period for the remainder of the Lease Year, and the next scheduled increase in Base Rent by the Rent Escalation Percent shall occur as originally scheduled on the same dates on which it would have occurred without the temporary hold on the annual increase.

3.7     FF&E Capital.  First, upon Tenant's written request (which shall be made no earlier than one hundred twenty (120) days prior to the Scheduled Final Completion Date), and second, upon Tenant's written request (which shall be made no earlier than the Commencement Date and the date Tenant pays the first month's Base Rent), Landlord shall provide to Tenant a cash payment in the amount equal to fifty percent (50%) of the FF&E Capital Amount on each instance (such two payments shall be referred to herein as "**FF&E Capital**") to be used by Tenant in its sole discretion for the preparation of the Premises for the Permitted Use, including, without limitation, purchasing and installing furniture, decor, household items, in-unit tech, painting and wallpaper.

## Article 4.      USE; LICENSES AND APPROVALS; HOTEL LICENSE

4.1     Use.     Tenant shall use the Premises only for the Permitted Use.

4.2     Licenses and Permits.  Landlord agrees that it will maintain in effect at all times during the Term all the Licenses and Permits and will not take any action, or fail to take any action, that would result in the suspension, expiration, or termination of any Licenses and Permits. In the event that Landlord fails to maintain the Licenses and Permits in effect through no fault of Tenant, such that Tenant is not legally permitted to use one or more Units for the Permitted Use,

8

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-983A-D891FE4633B2

then, notwithstanding any contrary provision contained herein, Base Rent shall abate from the date of suspension, expiration or termination thereof on a per diem basis until such License or Approval is obtained or renewed. If the Licenses and Approvals are not obtained or renewed within one hundred twenty (120) days following the suspension, expiration or termination thereof, Tenant shall have the right to terminate this Lease at any time thereafter by delivering written notice to Landlord. Upon the effectiveness of such termination, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease arising from and after the effective date of such termination, except for the obligations which expressly survive the termination of this Lease.

4.3     Hotel License. Prior to Tenant commencing operations in the Premises, to the extent that Landlord has delivered the Premises to Tenant with all of the Final Completion Conditions satisfied, Tenant shall commence and exercise diligent efforts to obtain the Hotel License, and Landlord shall cooperate with Tenant as reasonably necessary to obtain the Hotel License, at no cost to Landlord. Once obtained, neither Landlord nor Tenant shall commit any act or omission which would jeopardize or result in the suspension, expiration, or termination of the Hotel License. Once Tenant has obtained the Hotel License, in the event that (a) the Hotel License is either suspended or permanently revoked; (b) Tenant has fully complied with all Chicago ordinances and licensing requirements relating to maintaining the Hotel License; (c) notwithstanding Tenant's compliance as required pursuant to subsection (b) above, the City of Chicago changes the governing ordinance; and (d) as a result of such change in the City ordinance, Tenant is not legally permitted to operate in the Premises for the Permitted Use; or (i) Landlord takes an action or fails to take a required action which results in the revocation or suspension of the Hotel License, and (ii) Tenant is not legally permitted to operate in the Premises for the Permitted Use, then, notwithstanding any contrary provision contained herein, Base Rent shall abate from the date of such suspension or revocation until such Hotel License is reinstated or obtained again. In such event, Landlord shall have the right, during ninety (90) days following the suspension or revocation of the Hotel License, cooperate with Tenant to reinstate or obtain the suspended or revoked Hotel License. If such suspension or revocation is not caused by any failure by Tenant to comply with  City of Chicago ordinances or licensing requirements, and the Hotel License is not reinstated or obtained within ninety (90) days following the suspension or revocation thereof, or if Landlord or Tenant has received notice within such ninety (90) day period that the Hotel License will not be reinstated, Tenant shall have the right to terminate this Lease at any time thereafter by delivering written notice to Landlord, in which event, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease, except for the obligations which expressly survive the termination of this Lease. Tenant hereby covenants that throughout the Term, Tenant shall maintain the Hotel License in good standing and renew the Hotel License prior to its expiration.

## Article 5.     TENANT'S WORK

5.1     Landlord's Consent. Tenant shall have the right to perform Tenant's Work without Landlord's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) so long as Tenant's Work does not (a) affect any part of the Project outside the Premises, (b) affect any structural element of the Building, (c) affects any Building System, (d) require an

9

amendment of the certificate of occupancy for the Premises or the Building, (e) require permits, or (f) affect the exterior of the Building or can be seen from the exterior of the Building. Tenant's Work shall be performed, at Tenant's expense, in a good and workmanlike manner and in compliance with this Lease and applicable Laws. For the avoidance of doubt, Onboarding Work shall not require Landlord's consent.

      5.2    <u>Landlord's Review and Approval</u>. Prior to performing any Tenant's Work which requires Landlord's consent pursuant to this Article 5, Tenant shall (a) deliver to Landlord copies of Tenant's Plans, (b) obtain any required authorizations and/or Permits from the Governmental Authority for Tenant's Work, and (c) deliver to Landlord certificates (in commercially reasonable and customary form) of (i) worker's compensation insurance covering all persons to be employed by Tenant for the performance of Tenant's Work, and all contractors and subcontractors performing any Tenant's Work, and (ii) commercial general liability insurance, including Landlord as an additional insured. Within fifteen (15) business days following Landlord's receipt of the proposed Tenant's Plans, Landlord shall review and approve (which approval shall not be unreasonably withheld, conditioned or delayed) or disapprove the proposed Tenant's Plans, provided that such disapproval shall state, in reasonable detail, the basis therefor. If Landlord disapproves of Tenant's Plans, Tenant shall make such changes as are reasonably necessary and shall resubmit the same to Landlord for approval, and Landlord shall have five (5) business days from receipt of any revised Tenant's Plans to approve or disapprove the same in the same manner, and such procedure shall continue until Tenant's Plans are approved. In the event Landlord does not respond to Tenant's submission within the aforementioned time periods, Tenant shall send Landlord a second request for approval containing the following language in bold print: "THIS IS A SECOND REQUEST FOR APPROVAL OF THE PROPOSED PLANS AND SPECIFICATIONS. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN THREE (3) BUSINESS DAYS, LANDLORD'S APPROVAL SHALL BE DEEMED GRANTED PURSUANT TO THE PROVISIONS OF THE LEASE." If Landlord shall again fail to respond within such three (3) business days after receipt of such second request, Landlord's approval of such Tenant's Plans shall be deemed granted. At Tenant's request, Landlord shall join in applications for any authorizations and/or Permits required by any Governmental Authority in connection with Tenant's Work (to which Landlord has consented, if such consent is required pursuant to this Article 5), and otherwise reasonably cooperate with Tenant in connection with Tenant's Work, at no cost to Landlord. Notwithstanding anything herein to the contrary, if Tenant intends to perform any Tenant's Work which does not require Landlord's consent pursuant to foregoing criteria, then Tenant shall, nonetheless, provide Landlord with written notice at least fifteen (15) business days prior to commencing such Tenant's Work, which notice shall detail the work to be performed in detail sufficient for Landlord to confirm that no consent is required.

      5.3    <u>Mechanic's Lien</u>. Tenant shall keep the Project, the Building and Premises free from any mechanic's, materialman's or similar liens or other such encumbrances in connection with any Tenant Work on or respecting the Premises, and shall indemnify and hold Landlord harmless from and against any Losses arising out of the same or in connection therewith. If, as a result of Tenant's Work, a mechanic's lien is filed against any part of the Project, the Building or the Premises or against Tenant's Work, and no action of Landlord caused the creation of such lien, then Tenant shall, at Tenant's expense, cause it to be released (by bond or otherwise) within twenty

<div align="center">10</div>

(20) days after Tenant receives notice of the filing thereof.   If Tenant fails, within such 20-day period to cause such lien to be released, Landlord may, but shall not be required or expected to, remove such lien in such manner as Landlord may, in its sole discretion, determine, and the full cost thereof, together with all Landlord's reasonable fees and costs, including reasonable attorney fees, shall be due and payable by Tenant to Landlord within thirty (30) days after written demand from Landlord along with copies of back up documentation.  The amount so paid shall be deemed Other Rent under this Lease payable, without limitation as to other remedies available to Landlord under this Lease.  Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Project, the Building or the Premises to any lien or encumbrance whether claimed by operation of law or express or implied contract.

      5.4    <u>Roof</u>.  Landlord agrees that Tenant may lease up to 10 square feet of space on the roof of the Building so that Tenant may install one or more satellite dishes, antennas, security cameras or other similar devices necessary for Tenant's business (and not for public broadcasting or use by third parties) (collectively, the "**Antenna**"), provided that (a) the size, location and manner of installation of such Antenna shall be determined by Landlord in its sole discretion, (b) the Antenna shall be located so as to not be visible except from above the Building and Tenant shall install such screens as may be necessary to prevent the visibility of the Antenna, (c) no such Antenna shall be affixed to the roof of the Building by any device which penetrates the roof and Landlord shall have the right to approve in advance Tenant's mounting of the Antenna, (d) Tenant shall bear all costs and liability incurred with respect to the installation, operation, maintenance, removal and insuring of the Antenna, (e) installation, operation and removal of the Antenna shall be performed in such manner as is necessary in order to preserve Landlord's roof warranty, (f) the installation, operation and maintenance of the Antenna is permitted under and performed in full compliance with all applicable laws and the rules and regulations of the Building, and (g) Tenant's Antenna shall not interfere with any other existing equipment and Tenant shall work with Landlord and Landlord's contractor to resolve any interference issues.  Landlord agrees that Tenant shall have the non-exclusive right to use the risers in the Building for installation, operation, maintenance and removal of the Antenna; provided that (i) such use of the riser space shall be shared with other tenants and the providers of services to the Building, (ii) Tenant shall make no installation or alteration in any riser without Landlord's prior written consent, and (iii) such use otherwise complies with this Section. Tenant shall be responsible for the repair and maintenance of the Antenna and all related equipment and wiring during the Term of this Lease, at Tenant's sole cost and expense, and upon the termination of this Lease shall, at Tenant's sole cost and expense, remove said Antenna and all related equipment and wiring and repair any damage to the roof or risers of the Building caused as a result of such use or removal.  Any required structural reinforcement shall be made at Tenant's sole cost and will be performed by Landlord or Landlord's contractors.  Landlord will not be liable to Tenant or to any other person whomsoever for any injury to person or damage to property, arising out of any use of the roof or any other portion of the Building in connection with the Antenna, and Tenant hereby indemnifies Landlord from any and all Losses arising out of Tenant's installation, operation and maintenance of the Antenna.

### Article 6.    SERVICES; UTILITIES

11

6.1     Services.       Landlord shall, at its sole cost and expense, provide to the Building those services designated as "Landlord" (collectively, the "**Landlord's Services**") on the Schedule of Services attached hereto as **Exhibit G** in a manner consistent with the operation, quality and condition of Class B multifamily properties in Chicago and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards. If, upon Tenant's request and Tenant's written approval of the related cost of such service, Landlord provides Tenant with any service which Landlord is not required to furnish pursuant to this Lease, Tenant shall pay to Landlord, within thirty (30) days following Tenant's receipt of an invoice reasonably sufficient to evidence such costs, Landlord's actual and reasonable costs for providing such service.  In addition, Landlord shall provide passenger elevator service and access to the Premises, the Amenities, and the Common Areas for Tenant, its guests and invitees, 24 hours a day, 7 days a week, subject to the terms and conditions of this Lease. Tenant shall be permitted to provide reasonable security to its guests, including security camera systems, additional locks and physical security, at Tenant's sole cost and expense and subject to Landlord's prior approval, which shall not be unreasonably withheld, conditioned or delayed, and Landlord shall cooperate with Tenant in connection therewith, at no cost to Landlord; provided, however, Landlord shall not have any liability to Tenant, any Tenant Party or any invitees, guests, licensees or sublessees, with respect to any matters relating to Tenant's security system except to the extent any Losses arise out of the negligence or willful misconduct of Landlord and/or Landlord Parties.  To the extent any third-party contractors are hired by Landlord to provide any of the Landlord's Services, Landlord shall require that all contractors providing any service to the Building carry general liability insurance to a commercially reasonably limit typically carried by reputable contractors of similar types in Chicago and, if work is being performed within the Premises, add Tenant as an additional insured to the contractor's liability policies, and Landlord agrees to provide Tenant with a  copy of their insurance upon Tenant's request therefor.  Tenant shall have the right to request and review copies of the applicable service contracts to verify the foregoing. Tenant shall, at its sole cost and expense, provide those services designated as "Tenant" on the Schedule of Services attached hereto as **Exhibit G** in a manner consistent with the operation, quality and condition of Class B multifamily properties in Chicago and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards. Tenant shall, within thirty (30) days following its receipt of the bill, reimburse Landlord for the actual out-of-pocket costs of all trash removal services with respect to the Premises which Landlord provides pursuant to this Lease, and Tenant shall be responsible for proper disposal of any trash in the Premises and moving any such trash from the Premises to the trash room or dumpster, as appropriate.

6.2     Service Interruption.  In the event Tenant reasonably determines that the Premises or any portion thereof is unsuitable for operation of its business due to a Service Interruption and ceases the operation of its business with respect to the Premises or any portion thereof for 48 consecutive hours or longer following Tenant's notice of such Service Interruption to Landlord, which shall include the applicable number of Units affected by such Service Interruption and Tenant's intent to invoke the rent abatement, then provided the Services Interruption was not caused by the negligence or willful misconduct of Tenant, then Tenant, as its sole and exclusive remedy if elected, shall be entitled to receive an abatement of Base Rent in

proportion to the Premises so affected beginning on the first day following the end of such 48-hour period until service has been restored. In the event Landlord fails to commence to cure a Service Interruption within 48 hours after Landlord's receipt of Tenant's notice thereof (provided that if 30 or more of such 48 hours occurs over a weekend or holiday, then the cure period shall be extended through the immediately following business day) and/or fails to diligently pursue the cure of the Service Interruption to completion, then following a notice of self-help to Landlord and an additional 24 hour cure period thereafter, Tenant may, at its option, as its sole and exclusive remedy if elected, carry out the cure of such Service Interruption. In the event Tenant exercises self-help, Landlord shall reimburse Tenant for all reasonable and actual expenses incurred by Tenant in performing such cure plus a five percent (5%) overhead charge within thirty (30) days following Landlord's receipt of a bill. If Landlord fails to do so, then Tenant shall provide Landlord with written notice of such failure and if Landlord fails to fully reimburse Tenant within five (5) business days after the receipt of such notice, then Tenant may deduct an amount not to exceed thirty percent (30%) of Tenant's monthly Base Rent from each subsequent monthly Base Rent payment until such amount is reimbursed in full. In no event shall there be any abatement if the Service Interruption is caused by negligence or willful misconduct of Tenant, its employees, agents, invitees, guests, licensees, sublessees or contractors. In the event Tenant exercises the foregoing self-help rights, Tenant shall indemnify and hold Landlord harmless from any and all Losses arising out of Tenant's exercise of its self-help rights.

6.3    Utilities and Infrastructure. Landlord shall make available throughout the Term the following utility connections and infrastructure to the Project, including the Premises (collectively, "**Utilities**"): hot and cold water, electricity, municipal gas, wastewater system for both sewage and stormwater, adequate Building Systems (including heating, ventilation, and air conditioning in each of the Units and the Premises), Building-wide high-speed fiber optic internet, and elevator.

6.4    Utility Cost. Tenant shall either pay to Landlord or pay directly to applicable utility providers, as applicable, the cost of electricity, gas, water, sewer and internet service used in the Premises and which are supplied and separately metered or sub-metered to the Premises. Prior to the Commencement Date, Landlord, at its sole cost, shall install meters or sub-meters to separate the cost of electricity, gas, water, sewer and internet service used in the Premises from the remainder of the Project.

6.5    Utilities Interruption. In the event (a) the Premises or any portion thereof is unsuitable for operation of Tenant's business due to an Utilities Interruption, and (b) Tenant in fact ceases the operation of its business with respect to the Premises or any portion thereof for 48 consecutive hours or longer following Tenant's notice of an Utilities Interruption to Landlord, which shall include the applicable number of Units affected by such Service Interruption and Tenant's intent to invoke the rent abatement, then, provided the Utilities Interruption was not caused by the negligence or willful misconduct of Tenant, Tenant shall be entitled, as its sole and exclusive remedy if elected, to receive an abatement of Base Rent in proportion to the Premises so affected (except to the extent such Utilities Interruption is covered by the business interruption insurance carried by Tenant) for the duration of the Utilities Interruption beginning the first day

13

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-883A-D891FE4633B2

following the end of such 48-hour period until such Utilities Interruption is fully remedied and Tenant is again able to operate its business in the affected portion of the Premises.

6.6    Amenities Interruption.  Notwithstanding anything to the contrary set forth in this Lease, in the event of an Amenities Interruption, Tenant shall promptly notify Landlord, and Landlord shall promptly, following its receipt of Tenant's notice, commence to remedy such Amenities Interruption at its sole cost and expense.  Should an Amenities Interruption (not caused by the negligence or willful misconduct of Tenant) continue for more than 48 hours following Tenant's notice to Landlord thereof, which shall include Tenant's intent to invoke the rent abatement, Tenant shall receive an abatement of Rent equal to five percent (5%) of the daily Base Rent (i.e., 1/30th of the monthly Base Rent) for each day any Amenities are unavailable for Authorized Parties' use in order to compensate Tenant for the continued loss of access to and/or use of the Amenities.

### Article 7.    REPAIRS, MAINTENANCE, REPLACEMENT

7.1    Landlord's Repairs.  Landlord shall, at its sole cost and expense, be responsible for and shall repair and maintain (including preventative maintenance) in safe and good working order, and replace, and in a manner consistent with the operation, quality and condition of a Class B multifamily property in Chicago and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards, all components of the Project (except to the extent they are Tenant's responsibility under Section 7.4 below), structural or otherwise, interior or exterior (collectively, "**Landlord Repairs**"), including, without limitation, foundations, building shell, roof, slab, basement, building exterior, exterior windows, curtain walls, structural elements of the Building, appliances, the Amenities, the Common Areas, and all Building Systems. Notwithstanding the foregoing, Tenant shall be responsible for the cost of any repairs and/or replacements that Landlord would otherwise be responsible for to the extent the need for same is caused by the gross negligence or willful misconduct of Tenant or its agents, representatives, employees or contractors. Except in connection with Landlord's Repairs or otherwise permitted under this Lease, Landlord shall not alter any portion of the Premises or materially alter the Common Areas or the Amenities on or after the Commencement Date without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord shall also be responsible for repairing any latent defects in the Premises and making any repairs and/or replacements to the Premises that Tenant is responsible for under Section 7.4 below to the extent the need for same is caused by the gross negligence or willful misconduct of Landlord or its agents, representatives, employees or contractors.   Landlord shall perform such repair, maintenance or replacement work (a) using commercially reasonable efforts to prevent and/or minimize interference with the conduct of Tenant's business in the Premises and to prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord if damaged, at Landlord's sole cost and expense), and (b) in compliance with Article 14 below.

7.2    Failure to Make a Landlord's Repair.  If a need for a Landlord's Repair arises, Tenant shall notify Landlord after Tenant obtains actual knowledge thereof, and Landlord shall promptly commence a Landlord's Repair and thereafter diligently pursue such Landlord's

14

Repair to completion.  Subject to Section 7.3 below, in the event Landlord fails to commence a Landlord's Repair (which directly causes a condition unsuitable for operation of Tenant's business in all or any portion of the Premises) within 48 hours after Landlord's receipt of Tenant's notice thereof (provided that if 30 or more of such 48 hours occurs over a weekend or holiday, then the cure period shall be extended through the immediately following business day) and/or fails to diligently pursue any such Landlord's Repair to completion, then Tenant shall send Landlord a second notice regarding the need for a Landlord's Repair, which notice shall containing the following language in bold print: "THIS IS A SECOND NOTICE REGARDING THE NEED FOR A LANDLORD'S REPAIR. IF LANDLORD DOES NOT PERFORM SUCH LANDLORD'S REPAIR WITHIN TWENTY-FOUR (24) HOURS FOLLOWING LANDLORD'S RECEIPT OF THIS NOTICE, THEN TENANT SHALL HAVE SUCH SELF-HELP RIGHTS AS DESCRIBED IN THE LEASE."  If Landlord shall again fail to perform such Landlord's Repairs within such twenty-four (24) hours (provided such 24-hour period includes a full business day) after receipt of such second request, then Tenant may, at its option and as its sole and exclusive remedy if elected, carry out the Landlord's Repair. In the event Tenant exercises self-help, Landlord shall reimburse Tenant for all reasonable and actual expenses incurred by Tenant in performing such cure plus a five percent (5%) overhead charge within thirty (30) days following  Landlord's receipt of a bill.  If Landlord fails to fully reimburse Tenant within five (5) business days after the Landlord's receipt of a written notice from Tenant of such failure to pay, then Tenant may deduct an amount not to exceed thirty percent (30%) of Tenant's monthly Base Rent from each subsequent monthly Base Rent payment until such amount is reimbursed in full. In the event Tenant is unable to rent any portion of the Premises to guests or needs to relocate the guests from the Premises due to any matter or condition that constitutes a Landlord's Repair (not caused by the negligence or willful misconduct of a Tenant Party) and ceases the operation of its business for 48 consecutive hours or longer following Tenant's notice of Landlord's Repair, which shall include the applicable number of Units affected by such Landlord's Repair and Tenant's intent to invoke the rent abatement if the matter or condition that constitutes such Landlord's Repair is not is not cured within such 48-hour period, then Tenant shall be entitled, as its sole and exclusive remedy if elected, to receive an abatement of Base Rent in proportion to the area of the Premises so affected from and after such 48-hour period (provided (provided that if 30 or more of such 48 hours occurs over a weekend or holiday, then the cure period shall be extended through the immediately following business day) until such Landlord's Repair is completed.  In the event Tenant exercises the foregoing self-help rights, Tenant shall indemnify and hold Landlord harmless from any and all Losses arising out of Tenant's exercise of its self-help rights.

   7.3 Urgent Landlord's Repairs. In the event of an urgent Landlord's Repair that materially prevents Tenant from conducting its business in the Premises, Tenant shall immediately notify Landlord prior to taking any action, but, in addition, Tenant may carry out such Landlord's Repair and deduct all reasonable and actual out-of-pocket expenses incurred by Tenant to carry out such Landlord's Repair, provided that the repairs were necessary in Tenant's reasonable discretion. In the event Tenant performs any such urgent Landlord Repairs or elects to exercise self-help affecting the structure, the roof, the building mechanical, engineering, and plumbing systems, or the exterior of the Property under this Lease, Tenant shall use commercially reasonable efforts to contract necessary repairs using the Approved Vendor List attached hereto as **Exhibit I**,

15

or if no list is attached, then Landlord shall supply such list within five (5) business days following a written request therefor from Tenant.

7.4    Tenant's Repairs.  Tenant shall, at its sole cost and expense, maintain and repair in good condition and replace as needed: (a) casework, window treatments, art, furniture, furnishings and accessories installed by Tenant, except to the extent any damage is caused by the negligence or willful misconduct of Landlord or Landlord Parties (which shall then be a Landlord's Repair), and (b) any damage to the Premises, the Common Areas or the Amenities caused by the negligence or willful misconduct of Tenant or Tenant Parties.   In addition, Tenant or its employees shall perform minor and common domestic repair work in the Premises, the Amenities, and in the hallways/areas on the floors 2-5 of the Building that exclusively serve the Premises that does not require any material trade skills or technical knowledge. Such work includes, but is not limited to, general upkeep of furniture, fitness equipment, and fixtures, drain maintenance, and spot cleaning of walls, carpet and upholstery.

## Article 8.    COMPLIANCE WITH LAWS

8.1    Legal Compliance.  Landlord covenants, represents and warrants to Tenant that the Premises and the Project will be in compliance with all applicable Laws, including, but not limited to, all applicable zoning laws, building codes, ordinances, statutes, and the ADA (for transient/hotel use) and other similar federal, state and local Laws and regulations as of the Commencement Date.  Landlord covenants, represents and warrants to Tenant that the Premises shall include 2 ADA accessible Units and 4 Units with ADA communication features, and the Amenities and the Common Areas shall be in compliance with the ADA applicable to hotels. During the Term, Landlord shall, at Landlord's expense, comply with all Laws applicable to the Project (except to the extent such compliance is Tenant's obligation under this Section 8.1), and, Tenant shall, at Tenant's expense, subject to the provisions of this Lease, comply with all Laws applicable solely to Tenant's operation of its business in the Premises and Tenant's Work at the Premises during the Term.   If, however, Tenant's compliance with applicable Laws requires structural work or any work to the Building Systems within and exclusively serving the Premises during the Term, at Tenant's request, Landlord shall perform the work and, if the obligation to comply arises from Tenant's Work or Tenant's particular manner of using the Premises (in excess of transient/hotel use), Tenant shall reimburse Landlord for the actual and reasonable costs incurred by Landlord in performing such work on Tenant's behalf plus a five percent (5%) overhead charge.

8.2    Hazardous Materials.  Landlord (a) represents and warrants to Tenant that as of the Effective Date, Landlord has no knowledge of the presence of any Hazardous Materials on the Project in violation of any Environmental Laws, and (b) covenants that as of the Commencement Date, the Premises and Project will be in compliance with all Environmental Laws and free of contamination by Hazardous Materials in violation of the Environmental Laws.  If any Hazardous Materials are discovered in or on the Premises or the Project at any time during the Term which are not caused by a Tenant Party, Landlord shall promptly notify Tenant thereof and cause the same to be inspected and remediated, at its sole cost and expense, in accordance with all Laws.  To the extent Tenant is unable to use the Premises (or any portion thereof) for the conduct

16

of Tenant's normal business operations, or if Tenant is deprived of access to the Premises (or any portion thereof) as a result of such inspection and/or remediation, the Base Rent shall abate in proportion to the portion of the Premises that Tenant is unable to use and ceases using as a result thereof.  During the Term, Tenant shall, at its sole cost and expense, (i) comply with Environmental Laws relating solely to Tenant's use and occupancy of the Premises, and (ii) not cause or permit the release of any Hazardous Materials in violation of Environmental Laws in the Premises. Landlord shall indemnify, defend and hold harmless Tenant and Tenant Parties from and against all Losses arising from or attributable to (x) any breach by Landlord of any of its warranties, representations or covenants in this Section 8.2, (y) any Hazardous Materials that exist on the Project as of the Commencement Date and any Hazardous Materials that are discovered in or on the Premises or the Project at any time during the Term which were brought thereon by a Landlord Party or another tenant in the Building, and (z) any violation of Environmental Laws related to the Project that is caused by a Landlord Party or another tenant in the Building.  Tenant shall indemnify, defend and hold harmless Landlord and Landlord Parties from and against all Losses arising from or attributable to any breach by Tenant of any of its warranties, representations or covenants in this Section 8.2.

## Article 9.    SUBORDINATION; ESTOPPEL CERTIFICATES

9.1    <u>Subordination</u>.        The lien of this Lease is subject and subordinate to the lien of any Mortgage, provided that such subordination is expressly contingent on Tenant receiving a fully executed SNDA from each Mortgagee in accordance with this Section 9.1. Landlord shall use commercially reasonable efforts to obtain from a Mortgagee a SNDA in favor of Tenant in such commercially reasonable form as is then used by the holder of such Mortgagee and is reasonably acceptable to Tenant, which shall provide, inter alia, that so long as no Event of Default exists, neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises and to conduct its business thereon, shall be interfered with or disturbed by Landlord or anyone claiming by, through or under Landlord, including Mortgagee. The lien of any Mortgage shall not cover Tenant's property located in or on the Premises, including, without limitation, Tenant's Property.  Landlord shall use commercially reasonable efforts to deliver such SNDA required under this Section 9.1 to Tenant within 120 days following the Effective Date.

9.2    <u>Estoppel Certificates</u>.        Each of Landlord and Tenant shall, without charge to the other, within twenty (20) days following receipt of a request from the other party, sign and deliver to the requesting party, or any other person designated by that party, a written statement certifying (a) that this Lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications); (b) the date to which the Rent has been paid; (c) whether or not, to its actual knowledge, there is then an Event of Default or any event has occurred which, with the serving of notice or the passage of time, or both, would give rise to an Event of Default, and if so, setting forth the specific nature of same; and (d) to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any estoppel certificate delivered pursuant to this Section 9.2 may be relied upon by the requesting party or any other person designated by the other party and named in such certificate.

17

9.3     Tenant Lender.        In the event Tenant secures financing in which Tenant grants to Tenant Lender a security interest in the leasehold estate under this Lease (which Tenant shall be permitted to do without obtaining further consent from Landlord), Landlord agrees to the following:  (a) Tenant Lender shall have the right to do any act or thing required to be performed by Tenant under this Lease, and Landlord shall accept any such act or thing performed by Tenant Lender as if such act or thing was done by Tenant itself; and (b) Landlord will provide a copy of any notice of default sent by Landlord to Tenant concurrently to Tenant Lender at the latest address that Landlord has been provided for such tenant Lender in writing, if any, and if Landlord shall become entitled to terminate this Lease due to an uncured Event of Default by Tenant, Landlord shall not terminate this Lease unless it has first given written notice to Tenant Lender of its intent to terminate this Lease and has given Tenant Lender at least ten (10) additional days to cure the Event of Default to prevent such termination of this Lease; provided, however, that if such Event of Default (excluding any payment default) cannot reasonably be cured within such 10-day period, then Tenant Lender shall have such additional period of time as is reasonably required to cure such Event of Default if Tenant Lender, with due diligence and in good faith, commences the cure of the same within the 10-day period and thereafter diligently prosecutes the curing of such Event of Default; provided in no event shall such cure period extend for a total period of more than thirty (30) days.

## Article 10.    INSURANCE

10.1    Tenant shall, at Tenant's expense, maintain at all times during the Term the following minimum coverage:

10.1.1  Commercial General Liability covering Tenant against liability for bodily injury, personal and advertising injury and property damage, and the use and occupation by the Tenant, on an occurrence basis, with a combined single limit of $1,000,000 per occurrence and $2,000,000 aggregate. Coverage shall include premises liability, products/completed operations liability, and contractual liability including coverage for insured contracts;

10.1.2  Umbrella Liability Insurance to be excess and follow-form over the Commercial General Liability with limits of liability of $12,000,000;

10.1.3  Personal property coverage provided under a Special Form or "All Risks" policy in an amount of the full replacement cost value of the Tenant's Property (which shall include Tenant's Work); and

10.1.4  Worker's compensation insurance, covering statutory workers compensation benefits and employer's liability coverage with limits of liability of $1,000,000 for bodily injury by accident.

10.2    Tenant's insurance policies shall: (a) be written with insurance companies authorized to do business in the Illinois, at all times maintaining a minimum A.M. Best rating of A VIII, (b) as respects to all liability policies, coverage shall include Landlord and other parties as designated in writing by Landlord, as additional insureds, and (c) be written on an occurrence basis.

18

Tenant shall further ensure that a waiver of subrogation endorsement and a primary wording endorsement are attached to its insurance policies.

10.3    Prior to the Onboarding Access Period, and during the Term, ten (10) days prior to the expiration of the policies of insurance (and with respect to any insurance required pursuant to this Article 10 before the commencement of any Tenant's Work), Tenant shall deliver to Landlord copies of certificates evidencing the insurance required by this Lease to be maintained by Tenant, which certificates shall evidence the waiver of subrogation required herein and state that such insurance coverage may not be changed or cancelled without at least ten (10) days prior written notice to Landlord and Tenant. Tenant may carry any required insurance under a blanket policy if such policy complies with the requirements of this Lease.

10.4    Landlord shall, at its sole cost and expense, maintain during the Term the following: (a) Commercial General Liability covering Landlord against liability for bodily injury, personal and advertising injury and property damage, on an occurrence basis, with a combined single limit of $1,000,000 per occurrence and $2,000,000 aggregate, which coverage shall include premises liability, products/completed operations liability, and contractual liability including coverage for insured contracts, with Umbrella Liability Insurance to be excess and follow-form over the Commercial General Liability with limits of liability of $12,000,000, and (b) insurance against all risks of loss or damage to the Building (except usual exclusions in a standard "All Risk" policy) including [water damage and earthquake with a replacement cost endorsement, in an amount equal to the full replacement cost of the Building, plus the cost of clearing].    Landlord shall further ensure that (i) Tenant is added as an additional insured on Landlord's commercial general liability policy for any claim arising from the Landlord's ownership of and operations at the Project; (ii) a waiver of subrogation endorsement and a primary wording endorsement are attached to its insurance policies; and (iii) Landlord shall deliver to Tenant insurance certificates establishing the insurance described herein, which certificates shall evidence the waiver of subrogation required herein, on or before the Commencement Date, and at least fifteen (15) days before the expiration of any such insurance.

10.5    Notwithstanding any contrary provision of this Article 10, Tenant and Landlord mutually agree to look first to the applicable insurance coverage in effect (or should be in effect under any policy required to be maintained under this Lease) in the event of any losses, regardless of the cause of any such losses.  Notwithstanding any other provisions of this Lease, Landlord and Tenant each releases the other party, and on behalf of itself and its insurers, waives its right to recovery against the other for loss or damage to the waiving party and its property to the extent that such loss or damage is insured against, or required to be insured against, under any insurance policy required in this Article 10. For the avoidance of doubt, the parties intend and hereby agree, that the risk of loss or damage to property or income shall be borne by the parties' insurance carriers. Landlord and Tenant each agrees to furnish to each insurance company which has or will issue such policies notice of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to prevent the invalidation of said coverage by said waivers. This waiver shall not be effective to relieve any party failing to maintain the insurance required by this Lease.  The provisions of this Section 10.5 will survive the expiration or earlier termination of this Lease.

19

## Article 11.     CASUALTY

11.1     If all or any portion of the Premises, the Building or the Project is affected by Casualty, and this Lease is not terminated pursuant to this Section 11.1 or Section 11.2 below, Landlord shall, at Landlord's sole expense (unless the Casualty is caused by the negligence or willful misconduct of Tenant or any of Authorized Parties), promptly perform Restoration, excluding any damage to Tenant's Work or Tenant's Property (unless the Casualty is caused by Landlord's negligence or willful misconduct), and Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent safe to do so and reasonably required by Landlord in connection with the Restoration. From the date of the Casualty until the date on which Tenant has prepared the Premises to substantially the same condition as existed prior to the performance of the Onboarding Work, the Base Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have access or which is unusable for the conduct of Tenant's normal business. If Landlord undertakes but fails to complete the Restoration within two hundred and seventy (270) days after the date of such Casualty for any reason other than a Tenant Delay, then Tenant may terminate this Lease (without payment of any penalty, damages or termination fee to Landlord) by delivering written notice to Landlord within thirty (30) days after the expiration of such two hundred and seventy (270) day period, but before the Restoration has been completed by Landlord.

11.2     Notwithstanding anything to the contrary set forth herein, if (a) a Mortgagee will not release to Landlord the amount of any insurance proceeds due or received from a Casualty for any reason other than Landlord's default, negligence or willful misconduct, (b) the time required to complete the Restoration exceeds two hundred and seventy (270) days (as estimated by a reputable third-party contractor selected by Landlord and reasonably approved by Tenant), or (c) if the Premises is materially affected by Casualty during the last twelve (12) months of the Term or any Renewal Term, each of Landlord and Tenant shall have the right, by written notice to the other party within thirty (30) days following the occurrence of the event set forth in (a), (b) or (c) herein, to terminate this Lease (without payment of any penalty, damages or termination fee), and such termination shall be effective as of the date stated in such written notice, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant.

## Article 12.     CONDEMNATION

12.1     If as a result of a Taking, (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant, is taken; (b) a portion of the Building or the Project is taken, resulting in Tenant no longer having reasonable access to or use of the Premises or a material portion thereof; (c) all or substantially all of the Building or the Project is taken; or (d) a portion of the Building or the Project is taken resulting in Landlord's determination to demolish the Building, then the Term shall expire on the earlier of taking of possession by the condemning authority, the date of vesting of title pursuant to such Taking, or the date on which the Premises is no longer reasonably usable by Tenant for its normal business. In such event, Tenant shall remain fully liable for all Rent through the date of termination, Rent shall be prorated as of

20

the date of termination, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant.

12.2    In the event of any such Taking of all or any part of the Premises, the Building or the Project, Landlord shall be entitled to any and all awards and/or settlements which may be given; except Tenant shall have a right to assert a claim with respect to the then unamortized value of any and all improvements and fixtures installed by Tenant, any relocation expenses and any damage to Tenant's Property. In no event shall Tenant have any claim against the subject public or quasi-public authority or Landlord for the value of this Lease or any unexpired Lease Term.

12.3    If a Taking does not result in the termination of this Lease, (a) Landlord shall, at Landlord's sole cost and expense, as soon as practicable, restore that part of the Premises, the Building or the Project not taken, so that the Premises, the Building and/or the Project (as applicable) are restored to a condition substantially similar to the condition of the Premises, the Building and/or the Project (as applicable) prior to such Taking (including restoring the Premises to the extent necessary to form a complete and fully functioning unit), and (b) from and after the date of Taking, the Base Rent shall be reduced permanently in the same proportion as the area of the Premises, if any, which was taken.

## Article 13.    ASSIGNMENT AND SUBLETTING

13.1    Except as provided in this Article 13, Tenant shall not, without Landlord's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) perform a Transfer. Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may market and advertise Tenant's services and rental of Units within the Premises on online platforms, including, without limitation, Airbnb, HomeAway, VRBO, Expedia.com and Booking.com, and may enter into various sublease or license agreements of any duration concerning the Units, without having to provide Landlord notice of its intention to sublease or license and without having to obtain Landlord's consent to sublease or license, and Landlord hereby agrees to such subleases or licenses. For the avoidance of doubt, the use and occupancy of the Premises by Tenant's guests or customers in accordance with the Permitted Use shall not be subject to the restrictions and prohibitions set forth in this Article 13.

13.2    If Tenant desires to perform a Transfer, Tenant shall give Landlord notice of Tenant's terms of the proposed Transfer and the desired effective date of such Transfer accompanied by (a) the proposed assignment or sublease, (b) a reasonably detailed description of the identity and previous business experience of the proposed assignee or subtenant, (c) the proposed assignee or subtenant's current financial information, including its most recent financial statements, and (d) any further information relevant to the proposed Transfer which Landlord shall reasonably request after receipt of Tenant's request for consent. Any Transfer shall be conditioned upon there being no material change in the Permitted Use of the Premise. Tenant shall reimburse Landlord for the actual and reasonable third-party costs that Landlord incurs in connection with the Transfer, including reasonable attorney's fees, not to exceed, in the aggregate, Three Thousand and 00/100 Dollars ($3,000.00).

13.3     Landlord shall approve or disapprove of the proposed Transfer within ten (10) business days after Landlord's receipt of the documentation required under Section 13.2 above; provided, however, that if Landlord disapproves of such proposed Transfer, Landlord shall give a reasonably detailed explanation for its disapproval.  If Landlord fails to respond to Tenant within such 10-business-day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO A PROPOSED [ASSIGNMENT] OR [SUBLETTING]. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED SUCH TRANSFER**."   If Landlord fails to provide a response to Tenant's second request within such five (5)-business-day period, Landlord will be deemed to have rejected the proposed Transfer. If Landlord grants its consent to a proposed assignment, Tenant shall deliver to Landlord, at least fifteen (15) days before the effective date of the assignment, a written agreement in form and substance reasonably satisfactory to Landlord, for the benefit of Landlord under which Tenant assigns Tenant's entire interest in this Lease to the assignee and under which the assignee expressly assumes all of the obligations of Tenant under this Lease and agrees to be bound to Landlord by all of the terms, conditions and provisions of this Lease.  If Landlord grants its consent to a proposed sublease, Tenant shall deliver to Landlord, at least fifteen (15) days before the effective date of the sublease, a written agreement from the subtenant to Landlord agreeing to attorn to Landlord, at the option of Landlord, in the event an Event of Default occurs under this Lease.

13.4     Notwithstanding anything to the contrary contained in this Lease, no consent from Landlord shall be required for any Transfer (a) to a corporation or other legal entity into or with which Tenant (or Tenant's direct or indirect parent company) is merged or consolidated, (b) to an entity to which all or substantially all of Tenant's assets are transferred, provided that any such merger, consolidation, transfer or other transaction is not principally for the purpose of transferring the leasehold estate created hereby, (c) to an Affiliate, or (d) in connection with either a bona fide financing for the benefit of Tenant or an initial public offering of Tenant's stock on a nationally-recognized stock exchange (and, following any such public offering, the sale or transfer of any such shares); provided, that Tenant delivers to Landlord, at least fifteen (15) days before the effective date (to the extent legally permissible) of any Transfers to (a), (b) and (c), written notice of the proposed Transfer and documentation showing to Landlord's reasonable satisfaction that any assignee permitted herein, or the surviving entity, as applicable, has (i) equal or greater tangible net worth as Tenant as of the Effective Date or the date of such transfer, which is greater, (ii) such assignee has assumed in writing the obligations of Tenant under this Lease first accruing after the date of assignment, and (iii) any further information relevant to the proposed Transfer which Landlord shall reasonably request to satisfy Landlord that the required conditions for such transfer without Landlord's consent have been met.

13.5     In the event of an assignment or sublease to a third party, fifty percent (50%) of any monthly rent or other payment paid to Tenant as the result of any such assignment or sublease which is in excess of the Rent then payable by Tenant under this Lease after subtracting the commercially reasonable costs actually incurred by Tenant in effectuating such assignment for legal fees, advertising expenses, so-called "free rent", improvement allowances and/or improvement contributions, the cost of work performed by Tenant to prepare the subleased

premises for its subtenant's use and occupancy and brokerage costs deducted as and when such sums are paid, all based upon bills, receipts or other evidence of such costs reasonably satisfactory to Landlord, shall be paid to Landlord monthly as Other Rent.  Landlord shall have the right to require Tenant to provide detailed information in writing specifying the full amount of the payment received by Tenant from such third party arising out of any such assignment or sublease. Notwithstanding any Transfer of this Lease or Tenant's rights hereunder, including any Transfer described in Section 13.4, Tenant shall remain fully liable under this Lease and for the performance of all terms, covenants and provisions of this Lease.  Any such attempted or purported Transfer or encumbering of this Lease or any of Tenant's interest hereunder in violation of this Article 13, whether voluntary or involuntary, or by operation of law or otherwise, shall be null and void, and shall not confer any rights upon any purported transferee, assignee, mortgagee, or occupant, and shall, at Landlord's option, terminate this Lease without relieving Tenant of any of its obligations hereunder for the balance of the remaining Term.  Notwithstanding anything to the contrary set forth herein, if Tenant delivers to Landlord reasonable documentation showing that any assignee consented to by Landlord has equal or greater tangible net worth as the greater of Tenant as of (i) the Effective Date, and (ii) the effective date of such assignment, and such assignee has assumed in writing all the obligations of Tenant under this Lease first accruing after the date of assignment in a form reasonably acceptable to Landlord, then Tenant shall be released from all liability accruing under this Lease from and after the date of such assignment.

13.6    Landlord shall have the right to transfer and/or sell the Project and its obligations and liabilities under this Lease from and after the Final Completion Date.  In the event of a transfer or sale of the Project by Landlord after the Final Completion Date, the transferee or assignee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer or assignment.  Upon the transferee or assignee under such transfer or assignment assuming in writing the obligation of Landlord under this Lease arising on and after the date of the transfer or assignment, no further liability or obligations shall accrue against Landlord; provided, however, that Landlord shall remain liable for any obligations that accrue prior to the date of such assignment.

**Article 14.        LANDLORD ENTRY; CONSTRUCTION DURING THE TERM**

14.1    Landlord shall have the right to enter the Premises, provided that (a) except in Emergencies (in which case Landlord shall provide notice as soon as reasonably practicable in consideration of the circumstances), Landlord shall provide Tenant with at least forty-eight (48) hours' prior written notice of its entry, (b) Landlord shall coordinate the timing of such entry with Tenant and shall not enter any Unit that is occupied by Tenant's subtenants or guests, (c) in exercising its rights under this Section 14.1, Landlord shall use commercially reasonable efforts to refrain from any acts which may interfere with Tenant's or Authorized Parties' use or occupancy of the Premises or access thereto and the rights and privacy of the Authorized Parties, and (d) Landlord and its representatives, at Tenant's option, shall be accompanied by a representative of Tenant and shall comply with the reasonable directions of such representative regarding the rights and privacy of the Authorized Parties (provided, however, if no representative of Tenant is available following the required notice from Landlord, if any, then Landlord may proceed with such accompaniment).  Landlord shall (x) exercise Landlord's rights under this Section 14.1 in a

commercially reasonable manner, (y) avoid interference with the conduct of Tenant's business in the Premises, and (z) prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord at its expense if damaged during Landlord's entry).

14.2    Notwithstanding anything to the contrary in this Lease, Landlord shall not, except for short term closures for maintenance (subject to Landlord providing no less than forty-eight (48) hours advance written notice thereof to Tenant) or emergencies (in which case Landlord shall provide notice as soon as reasonably practicable in consideration of the circumstance) take or permit any of the following actions without Tenant's prior written consent: (a) close or alter any portion of the entranceways, exits, elevators or other accessways to and from the Premises and the Amenities, particularly accessible routes and options, or (b) close or alter any portion of the Common Areas adjacent to the Premises or the Amenities.  Notwithstanding the foregoing, Landlord shall, at all times, provide adequate access to the Premises, the Amenities (e.g., some other alternate form of adequate access) to the Authorized Parties.

14.3    In the event Landlord or any Landlord Party performs, or permits to be performed, any construction, alteration, repair, replacement or maintenance to any portion of the Building, (a) Landlord or Landlord Party shall use commercially reasonable  efforts to prevent interference with operations or occupancy of the Premises, the Amenities, and Common Areas by the Authorized Parties, including, without limitation, preventing any interruption to HVAC, power, water and elevator service; (b) Landlord shall take proper security measures to prevent any unauthorized workers from accessing the Premises, the Amenities or the Common Areas; (c) Landlord shall take all safety precautions around the area of the Building where the work is being performed for the occupants of the Building in compliance with all Laws; (d) any work that creates noise that can be heard from the Premises should be limited to 9am - 6pm; (e) no debris or construction materials shall be placed on any portions of the Premises, the Amenities, or the Common Areas (such as doorways, stairs, elevators or corridors) used to access the Premises; (f) Landlord shall use reasonable efforts to avoid settling of or dispersion of dust onto the Premises, the Amenities, and the Common Areas; (g) all construction equipment and materials shall be located so as to prevent interference with operations or occupancy of the Premises, the Amenities, and Common Areas by the Authorized Parties, and (h) Landlord shall promptly, with respect to such work performed by or on behalf of Landlord, (i) repair any damage to the Premises (including Tenant's Work and Tenant's Property), the Amenities or the Common Areas caused by the performance of such work, (ii) remove any trash and construction waste relating to such work, (iii) clean any dust, dirt and debris caused by such work, and (iv) mitigate any odor and off-gassing caused by such work.  For the avoidance of doubt, Landlord shall not be permitted to perform any work in the Premises without Tenant's prior written consent unless such work is expressly permitted in this Lease.

## Article 15.    QUIET ENJOYMENT

15.1    Landlord covenants and agrees that Tenant, so long as no Event of Default is continuing, shall lawfully, peaceably and quietly hold, occupy and enjoy the Premises during

the Term without hindrance or molestation by Landlord or by any person or persons claiming by, through or under Landlord.

15.2    Landlord shall ensure the levels of noise attributable to any other tenants and/or occupants of the Project and their activities comply with all applicable Laws and codes relating to the Building.  In the event any operation of any other tenants' or occupants' equipment or installations or businesses in the Building shall cause vibration and/or noise which may be transmitted to the Premises, the Common Areas or the Amenities, Landlord shall use commercially reasonable efforts to cause such tenant or occupant to reduce or eliminate such vibration and/or noise (including noise in connection operation of a restaurant or bar in the Excluded Premises).  If there are excessive and disturbing noises or vibrations within the Building which substantially and reasonably disturbs a guest (which such noises and vibrations are not related to commercially reasonable noises to be expected in connection with the operation of a restaurant or bar or other use of the Excluded Premises), and as a result of such noises or vibrations Tenant either has to relocate the guest to (i) another Unit in the Building, or (ii) to another place of accommodation, more than three (3) times a month, then Tenant shall be entitled to receive an abatement of Base Rent for such affected Unit(s) for the duration of cessation of Tenant's operation of its business in such affected Unit(s).

## Article 16.    INTELLECTUAL PROPERTY

16.1    Tenant shall have the right to modify Tenant Building Name during the Term. Landlord acknowledges that the Brand Name is a valuable property of Tenant.  Tenant Building Name is the exclusive property of Tenant and its affiliates.  No default of Tenant or any provision of this Lease confers upon Landlord, or its successors or assigns, the right to use Tenant Building Name for any purpose, provided, however, Landlord shall have the right to list Tenant's name in the Building's or in Landlord's marketing materials or website.

16.2    Landlord acknowledges that Tenant has a proprietary interest in all Proprietary Materials (whether or not subject to any registration or application for registration), which will be under the exclusive control of Tenant and its affiliates.  Landlord shall keep such Proprietary Materials confidential pursuant to the terms of that certain non-disclosure agreement, dated March 31, 2021, by and between Landlord and Tenant.

## Article 17.    PCA CONTINGENCY

17.1    Landlord represents and warrants to Tenant that Landlord has ordered and paid for a Property Condition Assessment, including an ADA survey (collectively, the "**PCA**") for the Project.  Upon receipt of the PCA, Landlord shall deliver a complete copy of the PCA to Tenant for review, which shall be delivered to Tenant no later than sixty (60) days following the Effective Date. Within ten (10) business days following Tenant's receipt of the PCA, Tenant shall prepare a list of material deficiencies identified in the PCA (collectively, the "**PCA Work**") and deliver such list to Landlord. Landlord shall complete the PCA Work to the reasonable satisfaction of Tenant with licensed contractors and in accordance with all applicable Laws prior to the Scheduled Final Completion Date.

25

## Article 18.    SIGNAGE

18.1    Subject to compliance with applicable Laws and required governmental approvals. Tenant shall have the right to install Tenant's initial signage, at Tenant's sole cost and expense, on the exterior of the Building in accordance with Tenant's signage plans attached hereto as **Exhibit J** with Landlord's limited approval respect to the location of such signage (which shall not be unreasonably withheld, conditioned or delayed) except as otherwise set forth herein. Landlord shall respond to a request for such approval within ten (10) business days after Tenant's submission thereof, provided, however, that if Landlord disapproves of such proposed signage, Landlord shall give a reasonably detailed explanation for its disapproval.  If Landlord fails to respond to Tenant within such 10-business day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO PROPOSED SIGNAGE. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED OF SUCH SIGNAGE.**"  If Landlord fails to provide a response to Tenant's second request within such five (5)-day period, Landlord will be deemed to have approved the proposed signage.  Notwithstanding the foregoing, Tenant may, subject to compliance with applicable Laws and required governmental approvals but without Landlord's consent, affix, install or place (a) any signs or other means of advertisement within the Premises that may not be seen from outside of the Building, such as signage in the lobby and wayfinding signage throughout the Premises, and (b) any professionally prepared signage (for identification and directional purposes) on its entry door and in the elevator lobby of each floor of the Premises. All signage installed by Tenant pursuant to this Section 18.1 shall be maintained in good condition, repaired and replaced by Tenant, at Tenant's sole cost, throughout the Term. Landlord acknowledges that Tenant requires its exterior signage to have lighting. Landlord and Tenant acknowledge that such electrified signage shall be subject to Landlord's prior consent to location, style, general aesthetic, and lighting quality/intensity of electrified signage, it being understood by both parties that the design of Tenant's logo shall be permitted to comply with Tenant's signage plans attached hereto as **Exhibit J**.  If such signage is approved by Landlord, Tenant shall be solely responsible for obtaining and paying for all permits in connection therewith and all costs and expenses relating to the fabrication of such signage, installation of such signage, any necessary electrical connections for both exterior and interior signage to be installed by Sonder to the extent any such signage requires lighting and the cost of such electricity throughout the Term.  Prior to the Final Completion Date, Landlord shall remove all existing signage on the Premises and shall repair all damage caused thereby.  In the event Tenant decides to change the Tenant Building Name during the Term, then Tenant shall be permitted to change such signage to reflect the change of name of the Building without the consent of Landlord, provided such replaced signage is substantially similar to the signage previously approved by Landlord. Prior to the Expiration Date or the Termination Date, as applicable, Tenant shall remove all signage installed by Tenant and shall repair all damage caused thereby at its sole cost and expense. Any such signage which is not removed by Tenant by the Expiration Date or the Termination Date, as applicable, shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's cost.

## Article 19.    SURRENDER; HOLD OVER

26

19.1    <u>Surrender</u>.  On the Expiration Date or the Termination Date, as applicable, (a) Tenant (and all other occupants) shall vacate and surrender the Premises broom clean and in good condition and repair, normal wear and tear typical for the Permitted Use, damage from Casualty that Landlord is responsible for repairing, damage from Landlord's failure to perform Landlord's repair and maintenance obligations, and damage for which Tenant is not responsible under this Lease excepted, and (b) Tenant shall remove from the Premises Tenant's Property which may be removed without material damage to the Premises or the Building and shall repair any damage to the Premises caused by the installation or removal of Tenant's Property.  Tenant's Property which is not removed by Tenant by the Expiration Date or the Termination Date, as applicable, shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's cost.

19.2    <u>Holdover</u>.  If, without Landlord's consent,  any portion of the Premises is not vacated and surrendered in accordance with this Lease by the Expiration Date or the Termination Date, as applicable, Tenant shall be liable to Landlord, in an amount equal to one hundred fifty percent (150%) of the daily Base Rent applicable to the Lease Year immediately preceding the Expiration Date or the Termination Date, as applicable, for each day that Tenant holds over in the portion of the Premises that Tenant has failed to vacate on a pro rata basis.  In addition, if Tenant holds over for more than sixty (60) days, then Tenant shall indemnify Landlord for all consequential damages sustained by Landlord on account of Tenant holding over in excess of sixty (60) days, provided that Landlord has provided Tenant with a notice of such consequential damages referencing this Section 19.2 after the Expiration Date or earlier Termination Date.  All provisions of this Lease except for those pertaining to the Term shall apply to any such tenancy. In no event, however, shall this Section 19.2 be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date or the Termination Date, as applicable, nor serve to extend the Term. The provisions of this Section 19.2 do not waive Landlord's right of re-entry or right to regain possession by actions at law or in equity or any other rights hereunder, and any receipt of payment by Landlord shall not be deemed a consent by Landlord to Tenant's remaining in possession or be construed as creating or renewing any lease or right of tenancy between Landlord and Tenant.

### Article 20.    DEFAULT

20.1    <u>Tenant Event of Default</u>.  The occurrence of any of the following shall constitute a default and breach of this Lease by Tenant (hereafter an "**Event of Default**"):

20.1.1    If Tenant fails to pay any installment of Rent as and when due, where such failure continues for more than five (5) business days after receipt of written notice thereof by Landlord to Tenant; or

20.1.2    If Tenant fails to perform any of Tenant's non-monetary obligations under this Lease for a period of thirty (30) days after receipt of written notice thereof from Landlord; provided that it shall not be an Event of Default if Tenant commences such performance within said thirty (30)-day period and thereafter diligently prosecutes such cure to completion (up to a maximum of one hundred twenty (120) days);

27

20.1.3  If: (x) Tenant fails to take possession of the Premises for the purposes of commencing the Onboarding Work on the Final Completion Date (subject to a Force Majeure Event); or (y) Tenant fails to open for business in the Premises within sixty (60) days from the Commencement Date (subject to a Force Majeure Event); or (z) Tenant fails to continuously operate its business in the Premises for the Permitted Use for more than ninety (90) consecutive days, other than if Tenant has temporarily ceased operations due to repairs, alterations, compliance with Laws, temporary taking or a Casualty event while repairs are ongoing, or as a result of a Force Majeure Event, or otherwise expressly permitted by the terms of this Lease;

20.1.4  If Tenant shall be given three (3) or more notices of default under this Lease within any given twelve (12) month period, notwithstanding any subsequent cure of the failure to perform or observe the terms or conditions of this Lease as identified in such notices;

20.1.5  If Tenant fails to procure and maintain any of the insurance coverages that Tenant is required to procure and maintain pursuant to this Lease, and such failure is not cured by Tenant within five (5) business days after written notice from Landlord; or

20.1.6  If (a) Tenant makes a general assignment or general arrangement for the benefit of creditors; (b) a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against Tenant and is not dismissed within ninety (90) days after the filing or entry of such petition; (c) a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within sixty (60) days; or (d) substantially all of Tenant's (i) assets located at the Premises or (ii) interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within sixty (60) days.

20.2     Landlord Default.  In the event (i) Landlord materially breaches any of the representations or warranties contained in this Lease, or fails to keep, observe or perform any of its material obligations or covenants contained herein, (ii) such breach or failure by Landlord materially and adversely interferes with the operation by Tenant of its business in accordance with this Lease; and (iii) such breach is not cured within thirty (30) days after written notice thereof from Tenant (or such longer period as is reasonable to cure said default, if said default cannot reasonably be cured within thirty (30) days, provided that Landlord promptly commences to cure within such thirty (30) day period and diligently prosecutes such cure to completion (up to maximum of one hundred twenty (120) days)), Tenant, in addition to any rights it has at law or equity, shall have the self-help rights set forth in Section 7.2 of the Lease, if applicable, and if such breach is not the type covered under Section 7.2 of the Lease, Tenant may, in its sole and absolute discretion, in addition to any rights it has at law or equity, cure any such Landlord's default, and withhold from Rent any amounts reasonably incurred by Tenant in curing any such default (including reasonable attorneys' fees and expenses). In no event shall Tenant have the right to exercise Tenant's right to cure in regard to the Common Areas or other tenant premises in the Building, other than in regard to those Common Areas exclusively serving the Premises or which are essential for access to the Premises.

### Article 21.     LANDLORD REMEDIES.

28

21.1    Upon the occurrence and continuance of any Event of Default by Tenant, Landlord shall have, subject to the provisions set forth in this Article 21 the option to pursue any one or more of the following remedies at any time thereafter, with or without further notice or demand, each and all of which shall be cumulative and non-exclusive:

21.1.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord upon notice from Landlord, and recover as damages a sum of money equal to the total of: (v) the cost of recovering the Premises incurred by Landlord, (w) all accrued and unpaid Rent at the time of termination, plus interest thereon at the Default Interest Rate from the due date(s) until so paid; (x) the present value of the balance of Base Rent and any other Rent which would have been payable for the remainder of the Term, less the present value of the fair market rental value of the Premises for said period (in each case, discounted to present value at a discount rate of six percent (6%) per annum); (y) the "Full Payment Amount" remaining at the time of such termination as set forth in **Exhibit H**; and (z) any other sum of money and damages owed by Tenant to Landlord under this Lease.  The right of Landlord to recover such damages from Tenant shall survive the expiration of termination of this Lease.  If Tenant fails to surrender possession as required herein, subject to applicable Laws, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim for damages therefor.

21.1.2    If Landlord does not elect to terminate this Lease on account of any Event of Default by Tenant, Landlord may, subject to Landlord's obligation to mitigate its damages, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due. Tenant shall pay to Landlord at the times and in the manner specified by the provisions of this Lease: (x) the installments of the Base Rent and Additional Rent and all other amounts accruing during such remainder, plus (y) the actual and reasonable expenses of reletting incurred by Landlord (including, by way of example rather of limitation, attorneys' fees, leasing or brokerage commissions, alterations, repairs, improvements, decoration expenses and the expense of any other actions taken in connection with such reletting), less any monies received by Landlord with respect to such remainder of the Term from such reletting of any or all of the Premises, plus (z) interest on all such expenses at the Default Interest Rate unless paid within ten (10) days following Tenant's receipt of the bill.

21.1.3    Landlord shall at all times have the right, without any additional prior demand or notice, to seek any and all other rights and remedies, including, but not limited to, declaratory, injunctive or other equitable relief, or restrain or enjoin a violation or breach of any provision hereof.

Upon the occurrence and continuance of an Event of Default, Landlord shall use good faith and commercially reasonable efforts to mitigate its damages to the extent required by applicable Law, including, without limitation, using commercially reasonable efforts to lease the Premises or any part thereof.

Mention in this Lease of any particular remedy shall not preclude Landlord or Tenant from any other remedy under this Lease or, at law or in equity.

Any damage or loss of Rent sustained by Landlord may be recovered by Landlord, at Landlord's option, at the time of the reletting or termination, in a single action or in separate actions, from time to time, as said loss of Rent or damages shall accrue, or in a single proceeding deferred by Landlord or with jurisdiction reserved by the court, until the expiration of the Term of this Lease (in which event Tenant hereby agrees that, at Landlord's option, the cause of action shall not be deemed to have accrued until the date of expiration of the Term).

21.2     No failure by Landlord or by Tenant to insist upon the performance of any of the terms of this Lease or to exercise any right or remedy upon an Event of Default, and no acceptance by Landlord of full or partial Rent from Tenant or any third party during the continuance of any Event of Default, shall constitute a waiver of any such Event of Default or of any of the terms of this Lease.  None of the terms of this Lease to be kept, observed or performed by Landlord or by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and/or by Tenant, as the case may be.  No waiver of any breach shall affect or alter this Lease, but each of the terms of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach of this Lease.  No expiration or termination of this Lease, abandonment, re-entry by Landlord or vacancy shall relieve Tenant of any of its accrued liabilities and obligations under this Lease (whether or not any or all of the Premises are relet), and Tenant shall remain liable to Landlord for all damages resulting from any Event of Default by Tenant, as and when accrued, including any damage resulting from the breach by Tenant of any of its obligations to pay Rent and any other sums which Tenant is obligated to pay hereunder.  In event of conflict between this paragraph and Article 21.1.1 of this Lease, Article 21.1.1 shall govern.

21.3     Upon the occurrence and continuance of any Event of Default by Tenant, and such Event of Default is reasonably likely to result in imminent injury to persons or damage to property, or other emergency situation, then, notwithstanding anything contained in Sections 21.1 or 21.2 to the contrary, and regardless of the expiration of any applicable notice and cure period set forth in Section 21.1, Landlord shall have the option, to cure the act or failure constituting said default for the account of and at the expense of Tenant.  Landlord's cure or attempt to cure any act or failure constituting the Event of Default by Tenant shall not result in a waiver or release of Tenant.  Tenant agrees to pay to Landlord upon demand all the reasonable and actual costs incurred by Landlord pursuant to this Section 21.3, plus an administration fee equal to 5% of such costs.

## Article 22.     BROKER

Each of Tenant and Landlord represents to the other party that it has not dealt with any broker in connection with this Lease. Each party shall indemnify, defend and hold the other party harmless from and against any claims for any brokerage commissions or other compensation which are made by any broker alleging to have dealt with Tenant or Landlord (as applicable) in connection with this Lease.

30

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-983A-D891FE4633B2

## Article 23.    REPRESENTATIONS AND WARRANTIES

23.1    Landlord hereby makes the following representations and warranties to Tenant, upon which Landlord acknowledges and agrees Tenant is entitled to rely, which representations and warranties shall be true and correct as of the Effective Date and as of the Commencement Date unless otherwise set forth herein:

23.1.1    (a) Landlord is duly formed, validly existing and in good standing in the jurisdiction of its formation or organization, as applicable; (b) Landlord has the full power and authority to execute and deliver this Lease and to perform all obligations of Landlord hereunder and has obtained all consents required to do so (including consent of any Mortgagee), and the execution and delivery by the individual executing the Lease on behalf of Landlord has been duly and validly authorized by all necessary action by Landlord; and (c) Landlord is the owner of fee simple title to the Project, free and clear of any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, warrant, purchase right or option, right of first refusal or similar right, lease, contract, easement or other encumbrance or restriction other than any Mortgage securing a loan for the purchase of the Project, previously disclosed to Tenant, which would preclude or otherwise adversely affect Tenant's Permitted Use or other rights or benefits under this Lease.

23.1.2    Neither the execution of this Lease nor the performance of Landlord's obligations hereunder by Landlord or any Landlord Party will (a) conflict with or result in a breach of the terms, conditions, and provisions of or constitute a default, or result in the termination of any agreement or instrument (other than those instruments or agreements to be terminated on or before the Commencement Date) to which Landlord is a party or by which Landlord may be bound, (b) to Landlord's knowledge, violate any restrictions to which Landlord is subject, or (c) to Landlord's knowledge, constitute a violation of applicable Laws.

23.1.3    As of the Commencement Date, (a) Landlord has not received any notice of a violation of any applicable Laws with respect to the Project which has not been cured or dismissed; (b) no administrative proceeding, investigation or inquiry is pending or, to Landlord's knowledge, threatened with respect to any violation of applicable Laws with respect to the Project; and (c) to Landlord's knowledge, there is no existing violation of any applicable Laws with respect to the Project.

23.1.4    As of the Commencement Date, (a) no litigation, arbitration, administrative or other adjudicatory proceeding or legal action is pending or, to Landlord's knowledge, threatened, with respect to the Project; (b) Landlord has not received any court filing, formal written charge, complaint, claim or written request for arbitration, mediation, administrative hearing/proceeding or similar legal or quasi-legal proceeding with respect to the Project, which has not been resolved, settled or dismissed; (c) no injunction, decree, order, writ or judgment is outstanding with respect to the Project; and (d) no claim which may result in any of the foregoing has been threatened in writing.

23.1.5  Landlord has not made any general assignment for the benefit of creditors, become insolvent or filed a petition for voluntary bankruptcy or filed a petition or answer seeking reorganization or an arrangement or composition, extension or readjustment of its indebtedness or consented, in any creditors' proceeding, to the appointment of a receiver or trustee of Landlord or the Project or any part thereof of either of them or been named in an involuntary bankruptcy proceeding, and to Landlord's knowledge, no such actions are contemplated or have been threatened.

23.1.6  To Landlord's knowledge, there exist no structural or other material defects or damage in and to the Project (including, without limitation, the Building Systems), whether latent or otherwise.

23.1.7  There will be no alterations or improvement projects at the Project other than with respect to the Excluded Premises that will not be completed prior to the Commencement Date.

23.1.8  To Landlord's knowledge as of the Effective Date, there exists no indoor mold growth, Legionella or any other types of waterborne contaminants in the Building Systems.

23.2  Tenant hereby represents and warrants to Landlord, upon which Tenant acknowledges and agrees Landlord is entitled to rely, which representations and warranties shall be true and correct as of the Effective Date and as of the Commencement Date: (a) Tenant is duly incorporated, validly existing and in good standing in the jurisdiction of its incorporation; and (b) Tenant has the full power and authority to execute and deliver this Lease, and the execution and delivery by the individual executing the Lease on behalf of Tenant has been duly and validly authorized by all necessary action by Tenant.

## Article 24.    LANDLORD COVENANTS

Landlord hereby makes the following covenants:

24.1    Landlord shall retain all Retained Liabilities.

24.2    Commencing on the Effective Date and until the Termination Date or the Expiration Date, as applicable, Landlord shall not knowingly enter into any agreement (including any covenant, condition or restriction) that will adversely affect Tenant's use of the Premises for the Permitted Use.

24.3    During the Term, Landlord shall maintain in good standing and renew all Licenses and Permits, which require renewal, prior to their expiration.

24.4    During the Term, unless prior written consent is obtained from Tenant in its sole discretion, Landlord shall not lease any portion of the Project to be used as (i) a tattoo parlor, sexually oriented establishment, or any establishment selling, renting or exhibiting pornographic or sexually explicit materials or drug-related paraphernalia, (ii) a pawn shop, thrift store or other

store which sells used, second-hand, damaged, discontinued, or surplus merchandise (except for high-end, luxury vintage clothing or antiques stores), (iii) a game arcade, casino, or other gambling establishment, (iv) a dry cleaning plant (it being agreed that a drop off dry cleaners shall be permitted) or laundromat, (v) a funeral parlor, or mortuary or similar services, (vi) a national chain convenience store (e.g., 7-Eleven), (vii) a liquor store, (viii) a marijuana dispensary, smoking or vaping facilities of any kind, (ix) a national chain fast food restaurant (e.g., Burger King), (x) a medical facility specializing in the diagnosing and treatment of medical conditions (such exclusion is agreed not to include dentists, optometrists, physical therapists, or similar higher end uses), or (xi) a disco or night club.  Landlord shall use good faith efforts to ensure the Project, including the Excluded Premises, is operated and maintained at all times to a high-quality aesthetic and operational standard at least on par with that of the Premises.  Landlord shall use commercially reasonable efforts to enforce the terms of the leases with the tenants of the Project, including the Excluded Premises, to protect Tenant's quiet enjoyment and occupancy of the Premises.

## Article 25.    NON-COMPETITION

25.1    In the event this Lease is terminated due to Landlord breach or default under this Lease arising out of Landlord's willful misconduct, gross negligence and/or bad faith, Landlord shall pay a break fee equal to six (6) months' then-current Base Rent to Tenant on the termination date as Tenant's sole and exclusive remedy. This Section 25.1 shall survive the termination of this Lease.

## Article 26.    INDEMNIFICATION

26.1    Subject to the terms of Article 10, Tenant shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Landlord Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from or arising from (a) any breach by Tenant of its representations, warranties and/or covenants contained in this Lease, (b) any negligence or willful misconduct of Tenant Parties in the Premises, (c) any accident, injury or damage occurring in the Premises unless caused by the negligence or willful misconduct of Landlord Parties, and (d) Tenant's performance of self-help during the Term; provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of Landlord and/or Landlord Parties. Tenant, upon notice of any such action or proceeding by a Landlord Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Landlord Party).

26.2    Subject to the terms of Article 10, Landlord shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Tenant Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from or arising from (a) any breach by Landlord of its representations, warranties and/or covenants contained in this Lease, (b) any negligence or willful misconduct of Landlord or Landlord Parties, (c) the Retained Liabilities, and (d) any accident, injury or damage occurring in the Common Areas or the Excluded Premises unless caused by the negligence or willful misconduct of Tenant Parties or Authorized Parties; provided that this indemnification shall not

33

apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of any Tenant Party. Landlord, upon notice of any such action or proceeding by a Tenant Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Tenant Party).

26.3    Notwithstanding any contrary provision of this Article 26, Tenant and Landlord agree to look first to the applicable insurance coverage in effect (or that should be in effect under any policy required to be maintained under this Lease) in the event of any Losses, regardless of the cause of any such Losses. The parties' indemnification obligations under this Article 26 shall survive the expiration or termination of this Lease.

## Article 27.    NOTICES

27.1    Except as may be provided in this Lease, all notices, demands, requests and other communications given or required to be given by either party to the other under this Lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its respective Notice Address set forth under Basic Lease Information, or at such other place as either party from time to time may designate in writing to the other party, or via email provided that a paper copy shall immediately follow via one of the additional notice methods listed above. Any notice or other communication sent as provided in this Article 27 shall be effective (a) on the date received (or rejected) if sent overnight courier service, (b) five (5) business days after mailing by registered or certified mail, or (c) on the day received if emailing, or the next business day if the email is sent after 5pm (local time for the Premises) (and provided the written notice by overnight courier service or mail is sent the same day or the immediately following business day).

## Article 28.    MISCELLANEOUS

28.1    This Lease shall be governed by the Laws of Illinois, and the parties irrevocably submit to the exclusive jurisdiction of the State and federal district courts of competent jurisdiction in Illinois with respect to all matters relating to this Lease.

28.2    Subject to the provisions of this Lease, this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns.

28.3    This Lease may not be modified, changed, altered or amended, in whole or in part, except in a writing signed by both Landlord and Tenant.

28.4    This Lease and any exhibits, schedules and addenda referred to herein, constitute the final and complete expression of the parties' agreements with respect to the leasing of the Premises. Each party agrees that it has not relied upon or regarded as binding any prior negotiations, representations, or understandings with respect to the leasing of the Premises, whether oral or written, except as expressly set forth herein and all prior negotiations, representations and understandings with respect to the leasing of the Premises are superseded and replaced by this Lease.

34

28.5    Notwithstanding any provision of this Lease, or any applicable Laws, to the contrary, or the execution of this Lease by Tenant, this Lease shall not bind or benefit Landlord or Tenant, unless and until this Lease is signed and delivered by both Landlord and Tenant.

28.6    At the request of either party, Landlord and Tenant shall execute a memorandum of lease on the form attached hereto as **Exhibit E**, which may be recorded in the county in which the Project is located.

28.7    The parties shall hold in confidence and shall not disclose to third parties the terms of this Lease, and Landlord shall hold in confidence and not to disclose to third parties any other Proprietary Materials, except that each party hereto may disclose such information to its officers, directors, partners, members, employees, representatives, agents, brokers, lenders, prospective lenders, investors, prospective investors, attorneys, accountants and advisors who have signed a commercially reasonable non-disclosure agreement, prior to any disclosure to such party.

28.8    Neither Landlord nor Tenant shall make any public announcement respecting this Lease, the terms herein or any of the transactions contemplated hereunder without the prior written approval of the other party.  Any such public announcement shall be subject to the other party's review and approval of the form and substance thereof prior to such public announcement, or as required under applicable Laws, in which case no such review and approval by the other party shall be required.  Furthermore, upon request, Landlord shall allow Tenant to communicate with any other tenants of the Project and shall cooperate with Tenant's reasonable requests to facilitate such communications.

28.9    Upon Tenant's request for Works, Landlord shall provide such materials in its possession or control to Tenant. For any Works delivered to Tenant, Landlord hereby grants to Tenant, its subsidiaries, licensees and its successors and assigns, a royalty-free, non-exclusive, worldwide license to reproduce, modify, distribute, and create derivative works of the Works, for the purpose of advertising and promotion of the Premises in any media or format, including online listings and other promotional materials. Landlord hereby waives any and all moral rights or droit rights or any rights to similar effect that it may have in the Works.  Landlord represents and warrants to Tenant that (a) it is the owner of the Works or has sufficient rights to grant the license granted herein; (b) the Works do not infringe on the rights of any third party, including, but not limited to, copyright rights; and (c) Landlord is not aware of any threats or claims that the Works infringe on such rights of any third party.

28.10    Any Schedules, Exhibits and Addenda attached to this Lease are a part of this Lease.

28.11    The captions in this Lease are for reference only and do not define, limit or enlarge the scope of this Lease or the intent of any term. All Article and Section references in this Lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease.

28.12   If any provision of this Lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by Laws.

28.13   If either party hereto is comprised of two or more persons, the liability of those persons under this Lease shall be joint and several.  Wherever appropriate in this Lease, personal pronouns shall be considered to include other genders and the singular to include the plural.

28.14   This Lease may be executed in one or more counterparts.  The parties contemplate that they may be executing counterparts of this Lease by facsimile, PDF or other electronic means and agree and intend that a signature by facsimile, PDF or other electronic means shall bind the party so signing with the same effect as though the signature were an original signature.

28.15   For the avoidance of doubt, whenever Tenant is entitled to an abatement of Rent based on the portion of the Premises that is not usable by Tenant, subject to the terms and conditions of this Lease, the percentage or Rent abated shall be based on the total number of square feet of the Units not able to be used by Tenant (in whole or in part) as a result of the specific event causing the abatement divided by the total number of square feet of the Units in the Premises.

28.16   Landlord and Tenant each hereby certifies that it is in compliance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (the "**Patriot Act**") and the Executive Order 13224 (the "**Executive Order**") and, in particular, Landlord and Tenant acknowledge that (a) it is prohibited from doing any business with any persons who commit, threaten to commit, or support terrorism; (b) Landlord and Tenant, each for themselves and their respective officers and directors, are not persons who commit, threaten to commit, or support terrorism; and (c) Landlord and Tenant shall take commercially diligent steps to ensure that it shall comply with the Patriot Act and Executive Order during the Lease Term.  Landlord and Tenant shall indemnify and hold the other and its agents harmless from and against any Losses arising from its respective breach of the foregoing sentence. The indemnification and hold harmless above shall survive the termination of this Lease.

28.17   A Force Majeure Event shall extend the due date for a party's performance of an obligation under this Lease for the duration of such Force Majeure Event. Notwithstanding the foregoing, a Force Majeure Event shall not operate to excuse Tenant from the prompt payment of Rent as required by the terms of this Lease; provided, however, if a Force Majeure Event is related solely to governmental restrictions or orders in connection with a pandemic, epidemic or similar health emergency that materially restricts Tenant's operation of the Premises for the Permitted Use (such as a mandatory shut-down of transient accommodation ordered by the Governmental Authorities in connection with COVID-19) ("**Order(s)**"), (a) if the Final Completion Date has occurred, but the Commencement Date has not occurred, at Tenant's election, the Commencement Date shall be extended day-for-day until such Orders are rescinded, and (b) if

36

the Commencement Date has occurred, Tenant shall be permitted to defer payment of Base Rent on a day-for-day basis for the duration of such Order up to three (3) months of Base Rent, and any such deferred Rent shall be repaid to Landlord on a monthly basis in three (3) equal installments commencing on the 1st of the month following six (6) months after such Order is lifted. Furthermore, in the event of a change in Laws (or an interpretation thereof) or new Laws which materially and actually restricts Tenant's ability to carry on its business at the Premises (e.g., the Permitted Use is no longer permitted for the Premises and not only a change which results in a monetary hardship), and Tenant's business is not "grandfathered" in, Tenant shall have the right to terminate the Lease upon at least sixty (60) days' prior written notice to Landlord, provided that the termination shall be effective as of the date upon which such relevant change in Laws or new Laws goes into effect. Upon such termination, this Lease shall be cancelled and of no further force or effect, and neither party shall accrue any further obligations under this Lease, provided that all obligations which accrued prior to the date of such termination or which expressly survive the termination of this Lease shall survive.

28.18    The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation.

28.19    Notwithstanding any provision of this Lease to the contrary (including, without limitation, any indemnification provision), in no event shall Landlord, Tenant or any of their members, partners, directors, officers, shareholders, employees, advisors or agents be responsible for any consequential, punitive, exemplary, or special damages, except to the extent expressly permitted under this Lease.

28.20    Dispute Resolution.

28.20.1 Arbitration.  Any claim to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), or Sections 1.4, 1.6, 1.7 or 1.11 of Exhibit C shall be determined by expedited arbitration in Chicago before a single neutral arbitrator.  The arbitration shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Expedited Procedures set forth therein (regardless of the amount in controversy).  Judgment on the award may be entered in any court of competent jurisdiction.

28.20.2 Mediation.  If any dispute arises out of or relates to this Lease (other than a claim to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), Section 15.2 (Noise and Vibration), or Sections 1.4, 1.6, 1.7 or 1.11 of Exhibit C), and such dispute cannot be resolved through good faith negotiation between Landlord and Tenant, the parties hereto agree to participate in a mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to litigation.

28.20.3 <u>Jurisdiction</u>.  Except with respect to claims to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), or Sections 1.4, 1.6, 1.7 or 1.11 of <u>Exhibit C</u>, which shall be resolved by expedited arbitration as set forth in Section 28.20.1 hereof, any dispute, claim, or controversy between Landlord and Tenant (and/or their officers, directors, employees, agents, or subsidiary or affiliated entities) arising out of or related to this Lease which cannot be resolved through a mediation in accordance with Section 28.20.2 above shall be adjudicated in Illinois or federal courts sitting in the county in which the Project is located.

28.21    THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH THEY (AND/OR THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ARE PARTIES THAT ARISES OUT OF OR RELATES TO THIS LEASE.

28.22    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, THE LIABILITY OF LANDLORD (AND OF ANY SUCCESSOR LANDLORD) TO TENANT SHALL BE LIMITED TO THE INTEREST OF LANDLORD IN THE PROJECT.  TENANT SHALL LOOK SOLELY TO LANDLORD'S INTEREST IN THE PROJECT FOR THE RECOVERY OF ANY JUDGMENT OR AWARD AGAINST LANDLORD. NEITHER LANDLORD NOR ANY LANDLORD PARTY SHALL BE PERSONALLY LIABLE FOR ANY JUDGMENT OR DEFICIENCY.  BEFORE FILING SUIT FOR AN ALLEGED DEFAULT BY LANDLORD, TENANT SHALL GIVE LANDLORD AND THE MORTGAGEE(S) ON THE PROJECT, BUILDING OR PREMISES, NOTICE AND REASONABLE TIME TO CURE THE ALLEGED DEFAULT AS PROVIDED IN THIS LEASE.

28.23    Tenant acknowledges that the adjoining property to the Project shall be undergoing a major construction project during the Term and Tenant agrees that Landlord shall not be responsible for or held liable nor shall such construction constitute a constructive eviction of Tenant, give rise to an abatement of Rent, or relieve Tenant from the obligation to fulfill any covenant or agreement under the Lease.

28.24    Within thirty (30) days of the Effective Date, Landlord shall make available to Tenant all documents, instruments and agreements relating to the Project requested by Tenant prior to the Effective Date (the "**Due Diligence Materials**").  If Landlord does not provide the Due Diligence Materials (except the PCA) to Tenant on or before thirty (30) days following the Effective Date, or any Due Diligence Materials disclose any facts materially inconsistent with the representations and warranties of Landlord contained in this Lease, then Tenant may, by providing thirty (30) days advance written notice to the Landlord, terminate this Lease. In the event of termination of this Lease pursuant to the preceding sentence, this Lease shall be cancelled and of no further force or effect, the parties shall be released from any obligations accruing under this Lease after such termination date.

*[Signatures commence on the following page]*

38

DocuSign Envelope ID: 6994D4B4-E8E9-4B16-983A-D891FE4633B2

IN WITNESS WHEREOF, Landlord and Tenant, acting herein through duly authorized individuals, have executed this Lease as of the date first above written.

**LANDLORD:**

1436 LOFT OFFICES, LLC,
an Illinois limited liability company

By: _____

Name:  Darren Sloniger

Title:  Manager

**TENANT:**

SONDER HOSPITALITY USA INC.,
a Delaware corporation

By: _____

Name:  Rikesh Patel

Title:  Managing Director, Americas

CHI – 1436 Randolph – Lease Signature Page

## APPENDIX A

### DEFINITIONS

In addition to terms defined in the Basic Lease Information and in the body of this Lease, the following terms shall have the following meanings:

a)      **ADA:**  The Americans with Disabilities Act (42 USC 12181 et seq.), as amended from time to time.

b)      **Additional Rent:**  Defined in Section 3.1.

c)      **Affiliate:**  An entity which controls, is controlled by, or is under common control with Tenant.

d)      **Agreed Reimbursement Cap:** $30,000.

e)      **Amenities**:  The fitness center (including the exercise equipment, to be purchased and installed by Landlord).

f)      **Amenities Interruption:** an interruption or a detrimental or dangerous condition, with respect to the Amenities, the use thereof or the access thereto, which is within Landlord's reasonable control to cure.

g)      **Authorized Parties:**   Tenant and its employees, agents, representatives, contractors, guests, customers, subtenants and licensees.

h)      **Brand Name:**  Tenant's name and any other name containing "Sonder" used by Tenant.

i)      **Building Systems**:   Collectively, all building systems, including, without limitation, all structural systems, all building assemblies and components, all risers, landscape, sitework, stormwater, plumbing, mechanical systems & heating, ventilation and air-conditioning systems, electrical systems, elevators, boilers, utility lines, meters, fire and life-safety systems including the fire alarm, sprinkler main and fire escape which are not installed by Tenant to serve the Premises exclusively.

j)      **Canceled Booking**: at Tenant's election, either (a) a night between the suspension, expiration or termination of the Permitted Use Approval or Hotel License, as applicable, and the issuance or renewal of the Permitted Use Approval or Hotel License, as applicable, that a Unit was actually reserved for occupancy by a guest and the reservation was made prior to the suspension, expiration or termination, or (b) the number of reservations for the Project during the preceding calendar year for the same period of time between the suspension, expiration or termination of the Permitted Use Approval or Hotel License, as applicable, and the issuance or renewal of the Permitted Use Approval or Hotel License, as applicable.

k)      **Casualty:** Fire, flood, windstorm, earthquake, casualty, riots, civil unrest, or any other event (beyond either party's control) making all or a portion of the Premises untenantable.

l)      **Commencement Date Certificate**: Defined in Section 2.1.

m)      **Common Areas**: All sidewalks, access roads, driveways, landscaped areas, truck service ways, loading docks, interior and exterior corridors, courts, stairs, ramps, elevators, common restrooms, elevator landings, patios, lobby and all other areas located on or serving the Project from time to time and made available for the common and joint use and benefit of Landlord, Tenant and any other tenants or invitees of the Project.

n)      **Construction Approval:** Collectively, all permits, zoning approvals, licenses and/or other approvals necessary for construction related permits and licenses and temporary or permanent certificates of occupancy for the Premises for the Permitted Use.

o)      **Deep-Cleaned**: Collectively, (i) all carpet in the Premises and the Common Areas are shampooed, (ii) all hard floors in the Premises and the Common Areas are steam-cleaned, (iii) all walls and baseboards in the Premises and the Common Areas are wiped down, (iv) the Premises and the Common Areas are dusted, swept and mopped, (v) any appliances in the Premises are cleaned and wiped out, and (vi) all garbage in the Premises and the Common Areas are properly disposed of.

p)      **Emergency**:  Any event, condition or occurrence that threatens imminent (a) damage or harm to persons or property, (b) violation of applicable Laws, or (c) imposition of fines or penalties.

q)      **Environmental Laws**:  Any and all federal, state and local health, safety, environmental or natural resource laws, statutes, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities, having jurisdiction, and all other state, federal and local laws, regulations, rules, ordinances, and orders which govern: (i) the existence, cleanup and/or remedy of contamination on property; (ii) the emission or discharge of Hazardous Materials into the environment; (iii) the control of Hazardous Materials; (iv) the use, generation, transport, treatment, storage, disposal, removal, or recovery of Hazardous Materials; or (v) the safety and health of employees, any tenant, other user or invitee; as well as all applicable judicial and administrative and regulatory decrees, judgments or orders (including without limitation the "common law") and all applicable covenants running with the land that relate to the protection of health, safety, environment or natural resources, including, without limitation: (a) The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by The Superfund Amendments and Reauthorization Act of 1986; (b) The Resource Conservation and Recovery Act of 1976, as amended by The Used Oil Recycling Act of 1980; (c) The Solid Waste Disposal Act Amendment of 1980;

(d) The Hazardous and Solid Waste Amendments of 1984; (e) The Hazardous Materials Transportation Act; (f) The Clean Water Act; (g) The Clean Air Act; (h) The Toxic Substances Control Act; (i) The Safe Drinking Water Act; (j) The Occupational Safety and Health Act; (k) The Federal Water Pollution Control Act; (l) The Federal Insecticide, Fungicide and Rodenticide Act; (m) The Georgia Hazardous Waste Management Act; and (n) The Georgia Hazardous Site Response Act.

r)  **Event of Default**:  Defined in Section 20.1.

s)  **Executive Order:** Defined in Section 28.16.

t)  **FF&E:** Furniture, fixtures and equipment.

u)  **FF&E Capital:** Defined in Section 3.7.

v)  **Final Completion Condition**: Collectively, (i) Landlord has delivered to Tenant vacant and exclusive possession of the Premises; (ii) the Premises and Common Areas are in structurally sound and watertight condition, Deep-Cleaned, free from Hazardous Materials, indoor mold growth and pest infestations, and free from any non-compliance with applicable Laws (including, without limitation, ADA, local building code requirements, ordinances and Laws applicable to the Permitted Use); (iii) the Premises and Common Areas are in good and satisfactory condition and working order (including, without limitation, all Building Systems); (iv) Landlord's Work is Complete in accordance with the Permitted 100% Construction Documents, as certified in writing by the Architect, except for Punchlist Items, and the PCA Work is completed; (v) final payment applications from contractors performing Landlord's Work have been approved by Landlord; (vi) all approvals required for the use and occupancy of the Premises for the Permitted Use which are Landlord's responsibility to obtain under this Lease, including, without limitation, the Licenses and Approvals have been issued by the Governmental Authority and are in full force and effect; (vii) the Premises and Common Areas are ready for Onboarding Access Period to commence, including, but not limited to, Tenant having access to and throughout the Premises and Common Areas; (viii) Landlord has delivered to Tenant a SNDA in accordance with Section 9.1 of this Lease; and (ix) Landlord has removed any existing signage in the Premises and any exterior signage and repair all damage caused thereby at its sole cost and expense. Notwithstanding anything to the contrary set forth in the Lease, rent abatement provided in Section 1.7 of <u>Exhibit C</u> shall not accrue due to Landlord's failure to satisfy subclause (viii) above.

w)  **Final Completion Date**:  The date Landlord delivers the Premises to Tenant with all of the Final Completion Conditions satisfied.

x)  **Force Majeure Event**: Any force majeure event beyond Landlord's or Tenant's reasonable control, including, without limitation, acts of God, Casualty, strikes or labor troubles, riots and civil unrest, accident, acts of war, terrorism, bioterrorism

(i.e., the release or threatened release of an airborne agent that may adversely affect the Premises or its occupants), governmental preemption in connection with an emergency, Laws, governmental delay, conditions of supply and demand which have been or are affected by war, terrorism, bioterrorism or other emergency, declaration by the World Health Organization of a pandemic, any applicable Laws imposing travel, quarantine, or shelter-in-place or similar restrictions, or any applicable Laws precluding, restricting, or impeding (or has the effect of precluding, restricting or impeding) Tenant's operation of the Premises (or preparation thereof) for the Permitted Use, or any other cause whatsoever, whether similar or dissimilar to the foregoing.

y)      **Governmental Authority**: Any government or authority having jurisdiction, whether federal, state, county, municipal, local or other, and any department, agency, entity or other body exercising executive, legislative, regulatory or administrative functions of government, including, without limitation, (a) the federal authorities of the United States of America and the authorities of Illinois and Chicago, and (b) judicial and quasi-judicial authorities of any of the foregoing.

z)      **Hazardous Materials**: Collectively, any element or substance, (i) the presence of which requires investigation, reporting, removal or remediation under any Environmental Law, (ii) that is or becomes defined as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous substance," or other type of pollutant or contaminant under any applicable Environmental Law, (iii) that is toxic, reactive, explosive, corrosive, flammable, radioactive, carcinogenic, mutagenic, teratogenic, or otherwise hazardous and is or becomes regulated by any applicable Environmental Law, (iv) that is or contains oil, gasoline, diesel fuel, aviation fuel, or other petroleum hydrocarbons, products or derivatives, other than petroleum, crude oil, and petroleum products to the extent contained within regularly operated motor vehicles, (v) that is or contains PCBs, asbestos, radon or urea formaldehyde, (vi) that is fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including but not limited to, mold (including, without limitation, penicillium/aspergillus and stachybotrys chartarum), and Legionella (legionella pneumophila), (viii) the presence of which causes or threatens to cause a nuisance upon the Project or to adjacent property or poses or threatens to pose a hazard to the health or safety of any person, to plant or animal life, or to the environment, including, but not limited to sewage sludge, industrial slag, solvents and/or any other similar substances or materials.

aa)     **Hotel License:** Collectively, any operating permits or licenses, business registrations, and/or other approvals specifically required by applicable Laws to be obtained by Tenant to operate a hotel in or at the Premises, including the hotel license.

bb) **Landlord Party, and collectively, Landlord Parties:** Landlord and its directors, trustees, members, partners, officers, agents, representatives, property managers, contractors, and employees.

cc) **Landlord:** Defined in the Recitals.

dd) **Landlord's Repair(s):** Defined in Section 7.1.

ee) **Landlord's Services:** Defined in Section 6.1.

ff) **Laws**: All present and future laws, statutes, rules, regulations, orders, ordinances, judgments, notices, determinations, directives, guidelines, policies, restrictions, curfews, and other requirements of any Governmental Authority having jurisdiction, including, without limitation, Environmental Laws, Privacy Laws, fire and life safety regulations and seismic standards set forth by any Governmental Authority, and requirements of any Governmental Authority pertaining to accessibility, special needs and/or disability matters, including, but not limited to, the ADA or any equivalent state or local law or ordinance.

gg) **Lease:** Defined in the Recitals

hh) **Lease Year**: A twelve (12) month period beginning on the Commencement Date or on each anniversary of the Commencement Date, provided, however, that if the Commencement Date does not fall on the first day of a calendar month, then the first Lease Year shall begin on the Commencement Date and end on the last day of the month containing the first anniversary of the Commencement Date, and each succeeding Lease Year shall begin on the day following the last day of the prior Lease Year.

ii) **Licenses and Permits:** Collectively, all licenses, permits, authorizations, approvals, registrations and certificates for the Project issued or required to be issued by any Governmental Authority, including, without limitation, the certificate of occupancy or local equivalent for the Permitted Use, elevator permit, and boiler permit. For the avoidance of doubt, Licenses and Permits do not include the Hotel License.

jj) **Losses**: Any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements).

kk) **Mortgage:** Any existing or future mortgage or deed of trust on the Building, including any modification, extension, supplement, consolidation and replacement thereof.

ll) **Mortgagee:** The holder of any Mortgage.

mm) **Onboarding Work:** Painting, applying wallpaper, bringing in, arranging and building furniture, placing and installing Tenant's Property and completing any other tasks necessary to prepare the Premises for Tenant's business.

nn) **Other Rent:** All sums, other than the Base Rent and Additional Rent, payable by Tenant to Landlord under this Lease. All Other Rent shall be separately invoiced by Landlord.

oo) **Patriot Act**: Defined in Section 28.16.

pp) **Permitted Use**: Operation of a hotel and any related uses (including operation of a short-term/extended stay rentals permitted under the hotel license) together with all uses incidentally or customarily related thereto, or that complement Tenant's business operations and services as presently conducted or as shall be conducted in the future, all as permitted by applicable Laws. Service animals and emotional support animals shall be permitted on the Project and the Premises.

qq) **Prevailing Market Rate:** The prevailing market rent per unit for comparable renewals recently executed for multifamily residential units of similar age, size, condition, and location, and with similar amenities as the Premises. The determination of Prevailing Market Rate shall take into consideration net versus gross lease; any differences in the size of space being leased, the location of space in the Building and the length of lease terms; the use of the Premises; any differences in definitions of rentable square feet or rentable area with respect to which rental rates are computed; the value of rent abatements, allowances, the creditworthiness of Tenant; the location and condition of the building, the location and condition of the Premises within the Building, and other pertinent factors. The Prevailing Market Rate may include an escalation of a fixed base rental rate (based on a fixed step or index) then prevailing in the market.

rr) **Privacy Laws:** Any and all federal, state and local laws, statutes, rules, ordinances, codes, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities that apply to the processing of personal information or a party's representations regarding its personal information processing activities, including, without limitation, the California Consumer Privacy Act of 2018 (California Civil Code §§ 1798.100 to 1798.199) and its implementing regulations, and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

ss) **Project**: The real property described on **Exhibit A-1** attached to this Lease and together with all improvements thereon and appurtenances thereto, and all other related areas.

tt) **Proprietary Materials**: All trademarks, trade names, trade secrets, distinct emblems, insignia, logos, slogans, distinguishing characteristics, copyright materials (including, without limitation, written or recorded material related to marketing), software applications and data (whether in tangible, electronic or oral

form), website URLs, central reservations systems, and information in written or tangible form that is indicated as being confidential, relating to Tenant or any of its affiliates, the business or affairs of Tenant or any of its affiliates, or any hotel or any rental property which Tenant or any of its affiliates owns or operates and manages (including all intellectual property connected with the Premises and developed or created by Tenant, or its affiliates, employees or agents) and including, without limitation, (i) Brand Name and Tenant Name, Tenant trade names and trademarks, (ii) operational manuals (including, without limitation, accounting, financial administration, personnel administration and policies and procedures manuals), (iii) corporate records of Tenant, (iv) software and other management programs developed by or on behalf of Tenant, notwithstanding any modification or alteration made for application at the Premises, (v) the operating and design standards of any hotel or rental property leased or operated by Tenant or any of its Affiliates and any materials relating thereto, (vi) business and marketing plans developed by Tenant, (vii) revenue management and forecasting data developed by Tenant and (viii) research, product plans, products, services, equipment, customers, markets, software, inventions, discoveries, ideas, processes, designs, drawings, hardware, formulations, specifications, product configuration information, prototypes, samples, data sets, equipment and all of Tenant's financial information, including finance documents.

uu)   **Punchlist Items**:  Minor details of construction and mechanical adjustments that do not interfere with Tenant's Onboarding Work.

vv)   **Renewal Notice:** Defined in Section 2.2.

ww)   **Rent:**  Collectively, Base Rent, Additional Rent, and all Other Rent.

xx)   **Rent Adjustment Date:** Defined in Section 3.2.

yy)   **Rent Adjustment Notice:** Defined in Section 3.2.

zz)   **Rent Commencement Date:**  The date that is the Commencement Date.

aaa)   **Restoration:** Repairing and restoring the Premises, the Building and/or the Project (as applicable) to substantially the same condition that existed prior to Tenant's Onboarding Work.

bbb)   **Retained Liabilities:** Collectively, all liabilities and obligations in connection with any Losses to the extent resulting from events or occurrences prior to the Commencement Date or  arising out of or related to ownership or operation of the Premises or Project prior to the Commencement Date.

ccc)   **Service Interruption:** an interruption to or material reduction of, failure to perform any, or any matter or condition that constitutes an interruption to, (i) Landlord's Services caused by the negligence or willful misconduct of a Landlord Party, or (ii) a material reduction of Tenant's and Authorized Parties' access to the Premises (subject to Article 11 of this Lease).

ddd)    **SNDA:** A subordination, non-disturbance and attornment agreement.

eee)    **Taking:** A taking by condemnation, eminent domain or similar legal action of a Governmental Authority.

fff)    **Tenant:** Defined in the Recitals.

ggg)    **Tenant Building Name**: Collectively, the Brand Name (whether used alone or with other words) and all other names, logos or designs owned by Tenant or its Affiliates and used in the marketing of the Premises or communication to Tenant's guests regarding the Premises (such as on tenant's website, in emails to guests, or other third party marketing materials), together with the goodwill appurtenant thereto.

hhh)    **Tenant Lender:** Any lender from which Tenant obtains financing.

iii)    **Tenant Party, and collectively, Tenant Parties**: Tenant, and its directors, trustees, members, partners, officers, agents, representatives and employees.

jjj)    **Tenant's Plans:** Plans and specifications for Tenant's Work in form reasonably satisfactory to Landlord.

kkk)    **Tenant's Property:** Tenant's trade fixtures, equipment and personal property.

lll)    **Tenant's Work:** Alterations or improvements to the Premises, the Project or any part thereof performed by Tenant during the Term.

mmm)  **Termination Date:** The date upon which the Lease is terminated by either party hereto pursuant to the express terms of the Lease.

nnn)    **Transfer:** Any assignment of this Lease or subletting of all or any part of the Premises.

ooo)    **Unit:** Each individual apartment comprising a part of the Premises.

ppp)    **Utilities:** Defined in Section 6.3.

qqq)    **Utilities Interruption:** an interruption to or material reduction of Utilities caused by the negligence or willful misconduct of a Landlord Party or which is within Landlord's reasonable control to cure.

rrr)    **Works**: Images, renderings, floorplans and other materials depicting the Project, including any high-resolution images.

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-883A-D894FE4633B2

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE PROJECT**

**LOTS 16 AND THE NORTHWEST 12 FEET OF LOT 17 IN BLOCK 1 IN UNION PARK ADDITION TO CHICAGO IN THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS**

Commonly known as: 1436 W. Randolph, Chicago, Illinois

PIN:        17-08-322-014-0000

**EXHIBIT A-2**

**DESCRIPTION OF THE PREMISES AND EXCLUDED PREMISES**





GROUND FLOOR PLAN



Premises

Common Area

B   A

STAIR 2

J.C.

AMENITY
341 SF

STUDIO
447 SF

STUDIO
438 SF

EXISTING 1 STORY
BUILDING

STUDIO
417 SF

ELEV.

STAIR 1

1 BED
710 SF

STUDIO
441 SF

STUDIO
361 SF

STUDIO
361 SF

STUDIO
361 SF

STUDIO
361 SF

STUDIO
361 SF

STUDIO
361 SF

STUDIO
361 SF

8

7

6

5

4

3

2

1

LEVEL 02
3/32" = 1'-0"

SECOND FLOOR PLAN

BRININSTOOL
+ LYNCH
©2021 Brininstool + Lynch, Ltd.



**EXHIBIT B**

**UNIT MIX**

| Bedroom Count | Kitchen Type | Bathroom Count | Quantity | Starting Rent | Approx. Rentable SF |
|---|---|---|---|---|---|
| 0 | Full | 1 | 45 | $1,475.00 | 350 |
| 1 | Full | 1 | 4 | $1,950.00 | 600 |

CHI – 1436 Randolph – Lease Definitions

# EXHIBIT C

## LANDLORD'S WORK

      I.1    <u>Landlord's Work</u>.  Landlord shall, at its sole cost and expense, plan, design and renovate the Premises, the hallways and areas exclusively serving the Premises in accordance with Sonder Design Standards which are attached hereto as **<u>Schedule 1</u>**, the Construction Documents (defined below), all applicable Laws, and the terms of this <u>Exhibit C</u> (collectively, "**Landlord's Work**"), and shall be responsible to apply for, obtain and maintain all required Construction Approvals.  Landlord shall cause the Landlord's Work to be performed with licensed contractors in accordance with all applicable Laws.  Landlord shall consult with Tenant and incorporate Tenant's reasonable input with respect to the design and furnishing of the Common Areas, provided that Landlord shall not be required to incur any additional cost as a result of incorporating Tenant's such input.

      I.2    <u>Design Document Submission</u>.  Landlord shall furnish to Tenant, for its review and approval, design documentation (the "**Design Document Submission**") prepared by Landlord's architect (the "**Architect**") in accordance with the submittal schedule to be attached hereto as **<u>Schedule 2</u>** (the "**Submittal Schedule**") at each phase of the design process, consisting of the following phases (each of which is hereinafter described in more detail): (a) Conceptual Design, (b) Schematic Design, (c) Design Development, and (d) Construction Documentation. Each Design Document Submission shall contain a deviation report (a form of which is included in the Sonder Design Standards) setting forth in detail any variances in the applicable Design Document Submissions from the Sonder Design Standards, any variances from any previously approved Design Document Submissions, as well as a proposed alternative thereto (a "**Deviation Report**").  The following deliverables (which shall be furnished to Tenant in digital form (PDF files and CAD/Revit files) and, upon Tenant's request, physical hard copies thereof) shall be submitted to Tenant (at a minimum) for each phase of the Design Document Submission, along with the deliverables required in the previous phase(s) of the Design Document Submission:

      I.2.1    Conceptual Design:  Deviation Report, feasibility analysis, programming, room and space sizes & quantities, spatial relationships, code and zoning analysis, and preliminary overall project schedule.

      I.2.2    Schematic Design:  Deviation Report, site plan, floor plans, key elevations, key sections, area analysis, rendering or model, preliminary cost budget, and the overall project schedule to be attached hereto as **<u>Schedule 3</u>** (the "**Overall Project Schedule**"). Landlord shall submit Schematic Design and Overall Project Schedule for Tenant review within 30 days from the Effective Date, subject to delays caused by Tenant.

      I.2.3    Design Development / Permit Set:  Deviation Report, outline specification, key interior elevations, reflected ceiling plans, interior finish schedules, key details, system consultants, structural, mechanical, electrical, plumbing, fire suppression and fire alarm, renderings, revised cost estimate. Landlord shall submit Design Development / Permit Set for Tenant review within 90 days from the Effective Date, subject to delays caused by Tenant.

I.2.4    Construction Documentation:  (i) Deviation Report, (ii) Permitted set and 100% Construction Documents, (iii) all finalized and complete site plans, floor plans, reflected ceiling plans, elevations, sections, interior elevations, all interior schedules (finishes, appliances, fixtures, lighting, plumbing and so forth), detailed construction drawings, and all consultant drawings, (iv) cost estimate, and (v) Overall Project Schedule with a detailed construction schedule. Landlord shall submit Construction Documentation for Tenant review within 90 days from the date that construction permits are received, subject to delays caused by Tenant or City of Chicago.

I.3    Approval Process.    Tenant shall have the right to review and either approve or disapprove each Design Document Submission furnished by Landlord within ten (10) business days following Tenant's receipt of such Design Document Submission.  If any of the Design Document Submission shall be disapproved by Tenant in any respect, Tenant shall state, in reasonable detail, the reasons for such disapproval, and Landlord shall revise the Design Document Submission as Tenant shall require and shall thereupon resubmit the same to Tenant for its approval within five (5) business days following receipt of Tenant's disapproval, and such procedure shall continue as set forth herein until such Design Document Submission is fully approved by Tenant.  All Design Document Submissions approved by Tenant shall be referred to herein as the "**Approved Design Documents**".  Any changes to the Approved Design Documents shall be subject to approval by Tenant, which approval shall not be unreasonably withheld or delayed and, in any event, shall be submitted to and reviewed by Tenant in accordance with the review and approval process set forth in this paragraph.

I.4    Changes to Approved Construction Documents.  Following Tenant's final approval of the Construction Documents (such Construction Documents approved by Tenant being the "**Approved Construction Documents**"), Landlord shall promptly, at its sole cost and expense, submit the Approved Construction Documents to the applicable Governmental Authority and obtain all necessary permits and approvals for the Landlord's Work (such governmental and quasi-governmental permits and approvals being hereinafter referred to collectively as the "**Permits**"). Landlord and Tenant acknowledge that the Governmental Authority may require modifications to the Approved Construction Documents prior to the issuance of the Permits. To the extent any such modifications are required by the Governmental Authority, Landlord and Tenant shall work together, in good faith, to timely approve any such modifications to the Approved Construction Documents.  If Landlord is required by the Governmental Authority to make any Material Deviation(s) (as hereinafter defined) to the Approved Construction Documents, Landlord shall notify Tenant in writing fully explaining the nature and necessity for such Material Deviation(s), and Tenant shall notify Landlord as to its approval or disapproval thereof within ten (10) business days after receipt of a request for approval.  The parties shall work together in good faith to resolve any disapproval received by Landlord. A "**Material Deviation**" shall consist of the following deviations from the Approved Construction Documents: (a) changes of five percent (5%) or more to the total square footage of any Unit or the Premises as a whole, (b) changes to the layout of the Units, the Premises or the Common Areas, (c) deviations from the Sonder Design Standards, or (d) changes to the number of rooms or the availability of any Amenities.  Landlord shall not otherwise modify the Approved Construction Documents in any manner that constitutes a Material Deviation without Tenant's prior written consent.  The date on which the Approved Construction Documents are approved by the Government Authorities and the necessary Permits are issued shall be the "**Building Permit Approval Date**".  Landlord shall endeavor to cause the Building Permit

Approval Date to occur on or before the date that is 135 days after the Effective Date (the "**Scheduled Building Permit Approval Date**"). If the Building Permit Approval Date does not occur on or before the Scheduled Building Permit Approval Date (subject to any delays actually caused by Force Majeure Event and Tenant Delay), then Tenant shall have the right to terminate this Lease upon no less than thirty (30) days' prior written notice to Landlord (the "**Building Permit Termination Notice**") delivered within thirty (30) days of the Scheduled Building Permit Approval Date, without payment of any termination fee, penalty or damages to Landlord, provided, however, if Landlord obtains the Permits prior to the termination date set forth in the Building Permit Termination Notice, then such Building Permit Termination Notice shall be deemed null and void, and this Lease shall continue in full force and effect. In the event of termination of this Lease pursuant to the preceding sentence, this Lease shall be cancelled and of no further force or effect, and the parties shall be released from any obligations accruing under this Lease first occurring after such termination date, provided that Landlord shall reimburse Tenant within thirty (30) days of Landlord's receipt of a detailed invoice therefor for the actual and reasonable expenses that Tenant incurred in connection with the Lease through the date of such termination, including reasonable attorney's fees, in an amount not to exceed, in the aggregate, the Agreed Reimbursement Cap. In the event Tenant fails to deliver Landlord the Building Permit Termination Notice within thirty (30) days of the Scheduled Building Permit Approval Date, Tenant's right to terminate the Lease pursuant to this Section I.4 shall be deemed waived and this Lease shall continue in full force and effect. Landlord shall furnish Tenant with a true, correct and complete copy of the Approved Construction Documents (including any modifications made thereto in accordance with this Section 1.4) approved by the Governmental Authority (the "**Permit Construction Documents**") within five (5) business days following the Building Permit Approval Date. Concurrently therewith, Landlord shall deliver to Tenant an updated construction schedule with a detailed critical path to deliver the Premises in the Final Completion Condition to Tenant by the Scheduled Final Completion Date (the "**Construction Schedule**") which shall be attached hereto as **Schedule 4**.

   I.5 Updates to Construction Schedule. Landlord shall commence Landlord's Work in accordance with the Construction Schedule and cause the construction of Landlord's Work to progress in accordance with the Construction Schedule. Following Landlord's delivery of the Construction Schedule in accordance with Section 1.4 above, Landlord shall provide weekly updates to the Construction Schedule until the Final Completion Date, each highlighting the critical path milestone completion dates that are required for Landlord to deliver the Premises in the Final Completion Condition by the Scheduled Final Completion Date and including certifications from Landlord and the Architect stating Landlord is on schedule to deliver the Premises in the Final Completion Condition by the Scheduled Final Completion Date in the form attached hereto as **Schedule 5**. If Landlord anticipates any delay in delivering the Premises in the Final Completion Condition by the Scheduled Final Completion Date, Landlord shall, at its sole cost and expense, provide to Tenant a recovery plan (and subsequent critical path schedule revisions) to ensure the progress of Landlord's Work is on track for Landlord to deliver the Premises to Tenant in Final Completion Condition by the Scheduled Final Completion Date. If Landlord anticipates the Final Completion Date to occur after the Scheduled Final Completion Date, Landlord shall have one-time right to update the Scheduled Final Completion Date by notifying Tenant in writing at least 120 days prior to the original Scheduled Final Completion Date so long as the updated Scheduled Final Completion Date is before the Outside Completion Date. Subject to Tenant's right to receive abatement of Rent and terminate the Lease as set forth in Sections 1.6 and 1.7 below, at Tenant's

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-883A-D891FE46633B2

request, Landlord and Tenant shall amend the Lease to update the Construction Schedule, and Landlord shall concurrently acknowledge in writing the amount of Rent abatement Tenant would be entitled to based on the updated Construction Schedule. Landlord hereby acknowledges that the nature of Tenant's operations requires Tenant to plan well in advance for the commencement of its operations in the Premises and that Tenant shall have no obligation to take possession of any portion of the Premises until the Premises are delivered in the Final Completion Condition.

I.6     Construction Commencement Delay.     Landlord shall commence the construction of Landlord's Work no later than the date that is 225 days following the Effective Date (the "**Scheduled Construction Commencement Date**"). In the event Landlord fails to commence the construction of Landlord's Work on or before the Scheduled Construction Commencement Date, Tenant shall receive abatement of Rent in an amount equal to one (1) day of Base Rent for each day that the commencement of the construction of Landlord's Work occurs after the Scheduled Construction Commencement Date, which abatement shall be in addition to any other abatement right granted in this Lease. In the event Landlord fails to commence the construction of Landlord's Work within thirty (30) days following the Scheduled Construction Commencement Date, subject to any Force Majeure Event and Tenant Delay, Tenant shall have the right to terminate this Lease at any time thereafter by providing no less than thirty (30) days' prior written notice to Landlord (the "**Termination Notice**") without payment of any termination fee, penalty or damages to Landlord, provided, however, if Landlord commences the construction prior to the termination date set forth in the Termination Notice, then such Termination Notice shall be deemed null and void, and this Lease shall continue in full force and effect. In the event of termination of this Lease pursuant to the preceding sentence, this Lease shall be cancelled and of no further force or effect, and the parties shall be released from any obligations accruing under this Lease first occurring after such termination date, provided that Landlord shall reimburse Tenant within thirty (30) days of Landlord's receipt of a detailed invoice therefor for the actual and reasonable expenses that Tenant incurred in connection with the Lease through the date of such termination, including reasonable attorney's fees, in an amount not to exceed, in the aggregate, the Agreed Reimbursement Cap. The Scheduled Construction Commencement Date shall be extended on a day-for-day basis for any delays actually caused by Force Majeure Event and Tenant Delay (as hereinafter defined). As used in this Exhibit C, "**Tenant Delay**" shall mean a delay in the performance by Landlord of Landlord's Work as a result of: (a) Tenant's failure to approve, disapprove, provide comment or otherwise respond to a request for plan approval within the express time provisions set forth in this Exhibit C, (b) Tenant's request for a change order to the Permit Construction Documentation which directly results in a delay in Landlord's Work, (c) any interference by Tenant with Landlord's Work other than during the Onboarding Access Period as set forth in Section 2.3, or (d) any other delay in the completion of the Landlord's Work caused directly by the negligence or willful misconduct of Tenant or any employee, agent, contractor, or invitee of Tenant. For purposes of this Exhibit C, a Force Majeure Event shall only extend the Scheduled Construction Commencement Date if Landlord notifies Tenant of any Force Majeure Event actually affecting the Landlord's Work within ten (10) days after the occurrence of such Force Majeure Event, and a Tenant Delay shall only extend such dates if Tenant fails to cure any event (or retract a change or request, if applicable) causing such delay within forty-eight (48) hours following receipt of Landlord's written notice thereof. In the event of any delay in the construction of Landlord's Work compared to the Construction Schedule, Landlord shall promptly provide to Tenant a recovery plan (and subsequent critical path schedule revisions) to ensure the progress of

Landlord's Work is on track for Landlord to deliver the Premises to Tenant in the Final Completion Condition by the Scheduled Final Completion Date.

I.7    Final Completion Delay.    Landlord shall achieve the Final Completion Condition by the Scheduled Final Completion Date. If Landlord fails to deliver the Premises in the Final Completion Condition to Tenant within thirty (30) days after the Scheduled Final Completion Date for any reason (subject to any delays actually caused by a Force Majeure Event or Tenant Delay), Tenant shall receive abatement of Rent in an amount equal to one (1) day of Base Rent for each day that the delivery of the Premises in the Final Completion Condition occurs after such date, which abatement shall increase to an amount equal to two (2) days of Base Rent for each day that the delivery of the Premises in the Final Completion condition occurs after sixty (60) days following the Scheduled Final Completion Date, and such abatement shall apply immediately following the Commencement Date (and the Rent Abatement Period shall be tolled until any abatement provided under this Section 1.7 has been applied in full, so that Tenant shall have the full benefit of the Rent abatement set forth in this Section 1.7 and the Rent Abatement Period).    In the event Landlord fails to deliver the Premises to Tenant in the Final Completion Condition on or before the Outside Completion Date, Tenant shall have the right to terminate this Lease upon no less than thirty (30) days' advance Termination Notice to Landlord without payment of any termination fee, penalty or damages to Landlord, provided, however, if Landlord delivers the Premises to Tenant in the Final Completion Condition prior to the termination date set forth in the Termination Notice, then such termination notice shall be deemed null and void, and this Lease shall continue in full force and effect. If Tenant terminates this Lease pursuant to this Section 1.7, Landlord shall, reimburse Tenant within thirty (30) days of Landlord's receipt of a detailed invoice therefor for the actual and reasonable expenses that Tenant incurred in connection with the Lease through the date of such termination, including reasonable attorney's fees, in an amount not to exceed, in the aggregate, the Agreed Reimbursement Cap, and this Lease shall be void and of no further force or effect, and neither party shall have any further obligations under this Lease, except for Landlord's obligation to so reimburse Tenant and for such obligations which expressly survive the termination of this Lease. The Scheduled Final Completion Date shall be extended on a day-for-day basis for any delays actually caused by Force Majeure Event and Tenant Delay.

I.8    Inspections; OAC Meetings.    Landlord shall notify Tenant of any OAC (Owner, Architect, Contractor) meetings among the Architect, Landlord and its contractors at least five (5) days prior to such meetings, and Tenant shall have the right to attend all such OAC meetings.    Upon reasonable prior written notice to Landlord, provided Tenant does not interfere with Landlord's Work, Tenant or any of its employees, agents or contractors (a) may inspect the Project when Tenant attends an OAC meeting and at least monthly commencing on the Scheduled Construction Commencement Date, and (b) shall have continuous early access to the Project commencing on the date that is 120 days prior to the Scheduled Final Completion Date. On or before such early access commencement date, Landlord shall provide to Tenant as-built plans with a Deviation Report (identifying any deviations from the Permit Construction Documents). Such inspection will be conducted for the sole purpose of determining if the Landlord's Work is being performed in conformance with Permit Construction Documents and this Lease, and Tenant shall use reasonable efforts to minimize interference with Landlord's Work during such inspection. Tenant's inspection of the Landlord's Work (or failure to object to the condition thereof) shall not be deemed to waive any of Landlord's obligations to deliver the Premises in the Final Completion Condition.    To the extent that Tenant reasonably determines during construction of Landlord's

Work or at any point thereafter that any part of Landlord's Work is not in material compliance with the Permit Construction Documents or this Lease, Landlord shall, upon receipt of a written notice thereof from Tenant, cause its contractor to expeditiously correct such non-compliance at Landlord's sole cost and expense.

I.9    Mechanics' Liens.  Landlord shall timely pay when due all bills for labor, services, materials, equipment and any other costs incurred in connection with the Landlord's Work, except to the extent any such costs are expressly required to be paid by Tenant under this Lease.  If any construction, mechanic's lien or other lien is filed against the Project by reason of work performed or equipment or materials supplied at the request of Landlord, and no action of Tenant caused the creation of such lien, then Landlord shall promptly cause any such lien to be released or bonded over.

I.10    Warranties.  Landlord shall cause Landlord's contractors and subcontractors to warrant all of their labor, materials and work performed at the Premises to be free of defect for a period of at least one (1) year after the Completion (as hereinafter defined) of such work, and such warranties shall be of the type and nature that a commercial property owner customarily receives in connection with commercial construction projects that are substantially similar to Landlord's Work on properties of the size, type, quality, and geographic location as the Project. Landlord shall use commercially reasonable efforts to enforce such warranties as reasonably requested by Tenant.  Prior to the expiration or termination of this Lease, Landlord shall not assign or encumber such warranties except pursuant to a sale or other transfer, financing, or refinancing of the Project.

I.11    Punchlist Items.  Punchlist Items include both an OAC Punchlist and a Sonder Punchlist.  No less than thirty (30) days prior to the Final Completion Date, Landlord shall prepare with the Architect and its contractor an initial list of Punchlist Items (each, an "**OAC Punchlist**").  The date of preparation of the OAC Punchlist shall be referred to herein as a "**OAC Punchlist Commencement Date**."  Landlord shall use commercially reasonable efforts to diligently and expeditiously cause all of the Punchlist Items identified on such OAC Punchlist to be completed to the reasonable satisfaction of Tenant within two (2) weeks following such OAC Punchlist Commencement Date.  Upon completion of the OAC Punchlist, Landlord shall provide to Tenant a certificate from the Architect stating all the Punchlist Items identified on the OAC Punchlist have been completed.  Upon receipt of such completion certificate, Landlord and Tenant shall together conduct another walk-through and identify any outstanding Punchlist Items on a revised Punchlist (each, a "**Sonder Punchlist**").  The date of such walk-through shall be referred to herein as a "**Sonder Punchlist Commencement Date**."  Landlord shall use commercially reasonable efforts to diligently and expeditiously cause all of the Punchlist Items identified on the Sonder Punchlist to be completed to the reasonable satisfaction of Tenant within ten (10) days following such Sonder Punchlist Commencement Date or as soon thereafter as is reasonably practicable given the nature of the Punchlist Items (the end of such ten (10) day period shall be referred to herein as the "**Sonder Punchlist Completion Deadline**").  If Landlord fails to complete such Punchlist Items to the reasonable satisfaction of Tenant on or before the Sonder Punchlist Completion Deadline, then, Tenant shall have the right to abate the Base Rent for the Units affected by any such outstanding Punchlist Items on a per-diem basis for each day after the Sonder Punchlist Completion Deadline until such incomplete Punchlist Items are completed to the reasonable satisfaction of Tenant.

As used in this <u>Exhibit C</u>, "**Complete**" or "**Completion**" shall mean, with respect to the entirety of Landlord's Work, the construction of such Landlord's Work, as certified by the Architect on an AIA standard form certificate of final completion, has been completed in accordance with the Permitted 100% Construction Documents, the final applications from contractors performing Landlord's Work have been fully approved by Landlord and, subject to Tenant's completion of Onboarding Work, Tenant can use and occupy the Premises for the purposes and uses for which the Premises are intended hereunder.

As used in this <u>Exhibit C</u>, "**Permitted 100% Construction Documents**" shall mean final plans, specifications, contracts and other related documents necessary for the commencement of construction of Landlord's Work.

Notwithstanding anything in this <u>Exhibit C</u> or the Lease to the contrary, either Landlord or Tenant may terminate this Lease by delivering written notice to the other party within sixty (60) days after the Effective Date, without payment of any termination fee, penalty or damages to the other party, in the event that the parties are unable to reasonably agree upon any design elements for the Premises or the costs relating thereto within such period, and in such event neither Landlord or Tenant shall have any further liability hereunder (except for any obligations which expressly survive the termination of this Lease).

**<u>SCHEDULE 1 TO EXHIBIT C</u>**

**SONDER DESIGN STANDARDS**

(to be attached)

**SONDER Design Standards**
**2/22/2021**

All information contained in these Design Standards is confidential and proprietary. By receipt and use of these Design Standards, the recipient agrees not to disclose any of the information herein to any third parties and shall only use such information in order to evaluate or engage in discussions concerning a project with Sonder. Without limiting the generality of the foregoing, the recipient agrees not to use this information in any manner detrimental to the interest of Sonder, including, without limitation, by disclosing such information to a competitor of Sonder. For the avoidance of doubt, these Design Standards shall be deemed confidential information pursuant to any non-disclosure agreement or other confidentiality agreement agreed to between the recipient and Sonder.

All USCS to Metric Units conversions are done as exact conversions from USCS to Metric, rounded to the nearest 10 millimeters (when >99mm). The conversions do not take simplicity of metric units or customary EU construction product sizes into account.

| 100 - General Requirements | |
|---|---|
| **100.00** | **Code, Performance and Construction Requirements** |
| A. | This document is not intended to be provide complete design solutions to project specific situations. These are the standards by which to guide design. Each project is unique and custom by nature of typology and location where deviations from the criteria may be required. Exceptions to these Design Standards must be discussed with and approved by Sonder. For all projects the Landlord must submit Deviation Report and any Exceptions for approval for any item not in compliance with this document. |
| B. | Reference to Building Code: The International Building Code (IBC) is a model building code developed by the International Code Council (ICC). It has been adopted for use as a base code standard by most jurisdictions in the United States. The IBC addresses both health and safety concerns for buildings based upon prescriptive and performance related requirements. The IBC is fully compatible with all other published ICC codes. The code provisions are intended to protect public health and safety while avoiding both unnecessary costs and preferential treatment of specific materials or methods of construction. |
| C. | All buildings must meet or exceed jurisdictional code requirements. It is the owner's responsibility to comply with all regulations, laws, and codes. Sonder Design Standards are not to supersede requirements of the Governmental Agency or any Authority Having Jurisdiction (AHJ). When in conflict, it must be brought to the attention of Sonder and the most stringent requirements prevail. |
| D. | "Landlord's Work" references scope of work as defined as landlord's responsibility by the lease. |
| E. | Landlord and their Architect of Record (AOR) and Engineer of Record (EOR) and their professional consultants are responsible for code compliance and adherence to all regulations and laws. |
| F. | Landlord and their General Contractor (GC) are responsible for delivering work in compliance with the Contract Documents, Federal, Local and all AHJ. Landlord is responsible to notify Sonder of any discrepancies. Landlord is responsible for all permits required for Landlord's Work, inspections, and approvals as required by Authorities Having Jurisdiction (AHJ) and all related costs and fees. Landlord will provide all the project's permits. |
| **100.01** | **Building and Construction Typology** |
| A. | Sonder's portfolio welcomes:<br>i. New Construction, Existing Building, Renovation, Historic and Adaptive Reuse<br>ii. Diverse Market/Location and Real Estate Nuance |
| **100.02** | **New Construction vs. Renovation (or Other)** |
| A. | Sonder Standards have been developed to provide Landlords with a guide for the minimum requirements needed to ensure exceptional Guest Experience and calls out particular standards that impact our mission. An exhaustive list of requirements for design and experience should be developed in partnership with the project specific Architect, Engineer and Construction (AEC) team to meet the particularities of your project location, typology and scale. New Construction projects should fully comply with Sonder Standards with minimal deviations, whereas Renovations and other such typologies may have more exceptions granted due to existing conditions due to the limitations of building upgrades compared with new construction. |
| **100.02** | **Code: Building Occupancy** |
| A. | The Landlord and their project specific Architect of Record (AOR) must determine the specific Building Occupancy requirements for all areas of the building, without limitation, the residential use portion of the building with the determination of R1 versus R2 code compliance and all other occupancy uses. |
| **100.03** | **Coordination: Design, Construction and Operations** |
| A. | All products and systems must be thoroughly coordinated with each other and complete with all fixtures, hardware, trim, and accessories including but not limited to:<br>Architecture, Structure, Mechanical, Electrical, Plumbing,Technology Infrastructure, Security, Audio Visual, Low Voltage, Fire Alarm, Fire Suppression. All fixtures, hardware, trim, and accessories; installation includes fixture installation, all mechanical, electrical/AV/LV/Security and plumbing connections to below-floor, and in-wall/ceiling infrastructure as required. |

| | | |
|---|---|---|
| | B. | Complete installation, including all labor, supervision, materials, equipment, tools, apparatus, transportation, warehousing, hoisting, rigging, staging, scaffolding, and other equipment and services necessary to accomplish Landlord's Work in accordance with the intent and meaning of the project documents. All demolition as required to properly and completely accomplish Landlord's Work. Include all patching as required for complete system. |
| | C. | All components, accessories, trim, moldings, and other materials required to produce a complete, finished system or building consistent with the intent of the design, lease, and project documents. |
| | D. | Landlord shall deliver the property fully watertight. Including, but not limited to, roof, all assemblies, openings, penetrations and building systems. All waterproofing, sealing, caulking and fire caulking as required for complete and compliant assembly. Water damage is unacceptable and must be remediated by Landlord. |
| | E. | To ensure full design coordination one mock-up room, or approved equal, must be completely finished per agreed design and approved by Tenant. |
| 100.04 | **Documentation** | |
| | A. | Drawings: Format: RVT, DWGs and PDF including but not limited to:<br>Architecture, Civil, Landscape, Interior, Structure, Mechanical, Electrical, Plumbing,Technology Infrastructure, Security, Audio Visual, Low Voltage, Fire Alarm, Fire Suppression<br>-Existing Buildings (EB): Full set of As-Built. 100% Construction Documents & Permit Set. Include all information pertaining to demolition and any portion of building and materials to remain.<br>-New Construction (NC): Full set of pre-construction drawings depending on phase; Conceptual, Schematic, Design Development, (%)Construction Drawings and Permit Set. Submittal of updated drawings are required at each phase in accordance with the lease. |
| | B. | Project Manual and Specifications:<br>i. All projects require submittal of existing and/or in development Project Manuals and Specifications.<br>ii. Submittal of updated Project Manuals and Specifications are required at each phase.<br>iii. Final specifications are to be reviewed and approved by Sonder in compliance with current Sonder Design Standards. |
| | C. | Warranty, Operations & Maintenance:<br>Close-out Submittals Requirements: Keys, Spare Parts/Attic Stock of Materials, Operation & Maintenance Information for all Finishes, Fixtures, and Equipment in building, Manufacturer(s) and Material(s) guarantees and warranties for all of Landlord's Work, Records and Logs of all Testing, Commissioning, & Operational Inspections, Permits, and As-Built Record Drawings/Specs/Changes. Proof of Insurance for all installers that remains in full effect during warranty period.<br>[See Appendix doc xxx: "Facilities Doc" for full requirements]. |
| | D. | Schedule:<br>i. Landlord shall submit full Project Schedule/ Real Estate Development schedules updated at key phases and milestones<br>ii. Schedules: All Schedules must include a detailed critical path to deliver the Premises in the Final Completion Condition to Tenant by the Scheduled Final Completion Date.<br>iii. Projects with design phases require detailed dates for the start and completion of Conceptual Design, Schematic Design (SD), Design Development (DD), Construction Documents (CD) and Permitting.<br>iv. Projects with construction activity require submittal of a Construction Schedule with all key activities, phases and milestones clearly defined.<br>v. Submittal of updated Construction Schedule is required weekly<br>vi. Access to Project Management Software for collaboration |
| | E. | Project Management Software System: Tenant uses Procore for Project Management. Landlord may be required to use Procore for project communications including but not limited to punchlists, RFIs, and submittals. Login to Procore will be provided to Landlord by Tenant at no cost to Landlord. |
| 100.05 | **Summary of Work** | |
| | A. | Scope of work includes all products, components, systems, assemblies, fixtures, etc…for an all inclusive project. If a standard, requirement or specification is not specifically referenced in any Sonder material this does NOT exclude it from the scope of work. When further clarification is required a Request For Information (RFI) will be issued. |
| 100.06 | **Alternates & Substitutions** | |
| | A. | i. Alternates, Substitutes and any Deviations from these Standards are to be submitted, discussed, and approved utilizing Sonder's Deviation Report.<br>ii. Submit Sonder Deviation Report for review and approval. |
| 100.07 | **Project Coordination** | |
| | A. | Projects with Construction:<br>i. Participation during preconstruction and construction required<br>ii. Attendance during OAC (Owner, Architect, Contractor) meetings and/or otherwise agreed upon coordination meetings |
| 100.08 | **Owner vs. Sonder Furnished Products** | |
| | A. | Sonder assumes ALL items to be furnished by owner unless expressly excluded by owner and included by Sonder in writing. Including all products, components, systems, assemblies, fixtures, etc. |
| 100.09 | **Closeout Procedure** | |
| | A. | [See Facilities Management docs for full requirements] |
| 100.10 | **Warranties** | |
| | A. | [See Facilities Management docs for full requirements] |

## 101 - General Criteria

| 101.01 | **Acoustical- STC (Sound Transmission Class) Rating** |
|---|---|
| A. | Location: guestroom, corridor, amenities, small public spaces, meeting spaces, service areas and offices.<br>55 STC rating for wall, and floor/ceiling assemblies min. 60 STC rating preferred. |
| B. | Location: Guestroom walls adjacent to elevators and stairwells<br>60 STC rating for wall, and floor/ceiling assemblies min. |
| C. | Location: Guestroom walls adjacent to the following locations: Laundry rooms, large public spaces, and restaurants.<br>65 STC rating for wall, and floor/ceiling assemblies min. |
| 101.02 | **Acoustical- Impact Sound Insulation Criteria - IIC Rating** |
| A. | Guestroom floor-ceiling assemblies meet a design rating of IIC 60, preferred and IIC 57, min. |
| 101.03 | **Acoustical- Sound Reduction Underlayment- Flooring** |
| A. | Flooring Installed with sound attenuating underlayment to meet or exceed Design Standards throughout |
| 101.04 | **Cleanliness - Odors** |
| A. | No detectable extraneous odors including smell of tobacco, mold, mildew, organic materials, etc. |
| B. | No odors caused by chemical or organic off-gassing caused by materials, machinery/equipment or processes. |

## 200 - Design - General

| 200.00 | See Appendix : "Look & Feel" for additional requirements |
|---|---|
| 200.01 | **Ceiling Height** |
| A. | Ceiling Height 9'-0" / 2.74 m, min. Higher ceilings preferred. |
| B. | Ceiling height of soffits or lowered ceilings (such as bathrooms) to be 8'-0" / 2.44 m, min. |
| 200.02 | **ADA Summary and Accessibility Compliance** |
| A. | All construction work shall be performed in accordance with the new construction standards of the Americans with Disabilities Act (ADA) and State and Local accessibility codes and as applied to R-1 Occupancy for Hotels. |
| B. | If parking is made available for Sonder's use, at least 5% of the parking, rounded up to the nearest number of whole parking spaces, shall be accessible, with a slope of not more than 2% in any direction. |
| C. | There shall be an accessible path of travel from the public sidewalk and the accessible parking (if applicable) to an accessible entrance to the building. Accessible paths of travel shall not have stairs or excessive slopes and shall be at least 36 inches wide. |
| D. | There shall be an accessible path of travel from the accessible entrance to all common areas of the building for use by Sonder. Accessible paths of travel shall be free of stairs or excessive slopes as defined by relevant law. |
| E. | Where code does not already dictate, 5% of guestrooms for use by Sonder shall be accessible guestrooms, min. |
| F. | Hallways in accessible guestrooms shall be at least 36 inches wide (at least 48 inches wide in California), or wider if required by relevant jurisdictionally specific regulations. |
| G. | Accessible guestrooms shall have at least one accessible bathroom that meets or exceeds all accessible clear space requirements not obstructed by fixtures or walls. |
| 200.03 | **Accessibility Compliance (Non-USA)** |
| A. | Compliance with all accessibility laws and regulations applicable to each jurisdiction. |
| 200.04 | **Circulation** |
| A. | Stairs and ramps to meet or exceed ALL code requirements including but not limited to:<br>Guardrails, handrail and handrail extensions, Width and rise/run, Clearances, Striping providing clear visual contrast, Landing size, Clearance from obstructions, Clearance from Standpipes other requirements located in stairwells, HVAC, Class "A" flame spread rating for all finishes |
| 200.05 | **Site Work - Sidewalks / Driveways** |
| A. | Primary landscaped areas must be generous in scale and concentration, and must be placed adjacent to the entrance drive, the primary entrance and other guest entrances, and all areas used for public functions. |
| 200.06 | **Exterior Screens** |
| A. | Provide Privacy Screening with design elements such as screens and/or gates to delineate between common and private space. The privacy and security of all Ground Level and Courtyard spaces, and Guestrooms adjacent to BOH or amenities is critical. |
| B. | Provide Privacy Screening with design elements such as landscaping and/or screens to block undesirable views such as parking, refuse/trash dumpsters, storage or equipment. |

## 201 - Design - Guestrooms / Units

| 201.00 | **Guestrooms / Units** |
|---|---|
| A. | A window is required in all Guestrooms and/or Units. |
| 201.01 | **Bedrooms & Rooms with Sleeping** |

| | |
|---|---|
| A. | Layouts vary extensively and 201.01B and 201.01C clarifies what Sonder defines as a Bedroom. To avoid conflict clearly call out which rooms meet the following definitions. |
| B. | Rooms classified and counted as "Bedrooms":<br>i. Provide natural light via an opening: window and/or door with glazing directly facing the Exterior of the Building. Rooms with Clerestory Windows, side lights or other forms of light "borrowing" are defined in 201.01.C<br>ii. Door and walls to ceiling for privacy |
| C. | Rooms classified and counted as "Flex Space" where sleeping is allowed.<br>i. Do not meet the requirements per 201.01.A.<br>ii. Dens, loft spaces, offices, nooks, and embedded rooms that are classified as "Flex Space" shall not be classified or counted as "Bedrooms" unless approved by Sonder. This includes rooms that utilize borrowed light through adjacent rooms via interior window, panels, doors or other openings. |
| | |
| **201.02** | **Solid Backing** |
| | All items that hang, are mounted or are not freestanding from any wall, ceiling, door or other must anchor into solid backing and use appropriate hardware for the size and weight of item to ensure structural integrity. This must not only prevent structural failure but prevent sagging or any other aesthetic or operational issue. Documentation from a licensed engineered may be required. |
| **201.03** | **Storage - Closets** |
| A. | Bedroom, located within room (inside dimensions):<br>i. One 3'-0" (914mm) wide x 2'-0" (610mm) deep, min.<br>Flex Rooms/ other areas that may have additional sleeping:<br>i. One 3'-0" (914mm) wide x 2'-0" (610mm) deep, or proportional to additional space provided for additional sleeping areas |
| B. | Entry closet (inside dimensions): 2'-0" (600mm) width x 2'-0" (600mm) depth, min. |
| C. | Hanging rod in each closet. |
| D. | All Closets require light - with automatic on/off functionality, triggered either by motion or by closet door. |
| **201.04** | **Guestroom Kitchen - (**where applicable) |
| A. | Layouts and size vary extensively depending on unit and building typology. To avoid conflict the following criteria shall be applied. For additional information regarding the appliances and equipment see Division 11 of this document. |
| B. | Kitchen A - Full Size Kitchen. Full Size Appliances include: Refrigerator, 4+Burner Stovetop, Oven, Exhaust Hood, Dishwasher and Microwave. Undermount Kitchen Sink w/ Garbage Disposal. Ample storage with upper and lower cabinets and drawers. Countertop space shall be proportional to size of the unit and must exceed 6'-0"/1.83 m min. |
| C. | Kitchen B - "Micro-Kitchen"/ Studio Kitchen: Refrigerator, Sink, Microwave, single or double countertop cooktop, Exhaust hood. May have other appliances. Appliances that are not Full-Size may be accepted. Submit for approval. |
| D. | Kitchen C - "Kitchenette": Refrigerator, Sink, Microwave. May have other appliances. Proportional storage and countertop for the size of room and maximum number of expected occupants. |
| E. | Kitchen D - Equipment or Hotel Amenity: Mini-refrigerator and Microwave. |
| **201.05** | **Guestroom Bathrooms - Finishes** |
| A. | Flooring – Natural stone, porcelain or ceramic tile. Min. thickness 3/8" / 9.5mm |
| B. | Wall Base –  Natural stone, porcelain or ceramic tile. Min. height 3"/76 mm |
| C. | Threshold - Single piece - natural stone, quartz composite or transition strip (i.e. Schluter). Not required if tile continues past bathroom door. |
| D. | Walls - Back painted/laminated toughened glass, ceramic or porcelain tile, natural stone, paint (non-wet areas only). Moisture-resistant wallboard must be used on all plumbing walls. |
| E. | Ceiling – Ceiling must be moisture resistant gypsum board with smooth, painted finish. Bathroom ceilings must have min. height of 8'-0"/2.44 m, higher is preferred. When automatic suppression systems are required concealed type sprinkler heads must be utilized. |
| F. | Tub/Shower Surrounds - Porcelain or ceramic tile, full-panel natural stone with reinforced backing, natural stone tile. Fiberglass, acrylic, plastic or similar materials are not permitted. Surround panels must have a finished edge. For shower-only set-ups, an integrated amenity shelf is required. |
| G. | Plumbing Fixtures – All fixtures must coordinate in material, color, and design. |
| H. | Hardware, Accessories, and Controls - All fixtures, trim, exposed drain lines, grab bars, and accessories must be non-corrosive and coordinate in material, color, and design. The following finishes for metal type hardware are acceptable: satin nickel, polished chrome, polished stainless steel, polished brass, antique brass, or matte black. |
| **201.06** | **Guestroom Bathrooms - Fixtures** |
| A. | Shower Dimensions – Shower pan dimensions 60"/1.52 m x 36"/914 mm, typical. |

Sonder Standards - PDF - 02.22.21

| | |
|---|---|
| B. | Shower Pans and Flooring – All shower pans and flooring must have an integral slip-resistant surface on the bottom of the well meeting ASTM F462-79 (2007) Slip-Resistant Bathing Facilities (www.astm.org).<br>Cast iron pans with: An acid-and scratch-resistant enameled finish on a single one-piece, sand-cast base with integral apron. Single-piece cast engineered stone pan with: Non-porous through body color material without gel coat or topcoat finishes. Must contain a min. of 60% natural stone materials. Solid surface resin must be premium grade, NPG-isophthalic (ISO), UV inhibited acrylic based polyester resin. Must feature a tile flange anywhere that wall meets the pan. Tile flange must be watertight and must not be thicker than 3/16" / 5mm. Must be leveled and supported.<br>Tile: Tile shower floors are acceptable contingent on approval by Sonder Design.<br>Unacceptable shower pans: Fiberglass, plastic, acrylic and any prefabricated shower stalls. |
| C. | Shower Enclosure - Shower enclosures must be clear or frosted glass - tempered or laminated safety glass. All hardware must withstand a wet environment. Sliding door should be on an approved decorative barn door track without a bottom track. Swinging door must not conflict with other doors. Shower door must clear a floor mat when opened and swing out. |
| D. | Bathtub Dimensions - Bathtub dimensions of 60" / 1.52 m x 36" / 914 mm, typical. 72" / 1.83 m x 36" / 914 mm, preferred. |
| E. | Bathtubs – All bathtubs must have an integral slip-resistant surface on the bottom meeting ASTM F462-79 (2007) Slip-Resistant Bathing Facilities (www.astm.org).<br>Cast iron bathtubs with: An acid-and scratch-resistant enameled finish on a single one-piece, sand-cast base with integral apron. Porcelain-on-steel composite bathtubs with: An acid-resistant enameled finish on a min. .0598"/1.5 mm gauge thickness, one-piece, steel-formed bathtub with an integral apron and an acrylic-composite backing on the underside of the bathtub. Porcelain-on-steel (POS) bathtubs with: An acid-resistant enameled finish on a min. .0598"/1.5 mm thickness (16-gauge), one-piece, steel-formed bathtub with an integral apron. Bathtubs materials such as Fiberglass, acrylic, plastic are unacceptable. Bathtub liners, applied bath mats or strips are unacceptable. Existing bathtubs must be resurfaced or recoated. |
| F. | Shower Rod - Rod must be round tube and must not rotate within the mounting bracket. Rod must be mounted 6'-8"/2.03 m above the finished floor to the centerline of the rod, vertically centered on back side of bathtub edge, and permanently secured. Blocking is required to securely fasten to wall. |
| G. | Shower Heads - Provide an overhead rain shower head and/or handheld shower head, located on an adjustable vertical bar. Shower Head includes flow rate restrictor providing a maximum flow of 2.5 GPM(Gallons per Minute)/9.5 LPM (Liters per Minute) at min. delivered water pressure of 30 PSI/2.1 bar. Shower Heads/hand showers rated at or below 2.0 GPM/7.6 LPM must comply with min. performance standards for low flow heads similar to US EPA Watersense listings. |
| H. | Toilet - Provide a 1.6 gallons per flush/6.06 liters per flush (maximum), tank type, vitreous china toilet. Toilets must have a commercial grade, closed-front, solid plastic seat with cover. Stainless steel hinges required with slow-closing feature preferred. The color of seat and lid must match the fixture. |
| I. | Vanity Faucets - Provide commercial grade faucets. Fixtures must be plated or solid brass with replaceable cartridges, as manufactured by nationally known manufacturers. Lever handles must not have exposed screws. Lever-activated/lift rod/pop-up waste stoppers are required. All faucets must have a min. 1.2 GPM/4.5 LPM aerator. |
| J. | Vanity Base - Vanities are wall-mounted and extend wall to wall or are supported by legs and held free of the sidewalls. Cantilevered or floating vanities are permitted with Construction and installation specs approved. Legs, when used, must have a non-corrosive metal cap at the bottom of the legs. Aprons are allowed. If of wood construction, must have a catalyzed waterproof finish. Vanity tops, sides (when wall-to-wall vanities are provided) and backsplash must be a min. of 3/4"/19 mm thick granite, engineered stone, glass (semi-frosted underneath) or approved alternative and be stain resistant. All tops must have a 4"/100 mm backsplash unless wall tile is used. Substrates for vanity tops must be a ¾"/ 19 mm thick with a nine-ply moisture resistant wood ply-core with MR glue line or a ¾" /19 mm marine grade plywood. |
| K. | Bathroom Accessories – Required bathroom accessories include: toilet paper holder; a min. of one 18"/460mm towel bar or two towels hooks within close proximity to the shower (Shower door handle can be incorporated as a towel bar); and a 18"/480mm towel bar or 6"/150 mm towel ring immediately adjacent to vanity. |
| L. | Mirror – Provide a mirror over the vanity. Mirror may have integral lighting and be frameless. There must be no visible clips or fasteners. Must be installed with tamper-proof wall mounts. Integral lit and backlit mirrors must have the entire mirror UL approved and labeled, not just the components. |
| M. | Vanity Lights – Backlit mirrors may require additional vanity lights to provide ample lighting. Lights must be UL listed for damp locations. Integrated bulbs are not permitted. |
| **201.07** | **Guestroom Bathrooms - Finishes** |
| A. | Exhaust - The guestroom bathroom area must be mechanically exhausted to the exterior. Re-circulating-type exhaust is not acceptable. If individual exhaust fans are used, select for maximum inlet noise level of 2.0 sones per AMCA Standards at design air flow and static pressure. If a central exhaust fan is used, design for standard noise levels within the Guestrooms. Provide separate wall switch for exhaust fan. |
| B. | Stoppers - Provide metallic, mechanical lift type operated stoppers from the overflow or twist and lift stoppers. |
| C. | Bathtub/Shower Valves and Controls - Valve must be anti-scald, pressure and/or thermostatic automatically compensating mixing valve. Construction must include integral stops, high temperature limit adjustment and replaceable cartridges. Brass/Bronze construction required for the main body and internal piston. Lever operation of the valve is required for manual valves. Unless integral diverter is provided as part of the mixing valve, a lift knob for shower diversion must be located on top of the bath spout. Comply to ASME A112.18.1/CSA B125.1 and ASSE 1016. |
| D. | Water Supplies - Each hot and cold water supply must have an individual shut off valve. |
| E. | Shower Head - Rough-in for the shower head must be 6'-10"/2.08 m to 7'-0"/2.13m above the finished floor. Exception: shower heads on an adjustable bar/rail, in which case the bottom of the Shower Head must reach at least 6'-6"/1.98 m. |
| F. | Internal Wood Blocking - Internal wood blocking secured to studs is required for all wall mounted accessory items. |

Sonder Standards - PDF - 02.22.21

| | |
|---|---|
| G. | Electrical – Locate Two GFCI/ELCB/RCCB or equal power outlets (socket outlets) at one end of the bathroom vanity. Power outlets (socket outlets) must not interfere with mirror. Locate outlet so that hanging towels do not obstruct use of the outlet. |
| H. | Shower doors and bathroom doors should not interfere with each other, cabinets, toilet operations, and/or sink operations. |

| 202 - Design - Common Spaces | |
|---|---|
| | Common spaces not listed below are allowable and may be required. Submit for Approval. |
| **202.01** | **FF&E - Common Space / Lobby** |
| A. | Landlord is responsible for all construction in common areas including but not limited to demo, framing, gypsum, painting, flooring, appliances, equipment, lighting fixtures and controls, low-voltage, security and Mechanical, Electrical, Plumbing, Fire Suppression and Fire Alarm. Sonder shall design, source and install the FF&E when required. |
| **202.02** | **Storage - Luggage** |
| A. | All full buildings and buildings with 8 guestrooms or more are required to provide guests with free on-site luggage storage. On-site luggage storage to be executed via luggage lockers. |
| B. | Location: Luggage lockers are placed in an unlocked space, with no door on the main floor or within close proximity of the elevator |
| C. | Include a security camera with 72 hours of playback time. |
| D. | Be clearly marked using signage from the Sonder Approved Package |
| E. | Space dedicated for luggage storage, required. |
| F. | Located on the main entry floor, preferred. |
| G. | Located on a floor where all Sonder guests have access, acceptable. |
| H. | Min. dimensions: <20 guestrooms: 50 ft2 (4.65 m2), 20-50 guestrooms: 100 ft2 (9.29 m2) , 51-100 guestrooms: 150 ft2 (13.94 m2), 101+ guestrooms: 200 ft2 (18.58 m2) |
| **202.03** | **Bathroom** |
| A. | i. Guest accessible bathroom required at either Ground Level, Level at which Sonder's operations are predominantly maintained, or an approved equal. ii. Access to Bathroom for Sonder employees when Sonder occupies 20 or more guestrooms. This bathroom not to be accessible by guests. |

| 203 - Design - Back of House | |
|---|---|
| **203.01** | **Loading Dock / Dumpster** |
| A. | Size and location is dependent on frequency of service, occupancy, and project density. Buildings with a loading dock accessible from the street shall have a dedicated area for placement and pick-up of dumpster. Submit for approval. |
| B. | The dumpster must be enclosed and out of sight from Sonder guests. |
| **203.02** | **Trash Room** |
| A. | Space for at least three 100-gallon (380-liter) bins in a dedicated trash room. |
| B. | Trash room must be located on the ground floor. |
| C. | For any buildings that are 6 or more stories high, there must be either (1) a dedicated trash room on each floor (in addition to a ground floor trash room); or (2) trash chutes on each floor. |
| D. | If there are trash chutes, they must lead directly to the ground floor trash room. |
| E. | In buildings with 50+ guestrooms, trash compactors are preferred. |
| **203.03** | **Storage** |
| A. | Min. 8 shelves, each one min. 4 ft (1.22 m) long x 2 ft (610 mm) wide. |
| B. | Min. room size equal to the equivalent of 10 ft2 (.93 m2) per guestroom. |
| C. | Lockable with the following mortise cut lock: Salto KS XS4 ANSI Keypad |
| D. | Ceiling height: 9 ft/2.74 m, or higher. |
| E. | Accessible without the use of stairs. |
| F. | Sealed floors. |
| **203.04** | **Housekeeping Closet** |
| A. | One small housekeeping closet per floor (35 ft2 / 3.25 m2 min.) If this is infeasible, then one larger housekeeping closet on an elevator-accessible floor with the following min. square footage: <20 Sonder Guestrooms: 40 ft2 (3.72 m2), 20-50 Sonder Guestrooms: 50 ft2 (4.65 m2) 51-100 Sonder Guestrooms: 60 ft2 (5.57 m2), 101+ Sonder Guestrooms: 70 ft2 (6.5 m2) |
| B. | Lockable with the following mortise cut lock: Salto KS XS4 ANSI Keypad |
| C. | Mop sink. |
| D. | Ceiling height: 9 ft/2.74 m, or higher. |

| E. | Accessible without the use of stairs. |
|---|---|
| F. | Sealed floors. |

| CSI | Format |
|---|---|
| | Starting with Division 08, order follows CSI MasterFormat |
| **Division 08 - Openings** | |
| **8.01** | **Doors - All** |
| A. | All Doors Finish and Hardware must match |
| **8.02** | **Guestroom Entry Door & Communicating Doors** |
| A. | STC 32, min. Communicating EACH Door in pair STC 32, min. |
| B. | Wood Solid Core Door |
| C. | i. Width: 3'-0" / 914mm, min.<br>ii. Height 7'-0" / 2.13 m, min., 8'-0" / 2.44 m, preferred.<br>iii. Thickness: 1-¾" / 44 mm |
| **8.03** | **Guestroom Interior Door - Bathroom & Bedroom/Suite Doors** |
| A. | Solid Core |
| B. | i. Width: 3'-0" / 914mm, preferred.<br>ii. Height: 7'-0" / 2.13 m, preferred. |
| **8.04** | **Public Area Door** |
| A. | Height: 8'-0" / 2.44 m, min. |
| B. | Width: 3'-0" / 914 mm, min. |
| **8.05** | **BOH Door - Back-of-house doors** |
| A. | Height: 7'-0" / 2.13 m, min. |
| B. | Width: 3'-0" / 914 mm, min. |
| **8.06** | **Interior/Exterior Metal Door** |
| A. | Interior: 18 gauge (.0478 inch/1.214 mm) cold-rolled steel, min.<br>Exterior: 16 gauge (.0598 inch/1.5 mm) 'A-60' galvanize, min. |
| **8.07** | **Metal Frames** |
| A. | Welded frames. |
| B. | Metal frames double rabbeted to allow for continuous acoustical seals along the perimeter of both doors. |
| C. | Snap on trim and knock down frames are not permitted. |
| D. | Interior -16 gauge (.0598 inch/1.5 mm) cold-rolled steel welded frame, min. |
| **8.08** | **Hardware - Guestroom Entry Doors** |
| A. | Salto KS XS4 ANSI Keypad ANSI Mortise locks. |
| B. | Utilizes the Salto KS platform |
| C. | Door prep for Salto lock |
| D. | 180 degree Door Viewer. Accessible Second viewer to be located at accessible code required height |
| E. | Security latches, required. Suggested: Privacy Door Latch |
| F. | Threshold: Provide acoustic threshold seal and positive door contact |
| G. | Automatic door bottom with compression @ solid surface |
| H. | Sweep with compression @ solid surface |
| I. | Closer - Low profile - adjustable, automatic, 2-stage hydraulic |
| J. | Seal/Gasketing - Sound & smoke frame - Multifin |
| K. | Doorstops - Provide doorstops for all doors. |
| **8.09** | **Hardware - Guestroom Interior Doors** |
| A. | Privacy lock. Must release by turning the inside lever and by closing the door; an emergency device must release this lock from outside of the room. |
| **8.10** | **Door View Panels** |
| A. | Provide either view panels in doors or side lights to guest amenities (ex: fitness center, pool, meeting rooms) |
| **8.11** | **Windows - All** |
| A. | Meet or exceed code natural light and air requirements and 10% of floor area, min. |
| B. | Double-glazing, min. |

| | C. | One window to exterior in all bedrooms and living rooms, min.<br>Glazed exterior balcony door, acceptable. |
|---|---|---|
| | D. | Meet or exceed all energy code requirements. |
| | E. | Safety Bar Requirement - Glass panels, windows, glass doors, sidelights, etc. that extend to the floor in all areas must be shatterproof, be tempered glass, or be equipped with a safety bar mounted at 3'-0"/914 mm above the finished floor. |
| | F. | Window washing schedule must be set for Hospitality Usage (transient) and reviewed and approved by Sonder. |
| **8.12** | | **Windows - Operable** |
| | A. | Locks must be childproof |
| | B. | Screens |
| | C. | Open 4 inches / 102 mm max. unless required otherwise by code. |
| | D. | Once opened, the window must remain in the open position without having to be propped open. |
| **8.13** | | **Window Sill Finishes** |
| | A. | i. Interior window sills must be granite, quartz, natural stone or approved composite solid surface material.<br>ii. Wood, drywall, plastic laminate and metal are discouraged and permitted with approval only. |

| **09 - Finishes** | | |
|---|---|---|
| **9.01** | | **Wall / Ceiling - Gypsum Finish Level** |
| | A. | Level 4 Finish: All walls and ceilings, min. |
| | B. | Level 5 Finish: All walls and ceilings that receive wall treatments; Wallpaper or Sim.- Required. |
| **9.02** | | **Paint** |
| | A. | Benjamin Moore Ultra Spec Scuff-X or Equal by approval only. |
| | B. | VOC - All paints must be low VOC (less than 50 VOC grams per liter) and low odor. |
| | C. | High Humidity - Paint in high humidity areas must be satin or eggshell finish with a mildew-resistant formulation. Paint in these areas must be satin or eggshell finish. |
| | D. | High Contact - High contact areas include BOH, public areas, and guest corridors. Paint in these areas must be satin or eggshell finish that is durable, washable and stain resistant. |
| | E. | Paint Performance – Paint must contain antimicrobial protection with a scrub resistance (ASTM D2486) of 2,800 cycles. |
| **9.03** | | **Tile - Wall** |
| | A. | Tile Material - Tile must be ceramic tile, stone, or porcelain tile, min. 1/4" / 6 mm thick. Tiles must be dimensionally accurate, flat and straight edged. and Tile must conform to ISO 13006 2018-09 Types BI, BIa, BIIa, BIIb, BIII and can be either calibrated pressed edge or rectified providing size tolerances of: CURVATURE SURFACE FLATNESS DEVIATION <0.15%.<br>Porcelain: Porcelain tile must have a rectified edge or pressed edge. Porcelain tile must be through-body color material or a glazed porcelain that meets Mohs scratch hardness min. rating of 4.0 for wall applications<br>Ceramic Tile: Tile must meet C648 breaking strength of 120 - 230 lbs.<br>Stone: All stone must be sealed |
| | B. | Tile Grout – Grout must be non-shrink-type epoxy or latex Portland cement and the min. grout joint must comply with ISO and ANSI guidelines. Non shrink epoxy must meet ANSI A118.3 min. 3/16" / 5 mm is the maximum width allowed. Tile grout must be ISO 13888 Type CG2 min. polymer modified cement and be anti-microbial, water resistant, anti-mold and color fast-efflorescence free. |
| | C. | Tile Performance – System must pass ASTM C373 for water absorption and ASTM C650 for chemical resistance or must comply with ISO 10545 -3 Determination of Water Absorption and ISO 10545-13 Chemical Resistance Class A cleaning chemicals / Class B acid=bases. Must pass ASTM CTI 81-7D for stain resistance or must comply with ISO 10545-14 Stain Resistance Class 4 Min. Tile must pass ISO 10545-11 Crazing Resistance. |
| **9.04** | | **Tile - Floor** |
| | A. | i. Material - Tile must be non-slip or unpolished porcelain or natural stone tile, min. 5/16" / 8 mm thick with a rectified edge. Glazed ceramic tile is not allowed. Public area floor tile must be 18" / 457mm wide min. Rectangular-shaped or plank-shaped tiles are permitted.<br>ii. Porcelain: Porcelain tile must have a rectified edge or pressed edge. Porcelain tile must be through-body color material or a glazed porcelain that meets Mohs scratch hardness min. rating of 7.0 for floor applications<br>iii. Stone: Natural stone must have a static coefficient of friction SCOF (ASTM-C1028-07e1) of 0.6 wet or better or Dynamic Coefficient of Friction DCOF (ASTM-A137.1) of .42 or better. Any natural porous materials must be sealed after installation with a penetrating sealer. |
| | B. | Tile Performance - Tile must pass ASTM C373 for water absorption, frost and chemical resistant and ASTM CTI 81-7D for stain resistance. |
| | C. | Grout – Grout must be non-shrink-type epoxy or latex portland cement to minimize staining and the min. grout joint should comply with ISO or ANSI guidelines. 3/16" / 5 mm is the maximum width allowed. |
| | D. | Slip Resistance Requirements – Tile must have a static coefficient of friction SCOF (ASTM-C1028-07e1) of 0.6 wet or better or Dynamic Coefficient of Friction DCOF (ASTM-A137.1) of .42 or better and a breaking strength |
| | E. | Wall base - Tile base must have a factory finish edge or approved alternate. |
| **9.05** | | **Vinyl Wall Covering** |

| | |
|---|---|
| A. | Use of Vinyl Wall Coverings is not permitted. When used this must be explicitly approved. |
| B. | **Rating Requirements:** Class A ASTM E84-12c tunnel test. **Adhesives:** All wall covering adhesives must be strippable and must contain mildew inhibitors. **Weight:** 20 oz. per linear yard/ 460 g per square meter, Type II or heavier must be used in corridors and public areas. 20 oz. per linear yard/ 400g per square meter, Type II or heavier must be used in Guestrooms. |
| C. | Backing - Fabric backing is required. |
| D. | Coatings – All wall coverings must contain an antimicrobial substance in the manufacturing process to safeguard against microorganisms such as bacteria, fungi and actinomycetes. |
| E. | Microventing - When microvented wallcovering is used it is required to meet ASTM E96-02, Method B. Min. 21 ounce rated at 10 perms and approximately 25,000 holes per square foot is required. |
| F. | Installation - Old wall vinyl must be completely removed before new wall vinyl is installed. |
| **9.06** | **Solid Wood Flooring or Existing Wood floor** |
| A. | Provide specification for new wood flooring or refinishing products and strategy for refinishing of existing wood flooring. Submit for approval. |
| **9.07** | **Acrylic Impregnated Wood Flooring** |
| A. | **Material** - Must be at least five-ply construction. |
| B. | **Installation** - Finished floor must be perfectly level, smooth and free of any visible defects, ripples, splits or gaps on completion. Provide a sub-base in compliance with the flooring system, manufacturers, or specialty consultant's recommendations. Flooring must be laid on approved substrate. |
| C. | **Preparation** - Supporting slab must be sufficiently dry to accept the flooring with a relative humidity of less than 75 percent when tested with a hygrometer. |
| **9.08** | **Luxury Vinyl Tile Flooring - LVT** |
| A. | **Material** - Must be a commercial grade, embossed vinyl tile flooring system. **Flexibility:** ASTM F 137. **Resistance to Heat:** ASTM 1514, Resistance to Chemical: ASTM F 1515. **Resistance to Chemical:** ASTM F925. **Radiant Flux:** ASTM E648 (> 0.45 watts/cm2, NFPA Class 1). **Standard Classification:** ASTM F 1700, Class 3. **Impact Insulation Class (AIIC):** ASTM E492-04. Min. rating of 51, achieved by combination of LVT and underlayment as field tested. **Impact Insulation Class (AIIC):** ASTM E492-04. Min. rating of 51, achieved by combination of LVT and underlayment as field tested. Sound Transmission Class (STC): ASTM 90-04. Min. rating of 50, achieved by combination of LVT and underlayment. **Thickness:** 4.5 mm min. **Wear layer:** 0.5 mm (20 mil) min. |
| B. | **Location** - This floor finish is not accepted in wet areas. Exceptions will be granted when there is no clear transition in space between other living areas and wet zones, such as open kitchen layouts. Specifications must state the material is suited for wet area use. |
| C. | **Underlayment** - When installed in areas above guestrooms, a noise-reducing impact insulation underlayment system will be required. Underlayment (LVT) System (areas above Guestrooms) with specification of 72 IIC and 65+ STC. Underlayment must be a commercial grade, noise-reducing impact insulation underlayment system and meet the following criteria or as required by the local municipality. **Thickness:** 1.4 mm min.. **Radiant Flux:** ASTM E648 (> 0.45 watts/cm2, NFPA Class 1). **Smoke Density:** ASTM E662 (<450). **Slip Resistance:** ASTM D 2047 (>.65 wet/dry). |
| D. | **Preparation** - When installed in areas above guestrooms, a noise-reducing impact insulation underlayment system will be required. Underlayment (LVT) System (areas above Guestrooms) with specification of 72 IIC and 65+ STC. Underlayment must be a commercial grade, noise-reducing impact insulation underlayment system and meet the following criteria or as required by the local municipality |
| **9.09** | **Carpet & Pad** |
| A. | **Installed Carpet Radiant panel:** ASTM E-648-10 Class 1 for Flammability. **Area rugs:** must meet DOC FF 1-70. **Smoke density:** ASTM E-662-09. **Lightfastness:** AATCC 16-E. **Color fastness to water:** AATCC 107. **Color fastness to rubbing:** AATCC 165. **Wear resistance:** ASTM D5252. **Appearance retention:** ASTM D5252. **Tuft anchorage:** ASTM D1335. **Static electricity/Stroll test:** AATCC 134 < 3.5 KV. **TARR (Texture Appearance Retention Rating):** 2.5 – 3.0 or higher. All nylon carpet must be stain treated with foam and heat set method. |
| B. | **Broadloom Cut Pile:** Guestrooms and Public Areas. **Construction:** Tufted. **Machine Gauge:** 1/10 Guestrooms and Public Areas. **Stitches per Inch:** Guestrooms - 10/Public Areas - 11.3 to 12. **Finished Pile Height:** .218" (7/32") or greater for 32 oz. and .250" (1/4") or greater for 36 oz. **Yarn:** 100 percent Solution Dyed Type 6 Nylon Branded or equivalent. **Primary Backing:** Woven polypropylene. **Secondary Backing:** Woven polypropylene or attached cushion. **Face Weight:** 36 oz./yd.² for Public Areas, 32 oz./yd.² for Guestrooms. **Loop Pile:** Guestrooms, Machine Gauge: 1/8 / 31.5/10cm. **Machine Gauge:** 1/8 / 31.5/10cm. **Stitches per Inch:** 10. Tufted Pile Height: max 3/16", min 1/8". **Face Yarn:** 100 percent Solution Dyed Type 6 Nylon Branded or equivalent. **Yarns Primary Backing:** Woven polypropylene. **Secondary Backing:** Woven polypropylene or attached cushion. 2514.03.H.2.e.8. **Face Weight:** 32. **Finished Pile Height:** .250 to .281. **Rows per Inch:** 8 for guestrooms, 80/20 and nylon and 9 for public areas. **Total pile weight:** 32-35 oz./yd.² (80/20), 29-32 oz./yd.² (nylon). **Total weight:** 60 – 63 oz./yd.² (80/20), 57 - 60 oz./yd.² (nylon), 50 oz./yd.² (3/42 yarn count). **Backing:** synthetic. |
| C. | **Carpet Pad** – Carpet pad must be Class II for Guestrooms and Class III for public areas, with a manufacturer's level of contract/commercial. **Synthetic Fiber:** Pad must be min. 32 oz. weight, 8.0 lb./ft³ density and 5/16" / 7.9 mm thickness. **100 % SBR Rubber:** Cushion must be a textured flat construction with a min 1/4"en installing double stick goods or attached cushions, use a multi-purpose adhesive. Use a premium seam sealer on all seams. Use an edge sealer on all edges that abut a hard surface. **Installation** - All carpet installed over padding must be power stretched except in double glue-down installations. Padding is required in all guest areas. Maximum of one seam allowed in each guestroom. |
| **9.10** | **Wall Base** |

| | |
|---|---|
| A. | Material – Corresponding Wood, MDF, or Tile base is required for all floor to wall transitions. Product type must meet any applicable requirements of the corresponding flooring type above. Decorative vinyl or rubber base may be used with Sonder approval. Carpet base is not permitted. Min. base height must be 3" / 76 mm. |
| B. | Installation – All base must be installed per manufacturer's instructions. Installation must not be visibly apparent. Visible joints and meeting points between all dissimilar hard surfaces must be caulked. |

## 10 - Specialties

| | |
|---|---|
| **10.01** | **Signage** |
| A. | All signage by landlord (including, but not limited to: exterior, entryway, wayfinding, evacuation maps, and all code-required signage). Landlord responsible for signage to be code compliant. |
| B. | All existing signage must be removed and replaced. Includes but is not limited to the use of name, logo, avatar, etc. |
| C. | All Signage must comply with Sonder Signage Guide (see Appendix doc xxx). Submit for approval. |
| E. | All Hotel and Multi-Family Guestrooms must receive an emergency exit Evacuation Plan on or adjacent to the Entry Door, inside the room, per the Sonder Signage Guide |
| **10.02** | **Wall and Door Protection** |
| A. | Corner Guards & Wall Protection. Provide at service areas and high traffic common areas. Color match adjacent wall(s). |
| B. | Stainless Steal Kick Plates. Provide at service areas and high traffic common areas. Half-door Stainless Steal plate required where carts are in service. |
| **10.03** | **Toilet, Bath & Laundry Accessories** |
| A. | See Section 201 - Design - Guestrooms |

## 11 - Equipment / Appliances

| | |
|---|---|
| **11.01** | **Size and Material/ Color** |
| A. | Sizes below are for Full Size Requirements for Standard Size Guestrooms. See 201.03. Apply for definitions and exception in size of appliances. Example: Two-burner cooktop and microwave convection oven. |
| B. | Cabinet Face Matching Preferred. Stainless Steel or approved equal. |
| **11.02** | **Rating & Compliance** |
| A. | UL listed |
| B. | Energy Star |
| **11.03** | **Refrigerator** |
| A. | Full Size: 15 Cubic Feet refrigerator portion (400 Liter), min. |
| B. | Filtered water and ice dispenser. |
| **11.04** | **Ranges** |
| A. | Full Size: Four-burner cooktop and full-sized oven |
| B. | Cabinet Face Matching Preferred. Stainless Steel or approved equal. |
| C. | Full Size: 30" (760 mm) wide, min. |
| **11.05** | **Dishwasher** |
| A. | Full Size: Built-in dishwasher, 24" (600 mm) wide. |
| **11.06** | **Microwave** |
| A. | 1.3 Cubic Feet (36 Liter), min. |
| **11.07** | **Garbage Disposal** |
| A. | Garbage Disposal w/ min. ½ HP |
| **11.08** | **Washer / Dryer** |
| A. | i. Multi-Family Buildings: Required in each guestroom<br>ii. Hotel Buildings: Required in Common Area designated for Guest use (not BOH) |

## 12 - Furnishings

| | |
|---|---|
| **12.01** | **Window Treatments** |
| A. | Window treatments installed on all windows. |
| B. | i. Blackout window treatments required for Sleeping Rooms – All rooms with either a bed or sleeper sofa must have min. 90% blackout fabric or coated fabric. Roller shades are permitted.<br>ii. Blackout window treatments required for all living rooms with sleeper sofas, as advised by Sonder. |
| C. | Contract grade motorized controls, preferred. |

| | | |
|---|---|---|
| D. | Curtain and Shade Material – Curtain and shade fabric must be commercial grade and meet or exceed NFPA 701 and any local code requirements. Natural fabrics preferred. Curtain fullness must be min 150%. | |
| E. | Installation – Curtains must be externally hung with either a commercial decorative rod or track. Finish should coordinate with surrounding finishes. Roller shades should be internal mount. | |
| **12.02** | **Architectural Films - Architectural films must meet the following requirements:** | |
| A. | Fire Rating: Class A ASTM E84 | |
| B. | Thickness: Min. 8 mil | |
| C. | VOC: Low | |
| D. | Taber Abrasion resistance: 5,000 cycle or greater | |
| **12.03** | **Countertop - Kitchen** | |
| A. | ***Studio & 1 Bedroom*** | |
| B. | 6'-0" (1.83m) long, min. | |
| C. | ***2+ bedrooms guestrooms*** | |
| D. | 8'-0" (2.44m) long, min. | |
| **12.04** | **Mirror** | |
| A. | 15" (380mm) wide x 5'-0" (1.52m) tall mirror in each bedroom, min. | |
| B. | Built into the closet door, acceptable. | |
| C. | Frame required for wall mounted application | |
| D. | Visible hardware is not acceptable | |

| | | |
|---|---|---|
| **14 - Conveying Equipment** | | |
| **14.01** | **Elevator** | |
| A. | Provide efficient passenger and service elevator for elevated guest experience and operations. | |
| B. | Capacity:<br>Elevators 3,000 lb/1,350 kg capacity each, min. | |
| C. | General<br>i. 3-5 stories above grade: one elevator<br>ii. 6+ stories above grade: two elevators<br>iii. 6+ stories and 150+ guestrooms: freight elevator required in addition to two+ passenger elevators.<br>iv. At least one of the elevators must have a min. width of 80 inches (2 m) and a min. depth of 54 inches (1.37 m) | |
| D. | Hydraulic: 2-3 Stories, 150 FPM/0.76 m/s, 165 FPM/0.84 m/s<br>Machine Room-less (MRL) systems for buildings with no more than 5 floors or more than 55 ft. of travel. MRL gearless: 2-3 Stories, 2-3 Stories, 150 FPM/0.64 m/s<br>MRL gearless: 4-5 Stories, 150 FPM/0.76 m/s, 150 FPM/0.64 m/s | |
| E. | Size:<br>Cab size must meet or exceed all code requirements for medical stretcher/ gurney. | |
| F. | Floor:<br>Hard surface flooring specified for heavy use and ease of maintenance. | |
| G. | Finishes:<br>See Sonder Interior Finish Index. | |
| H. | Access:<br>i. Keypad enabled Reader Access<br>ii. Coordinated with Guestroom Door Locks<br>iii. All conduit or other pathways for reader | |
| I. | Coordination:<br>Provide and coordinate all Electrical, Security, Low Voltage, AV and any other relevant system. | |
| J. | Service:<br>Manufacturer Service must be available in a timely manner and within a 60 minute max. response time. | |
| K. | Security:<br>Security system of elevator connected to full building security system. Submit for Approval. | |
| L. | Providers: Kone Inc., Mitsubishi, Otis Elevator Company, Schindler Elevator Corporation, ThyssenKrupp | |

| | | |
|---|---|---|
| **21 - Fire Suppression - TBD** | | |
| **21.01** | **Fire Sprinkler Heads** | |
| A. | Concealed Heads at all Guest facing locations | |

| | |
|---|---|
| **22 - Plumbing** | |

| 22.01 | **Sanitary System** |
|---|---|
| A. | Complete sanitary waste-vent system connected to a public sanitary system provided in its entirety. |
| B. | Each fixture vented to exterior free air. |
| 22.02 | **Water System** |
| A. | Each guestroom to have domestic water distributed from building system |
| B. | Potable Water provided at every fixture in compliance, required. Provide current water analysis table describing contaminant concentrations. Submit for approval. |
| 22.03 | **Hot Water System** |
| A. | Building system, storage and heaters provide stable water temperature during all flow conditions. |
| B. | System equipment must provide 100 percent design heating capacity at all times. |
| 22.04 | **Temperature** |
| A. | Hot water at guestroom outlets at 120° F/50° C, min. |
| B. | Building domestic hot water delivery set to prevent scalding at all fixtures. |
| 22.05 | **Water Pressure** |
| A. | 60 – 80 psi (pounds per square inch) / 415 - 550 kPAs (Kilopascals) |
| 22.06 | **Fixtures** |
| A. | Commercial grade plumbing fixtures required in: i. Public spaces and amenities ii. Back-of-house |
| B. | All Toilets (Guestrooms, Public Spaces and BOH): Flush exceeds 800 MaP test |
| 22.07 | **Drains** |
| A. | Standard size, with ability to treat p-traps without obstructions. |
| 22.08 | **Hose Bibs** |
| A. | Required in Boiler Room, Water Meter Room, Trash Room, Fire Pump Room, Courtyards & Roof Exterior (on stair bulkhead only Freeze proof). |
| 22.09 | **Floor Drain** |
| A. | Required in Boiler Room, Water Meter Room, Trash Room, Fire Pump Room, Courtyards, Housekeeping Closets, Mop Sink locations and any other location where there is possibility of water intrusion. |
| 22.10 | **Filtered Water Station** |
| A. | Sonder approved filtered water solution. See Supplemental Doc F, "Sonder Approved Filtered Water Solutions" in Appendix for requirements. i. Located at each level if filtered water is not provided at each guestroom's refrigerator. ii. Additionally required in or near the fitness center (if provided). iii. Type of Solution (see Supplemental Doc F): Built-In model preferred. Standalone model acceptable. |
| 22.11 | **Sub-Meters** |
| A. | Water submeters, if acceptable per code |
| B. | Gas submeters, if acceptable per code |
| 22.12 | **Sewage Ejector** |
| A. | Sewage ejectors are not acceptable. |
| 22.13 | **Water Conditioning** |
| A. | Water conditioning required if water testing produces hardness levels exceeding the below levels. i. Domestic Water: 110 ppm (mg/L) ii. Laundry & Kitchen: 80 ppm (mg/L) (Testing required for all domestic water.) |

**23 - HVAC & Mechanical**

| 23.01 | **General** |
|---|---|
| A. | Temperature and humidity must be designed to ensure guest comfort and must exceed code minimums for environmental standards. Provide engineered documents to assess comfort level and environmental standards. Submit for approval. |
| B. | All common areas including corridors, staircases, garages, lobby, and utility rooms have sufficient and code compliant HVAC/exhaust/air systems to maintain acceptable air pressure and a temperature of 68F-72F (20C – 22C) degrees at all times. |

| | | |
|---|---|---|
| | C. | Guestrooms to be provided with service to maintain 68F (20C) min. for heating and 70F (22C) for cooling. |
| | D. | Heat and domestic hot and cold water supply piping properly insulated to prevent both heat loss to surrounding spaces and loss of energy within the piping systems |
| **23.02** | **Air Handling Equipment & Devices** | |
| | A. | Install all HVAC equipment with access for maintenance. Do not install air-handling units, fan coil units, and mechanical equipment requiring regular maintenance above gypsum board or inaccessible ceilings. Service access of non-guest area equipment must not be from guest areas. |
| | B. | Thermal comfort for Heating and Cooling provided through full Building System, such as VRV/VRF with Guestroom local controls preferred. |
| | C. | Mini-Split Systems: If using, provide product type and maintenance plan. Submit for approval. |
| | D. | Packaged Terminal Air Conditioners (PTAC) are not acceptable. |
| **23.03** | **Controls** | |
| | A. | i. Provide electric silent two-position or modulating motorized valve actuators that are replaceable without valve removal. <br> ii. Provide silent type relays in guestroom devices. |
| **23.04** | **Filtration** | |
| | A. | Provide minimum single-stage MERV 8 filtration (or equivalent) for recirculating equipment. Provide minimum MERV 12 filtration (or equivalent) for air handling equipment used to condition and supply ventilation air. |
| **23.05** | **Other System Design and Installation requirements** | |
| | A. | Use duct liner where required for acoustic needs using closed-cell elastomeric material that complies with ASTM C1534-07-E1. |
| | B. | Provide non-adjustable temperature sensors located in all common spaces to effectively control the temperature in all conditioned areas. Thermostats in fitness center, individual meeting rooms and boardrooms must be adjustable by guests. |
| | C. | Screen all rooftop and ground mounted equipment from street views. |
| | D. | Locate equipment to avoid increased noise levels in adjacent guestrooms. |
| | E. | Provide a complete and fully automated monitoring and dosing water treatment system for open loop systems, and chemical feed capacity for closed loop systems. |
| **23.06** | **Building Automation System (BAS)** | |
| | A. | General: Provide direct digital control and monitoring of all guest and back of house area HVAC systems, using an open protocol type BAS. |
| | B. | The BAS must be capable of interface with HVAC system control panels, lighting control panels, energy use panels, electrical power supplies, property management systems, and fire and life safety systems. |
| | C. | Provide backup power to the BAS to remain available during loss of utility power supply. |
| | D. | Provide third-party (independent of the Sonder Architecture and Construction team) commissioning agent for all guest area and back of house HVAC systems that comply with ASHRAE Guideline 1.1-2007. |
| **23.07** | **Water Chillers and Chilled Water Distribution** | |
| | A. | Select system and unit efficiencies that exceed national and local energy code requirements or ASHRAE Standard 90.1-2013. |
| **23.08** | **Ventilation Air** | |
| | A. | Distribute conditioned ventilation air directly into each guestroom. Operable windows are not acceptable as the primary means of guestroom ventilation. |
| | B. | All venting must be ducted and discharge to outside/exterior of building. Recirculating exhaust is not acceptable. |
| | C. | Dedicated ventilation air equipment must be specifically designed to allow the ventilation air to be supplied at room neutral conditions. |
| | D. | Packaged terminal air conditioning units (PTAC) and fan coils are not acceptable for providing ventilation air. |
| | E. | Dedicated Ventilation Air Equipment Selection: <br> Select ventilation air units to offset any continuous bathroom exhaust air quantity, any other exhaust air from the corridors, plus air flow to maintain pressure relationships identified in the Environmental Conditions matrix. If prevailing winds will affect building pressurization, this must be taken into account in determining building air balance calculations and air quantity for pressurization. |
| | F. | Provide combustion air for all fuel-fired appliances that complies with the requirements of their listing, all local codes and ordinances. |
| | G. | Fresh air must be pre-conditioned before being distributed. |
| **23.09** | **System Design Criteria** | |

| | |
|---|---|
| A. | Summer<br>Outdoor Conditions: Select ventilation air entering air temperature (EAT) for cooling based on ASHRAE 0.4 percent summer design Dehumidification [dew point/mean coincident dry bulb (DP/MCDB)] and Humidity Ratio (HR).<br>Discharge Air Conditions: Select the cooling coil to produce 55 °F DB/12.8 °C DB leaving air temperature and reheat to approximately 68 °F DB/20 °C if for corridor distribution or 70 °F DB/ 21 °C DB if supplied directly into guestroom.<br>Winter<br>Select EAT for heating based on ASHRAE Annual Extreme Daily Mean Dry Bulb (MDB) Minimum winter design temperature (not Heating DB at 99.6 or 99 percent). |
| 23.10 | **Dedicated Ventilation Air Units** |
| A. | Provide ETL or Underwriters Laboratories (www.ul.com) listed equipment, or similar recognized agency that complies with local code requirements. Rate per ARI Standards or equivalent refrigeration standards agency. |
| B. | Humidification Requirement: Provide ventilation air units in ASHRAE Climate Zones 7 and 8 with humidification capability to comply with the Environmental Conditions Matrix included in the beginning of this Section. |
| C. | Wall construction must be double-wall insulated type. |
| D. | Condensate drain pans must be insulated, stainless steel and corrosion-resistant construction. |
| E. | Provide spacer for temperature sensor between cooling and reheat coils or means of coil temperature measurement via suction pressure sensing device. |
| F. | Fresh air must be pre-conditioned before being distributed. |
| G. | Provide special filter support structure to prevent moisture laden filter collapse. |
| H. | Provide combustion air for all fuel-fired appliances that complies with the requirements of their listing, all local codes and ordinances. |

| | |
|---|---|
| **26 - Electrical** | |
| 26.01 | **All Products** |
| A. | All products and lighting fixtures must have a safety listing as provided by a nationally recognized testing laboratory, e.g. CE, ETL, ISI, UL, VDE. Comply with ASHRAE Standard 90.1 (www.ashrae.org) and applicable Energy Codes. |
| 26.02 | **Common Area Lighting** |
| A. | Provide lighting fixtures at all entrances and exits of buildings. There should be ample lighting for easy viewing of the doors, the path to the doors, and any entry access equipment. |
| B. | All lighting must meet Correlated Color Temperature (CCT) of 2700-3000 Kelvin and Color Rendering Index (CRI) min. of 80. |
| C. | Provide ceiling mounted light fixtures in all lobbies, corridors, staircases, amenities and all other common areas. Submit for approval. |
| D. | Building Entrance Full Daylight: Horizontal FC/LX: 10/100. Vertical FC/LX: 3/30. Max. Light Source Kelvin Color Temperature: 3000 |
| E. | Building Entrance Non-Full Daylight: Horizontal FC/LX: 5/50. Vertical FC/LX: 2/20. Max. Light Source Kelvin Color Temperature: 3000 |
| F. | Lobby Circulation: Horizontal FC/LX: 2/20. Vertical FC/LX: N/A. Max. Light Source Kelvin Color Temperature: 3000 |
| G. | Corridors: Horizontal FC/LX: 2/20. Vertical FC/LX: 2/20. Max. Light Source Kelvin Color Temperature: 3000 |
| H. | Guest Room Door: Horizontal FC/LX: 15/150. Vertical FC/LX: N/A. Max. Light Source Kelvin Color Temperature: 3000 |
| I. | Emergency lighting provided by fixtures with battery packs as required. |
| J. | If the building contains an emergency lighting circuit the exterior lighting fixtures shall be connected to it. |
| 26.03 | **Guestroom Lighting** |
| A. | Provide ample lighting in each individual room to ensure elevated room functionality and guest comfort. |
| B. | Provide at least one ceiling-mounted light fixture in each guestroom (in addition to electrical receptacles and lighting provisions in accordance with jurisdictional requirements). Submit for Approval. |
| C. | Provide task lighting above kitchen range and sink. Submit for Approval. |
| D. | Entrance: Horizontal FC/LX: 5/50. Vertical FC/LX: 1/10. Max. Light Source Kelvin Color Temperature: 2700 |
| E. | Floor Locations: Horizontal FC/LX: 2/20. Vertical FC/LX: N/A. Max. Light Source Kelvin Color Temperature: 2700 |
| F. | Tables & Counter Surfaces: Horizontal FC/LX: 2/20. Vertical FC/LX: N/A. Max. Light Source Kelvin Color Temperature: 2700 |
| G. | Seating: Horizontal FC/LX: 15/150. Vertical FC/LX: 5/50. Max. Light Source Kelvin Color Temperature: 2700 |
| H. | Kitchen: Horizontal FC/LX: 50/500. Vertical FC/LX: 2/200. Max. Light Source Kelvin Color Temperature: 2700 |
| I. | Bath Vanity: Horizontal FC/LX: 40/400. Vertical FC/LX: 30/300. Max. Light Source Kelvin Color Temperature: 2700 |
| J. | Tub/Shower: Horizontal FC/LX: 5/50. Vertical FC/LX: 2/20. Max. Light Source Kelvin Color Temperature: 2700 |
| K. | Light switch control of electrical outlets is only acceptable for outlets that Sonder is planning on using for plug in lights. Light switch control of electrical outlets that will be used for appliances or equipment is not acceptable. |
| 26.04 | **Outlet Location** |

| | A. | Two outlets for headboard side of bed, min. |
|---|---|---|
| | B. | One outlet per wall in the living room, min. |
| | C. | Additional outlets adjacent to All furniture, appliances and equipment. |
| **26.05** | | **Outlet & Switch Type** |
| | A. | Switches: Dimmable |
| | B. | Outlets & Switches: SMART (Wi-Fi enabled) |
| **26.06** | | **Acoustics** |
| | A. | Outlet boxes: Stagger and offset outlet boxes between studs. Do NOT place back to back. Fully seal boxes in putty packs/pads. Putty and seal around all wiring, conduit and cables. |
| **26.07** | | **Thermostats** |
| | A. | Thermostats programmable and Wi-fi enabled (Nest, Honeywell or SIM.). |

| **26.2 - LV/AV** | | |
|---|---|---|
| **26.21** | | **Common Area Sound** |
| | A. | Provide wall and/or ceiling mounted speakers in lobby. Concealed preferred. Submit for approval. |

| **27 - Networking and Technology** | | |
|---|---|---|
| **27.01** | | **General** |
| | A. | In addition to the below requirements, design must meet requirements outlined in Appendix doc: Sonder Cabling and Network Standards document. |
| **27.02** | | **Structured Cabling - General** |
| | A. | Ethernet CAT6 plenum rated ethernet cables. i. Ethernet Runs: a. At least one ethernet run per guestroom run to the networking closet. b. Additional runs for wifi access point locations TBD by low voltage installer through the development of a wifi heat map. Heat maps are to be submitted to Sonder for review and approval. Ethernet runs for access points should terminate in those positions and be run to the networking closet. ii. Provide all required pathways throughout to accommodate network needs of Salto access control system. Sonder or selected certified Salto installer will provide guidance for each location of each termination. iii. Multiple floors shall run to a single Networking Closet where possible. iv. Cable runs must not exceed 90 meters. v. Ethernet and Electrical runs should be separated/shielded. vi. Installer should test and confirm port to patch panel meets CAT6 specifications and provide them in PDF prior to acceptance. Each guestroom is required to have pull strings for Coax and Fiber runs. The runs should terminate behind the TV and run to the networking closet. |
| **27.03** | | **Network ISP (USA only) - Internet** |
| | A. | For buildings > than 40 guestrooms, Developer has ensured that either a Tier 1 Internet Service Provider (ISP) or Broadband Provider has installed high-speed fibre-optical cabling to the building. The building should be non-exclusive to ISPs, e.g. other ISPs can compete for business. |
| **27.04** | | **Network Bandwidth** |
| | A. | The calculation for building bandwidth is: Total bandwidth for all units (where total for each unit = 10mbit*(First Bedroom in a Unit) + 7mbit*(Each Additional Bedroom in Unit)) + 25mbit (if building contains any # of Salto locks) + 5mbit*(Count of Security Cameras). Example: A 1-BR/Studio = 10mbit, a 2-BR = 17mbit, a 3-BR = 24mbit. Example: If a building has 4x 2BR units, 10x 1BR units, Salto Locks, and 10 Security Cameras, the minimum bandwidth required would be 243mbit (4*17+10*10+25+10*5) |
| | B. | Once install complete, minimum download speeds at any location expected to be 20 mb/s, and should not drop below 19 mb/s. |
| **27.05** | | **Networking Hardware - General** |
| | A. | i. Provide a wifi heat map outlining Mist wifi access point locations. Submit for approval. As designed, where a WAP is located, the Developer's Structured Cabling vendor will mount and connect the WAP to the in-guestroom CAT6 Cable. ii. Developer's Structured Cabling vendor will also mount any of Sonder's provided Networking Firewalls, POE Switches and UPS in the networking closet(s). Sonder IT's department will configure the wifi and network remotely. iii. The lobby has ethernet accessibility for installation of hard-wired technology. |
| **27.06** | | **RF Survey - Cellular Reception** |
| | A. | Cellular reception is strong in all areas of the building and rate better than -75 dBm. Cellular signal boosters shall be added if necessary post-construction to improve the cellular reception. |
| **27.07** | | **Building Security - Security Cameras** |
| | A. | i. Building owned and installed security camera system. ii. Cameras cover all perimeter entryway and exits to the building. iii. Cameras cover elevators, all common spaces, all guestroom doors, and all hallways of Sonder floors. |

| 27.08 | **Guestroom Security - Entry Door Locks** |
|---|---|
| A. | Guestroom Entry Door: Salto KS XS4 ANSI Keypad ANSI Mortise locks.<br>i. Utilizes the Salto KS platform<br>ii. Door prepped for lock, required.<br>iii. Security latches, required.<br>iv. Suggested: Privacy Door Latch |
| 27.09 | **Low Voltage Systems - Networking Closet** |
| A. | i. Sufficient and code compliant HVAC or air flow to maintain a temperature of 68F-80F (20-26C) degrees at all times.<br>ii. Wall mounted 20U 19" (48 cm) rack to house the patch panels for Structured Cabling and Sonder Networking Equipment and should be mounted 60 inches (152 cm) above the finished floor. Suggestion: Chatsworth 15320-724<br>iii. USA - Power (2 Nema 5-20R) 60" (152CM) above the finished floor (AFF) located next to the 20U 19" rack and (1 Nema L5-30R) should be provided 60" (152cm) AFF and located next to the 20U 19" rack.<br>iv. Europe Power (2 Nema L6-30R) should be provided 60" (152cm) AFF and located next to the 20U 19" rack.<br>v. Electrically grounded.<br>vi. Cable patchway between networking closets.<br>vii. Closet door should be secured.<br>viii. Rack, power, ground, and a secure door complete and clean at least 30 days before occupancy to enable the ISP to terminate their circuit. |
| 27.1 | **Roof Rights - Roof** |
| A. | i. Sonder may require access to the roof for Fixed Wireless Internet Services.<br>ii. Cable pathway available from the Network Closet to the designated roof area for a CAT 6 Ethernet cable.<br>iii. Power: for the US please install 2 5-15R plugs, 1 5-30R, and 1 5-20R plug. |
| 27.11 | **Building Access** |
| A. | i. Requires one CAT6 drop and 1 Nema 5-20R for any exterior entrances<br>ii. Hardware requirement for building entry: Salto KS Keypad Wall Reader<br>iii. Optional: Intercom system of developer's choice |
| 27.12 | **Common Area Access** |
| A. | i. Networking requirements: One CAT6 drop and 1 power receptacle. For the US, please install a Nema L5-20R for any common area entrances.<br>ii. Hardware requirements for any electronic doorways, including elevators, hallways, and common spaces: Salto KS Keypad Wall Reader or Salto KS XS4 ANSI Keypad where appropriate.<br>iii. Doors cut for ANSI Mortise locks, required. |

| **28 - Fire Life Safety** | |
|---|---|
| 28.01 | **Fire Alarm System** |
| A. | Point addressable intelligent central fire alarm system for the entire building. |
| 28.02 | **Smoke and Carbon Monoxide Detectors** |
| A. | One combined smoke & CO detector in:<br>i. Each bedroom & other designated Sleeping Areas<br>ii. Outside each sleeping area and throughout the guestroom depending on partitions and layout.<br>iii. Every level of the building with minimal spacing set forth by product instructions.<br>All detectors to be accessible with a 6-foot (1.83-meter) ladder, max. |

**Sonder Data Cabling Standard**
Updated January 28, 2021

**Introduction:**
This document outlines the technical cabling and network standards required for all Sonder properties. All other low voltage requirements, including security and access, are in addition to the below. All low voltage should be coordinated and submitted to Sonder for approval. This document is used in conjunction with and is part of the overarching Sonder Standards.

**Standard System Components:**
The below standard system components are purchased through Insight:

- Firewalls: Palo Alto NGFW

- Switches: Juniper EX2300 series

- Access Points: Mist AP32 (ceiling mount) AP12 (in-wall mount) and

   Mist AP62 (outdoor)

 Account Representatives:

John Fitch 480-544-7080 [SEP] john.fitch@insight.com

**Network Design:**
Landlord's qualified low voltage designer must provide antenna locations to Sonder for approval prior to any installation work in a heat map format, showing each antenna location on current floor plans.  This should be provided as an ekahau compatible file.[SEP]
[SEP]
If the installer is not equipped to create this Sonder can provide the design at additional cost.

**Installation and System Standards:**
Sonder has standardized voice and data cabling at all facilities as follows.

   1.  Copper voice and data cable
         a. Structured Drop Locations
               i. In each unit
                     • 1 drop to be located behind each TV ii. Wifi
                  Access Points
                        • 1 ceiling drop for each access point, see #15
                     for locations.
                  iii. Locations for door lock controller cabling will be provided by Salto installer.
         b. Jacks
               i. Use Panduit Mini-Com Cat6 RJ45 jacks.
         c.  Patch panels
               i.   Use Panduit Mini-Com patch panels for data cabling.
               ii.   Segregate data and facility-related (see 1f below) connections into their own patch panels.
         d. Cable

       i. Use 100% copper cable. Copper clad Aluminum cable is not to be used for any reason. All copper cable runs must be 90 meters or less.

       ii. Use Cat6 cable for data, except where Cat5e cable is specified and agreed upon with Sonder.

       iii. Provide a 6' service loop in the MDF.

e. Color code

    i. Blue for data (both cable and jacks)

    ii. White for video (both cable and jacks) iii. Yellow for Locks (both cable and jacks)

    iii. Red for Mechanical, Fire Alarm, building automation or other facility related devices

f. Use the EIA/TIA 568B wiring standard.

g. For mechanical, fire alarm, building automation, or other facility-related systems that need network connections, run those drops using the same standards as above, and terminate them into a separate RJ45 patch panel, with each connection clearly labeled. Use Red for both cable and jacks.

2. Salto IQ

   a. Salto IQs should be connected to the same switching infrastructure as guest wifi.

      i. Ports used must be labeled and port numbers communicated to Sonder  ii. Salto jacks and cables should be Yellow.

3. Fiber optic cable

   a. Cable type

      i. Use high-quality (no preferred brand) fiber optic cable rated for 10 Gb/s data transmission or higher.

      ii. For cable runs of up to 400 meters (1300 feet), use OM3 multi-mode fiber cable. Color will be aqua as is standard for OM3 cable.

      iii. For cable runs exceeding 400 meters (1300 feet), use OS1 single-mode fiber cable. Color will be yellow as is standard for single-mode fiber.

   b. Use Panduit OM3-grade LC/UPC connectors.

   c. Use Panduit FMD series fiber trays.

4. Racks

   a. Use lockable vertical wall mount cabinets in IDF and MDF (no brand preference)

      i. If larger rack is required use Panduit two-post system

   b. Use EIA/TIA hole spacing.

   c. Racks will use 10-32 or 12-24 screws, NOT 10-24.

   d. Provide one 15A circuit per cabinet and rack, distributed between phases. Use 15A (NEMA 5-15) for circuits supplying racks and cabinets.

   e. If UPS is being installed provide 1  20A (NEMA 5-15/20R) outlet in IDF and

MDF for this purpose.

   i. If using vertical wall mount cabinets provide power inside the cabinet.

f. Racks to be installed following manufacturer specifications

g. Device elevation and weight distribution to be installed following manufacturer specifications

5. Testing, labeling, and documentation

a. Test for 1 Gb/s data transmission on Cat5e and Cat6 data and voice copper cables.

b. Test for 10 Gb/s data transmission or higher on fiber optic cables.

c. Provide labels at jacks and patch panels.

   i. Label each with the corresponding unit number.

d. Provide test results for all cables.

e. Provide as-built drawings upon completion.

   i. Provide list of AP by Mac address and the unit in which they're installed ii.

   Provide a list of switch ports and the unit to which that port is run

6. Installer

a. Lead installer must be BICSI Technician certified

7. Landlord provided equipment

a. Landlord will provide network hardware including Firewall, switches, WAPs and SFPs (if required).

   i. Firewalls will be Palo Alto NGFW ii.

   Switches will be Juniper EX2300 series

   iii. Access points will be Mist AP32 (ceiling mount) AP12 (in-wall mount) and Mist AP62 (outdoor)

8. Sonder's preferred vendor is Insight. We have secured very favorable pricing for this equipment.

a. Our Insight account team contact info:

   i. John Fitch 480-544-7080  jfitch@insight.com

b. The equipment may be sourced elsewhere if better pricing is available.

9. Installer provided equipment

a. Installer will provide racks/cabinets, mounting hardware and cabling

10. Equipment Naming Standards

a. Firewalls <Building Code>_FW<floor number>

   i. MDF Firewall for Cadillac Square - DET-CADI139_ FW1

b. Switches <Building Code>_ SW< floor number>

   i. 3rd floor Switch – DET-CADI139_SW3

    c.  Access Points AP<unit# in which it is located>

        i. Access Point in unit #2 – AP02

    d.  Provide Sonder a list of devices with Name and MAC address

11. Bandwidth requirements

    a.  The baseline for bandwidth is per-bedroom in each unit + Salto + cameras. This can always be adjusted up or down after it's installed, this is just a baseline.

        i.  The first bedroom requires 10mbit, each additional bedroom requires 7mbit.

        ii.  Locks requires 25mbit per building iii. Cameras require 5mbit per camera.

        iv. For example - if a building has 4x 2br units, 10x 1br units, salto locks, and 10 cameras, the bandwidth required is 243mbit. Rounding up is always better than rounding down, more is always acceptable

12. Rack Guidelines

    a.  If using vertical wall mount cabinets mount devices per manufacturer instructions.

        i.  Mount the UPS at the bottom of the rack

        ii.  If using a camera server/NVR mount it on the bottom third iii. Network equipment should be mounted according to rack manufacturer guidelines for weight distribution

            • Rackmount firewalls to be mounted below last switch

            • Desktop firewall to be set on a rack shelf below last switch

            • DAC interconnects to be used where possible

        iv. Patch panel to be mounted directly above the switch it is servicing

            • Patch cables between switch and patch panel should be no longer than 12 inches

13. Cabling requirements

    a.  Each IDF must have a home run to the MDF.

        i. Copper runs must not exceed 90 meters ii. Multi Mode Fiber if run is under 400 meters iii. Single Mode Fiber if run is over 400 meters.

    b.  Home runs to terminate directly in firewall if possible, if not a distribution switch will be used.

14. IDF + MDF Rack & Stack

    a. MDF devices to be installed according to mfgr recommendations, example rack elevation is below, see  )

    b. IDF devices to be installed in locked enclosures, wall mount enclosures, tabletop or floor racks are acceptable.  Enclosure or racks to be sized for the number of devices to be installed with an extra 1U space for future expansion.

15. Wifi antennas (access points) to be installed in accordance to manufacturer specifications.

    a. Requirements

       i   -76dbm is lowest acceptable wifi signal strength in all areas of the building.

       ii  Wifi must be available in all areas of the building

    b. Wifi design

         i. Landlord must provide antenna locations to Sonder for approval prior to any installation work in a heat map format, showing each antenna location on current floor plans.

            • This should be provided as an ekahau compatible file.

         ii. If the installer is not equipped to create this Sonder can provide the design at additional cost.

16. Handoff to Sonder once installation is complete

    a. When equipment is racked and powered on Sonder Network is to be notified.

         i. Sonder will provide XML file for PAN firewall initial configuration

         ii. Sonder will configure wifi via cloud console iii. Sonder will configure switches remotely

    b. Sonder may request an RF survey to confirm signal strength requirements and wifi availability

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B3

**Interior Design | August 2020**

# Look & Feel Guide

Interior Finishes

**SONDER**



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B3

# Contents

Introduction

Modern

Traditional modern

Retro modern

# Introduction

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B3

# Look & Feel Guide

**How to use this document**

The Look and Feel Guide illustrates Sonder's brand voice for its interior finish standards. All interior finishes must meet the <u>performance standards</u>.

For each new project, an Interior Finish Schedule with corresponding specifications must be submitted for approval.

This deck highlights Sonder's look and feel for the following materials:

- Flooring
- Wall finishes (paint, tile, etc.)
- Plumbing fixtures (showers, vanities, kitchen, etc.)
- Millwork (cabinets, vanities, built-ins, etc.)
- Appliances
- Doors and windows

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B3

# Modern

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B3

**Modern**

# Creative concept

## Overview

   

**Modern**

# Interior finish inspiration

## Kitchen

   

**Modern**

# Interior finish inspiration

## Bathroom






**Modern**

# Interior finish inspiration

## Mood board



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# Traditional modern

# Creative concept

## Overview






# Interior finish inspiration

## Kitchen






**Traditional modern**

# Interior finish inspiration

## Bathroom

   

**Traditional modern**

# Interior finish inspiration

## Mood board



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891E4633B2

# Retro modern

**Retro modern**

# Creative concept

## Overview






**Retro modern**

# Interior finish inspiration

## Kitchen






**Retro modern**

# Interior finish inspiration

## Bathroom






**Retro modern**

# Interior finish inspiration

## Mood board



# Thank you.

## SCHEDULE 2 TO EXHIBIT C

## SUBMITTAL SCHEDULE

(to be attached)

**<u>SCHEDULE 3 TO EXHIBIT C</u>**

**OVERALL PROJECT SCHEDULE**

(to be attached)

**<u>SCHEDULE 4 TO EXHIBIT C</u>**

**CONSTRUCTION SCHEDULE**

(to be attached)

## SCHEDULE 5 TO EXHIBIT C

## FORM OF LANDLORD AND ARCHITECT CERTIFICATION

## LANDLORD AND ARCHITECT CERTIFICATION

This Certification (this "**Certification**") is made this [_____] day of [_____, 20__], by **[_____]** ("**Landlord**") and [_____] ("**Architect**") to **SONDER HOSPITALITY USA INC.**, a Delaware corporation ("**Tenant**") pursuant to that certain Lease Agreement dated [_____], 20[__] ("**Lease**") by and between Landlord and Tenant.

<center>Recitals:</center>

A.   Under Section [____] of the Lease, Landlord and Architect are required to provide certifications on this form stating Landlord is on schedule to deliver the Premises with the Final Completion Conditions achieved by the Scheduled Final Completion Date.

B.   Capitalized terms used but not defined herein shall have the meaning set forth in the Lease.

Landlord and Architect, as applicable, hereby certify to Tenant as follows:

1.       Architect hereby certifies to Tenant that Landlord commenced the construction of Landlord's Work no later than the Scheduled Construction Commencement Date of [_____, 20__].

2.       Architect hereby certifies to Tenant that the following Landlord's Work has been completed        as        of        the        date        of        this        Certification: [_____].

3.       Each of Architect and Landlord hereby certifies that Landlord is on schedule (based on the Construction Schedule) to deliver the Premises in the Final Completion Condition by the Scheduled Final Completion Date which is [_____, 20 ____].

4.       Landlord hereby agrees that, in the event any of Landlord's Work certified complete by the Architect pursuant to this Certification subsequently requires any correction work to satisfy any of the Final Completion Conditions ("**Corrections**"), (a) such Corrections shall be performed promptly by Landlord at Landlord's sole cost and expense, (b) Tenant may commence, at its sole discretion, its Onboarding Work notwithstanding Landlord's performance of such Corrections, and (c) the Commencement Date shall in no event occur until the Corrections are completed to Tenant's satisfaction.  The foregoing provisions shall be in addition to, and in no way limit, Tenant's rights or the definition of the Commencement Date under the Lease.

5.       Subject to the provisions of the Lease, this Certification shall bind and inure to the benefit of Landlord, Architect and Tenant and their respective legal representatives, successors and assigns.

IN WITNESS WHEREOF, Landlord and Architect have executed this Certification as of the date and year first above written.

**LANDLORD:**

[_____],

a [_____]

By: _____

Name: _____

Title: _____

**ARCHITECT:**

[_____],

a [_____]

By: _____

Name: _____

Title: _____

**EXHIBIT D**

**FORM COMMENCEMENT DATE CERTIFICATE**

<u>**COMMENCEMENT DATE CERTIFICATE**</u>

This Commencement Date Certificate (this "**Certificate**") is entered into this _____ day of _____, 20__, by and between [_____], a [_____] ("**Landlord**") and Sonder Hospitality USA Inc., a Delaware corporation ("**Tenant**"), who declare the following:

Recitals:

A.  Landlord and Tenant have entered into that certain Lease Agreement, dated _____, 20____ ("**Lease**") for the Premises located at [_____], and,

B.  Landlord and Tenant now wish to set forth their agreements as to certain key dates during the Term of this Lease.  Capitalized terms used but not defined herein shall have the meanings set forth in the Lease.

Agreement:

In consideration of the mutual promises and covenants set forth in the Lease, Landlord and Tenant agree as follows:

1.  The Final Completion Date  occurred on _____, 20____. [Revise as applicable if there is staggered handover for batches of Units]

2.  The Commencement Date occurred on _____ ____, 20___ (the "**Commencement Date**").

3.  [The following initial Units were delivered on the Commencement Date: Units [X-X].  The first Expansion Date occurred on _____ ____, 20___, and the following Units were delivered on such date: Units [X-X].  The second Expansion Date occurred on _____ ____, 20___, and the following Units were delivered on such date: Units [X-X.] [Include if applicable; revise as appropriate based on number of Expansion Dates]

4.  The Rent payments shall commence _____ ____, 20___ .  The Rent amounts and payment dates during the Initial Term of the Lease shall be set forth on <u>Exhibit "A"</u> attached hereto.

5.  The Expiration Date of the Initial Term shall be _____, 20____, unless sooner terminated or extended in accordance with the Lease.

6.  The date by which the [First Renewal Option] must be exercised is no earlier than

CHI – 1436 Randolph – Exhibit D

_____ ____, 20___ and no later than _____ ____, 20___.

[*Signature Page Follows*]

The parties hereto have executed this Certificate as of the day and year first written above.

**LANDLORD:**

[_____],
a [_____]

By: _____ _____
    Name:_____
    Title:_____

**TENANT:**

**SONDER HOSPITALITY USA INC.,**
a Delaware corporation

By: _____ _____
    Name:_____
    Title:_____

**Exhibit "A"**

**<u>Rent Payment Schedule</u>**

(to be attached)

# EXHIBIT E

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "**Memorandum**") is executed as of _____, 20__, by and between [_____], a [_____] ("**Landlord**"), and **SONDER HOSPITALITY USA INC.**, a Delaware corporation ("**Tenant**").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement, dated the same date herewith (the "**Lease**"), pursuant to which Landlord leases to Tenant certain premises more fully described in the Lease (the "**Premises**") in the property located at [_____] (as described in Exhibit A attached hereto, the "**Property**"), for an initial Term of [_____] ([___]) years, with Tenant having the right to [_____] ([___]) options to extend the Term of the Lease for an additional period of [_____] ([___]) years each; and

WHEREAS, Landlord and Tenant have executed this Memorandum to provide third parties with notice of the existence of the Lease.

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, the parties to this Memorandum agree as follows:

1. Recitals. The recitals above are incorporated by reference into this paragraph as if set forth in full.

2. Notice of Lease. Landlord and Tenant agree that this Memorandum is intended to provide notice to third parties of the existence of the Lease. This Memorandum is not a complete summary of the Lease, and shall not amend or modify the Lease. In the event of a conflict between the terms of this Memorandum and the terms of the Lease, the terms of the Lease shall control. Upon the expiration or earlier termination of the term of the Lease, this Memorandum shall automatically terminate, and Landlord shall be entitled to record a notice of termination on its own signature. Landlord shall be deemed to be Tenant's attorney-in-fact (which power of attorney shall be irrevocable and coupled with an interest) for the sole purpose of executing and recording such termination notice.

3. Applicable Law. This Memorandum shall be interpreted in accordance with the laws of the State of [_____] (without regard to principles of conflicts of laws). Neither the rule against perpetuities nor any similar law of the State of [_____] shall apply to this Memorandum or the Lease.

[remainder of page intentionally left blank]

1

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-802A-D891FE4633B2

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date and year first above written.

**LANDLORD**:

[_____],

a [_____]

By: _____    _____

    Name:_____

    Title:_____

STATE OF _____    )

COUNTY OF _____    )  ss:

I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of _____, Landlord in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

GIVEN under my hand and notarial seal this _____ day of _____, 20__.

_____

Notary Public

My Commission Expires:

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

CHI – 1436 Randolph – Exhibit E

DocuSign Envelope ID: 6994D4B4-E859-4B15-802A-D891F54633B2

**TENANT**:

**SONDER HOSPITALITY USA INC.,**
a Delaware corporation


By:    _____
        Name:
        Title:


STATE OF                         )
COUNTY OF                     ) ss:

        I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of **SONDER HOSPITALITY USA INC.**, the Tenant in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

        GIVEN under my hand and notarial seal this _____ day of _____, 20__.


_____
Notary Public

My Commission Expires:

**<u>Exhibit A</u>**

**Legal Description of Project**

(to be inserted)

**EXHIBIT F**

INTENTIONALLY DELETED

**EXHIBIT G**

**SCHEDULE OF SERVICES**

(to be attached)

| Category | Equipment/Service | Frequency of Service | Responsible Party |
|---|---|---|---|
| Heating, Ventilating, and Air Conditioning (HVAC) | Servicing HVAC Filters (in the Premises) | 2x per year | Tenant |
| | Servicing HVAC Filters (outside the Premises) | 2x per year | Landlord |
| | Replacement of light bulbs for Non-Wired (Plug-in) Lighting (outside the Premises) | As necessary | Landlord |
| | Replacement of light bulbs for Non-Wired (Plug-in) Lighting (in the Premises) | As necessary | Tenant |
| | Replacement of light bulbs for Hard Wired Lighting | As necessary | Landlord |
| Electronic Safety and Security | Battery replacement of unit door access control (Door handle/lock) | 1x per year | Tenant |
| | Battery replacement of smoke detectors (in Premises) | 2x a year | Tenant |
| | Battery replacement of smoke detectors (outside the Premises) | 2x a year | Landlord |
| | Cleaning Service (in the Premises and hallways exclusively serving the Premises) | As necessary | Tenant |
| | Cleaning Service (rest of the building) | As necessary | Landlord |
| | Life Safety, Fire Detection, and Alarm Inspection & Testing | As required by Law | Landlord |
| | Trash Removal (From trash room) | As necessary | Landlord |
| Building Services | Recycling (From trash room) | As necessary | Landlord |
| | Pest Control  (outside the Premises) | As necessary | Landlord |
| | Exterior Window Cleaning | 4x per year | Landlord |
| | Landscaping | As necessary | Landlord |
| | Snow and Ice Removal | As necessary | Landlord |

**EXHIBIT H**

**ADDITIONAL RENT SCHEDULE**

| Deal Month | Beg. Principal | Total Monthly Payment | Full Payment Amount |
|---|---|---|---|
| Month 1 | $540,619 | $11,092 | $533,357 |
| Month 2 | $533,357 | $11,092 | $526,043 |
| Month 3 | $526,043 | $11,092 | $518,678 |
| Month 4 | $518,678 | $11,092 | $511,260 |
| Month 5 | $511,260 | $11,092 | $503,790 |
| Month 6 | $503,790 | $11,092 | $496,267 |
| Month 7 | $496,267 | $11,092 | $488,690 |
| Month 8 | $488,690 | $11,092 | $481,060 |
| Month 9 | $481,060 | $11,092 | $473,376 |
| Month 10 | $473,376 | $11,092 | $465,638 |
| Month 11 | $465,638 | $11,092 | $457,844 |
| Month 12 | $457,844 | $11,092 | $449,996 |
| Month 13 | $449,996 | $11,092 | $442,092 |
| Month 14 | $442,092 | $11,092 | $434,131 |
| Month 15 | $434,131 | $11,092 | $426,115 |
| Month 16 | $426,115 | $11,092 | $418,042 |
| Month 17 | $418,042 | $11,092 | $409,911 |
| Month 18 | $409,911 | $11,092 | $401,723 |
| Month 19 | $401,723 | $11,092 | $393,477 |
| Month 20 | $393,477 | $11,092 | $385,172 |
| Month 21 | $385,172 | $11,092 | $376,809 |
| Month 22 | $376,809 | $11,092 | $368,386 |
| Month 23 | $368,386 | $11,092 | $359,904 |
| Month 24 | $359,904 | $11,092 | $351,362 |
| Month 25 | $351,362 | $11,092 | $342,759 |
| Month 26 | $342,759 | $11,092 | $334,095 |
| Month 27 | $334,095 | $11,092 | $325,370 |
| Month 28 | $325,370 | $11,092 | $316,583 |
| Month 29 | $316,583 | $11,092 | $307,734 |
| Month 30 | $307,734 | $11,092 | $298,822 |

CHI – 1436 Randolph – Exhibit H

| Month 31 | $298,822 | $11,092 | $289,847 |
| Month 32 | $289,847 | $11,092 | $280,809 |
| Month 33 | $280,809 | $11,092 | $271,706 |
| Month 34 | $271,706 | $11,092 | $262,539 |
| Month 35 | $262,539 | $11,092 | $253,307 |
| Month 36 | $253,307 | $11,092 | $244,010 |
| Month 37 | $244,010 | $11,092 | $234,647 |
| Month 38 | $234,647 | $11,092 | $225,217 |
| Month 39 | $225,217 | $11,092 | $215,721 |
| Month 40 | $215,721 | $11,092 | $206,157 |
| Month 41 | $206,157 | $11,092 | $196,526 |
| Month 42 | $196,526 | $11,092 | $186,826 |
| Month 43 | $186,826 | $11,092 | $177,058 |
| Month 44 | $177,058 | $11,092 | $167,220 |
| Month 45 | $167,220 | $11,092 | $157,313 |
| Month 46 | $157,313 | $11,092 | $147,336 |
| Month 47 | $147,336 | $11,092 | $137,288 |
| Month 48 | $137,288 | $11,092 | $127,169 |
| Month 49 | $127,169 | $11,092 | $116,978 |
| Month 50 | $116,978 | $11,092 | $106,715 |
| Month 51 | $106,715 | $11,092 | $96,379 |
| Month 52 | $96,379 | $11,092 | $85,970 |
| Month 53 | $85,970 | $11,092 | $75,488 |
| Month 54 | $75,488 | $11,092 | $64,931 |
| Month 55 | $64,931 | $11,092 | $54,299 |
| Month 56 | $54,299 | $11,092 | $43,592 |
| Month 57 | $43,592 | $11,092 | $32,809 |
| Month 58 | $32,809 | $11,092 | $21,950 |
| Month 59 | $21,950 | $11,092 | $11,014 |
| Month 60 | $11,014 | $11,092 | $0 |

CHI – 1436 Randolph – Exhibit H

# EXHIBIT I

# APPROVED VENDORS

(to be provided by Landlord)

**EXHIBIT J**

**SIGNAGE PLAN**

(to be provided by Tenant)

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# SONDER

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

1

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# EXTERIOR SIGNAGE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

2



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

5'-7 1/8"
10"
SONDER

**FRONT VIEW**
**SCALE: 1"=1'-0"**

**SIGNTYPE** **SON-LPL-10-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) LED FACE LIT ACRYLIC LETTER SET**

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

SONDER

**ISOMETRIC VIEW, DAYTIME**

SONDER

**ISOMETRIC VIEW, NIGHT TIME**

1 ¼"
P2
#8 x 32 STUD ATTACHMENT THROUGH BACK
FACE LIT ACRYLIC LETTER
REMOTE LED POWER SUPPLY
ACCESS FOR REMOTE POWER SUPPLY PLACEMENT TO BE PROVIDED BY GC
6500K WHITE LEDS

**SECTION DETAIL** **SCALE: 3" = 1'-0"**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

3



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

VARIES
7"
1234

**FRONT VIEW**
**SCALE: 3"=1'-0"**

**SIGNTYPE** **SON-ADDRESS-LPL-7-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) LED FACE LIT ACRYLIC LETTER SET**

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

1234

**ISOMETRIC VIEW, DAYTIME**

1234

**ISOMETRIC VIEW, NIGHT TIME**

1 ¼"
P2
#8 x 32 STUD ATTACHMENT
THROUGH BACK
FACE LIT ACRYLIC LETTER
REMOTE LED POWER SUPPLY
ACCESS FOR REMOTE
POWER SUPPLY PLACEMENT
TO BE PROVIDED BY GC
6500K WHITE LEDS

**SECTION DETAIL** **SCALE: 3" = 1'-0"**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

4

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

VARIES
7"
1234

FRONT VIEW
SCALE: 3"=1'-0"

1 ¼"
P2
#8 x 32 STUD ATTACHMENT
THROUGH BACK
FACE LIT ACRYLIC LETTER
WITH PERFORATED BLACK VINYL OVERLAY
V2
REMOTE LED POWER SUPPLY
ACCESS FOR REMOTE
POWER SUPPLY PLACEMENT
TO BE PROVIDED BY GC
6500K WHITE LEDS

SECTION DETAIL SCALE: 3" = 1'-0"

**SIGNTYPE** **SON-ADDRESS-LPL-7-B**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) LED FACE LIT ACRYLIC LETTER SET

| PAINT | | VINYL | |
|---|---|---|---|
| P2 | MATTHEWS BLACK, MATTE FINISH | V2 | 3M #3635-222 DUAL FILM DAY/NIGHT BLACK VINYL |

1234

ISOMETRIC VIEW, DAYTIME

1234

ISOMETRIC VIEW, NIGHT TIME

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:
date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1
5

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

VARIES
7"
1234

**FRONT VIEW**
**SCALE: 3"=1'-0"**

1"
P1
1" THICK PLEX FCO
THREADED STUD/SILICONE
BRASS FINSERT

**SECTION DETAIL SCALE: 3" = 1'-0"**

**SIGNTYPE SON-ADDRESS-FCO-7-W-NI**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED LETTERSET**

**PAINT**

**P1** MATTHEWS WHITE, MATTE FINISH

1234

**ISOMETRIC VIEW**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

6

VARIES
7"
1234

**FRONT VIEW**
**SCALE: 3"=1'-0"**

1"
P2
1" THICK PLEX FCO
THREADED STUD/SILICONE
BRASS FINSERT

**SECTION DETAIL SCALE: 3" = 1'-0"**

**SIGNTYPE** **SON-ADDRESS-FCO-7-B-NI**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED LETTERSET**

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

1234

**ISOMETRIC VIEW**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



¼”
2”
16”
¼”
15½”
¼”
EQ
10.62”
EQ
¼”
SONDER
EQ
1.65”
10½”
11”
EQ
¼”
¼” THICK ALUM. PLATE
1
ACORN NUTS

**FRONT VIEW**
**SCALE: 3”=1’-0”**

3”
P1 .125” ALUMINUM CABINET RETURNS
P1 .25”x.125” ALUMINUM TRIM
3/4” X 3/4” X .125” ALUM. ANGLE INSET 1/8” & WELDED TO FACE PANEL
6500K WHITE LEDS
3/4” THICK #2447 DIFFUSER PLEX PUSH THRU COPY
1½” X 1½” ALUM. SQ. TUBE SUPPORT
V2 1ST SURFACE
#6 COUNERSUNK SCREWS TOP AND BOTTOM (TYP. ON REMOVABLE SIDE ONLY)
WEEP HOLE AND LIGHT BAFFLE REQ’D
(EXTERIOR LOCATIONS)

1 **SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** | **SON-BLD-11X16-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED DOUBLE FACED BLADE SIGN**

**PAINT**

P1 MATTHEWS WHITE, MATTE FINISH

**VINYL**

V2 3M #7725-22 OPAQUE MATTE BLACK VINYL

SONDER

**ISOMETRIC VIEW**
**DAY TIME**

SONDER

**ISOMETRIC VIEW**
**NIGHT TIME**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



¼”
2”
16”
¼”
15½”
¼”
EQ
10.62”
EQ
¼”
SONDER
EQ
1.65”
10½”
11”
EQ
¼”
¼” THICK ALUM. PLATE
1
ACORN NUTS

**FRONT VIEW**
**SCALE: 3”=1’-0”**

3”
P2 .125” ALUMINUM CABINET RETURNS
P2 .25”x.125” ALUMINUM TRIM
3/4” X 3/4” X .125” ALUM. ANGLE INSET 1/8” & WELDED TO FACE PANEL
6500K WHITE LEDS
3/4” THICK CLEAR PLEX PUSH THRU COPY
1½” X 1½” ALUM. SQ. TUBE SUPPORT
V1 1ST SURFACE
#6 COUNERSUNK SCREWS TOP AND BOTTOM (TYP. ON REMOVABLE SIDE ONLY)
WEEP HOLE AND LIGHT BAFFLE REQ’D
(EXTERIOR LOCATIONS)

1 **SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-11X16-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED DOUBLE FACED BLADE SIGN**

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

**VINYL**

**V1** 3M #7725-20 OPAQUE MATTE WHITE VINYL

SONDER

**ISOMETRIC VIEW**
**DAY TIME**

SONDER

**ISOMETRIC VIEW**
**NIGHT TIME**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



¼”
2”
11”
¼”
10½”
¼”
EQ
3”
EQ
¼”
5”
1½”
EQ
SONDER
19.3
39½”
40”
6”
EQ
¼”
1

FRONT VIEW
SCALE: 1½”=1’-0”

3”
3/4” THICK #2447 DIFFUSER
PLEX PUSH THRU COPY
P1 .125” ALUMINUM
CABINET FACE & RETURNS
V2 1ST SURFACE
6500K WHITE LEDS
1½” X 1½” ALUM.
SQ. TUBE SUPPORT
#6 COUNERSUNK SCREWS
TOP AND BOTTOM
(TYP. ON REMOVABLE SIDE ONLY)
3/4” X 3/4” X .125” ALUM.
ANGLE INSET 1/8” & WELDED
TO FACE PANEL
P1 .25”x.125” ALUMINUM TRIM
WEEP HOLE AND
LIGHT BAFFLE REQ’D
(EXTERIOR LOCATIONS)

1 SECTION DETAIL
SCALE: 3”=1’-0”

SONDER

ISOMETRIC VIEW

| SIGNTYPE | SON-BLD-40X11-W |
|---|---|

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED DOUBLE FACED BLADE SIGN

**PAINT**

P1 MATTHEWS WHITE, MATTE FINISH

**VINYL**

V2 3M #7725-22 OPAQUE MATTE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

¼"
2"
11"
¼"
10½"
¼"
EQ
3"
EQ
¼"
5"
1½"
EQ
19.3
39½"
40"
SONDER
6"
EQ
¼"
1

FRONT VIEW
SCALE: 1½"=1'-0"

3"
3/4" THICK CLEAR PLEX PUSH THRU COPY
P2 .125" ALUMINUM CABINET FACE & RETURNS
V1 1ST SURFACE
6500K WHITE LEDS
1½" X 1½" ALUM. SQ. TUBE SUPPORT
#6 COUNERSUNK SCREWS TOP AND BOTTOM (TYP. ON REMOVABLE SIDE ONLY)
3/4" X 3/4" X .125" ALUM. ANGLE INSET 1/8" & WELDED TO FACE PANEL
P2 .25"x.125" ALUMINUM TRIM
WEEP HOLE AND LIGHT BAFFLE REQ'D
(EXTERIOR LOCATIONS)

1 SECTION DETAIL
SCALE: 3"=1'-0"

SONDER

ISOMETRIC VIEW

**SIGNTYPE** **SON-BLD-40X11-B**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED DOUBLE FACED BLADE SIGN

**PAINT**

P2 MATTHEWS BLACK, MATTE FINISH

**VINYL**

V1 3M #7725-20 OPAQUE MATTE WHITE VINYL

Signtech 4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

11



**FRONT VIEW**
**SCALE: 3”=1’-0”**

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-NI-11X16-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED DOUBLE FACED BLADE SIGN**

**PAINT**

P1 MATTHEWS WHITE, MATTE FINISH

**VINYL**

V2 3M #7725-22 OPAQUE MATTE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

20”
18 7/8”
1 1/8”
16”
1/2”
8 1/2”
1/2”
3/4” ALUM. ROUND PIPE ‘HANGBAR’
SONDER
1”
2”
EQ
1.65”
11”
EQ
EQ
10.62”
EQ
16”

**FRONT VIEW**
**SCALE: 3”=1’-0”**

1/8” X 4” DIA. ALUMINUM COVER PLATE
3/4” DIA. STEEL PIPE ‘HANGBAR’
1/4” x 7/8” DIA. STEEL END CAP
CUSTOM FABRICATED STEEL CLIP W/ ACORN NUT & COUNTER-SUNK SCREW ATTACHMENT WELDED TO 3/4” DIA. STEEL PIPE ‘HANGBAR’ ATTACHMENT HARDWARE PAINTED MATTE BLACK
4”
1¾”
¼” CLEAR PLEX P2
V1
¼”

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-NI-11X16-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED DOUBLE FACED BLADE SIGN**

**PAINT**

P2 MATTHEWS BLACK, MATTE FINISH

**VINYL**

V1 3M #7725-20 OPAQUE MATTE WHITE VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

13



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

20”
18 7/8”
1 1/8”
16”
3/4” ALUM.
ROUND PIPE
‘HANGBAR’
D2
SONDER
EQ
1.65”
11”
EQ
ATTACHMENT
HARDWARE / GROMMETS
PAINTED MATTE BLACK
EQ
10.62”
EQ
16”

**FRONT VIEW**
**SCALE: 3”=1’-0”**

1/8” X 4” DIA. ALUMINUM
COVER PLATE
3/4” DIA. STEEL PIPE
‘HANGBAR’
4”
1¾”
1/4” x 7/8” DIA. STEEL
END CAP
ALL ATTACHMENT HARDWARE PAINTED
MATTE BLACK
WHITE SUNBRELLA
#4604-0000

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-NI-11X16-BANNER-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SUNBRELLA BLADE SIGN BANNER**

**DIGITAL PRINT**

**D2** DIGITALLY PRINTED BLACK WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:**
**rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

14

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

20”
18 7/8”
1 1/8”
16”
3/4” ALUM.
ROUND PIPE
‘HANGBAR’
D2
SONDER
EQ
1.65”
11”
EQ
EQ
10.62”
EQ
16”
ATTACHMENT
HARDWARE / GROMMETS
PAINTED MATTE BLACK

**FRONT VIEW**
**SCALE: 3”=1’-0”**

1/8” X 4” DIA. ALUMINUM
COVER PLATE
4”
1¾”
3/4” DIA. STEEL PIPE
‘HANGBAR’
1/4” x 7/8” DIA. STEEL
END CAP
ALL ATTACHMENT HARDWARE PAINTED
MATTE BLACK
BLACK SUNBRELLA
#4608-0000

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-NI-11X16-BANNER-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SUNBRELLA BLADE SIGN BANNER**

**DIGITAL PRINT**

D1 DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

15



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

16"
14 7/8"
11"
1/2"
6 1/2"
1/2"
1"
2"
3/4" ALUM.
ROUND PIPE
'HANGBAR'
EQ
SONDER
19.3
40"
EQ

FRONT VIEW
SCALE: 1 1/2"=1'-0"

1/8" X 4" DIA. ALUMINUM
COVER PLATE
3/4" DIA. STEEL PIPE
'HANGBAR'
1/4" x 7/8" DIA. STEEL
END CAP
4"
1¾"
¼" ALUMINUM
PANEL
P1
CUSTOM FABRICATED STEEL CLIP
W/ ACORN NUT & COUNTER-SUNK
SCREW ATTACHMENT WELDED
TO 3/4" DIA. STEEL PIPE 'HANGBAR'
ATTACHMENT HARDWARE PAINTED
MATTE BLACK
V2
¼"

SECTION DETAIL
SCALE: 3"=1'-0"

**SIGNTYPE** **SON-BLD-NI-11X40-W**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED DOUBLE FACED BLADE SIGN

**PAINT**

P1 MATTHEWS WHITE, MATTE FINISH

**VINYL**

V2 3M #7725-22 OPAQUE MATTE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

16

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

16”
14 7/8”
11”
1/2”
6 1/2”
1/2”
1”
2”
EQ
19.3
40”
EQ
SONDER
3/4” ALUM.
ROUND PIPE
‘HANGBAR’

FRONT VIEW
SCALE: 1 1/2”=1’-0”

1/8” X 4” DIA. ALUMINUM
COVER PLATE
3/4” DIA. STEEL PIPE
‘HANGBAR’
1/4” x 7/8” DIA. STEEL
END CAP
CUSTOM FABRICATED STEEL CLIP
W/ ACORN NUT & COUNTER-SUNK
SCREW ATTACHMENT WELDED
TO 3/4” DIA. STEEL PIPE ‘HANGBAR’
ATTACHMENT HARDWARE PAINTED
MATTE BLACK
4”
1¾”
¼” ALUMINUM
PANEL
P2
V1
¼”

SECTION DETAIL
SCALE: 3”=1’-0”

**SIGNTYPE** | **SON-BLD-NI-11X40-B**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED DOUBLE FACED LOZENGE BLADE SIGN

**PAINT**

P2 MATTHEWS BLACK, MATTE FINISH

**VINYL**

V1 3M #7725-20 OPAQUE MATTE WHITE VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing:
rev: R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

17



16”
14 7/8”
11”
EQ
19.3
40”
EQ
SONDER
D2
ATTACHMENT
HARDWARE / GROMMETS
PAINTED MATTE BLACK

**FRONT VIEW**
**SCALE: 1½”=1’-0”**

1/8” X 4” DIA. ALUMINUM
COVER PLATE
3/4” DIA. STEEL PIPE
‘HANGBAR’
1/4” x 7/8” DIA. STEEL
END CAP
ALL ATTACHMENT HARDWARE PAINTED
MATTE BLACK
4”
1¾”
WHITE SUNBRELLA
#4604-0000

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** **SON-BLD-NI-11X40-BANNER-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SUNBRELLA BLADE SIGN BANNER**

**DIGITAL PRINT**

**D2** DIGITALLY PRINTED BLACK WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

16”
14 7/8”
11”
EQ
19.3
40”
EQ
SONDER
D1
ATTACHMENT
HARDWARE / GROMMETS
PAINTED MATTE BLACK

**FRONT VIEW**
**SCALE: 1½”=1’-0”**

1/8” X 4” DIA. ALUMINUM
COVER PLATE
3/4” DIA. STEEL PIPE
‘HANGBAR’
4”
1¾”
1/4” x 7/8” DIA. STEEL
END CAP
ALL ATTACHMENT HARDWARE PAINTED
MATTE BLACK
BLACK SUNBRELLA
#4608-0000

**SECTION DETAIL**
**SCALE: 3”=1’-0”**

**SIGNTYPE** | **SON-BLD-NI-11X40-BANNER-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SUNBRELLA BLADE SIGN BANNER**

**DIGITAL PRINT**

D1 DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

19



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

7”
1 ¾”
3 ½”
5/8”
3/16”
5/8”
3/8”
4321
1/16” STROKE
SONDER
SCALE: 1:2
7”
1 ¾”
3 ½”
5/8”
3/16”
5/8”
3/8”
765
V1
SONDER
SCALE: 1:2

7”
2 ½”
4 ¼ ”
5/8”
3/16”
5/8”
3/8”
28
SONDER
SCALE: 1:2
7”
2 ½”
4 ¼ ”
5/8”
3/16”
5/8”
3/8”
0
V2
SONDER
SCALE: 1:2

**E3** **SIGNTYPE** **SON-VYL-3X7-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) DOOR VINYL(S)**
VINYL TO BE APPLIED SECOND SURFACE ON WINDOWS

**VINYL**

**V1** 3M #7725-20 OPAQUE MATTE WHITE VINYL

**E3** **SIGNTYPE** **SON-VYL-3X7-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) DOOR VINYL(S)**
VINYL TO BE APPLIED SECOND SURFACE ON WINDOWS

**VINYL**

**V2** 3M #7725-22 OPAQUE MATTE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

20

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# LOBBY SIGNAGE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

21



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

25"
1
V3
We're glad you're here.
D2
35"
2 3/8"
1¾"
2 3/8"
6"
3/8"
2"
½"
3 ½"
1/32" STROKE
At Sonder, we're here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We're available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
SONDER
P1
SCALE: 1 1/2"=1'-0"

3"
#6 COUNTERSUNK SCREW
2 3/4" DEEP x .063" ALUM LETTER RETURN
3/4" x .063" ALUMINUM INSIDE RETURN (TYP. ALL AROUND)
CONSTRUCTION GRADE SILICONE AT ALL PENETRATIONS
.177" CLEAR PLEX FACE
WHITE LEDS
.125" ALUMINUM LETTER BACK
CONTINUOUS BEAD OF OPAQUE CONSTRUCTION ADHESIVE (TYP. ALL AROUND)
1/4" WIDE x .125" ALUMINUM TRIM LIP
FABRIC COATED CORD

1 SECTION DETAIL SCALE: 1 1/2"=1'-0"

**LI1** **SIGNTYPE** **SON-WS-35X25-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED SINGLE FACED LIGHT BOX SIGN**

**FACE:** .177" THICK CLEAR PLEX WITH TRANSLUCENT WHITE OVERLAY WITH DIGITALLY PRINTED BLACK INK WITH MATTE LAMINATE

**TRIM LIP:** 1/4" WIDE x .125" ALUMINUM PAINTED MATTHEWS MATTE BLACK.

**RETURNS:** 2 3/4" DEEP x .063" ALUMINUM PAINTED MATTHEWS MATTE BLACK. (OVERALL DEPTH =3")

**BACKS:** .125" ALUMINUM. PAINT ALL EXPOSED EXTERIOR EDGES MATTE BLACK.

**SCREWS:** #6 COUNTERSUNK SCREWS PAINTED MATTHEWS MATTE BLACK.

**ILLUMINATION:** WHITE LEDS

We're glad you're here.
SONDER

| PAINT | DIGITAL PRINT | VINYL |
|---|---|---|
| P2 MATTHEWS BLACK, MATTE FINISH | D2 DIGITALLY PRINTED BLACK WITH MATTE LAMINATE | V3 3M #3630-20 TRANSLUCENT MATTE WHITE VINYL |

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**
**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1
22

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

20"
1
9 5/8"
1 7/8"
1 1/8"
1 7/8"
28"
4 ¾"
3/8"
2"
½"
2 ½"
P1
D2
We're glad you're here.
1/32" STROKE
At Sonder, we're here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We're available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
SONDER

SCALE: 1 1/2"=1'-0"

KEYHOLE ATTACHMENT
1/8" BREAKFORMED ALUM.

1 SECTION DETAIL SCALE: 1 1/2"=1'-0"

**LI2** **SIGNTYPE** **SON-WS-28X20-W**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SINGLE FACED WALL SIGN

**PAINT**

P1 MATTHEWS WHITE, MATTE FINISH

**DIGITAL PRINT**

D2 DIGITALLY PRINTED BLACK WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

23



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

20”
1
P1
D1
9 5/8”
1 7/8”
1 1/8”
1 7/8”
28”
4 ¾”
3/8”
2”
½”
2 ½”
We’re glad
you’re here.
1/32” STROKE
At Sonder, we’re here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We’re available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
SONDER

SCALE: 1 1/2”=1’-0”

KEYHOLE ATTACHMENT
1/8” BREAKFORMED ALUM.

1 SECTION DETAIL SCALE: 1 1/2”=1’-0”

**LI2** **SIGNTYPE** **SON-WS-28X20-B**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED SINGLE FACED WALL SIGN

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

**DIGITAL PRINT**

**D1** DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

24

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval



20”
1
15”
5”
5”
3”
1”
3”
P2
D2
V3
Hi there,
traveler.
SONDER
1/16” STROKE

SCALE: 3”=1’-0”

9”
COUNTER SUNK SCREW
.125 ALUM. RETURN
1" x .063" ALUMINUM INSIDE
RETURN (TYP. ALL AROUND)
WHITE LEDS
.177” CLEAR PLEX FACE
.125 ALUM BACKER PANEL
CONTINUOUS BEAD OF OPAQUE
CONSTRUCTION ADHESIVE
(TYP. ALL AROUND)
1/4" WIDE x .125" ALUMINUM TRIM LIP

1 SECTION DETAIL SCALE: 3”=1’-0”

**LW1** **SIGNTYPE** **SON-WS-15X20-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) ILLUMINATED SINGLE FACED LIGHT BOX SIGN**

**FACE:** .177” THICK CLEAR PLEX WITH TRANSLUCENT WHITE OVERLAY WITH DIGITALLY PRINTED BLACK INK WITH MATTE LAMINATE
**TRIM LIP:** 1/4" WIDE x .125" ALUMINUM PAINTED MATTHEWS MATTE BLACK.
**RETURNS:** 2 3/4" DEEP x .063" ALUMINUM PAINTED MATTHEWS MATTE BLACK. (OVERALL DEPTH =3")
**BACKS:** .125" ALUMINUM. PAINT ALL EXPOSED EXTERIOR EDGES MATTE BLACK.
**SCREWS:** #6 COUNTERSUNK SCREWS PAINTED MATTHEWS MATTE BLACK.
**ILLUMINATION:** WHITE LEDS

Hi there,
traveler.
SONDER

| PAINT | DIGITAL PRINT | VINYL |
|---|---|---|
| P2 — MATTHEWS BLACK, MATTE FINISH | D2 — DIGITALLY PRINTED BLACK WITH MATTE LAMINATE | V3 — 3M #3630-20 TRANSLUCENT MATTE WHITE VINYL |

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

16"
1 7/8"
1"
3/8"
50"
We're glad you're here.
SONDER
1/16" STROKE
D1
P2

FRONT SIDE SCALE: 1 1/2"=1'-0"

1
We're glad you're here.
SONDER

BACK SIDE SCALE: 1 1/2"=1'-0"

BASE SIZE AND THICKNESS TBV

ROLLED ALUM. RETURN WELDED TO .125" ALUM. FACE (TYP. ALL AROUND)
1 ½"x 1½"x .125 ALUM. SQ. TUBE SUPPORT WELDED TO BACK OF .125" ALUM FACE
.125" ALUM. FACE
.125" ALUM. FACE PLUG WELDED TO SQ. TUBE AND CLIPS ON RETURN

1 SECTION DETAIL SCALE: 3"=1'-0"

LW2 SIGNTYPE SON-DIR-16X50-B NON-REMOVABLE FACE

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED ROUND DOUBLE FACED FREESTANDING SIGN(S)

PAINT

P2 MATTHEWS BLACK, SATIN FINISH w/ SATIN CLEARCOAT

DIGITAL PRINT

D1 DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

26



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

ROLLED ALUM. RETURN WELDED TO
.125" ALUM. FACE (TYP. ALL AROUND)
1 ½"x 1½"x .125 ALUM. SQ. TUBE SUPPORT
WELDED TO BACK OF .125" ALUM FACE
.125" ALUM. FACE
.125" ALUM. FACE PLUG
WELDED TO SQ. TUBE
AND CLIPS ON RETURN

50"
16"
1 7/8"
1"
3/8"
We're glad
you're here.
SONDER
D2
1/16" STROKE
P1

FRONT SIDE SCALE: 1 1/2"=1'-0"

We're glad
you're here.
SONDER

BASE SIZE AND THICKNESS TBV

BACK SIDE SCALE: 1 1/2"=1'-0"

1 SECTION DETAIL SCALE: 3"=1'-0"

**LW2** **SIGNTYPE** **SON-DIR-16X50-W** **NON-REMOVABLE FACE**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED ROUND DOUBLE FACED FREESTANDING SIGN(S)

**PAINT**

P1 MATTHEWS WHITE,
SATIN FINISH w/
SATIN CLEARCOAT

**DIGITAL PRINT**

D2 DIGITALLY PRINTED BLACK
WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

27



48”
6 3/4”
We’re glad
you’re here.
P2
37 5/8”
0.088” STROKE
At Sonder, we’re here to take your stay further.
Take a look in your inbox for complete check-in
instructions. Questions? We’re available 24/7
for anything you need to make your visit the best
it can be. Just shoot us a text at xxx-xxx-xxxx or
give us a ring at xxx-xxx-xxxx.
15 1/8”
D2
SONDER
28”

1/4”
1/4” THICK PLEX FCO LETTERS
WALL WITH VHB TAPE AND GLUE
DIGITALLY PRINTED VINYL

**SECTION** **HALF SCALE**

**LI3** | **SIGNTYPE** | **SON-FCO-PL-VYL-15X28-B** **SCALE: 1 1/2”=1’-0”**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) FCO WITH WALL VINYL(S)**

**“EXHALE...HERE”:** 1/4” PLEX PAINTED MATTHEWS WHITE, MATTE FINISH

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

**VINYL**

**D2** DIGITALLY PRINTED BLACK ON CLEAR WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



48”
6 3/4”
We’re glad you’re here.
P1
37 5/8”
0.088” STROKE
At Sonder, we’re here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We’re available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
15 1/8”
D1
SONDER
28”

1/4”
1/4” THICK PLEX FCO LETTERS
WALL WITH VHB TAPE AND GLUE
DIGITALLY PRINTED VINYL

**SECTION** **HALF SCALE**

**LI3 | SIGNTYPE | SON-FCO-PL-VYL-15X28-W**

**SCALE: 1 1/2”=1’-0”**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) FCO WITH WALL VINYL(S)**
**“EXHALE...HERE”:** 1/4” PLEX PAINTED MATTHEWS WHITE, MATTE FINISH

**PAINT**

**P1** MATTHEWS WHITE, MATTE FINISH

**VINYL**

**D1** DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

120”
16 7/8”
We’re glad you’re here.
94 1/8”
P2
37 3/4”
At Sonder, we’re here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We’re available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
V2
SONDER
70”

1/4”
1/4” THICK PLEX FCO LETTERS
WALL WITH VHB TAPE AND GLUE
VINYL

**SECTION HALF SCALE**

**LI3 SIGNTYPE SON-FCO-PL-VYL-37X70-B**

**SCALE: 1/2”=1’-0”**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) FCO WITH WALL VINYL(S)**

**“EXHALE...HERE”:** 1/4” PLEX PAINTED MATTHEWS BLACK, MATTE FINISH

**PAINT**

**P2** MATTHEWS BLACK, MATTE FINISH

**VINYL**

**V2** BLACK VINYL APPLIED FIRST SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**
**date:** 5/29/20
**drawing:**
**rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1
30



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

120”
16 7/8”
94 1/8”
37 3/4”
We’re glad you’re here.
At Sonder, we’re here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We’re available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text at xxx-xxx-xxxx or give us a ring at xxx-xxx-xxxx.
SONDER
70”
P1
V1

1/4”
1/4” THICK PLEX FCO LETTERS
WALL WITH VHB TAPE AND GLUE
VINYL

**SECTION HALF SCALE**

**LI3 SIGNTYPE SON-FCO-PL-VYL-37X70-W**

**SCALE: 1/2”=1’-0”**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) FCO WITH WALL VINYL(S)**
**“EXHALE...HERE”:** 1/4” PLEX PAINTED MATTHEWS WHITE, MATTE FINISH

**PAINT**

**P1** MATTHEWS WHITE, MATTE FINISH

**VINYL**

**V1** WHITE VINYL APPLIED FIRST SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

31

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

8”
3 1/8”
¾”
8”
1¾”
¼”
2 1/8”
We’re glad you’re here.
At Sonder, we’re here to take your stay further. Take a look in your inbox for complete check-in instructions. Questions? We’re available 24/7 for anything you need to make your visit the best it can be. Just shoot us a text or give us a ring at +1 (617) 300-0956.
SONDER
D2
D1
.015” STROKE

We’re glad you’re here.
SONDER

1 ½”
1 ½” THICK CLEAR PLEX WITH CLEAR POLISHED EDGES
SECOND SURFACE DIGITAL PRINT ON CLEAR

**SCALE: 1:2**

**LI4 | SIGNTYPE | SON-FCO-8X8**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED) NON-ILLUMINATED DESK SIGN(S)**

**DIGITAL PRINT**

D1 DIGITALLY PRINTED WHITE WITH MATTE LAMINATE

D2 DIGITALLY PRINTED BLACK WITH MATTE LAMINATE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

32

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

8"
2 1/4"
1/2"
8"
3/8"
1 7/8"
1 7/8"
This elevator is for the use of Sonder guests only.
SONDER

SCALE: 1:2

1/4"
1/8"
.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE
1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
RAISED TACTILE BRAILLE

**LI5** **SIGNTYPE** **SON-WS-8X8-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)**
**WALL MOUNTED DIRECTIONAL SIGN**

V2 SECOND SURFACE VINYL (OPTION 1)
.125 THICK PHOTOPOLYMER WITH BLACK VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED WHITE (OPTION 1)
ENTIRE SIGN TO BE MATTE CLEAR COATED
1/4" BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE
This elevator is for the use of Sonder guests only.
SONDER

SCALE: 3" = 1'- 0"

**VINYL**

**V2** BLACK VINYL APPLIED SECOND SURFACE

Signtech 4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

33

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

8”
8”
2 1/4”
1/2”
3/8”
1 7/8”
1 7/8”
This elevator is for the use of Sonder guests only.
SONDER

SCALE: 1:2

1/4”
1/8”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
RAISED TACTILE BRAILLE

**LI5** **SIGNTYPE** **SON-WS-8X8-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)**
**WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

V1 SECOND SURFACE VINYL (OPTION 1)
.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED BLACK
This elevator is for the use of Sonder guests only.
SONDER
1/4” WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

SCALE: 3”= 1’- 0”

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

34

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# WAYFINDING SIGNAGE

## DIRECTIONAL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

35



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

1/32" STROKE
3/8"
3/8"
3/8"
3/8"
8"
Pool
Lounge
100-120
140-180

SCALE: 1:2

V2 SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH BLACK VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED WHITE
Pool
Lounge
100-120
140-180
ENTIRE SIGN TO BE MATTE CLEAR COATED
1/4" BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

1/8"
¼"
.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE
1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3"= 1'- 0"

**DW3** **SIGNTYPE** **SON-WS-8X8-B** ALL HORIZONTAL RULE LINES THICKENED FOR DIGITAL PRINT

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

**V2** BLACK VINYL APPLIED SECOND SURFACE

Signtech 4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

36



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

1/32" STROKE

P1

3/8"
3/8"
3/8"
3/8"
8"
Pool
Lounge
100-120
140-180

SCALE: 1:2

V1 SECOND SURFACE VINYL

.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE

RAISED COPY FOIL STAMPED BLACK

Pool
Lounge
100-120
140-180

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

1/4" WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

1/8" ¼"

.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE

1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3"= 1'- 0"

**DW3** **SIGNTYPE** **SON-WS-8X8-W** **ALL HORIZONTAL RULE LINES THICKENED FOR DIGITAL PRINT**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

Signtech 4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

37

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

12"
1/32" STROKE
3/8"
3/8"
3/8"
3/8"
Pool ←
Lounge →
100-120 ↗
140-180 ↑
P1
P1
12"
2
2"

SCALE: 1:2

.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE
V1 SECOND SURFACE VINYL
RAISED COPY FOIL STAMPED BLACK
Pool
Lounge
100-120
140-180
2
1/8" BLACK PLEX FCO WITH FIRST SURFACE 3M #7725-12 MATTE BLACK VINYL APPLIED TO FACE WITH VHB TAPE
1/4" WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

1/8"
1/4"
.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE
1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
1/8" PLEX FCO ATTACHED TO FACE

SCALE: 3"= 1'- 0"

**DW5** | **SIGNTYPE** | **SON-WS-12X12-W** | ALL HORIZONTAL RULE LINES THICKENED FOR DIGITAL PRINT

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:
date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1
38



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

12"
1/32" STROKE
3/8"
3/8"
3/8"
3/8"
12"
Pool
Lounge
100-120
140-180
2
P2
P1
2 ½"

SCALE: 1:2

V2 SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH BLACK VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED WHITE
ENTIRE SIGN TO BE MATTE CLEAR COATED
1/8" WHITE PLEX FCO WITH FIRST SURFACE 3M #7725-20 MATTE WHITE VINYL APPLIED TO FACE WITH VHB TAPE
1/4" BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

1/8"
¼"
.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE
1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
1/8" PLEX FCO ATTACHED TO FACE

SCALE: 3"= 1'- 0"

DW5 | SIGNTYPE | SON-WS-12X12-B ALL HORIZONTAL RULE LINES THICKENED FOR DIGITAL PRINT

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

V2 BLACK VINYL APPLIED SECOND SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

39

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# WAYFINDING SIGNAGE

## UNIT IDENTIFICATION

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

40

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

5”
5”
1 1/8”
5/8”
¼”
202

SCALE: 1:1

V2 SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH BLACK VINYL APPLIED SECOND SURFACE
ENTIRE SIGN TO BE MATTE CLEAR COATED
RAISED COPY FOIL STAMPED WHITE
XXX
1/4” BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

1/8”
¼”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

**UI1** | **SIGNTYPE** | **SON-WS-5X5-B**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

**V2** 3M #7725-12 OPAQUE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

5”
5”
1 1/8”
5/8”
¼”
202

SCALE: 1:1

V1 SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE
ENTIRE SIGN TO BE MATTE CLEAR COATED
RAISED COPY FOIL STAMPED BLACK
XXX
1/4” WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

1/8”
¼”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

**UI1** | **SIGNTYPE** | **SON-WS-5X5-W**

MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

**V1** WHITE VINYL APPLIED SECOND SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

42

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# WAYFINDING SIGNAGE

## DESTINATION

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

43

6”
6”
Water

V2
SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH **BLACK** VINYL APPLIED SECOND SURFACE
XXXX
XXXX
RAISED COPY FOIL STAMPED WHITE
1/4” **BLACK** PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

**SCALE: 1:2**

**DI2** | **SIGNTYPE** | **SON-WS-6X6-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

**V2** BLACK VINYL APPLIED SECOND SURFACE

| Signtype | Option | Destination |
|---|---|---|
| DI2 (black)<br>DI2 (white) | A | Employees Only |
| | B | Electrical Closet |
| | C | Water |
| | D | [custom] |

1/8”
¼”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

**SCALE: 3”= 1’- 0”**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
6”
Water

V1
SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH **WHITE** VINYL APPLIED SECOND SURFACE
XXXX
XXXX
RAISED COPY FOIL STAMPED BLACK
**ENTIRE SIGN TO BE MATTE CLEAR COATED**
1/4” **WHITE** PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**SCALE: 1:2**

1/8”
¼”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

**SCALE: 3”= 1’- 0”**

**DI2** **SIGNTYPE** **SON-WS-6X6-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

**V1** WHITE VINYL APPLIED SECOND SURFACE

| Signtype | Option | Destination |
|---|---|---|
| DI2 (black)<br>DI2 (white) | A | Employees Only |
| | B | Electrical Closet |
| | C | Water |
| | D | [custom] |

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**
**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1
45



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

Gym
Ok, let's do this
8"
1"
4 5/8"
3/8"

SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH BLACK VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED WHITE
XXXX
1/4" BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

**SCALE: 1:2**

**DI1** **SIGNTYPE** **SON-WS-8X8-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**FONT:** MILLER DISPLAY

**VINYL**

**V2** BLACK VINYL APPLIED SECOND SURFACE

| Signtype | Option | Destination | Message | Hours |
|---|---|---|---|---|
| DI1 (black)<br>DI1 (white) | A | Pool | Go on. Make waves. | [optional: Open DDD - DDD, XXam - XXpm] |
| | B | Gym | So you can say you went. | |
| | C | Lounge | Really comfy seating. | |
| | D | Rooftop | Our view from the top. | |
| | E | Essentials | We've got you covered. | |
| | F | Bar | It's 5 o'clock somewhere. | |
| | G | Luggage Storage | Your shoulders thank you. | |
| | H | [custom] | | |

1/8"
1/4"
.125" THICK PLEX FACE ATTACHED TO 1/4" STANDOFF WITH VHB TAPE AND GLUE
1/4" THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

**SCALE: 3"= 1'- 0"**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

46

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval





8”
1”
4 5/8”
3/8”
Gym
Ok, let’s do this

V1 SECOND SURFACE VINYL
.125 THICK PHOTOPOLYMER WITH **WHITE** VINYL APPLIED SECOND SURFACE
RAISED COPY FOIL STAMPED BLACK
XXXX
XXXX
XXXX
XXXX
1/4” **WHITE** PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

**SCALE: 1:2**

**DI1** **SIGNTYPE** **SON-WS-8X8-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**FONT:** MILLER DISPLAY

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

| Signtype | Option | Destination | Message | Hours |
|---|---|---|---|---|
| DI1 (black)<br>DI1 (white) | A | Pool | Go on. Make waves. | [optional: Open DDD - DDD, XXam - XXpm] |
| | B | Gym | So you can say you went. | |
| | C | Lounge | Really comfy seating. | |
| | D | Rooftop | Our view from the top. | |
| | E | Essentials | We've got you covered. | |
| | F | Bar | It's 5 o'clock somewhere. | |
| | G | Luggage Storage | Your shoulders thank you. | |
| | H | [custom] | | |

1/8”
¼”
.125” THICK PLEX FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

**SCALE: 3”= 1’- 0”**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
8”
P1
MEN
5/8”
1/16” STROKE

SECOND SURFACE VINYL
V2
1/4” BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE
ENTIRE SIGN TO BE MATTE CLEAR COATED
FOIL STAMPED RAISED COPY WHITE
MEN
.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE

**SCALE: 1:2**

**DI3** **SIGNTYPE** **SON-WS-ADA-8X6-B**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

**V2** BLACK VINYL APPLIED SECOND SURFACE

| Sign Type | Option | Message |
|---|---|---|
| DI3 (black)<br>DI3 (white) | A | Men |
| | B | Women |
| | C | All Gender |
| | D | Men Accessible |
| | E | Women Accessible |
| | F | All Gender Accessible |

1/8” ¼”
.125” THICK PHOTOPOLYMER FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
FOIL STAMPED COPY

**SCALE: 1:2**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

48



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
8”
5/8”
P1
MEN
1/16” STROKE

SECOND SURFACE VINYL
V1
1/4” WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE
ENTIRE SIGN TO BE MATTE CLEAR COATED
FOIL STAMPED RAISED COPY BLACK
MEN
MEN
.125 THICK PHOTOPOLYMER WITH WHITE VINYL APPLIED SECOND SURFACE

**SCALE: 1:2**

**DI3** **SIGNTYPE** **SON-WS-ADA-8X6-W**

**MANUFACTURE AND INSTALL (QUANTITY TO BE DETERMINED)WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

**V1** WHITE VINYL APPLIED SECOND SURFACE

| Sign Type | Option | Message |
|---|---|---|
| DI3 (black)<br>DI3 (white) | A | Men |
| | B | Women |
| | C | All Gender |
| | D | Men Accessible |
| | E | Women Accessible |
| | F | All Gender Accessible |

1/8” ¼”
.125” THICK PHOTOPOLYMER FACE ATTACHED TO 1/4” STANDOFF WITH VHB TAPE AND GLUE
1/4” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE
FOIL STAMPED COPY

**SCALE: 1:2**

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval
**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:**R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

49

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

# WAYFINDING SIGNAGE

## REGULATION

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA
This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

50



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
9”
5/8”
STAIRS

SCALE: 1:2

SECOND SURFACE VINYL V2
.125 THICK PHOTOPOLYMER
RAISED COPY
FOIL STAMPED WHITE
RAISED COPY
FOIL STAMPED WHITE
STAIRS
ENTIRE SIGN TO BE MATTE CLEAR COATED
3/8” BLACK PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

3/8”
1/8”
.125” THICK PHOTOPOLYMER FACE ATTACHED TO 3/8” STANDOFF WITH VHB TAPE AND GLUE
RAISED COPY
FOIL STAMPED WHITE
3/8” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

**RW1 SIGNTYPE SON-WS-ADA-9X6-B**

MANUFACTURE AND SHIP XX (XX) WALL MOUNTED DIRECTIONAL SIGNS

**VINYL**

**V2** 3M #7725-22 OPAQUE MATTE BLACK VINYL

| Signtype | Option | Message |
|---|---|---|
| RW1 (black)<br>RW1 (white) | A | Stairs |
| | B | No Smoking |
| | C | Emergency Exit |
| | D | [custom] |

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

51



DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
9”
5/8”
STAIRS

**SCALE: 1:2**

SECOND SURFACE VINYL
V1
.125 THICK PHOTOPOLYMER
RAISED COPY
FOIL STAMPED BLACK
RAISED COPY
FOIL STAMPED BLACK
STAIRS
3/8” WHITE PLEX STANDOFF
SANDWICHED BETWEEN
BACK OF PHOTOPOLYMER
AND WALL SURFACE WITH
VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

3/8”
1/8”
.125” THICK PHOTOPOLYMER FACE ATTACHED TO 3/8”
STANDOFF WITH VHB TAPE AND GLUE
RAISED COPY
FOIL STAMPED BLACK
3/8” THICK PLEX STANDOFF ATTACHED TO
WALL WITH VHB TAPE AND GLUE

**SCALE: 3”= 1’- 0”**

**RW1 | SIGNTYPE | SON-WS-ADA-9X6-W**

**MANUFACTURE AND SHIP XX (XX) WALL MOUNTED DIRECTIONAL SIGNS**

**VINYL**

V1 — WHITE VINYL APPLIED SECOND SURFACE

| Signtype | Option | Message |
|---|---|---|
| RW1 (black)<br>RW1 (white) | A | Stairs |
| | B | No Smoking |
| | C | Emergency Exit |
| | D | [custom] |

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing: rev:R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

52

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
9”
5/8”
NO SMOKING

SCALE: 1:2

NO SMOKING

SECOND SURFACE VINYL **V2**

.125 THICK PHOTOPOLYMER

FOIL STAMPED RAISED COPY
WHITE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

3/8” BLACK PLEX STANDOFF
SANDWICHED BETWEEN
BACK OF PHOTOPOLYMER
AND WALL SURFACE WITH
VHB TAPE AND SILICONE

3/8”
1/8”

.125” THICK PHOTOPOLYMER FACE ATTACHED TO 3/8”
STANDOFF WITH VHB TAPE AND GLUE

RAISED COPY
FOIL STAMPED WHITE

3/8” THICK PLEX STANDOFF ATTACHED TO
WALL WITH VHB TAPE AND GLUE

SCALE: 3” = 1’- 0”

**RW1** **SIGNTYPE** **SON-WS-ADA-9X6-B**

MANUFACTURE AND INSTALL ONE (1) WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

**V2** BLACK VINYL APPLIED
SECOND SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

53

DocuSign Envelope ID: 6994D4B4-E8E9-4B15-803A-D891FE4633B2

6”
9”
5/8”
NO SMOKING

SCALE: 1:2

SECOND SURFACE VINYL V1
.125 THICK PHOTOPOLYMER
FOIL STAMPED RAISED COPY BLACK
NO SMOKING
3/8” WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

3/8”
1/8”
.125” THICK PHOTOPOLYMER FACE ATTACHED TO 3/8” STANDOFF WITH VHB TAPE AND GLUE
RAISED COPY FOIL STAMPED BLACK
3/8” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

**RW1** **SIGNTYPE** **SON-WS-ADA-9X6-W**

MANUFACTURE AND INSTALL ONE (1) WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

SONDER
101 15th Street
San Francisco, CA 94103 USA

Sales: Christine M. Mello
Coordinator: Hailey Larsen
Design: kendra murray
Engineering:

date: 5/29/20
drawing:
rev: R4 - 7.9.20
quote:
project ID: SONDER_STANDARDS_1

54

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

6”
9”
5/8”
EMERGENCY
EXIT

SCALE: 1:2

SECOND SURFACE VINYL V2
.125 THICK PHOTOPOLYMER
RAISED COPY
FOIL STAMPED WHITE
RAISED COPY
FOIL STAMPED WHITE
EMERGENCY
EXIT
3/8” BLACK PLEX STANDOFF
SANDWICHED BETWEEN
BACK OF PHOTOPOLYMER
AND WALL SURFACE WITH
VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

3/8”
1/8”
.125 THICK PHOTOPOLYMER V2
RAISED COPY
FOIL STAMPED WHITE
3/8” THICK PLEX STANDOFF ATTACHED TO
WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

**RW1 | SIGNTYPE | SON-WS-ADA-9X6-B**

MANUFACTURE AND SHIP FIVE (5) WALL MOUNTED DIRECTIONAL SIGN

**VINYL**

**V2** 3M #7725-22 OPAQUE
MATTE BLACK VINYL

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1

6”
9”
5/8”
EMERGENCY
EXIT

SCALE: 1:2

SECOND SURFACE VINYL V1
.125 THICK PHOTOPOLYMER
RAISED COPY FOIL STAMPED BLACK
RAISED COPY FOIL STAMPED BLACK
EMERGENCY
EXIT
3/8” WHITE PLEX STANDOFF SANDWICHED BETWEEN BACK OF PHOTOPOLYMER AND WALL SURFACE WITH VHB TAPE AND SILICONE

**ENTIRE SIGN TO BE MATTE CLEAR COATED**

**RW1 | SIGNTYPE | SON-WS-ADA-9X6-W**

**MANUFACTURE AND SHIP FIVE (5) WALL MOUNTED DIRECTIONAL SIGN**

**VINYL**

V1 WHITE VINYL APPLIED SECOND SURFACE

3/8”
1/8”
.125 THICK PHOTOPOLYMER
RAISED COPY FOIL STAMPED WHITE
3/8” THICK PLEX STANDOFF ATTACHED TO WALL WITH VHB TAPE AND GLUE

SCALE: 3”= 1’- 0”

Signtech
4444 Federal Blvd San Diego, CA 92102
(619) 527-6100 signtech.com

**SONDER**
101 15th Street
San Francisco, CA 94103 USA

This design is the exclusive property of Signtech and cannot be reproduced in whole or in part, without their prior written approval

**Sales:** Christine M. Mello
**Coordinator:** Hailey Larsen
**Design:** kendra murray
**Engineering:**

**date:** 5/29/20
**drawing:** **rev:** R4 - 7.9.20
**quote:**
**project ID:** SONDER_STANDARDS_1