# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| SONDER HOLDINGS INC., | ) | Case No. 25-12040(KBO) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: |
| | ) | Objection Deadline: |
| | ) | |

**DECLARATION OF ELIRAN ANER IN SUPPORT OF MOTION OF ISSTA 27th STREET LLC FOR ENTRY OF AN ORDER: (I) CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY TO: (A) THE PROTECTIVE MEASURES, AND (B) DISPOSITION OF THE ABANDONED FURNITURE FIXTURES & EQUIPMENT, (II) ALTERNATIVELY, GRANTING RELIEF FROM THE AUTOMATIC STAY TO DISPOSE OF THE FURNITURE FIXTURES & EQUIPMENT, (III) GRANTING RELIEF FROM THE AUTOMATIC STAY TO PROCEED AGAINST THE SURETY BOND, (IV) GRANTING ADEQUATE PROTECTION, AND (V) WAIVING THE 14-DAY STAY UNDER BANKRUPTCY RULE 4001(a)(3)**

I, Eliran Aner, under penalty of perjury, declare as follows:

1.      I am the Vice President of Business Development of ISSTA Assets Ltd., a company that is registered in Israel, which is sole member of ISSTA Hotels NY LLC, which sole member of ISSTA 27th Street LLC (the "Landlord"), the successor-in-interest to SELA 27 Street LLC. In that capacity, I oversee the management of the Landlord.

2.      This declaration is made in support of the *Motion of ISSTA 27th Street LLC for Entry of an Order: (I) Confirming that the Automatic Stay Does Not Apply to: (A) the Protective Measures, and (B) Disposition of the Abandoned Furniture, Fixtures & Equipment, (II)*

---

[1]      The Debtors in these chapter 7 along with the last four digits of their federal tax identification numbers, are Sonder Holdings, Inc. (7088), Sonder Germany GMBH (NONE), Sonder Group Holdings LLC (NONE), Sonder Guest Services LLC (3210), Sonder Holdings LLC (5746), Sonder Hospitality Holdings LLC (NONE), Sonder Hospitality USA Inc. (8502), Sonder Partner Co. (5584), Sonder Technology Inc. (4436) and Sonder USA Inc. (1947). The Chapter 7 Trustee's mailing address is Jami B. Nimeroff, Chapter 7 Trustee, 919 North Market Street, Suite 420, Wilmington, DE 19801.

*Alternatively, Granting Relief from the Automatic Stay to Dispose of the Furniture, Fixtures & Equipment, (III) Granting Relief from the Automatic Stay to Proceed Against the Surety Bond, (IV) Granting Adequate Protection, and (V) Waiving the 14 Day Stay Under Bankruptcy Rule 4001(a)(3)* (the "Motion").

3.      On or about November 24, 2021, Sonder Hospitality USA Inc. (the "Debtor") entered into a ten-year commercial lease (as amended, the "Lease") commencing in June 2022 with SELA 27 Street LLC, predecessor-in-interest to Landlord, for ten floors of a building located at 39-35 27th Street, Long Island City, New York (the "Premises"), also known as Dutch House, to operate a hotel including short-term and extended stay rentals.

4.      A true and correct copy of the Lease and first amendment thereto is attached hereto as Exhibit 1.

5.      The Premises consist of (i) seventy-nine rooms located on floors one to nine of the building; (ii) the corridors in which the seventy-nine rooms are located (including any and all fixtures, improvements, and personal property owned by Landlord and located thereon at any time during the Lease term); (iii) the lobby/welcome desk; (iv) all storage space/housekeeping closets in the building; (v) all employee offices and break rooms in the building; (vi) the garden/patio at the rear of the building; (vii) any and all roof decks; (viii) guest lounge/co-working and accessory spaces located on the ground floor of the building; and (ix) one floor of cellar space.

6.      The Debtor delivered to the Landlord a surety bond in the amount of $363,795.00 to secure the Debtor's obligations under the Lease.

7.      To secure its obligations under the Lease, the Debtor obtained lease bond number CMS0336167 in the amount of $363,795.00 issued by RLI Insurance Company in favor of Landlord dated July 7, 2022 (the "Surety Bond").

8.      The Debtor failed to pay Fixed Rent (defined under the Lease) due November 1, 2025 for the months of November and December in the amount of $121,265.00 for each month.

9.      On November 3, 2025, Landlord served the Debtor with a notice of default and demand to cure the default on the November Fixed Rent, a true and correct copy of which is attached hereto as <u>Exhibit 2</u>.

10.     The Debtor failed to pay the Q3 2025 Revenue Share Rent (defined under the Lease) which was due 21 days following the end of the 3rd quarter 2025, or October 21, 2025, in the amount of $26,395.

11.     On November 10, 2025, Landlord served the Debtor with a notice of default on the Q3 2025 Revenue Share Rent, a true and correct copy of which is attached hereto as <u>Exhibit 3</u>.

12.     The Debtor has also failed to pay any rent since the Petition Date, including Fixed Rent which would have been due on December 1, 2025.

13.     In the evening of November 9, 2025, an employee of the Debtor or one of its affiliates informed the Landlord that the Debtor requested that guests vacate its properties by 9 a.m. local time on November 10, 2025 and that all of the Debtor's staff would be leaving the Premises after guests check out.

14.     Kristen Finlayson, a manager of the hotel the Debtor operated on the Premises, informed the Landlord that as of November 10, 2025, the Debtor's staff and employee emails were not functioning and access to the door-lock system on the Premises was about to be disabled.  She also reported that the key to the staff entrance on the side of the building was lost and provided a temporary code so the Landlord could enter the rooms.  She initially told the Landlord that afternoon that a locksmith would be securing the side door to the building, but later informed the Landlord that it is unlikely that they would get a locksmith.

3

15.     On November 10, 2025, the Debtor abandoned the Premises and left the building unsecured.  In order to prevent vandalization, destruction of the Premises, and squatters and in the interest of public safety, Landlord took steps to protect and preserve the value of the Premises (the "Protective Measures"), including retaining security personally and grant them access to the Premises to monitor the building entrance, maintaining insurance on the Premises, changing utilities into the name of Landlord, room by room garbage removal and inspection for heated appliances such as coffee makers, irons, and hair dryers, deep cleaning of rooms, corridors and common areas, assessing damage to the building (including HVAC failures, missing alarm heads, floor and wall damage), bulk garbage removal from exterior and loading areas, repairing the HVAC in multiple rooms, replacing missing alarm heads and other fire safety components, installing locks, and other damage remediation and necessary plumbing services.

16.     On November 10, 2025, Landlord issued a notice (the "Termination Notice") to the Debtor terminating the Lease effective immediately based on the Debtor's repudiation of its obligations, incurable breaches of the Lease including cessation of business operations, directing that guests vacate as of November 10, 2025, and defaulting under its licensing agreement with Marriott International resulting in the termination of the licensing agreement.  The Termination Notice was delivered by both email and Federal Express.  A true and correct copy of the Termination Notice is attached hereto as Exhibit 4.

17.     On November 10, 2025, Landlord issued a notice (the "Surety Bond Notice") of the Debtor's breach and demand for payment to RLI Insurance Company ("Surety") on the Surety Bond, demanding payment of $363,795.00 plus interest. A true and correct copy of the Surety Bond Notice is attached hereto as Exhibit 5. That same day, the Surety issued a letter to the

Landlord purporting to cancel the Surety Bond effective February 11, 2026, as the 90 day notice for termination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 3, 2025

_____

Eliran Aner
Vice President of Business Development of ISSTA
Assets Ltd., sole member of ISSTA Hotels NY
LLC, sole member of ISSTA 27th Street LLC

## **EXHIBIT 1**

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made as of November 24, 2021 (the "**Effective Date**"), by and between SELA 27 STREET LLC, a New York limited liability company ("**Landlord**"), and SONDER HOSPITALITY USA INC., a Delaware corporation ("**Tenant**").

WHEREAS, Landlord is the fee owner of the Project (defined below), and Tenant and Landlord have agreed that Landlord shall lease to, and Tenant shall lease from Landlord, that certain portion of the Project specified herein, which shall be licensed or subleased by Tenant to its guests for the Permitted Use (defined below), all pursuant to the terms, provisions and conditions more specifically set forth in this Lease.

NOW, THEREFORE, for and in consideration of the rent hereinafter reserved and the terms, covenants and obligations contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## BASIC LEASE INFORMATION

The following is a summary of the basic Lease information ("**Basic Lease Information**"), which is incorporated into this Lease. The Basic Lease Information contains specific business terms, each of which shall be expanded upon in the Lease; however, if the terms set forth in this Lease conflict with the terms and definitions in the Basic Lease Information, then the Basic Lease Information shall prevail:

A.    **Landlord's Notice Address**:    36-37 36th Street, Second Floor
Astoria, New York 11106
Attention: Gal Sela

With a copy to:

Mavrides Moyal Packman & Sadkin LLP
276 Fifth Avenue, Suite 404
New York, NY 10001
Attention: Dean Mavrides, Esq.

B.    **Tenant's Notice Address**:    Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager
Email: [_____]

1

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB4B-E5F5345550FD

With a copy to:

Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel
Email: relegalnotices@sonder.com

C.  **Building**:  The 9-story building and one (1) floor of cellar space that is part of the Project commonly known as Dutch House located at 39-35 27th Street, Long Island City, New York, 11101.

D.  **Premises**:  All of the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on **Exhibit A-3** attached hereto) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks     (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building      (all as shown on **Exhibit A-4**). No other portion of the Project shall be included within the Premises, including without limitation, (i) the gym located in the cellar floor of the Building, (ii) the two (2) parking spaces located on the ground floor of the building s (collectively, the "**Excluded Premises**(collectively, the "**Excluded Premises**"). The Premises and the Excluded Premises are depicted as such on **Exhibit A-2** attached hereto and, subject only to the Final Completion Condition, the Premises are all being delivered in their current AS IS WHERE IS CONDITION subject to any and all defects and Tenant has had ample opportunity to inspect the Premises prior to signing this Lease.

E.  **Scheduled Final Completion Date**: January 1, 2022

F.  **Outside Completion Date**:  Two (2) months after the Scheduled Final Completion Date

G.  **Commencement Date**:  The date that is the later of: (a) ninety (90) days following the Effective Date, and (b) the day after the expiration of the Onboarding Access Period.

H.  **Estimated Commencement Date**: March 1, 2022

I.  **Expiration Date**:  The date that is the last day of the calendar month occurring ten (10) years after the Commencement Date, subject to Tenant's Renewal Options as herein provided.

J.  **Initial Term**:  Ten (10) years.

K.  **Base Rent (Initial Term)**:  An amount equal to the greater of (i) Fixed Rent, and (ii) Revenue Share Rent.

L.  **Rent Escalation Percent**: 2.3%, compounding annually.

M.  **Rent Abatement Period**:  3 months of rent abatement for the Initial Term commencing on the Commencement Date.

N.  **Surety Bond Amount**:    $363,795.00 which is equal to 3 months of Fixed Rent (calculated as of the Commencement Date (defined below)).

O.  **Onboarding Access Period**:  60-day period following the date Landlord delivers the Premises to Tenant with all of the Final Completion Conditions satisfied.

P.  **FF&E Capital Amount**:  $200,000 however Landlord shall have the right to remove all existing locks from the doors and leave them in AS IS condition.

Q.  **Refurbishment Allowance**:  An amount equal to two (2) months of the then-current Fixed Rent.

R.  **Landlord Broker**: Avi Kadosh.

Whenever used in this Lease, all defined words and phrases, unless the context otherwise requires, shall have the meanings assigned to each as set forth and described in this Lease (including, without limitation, Appendix A attached hereto).

## LEASE

### Article 1.         PREMISES; FINAL COMPLETION CONDITION

1.1    Premises; Common Areas.    Subject to all of the terms and conditions hereinafter set forth, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord, the Premises.  In addition to the lease of the Premises, subject to all of the terms and conditions hereinafter set forth, Landlord grants to Tenant and all Authorized Parties during the Term an irrevocable exclusive license to use all Common Areas, and the exclusive use of 2 passenger elevator(s) located in the Building.  Subject to the terms and conditions of this Lease and applicable Laws, Tenant and Authorized Parties shall have access to and use of the Premises and all Common Areas 24 hours per day, 7 days per week.

1.2    Final Completion Condition.  Landlord shall deliver the Premises and the Common Areas in the Final Completion Condition.

### Article 2.         TERM; ONBOARDING ACCESS PERIOD; EARLY TERMINATION

3

DocuSign Envelope ID: 1C8AF899-43A8-4053-AB48-52F531455595D

2.1    Term.  The Initial Term shall commence on the Commencement Date and end on the Expiration Date, unless extended or earlier terminated as provided herein. Promptly following the Commencement Date, Landlord and Tenant shall memorialize the Commencement Date, Rent Commencement Date and the Expiration Date in a certificate in the form attached hereto as Exhibit D (the "Commencement Date Certificate"), provided, however, that failure to execute and deliver the Commencement Date Certificate shall not affect the Commencement Date, the Rent Commencement Date or the Expiration Date.  Subject to Tenant Delays and Force Majeure Event, Landlord shall deliver the Premises to Tenant with all of the Final Completion Conditions satisfied on or before the Scheduled Final Completion Date.

2.2    Visual Inspection; Storage; Onboarding Access Period.  From and after the Effective Date with Landlord's prior written consent (which may be by email) in each instance and, at Landlord's option, accompanied by an agent designated by Landlord in each instance and until the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of conducting visual inspections, creating digital floor plans, and taking photographs and videos and for the purposes of storing Tenant's FF&E in locations designated by Landlord so as not to unreasonably interfere with Landlord's activities.  Subject to Tenant's Delay, on or before the Effective Date, Landlord shall deliver to Tenant a true, correct and complete set of Building plans, including, without limitation, plans for architectural, structural, mechanical, electrical, plumbing, fire sprinkler and fire alarm systems of the Building in Landlord's possession. Commencing on the Final Completion Date and continuing for the Onboarding Access Period, Tenant may perform the Onboarding Work.  During the Onboarding Access Period, Landlord shall, at no additional cost to Tenant, (a) make available to Tenant at least one (1) [freight] elevator at the Building for Tenant's use, on an exclusive basis, at all times (including after business hours), and (b) supply temporary power, a material staging area at a location to be selected by Tenant and reasonably acceptable to Landlord, dock space, dumpster space, restroom facilities and access in and out of the loading/truck docks at the Building. If Tenant completes the Onboarding Work prior to the expiration of the Onboarding Access Period, Tenant shall have the right to commence operation of its business in the Premises without payment of any Fixed Rent until the Rent Commencement Date.

2.3    Early Termination.    Either party shall have the right to terminate this Lease by providing at least 180 days' prior written notice to be effective as of the 5th anniversary of the Commencement Date (the "**Early Termination Date**").

**Article 3.    RENT; TAXES; SURETY BOND; FF&E CAPITAL; REFURBISHMENT ALLOWANCE**

3.1    Rent.  Commencing on the Rent Commencement Date, Tenant shall pay Landlord the Fixed Rent, without notice, deduction or offset, except to the extent otherwise expressly provided in this Lease, in lawful money of the United States of America, by ACH or wire transfer in immediately available funds as designated by Landlord to Tenant in accordance with this Section 3.1.  Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term.  If the Rent Commencement Date is not the

4

first day of a month, the Fixed Rent for the month in which the Rent Commencement Date occurs shall be prorated according to the number of days remaining in that month. For the purposes of this Lease, "Additional Rent" shall mean all sums of money, other than Fixed Rent and Revenue Share Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease. Landlord shall have the same rights and remedies upon Tenant's failure to pay Additional Rent as for the non-payment of the Fixed Rent.

Following the Commencement Date, Tenant shall provide to Landlord, on or before the date that is twenty-one (21) days following the end of each quarter of Tenant's fiscal year (the "**Quarter**"), a written statement of Revenue for the immediately preceding Quarter broken out by month (the "**Revenue Statement**"). Tenant shall record Revenue in accordance with the U.S. generally acceptable accounting principles and maintain such records to support the calculation of Revenue ("**Revenue Records**"). If monthly Revenue Share Rent calculated based on the Revenue Statement during any Quarter following the Rent Commencement Date is greater than monthly Fixed Rent paid by Tenant to Landlord during such Quarter, any such excess (the "**Excess**") shall be paid by Tenant to Landlord, on a quarterly basis in arrears, on or before the date the next Fixed Rent is due. Notwithstanding anything to the contrary, any corrections or adjustments to Revenue previously reported by Tenant in the Revenue Statements may be made in any subsequent Revenue Statement, and Tenant shall have the right and obligation to apply any such corrections or adjustments to the Fixed Rent next payable to Landlord. Landlord acknowledges and agrees that Tenant has not made and does not make any representations, warranties or guarantees regarding any minimum Revenue or Revenue Share Rent, and Tenant shall have the right to operate its business in its sole and absolute discretion. For the Initial Term, on the first anniversary of the Rent Commencement Date and each anniversary thereafter, annual Fixed Rent shall increase by the Rent Escalation Percent.

Within one hundred twenty (120) days following the end of each of Tenant's fiscal years during the Term, Tenant shall perform a reconciliation of the Revenue for the prior fiscal year of Tenant (the "**Prior Year**") and provide Landlord with a statement signed by an officer of Tenant of the actual Revenue for the Prior Year (the "**Reconciliation Statement**"). If the actual monthly Revenue for the Prior Year set forth in the Reconciliation Statement is greater than the monthly Revenue as set forth in the Revenue Statements from the Prior Year, then Tenant shall pay Landlord such difference between the monthly Excess that Tenant actually paid and the monthly Excess that Tenant should have paid in accordance with the terms of this Lease no later than the date monthly Excess is due for the first month following Tenant's delivery to Landlord of such Reconciliation Statement. If the actual monthly Revenue for the Prior Year set forth in the Reconciliation Statement is less than the monthly Revenue set forth in the Revenue Statements from the Prior Year, then Tenant shall receive a credit in the amount of such difference between the monthly Excess that Tenant actually paid and the monthly Excess that Tenant should have paid in accordance with the terms of this Lease against future Excess payable to Landlord, provided that Landlord shall reimburse to Tenant such difference within thirty (30) days' of its receipt of the Reconciliation Statement if there is no Excess payable to Landlord under this Lease for the month following such Reconciliation Statement. If Landlord wishes to dispute Tenant's calculation of the actual Revenue in the Reconciliation Statement, Landlord shall

engage a nationally or regionally recognized accounting firm which is not a tenant of Landlord ("**Accountant**"), in either case not working on a contingency fee basis, to inspect the Revenue Records at the offices of Tenant where such records are customarily maintained or at such other location reasonably selected by Tenant.  Any such inspection may only be conducted if (i) Landlord has provided Tenant with written notice of the dispute within sixty (60) days after Landlord received the Reconciliation Statement, which notice shall state with reasonable particularity the basis for the dispute, the amount at issue and shall identify the Accountant engaged or to be engaged by Landlord; (ii) such inspection is conducted at time(s) reasonably designated by Tenant during Tenant's normal business hours (with such on-site inspection to be completed within five (5) business days and the audit being completed within sixty (60) business days); (iii) Landlord, Accountant, and their agents have, in a writing reasonably acceptable to Tenant, agreed in advance of such inspection (a) to follow Tenant's reasonable rules and procedures regarding inspections of Tenant's records (including no photocopying), and (b) to maintain the confidentiality of the information provided by signing a non-disclosure agreement in a form reasonably acceptable to Tenant; and (iv) the Accountant completes the audit in a prompt and timely fashion and provides a copy of its report to Tenant. If, after the Accountant's report is delivered to Tenant, the parties are unable to agree on the actual Revenue within ninety (90) days, the actual Revenue shall be determined by an independent certified public accountant (the "**Neutral Accountant**") selected by Tenant subject to Landlord's reasonable approval. Landlord shall advance the costs for the Neutral Accountant, but Tenant shall reimburse Landlord for such fees and costs if the Neutral Accountant determines that the actual Revenue was understated in the Reconciliation Statement by more than five percent (5%).  If, it shall be determined as a result of the Neutral Accountant's determination or Tenant's written agreement there has been a deficiency in the payment of Excess, then such deficiency shall become due and payable within thirty (30) days after the Neutral Accountant's decision or Tenant's agreement (in the event a Neutral Accountant is not utilized) plus interest thereon at the lesser of eight percent (8%) per annum and the maximum amount permitted by law until the date the payment is made. . Landlord hereby acknowledges that Landlord's sole right to inspect the Revenue Records and to contest the amount of actual Revenue payable by Tenant shall be as set forth in this Section 3.1, and Landlord hereby waives any and all other rights pursuant to applicable Laws to inspect such Revenue Records and/or to contest the amount of Excess payable by Tenant.  If Landlord does not contest Tenant's calculation of the actual Revenue in the manner and in accordance with this Section 3.1, Tenant's calculation of the actual Revenue shall be deemed final and not subject to further dispute.

3.2     <u>Intentionally Omitted</u>.

3.3     <u>Delinquent Rent</u>.  If any installment of "Rent" (collectively Fixed Rent, Revenue Share Rent (when applicable hereunder) and Additional Rent) is delinquent, and Tenant fails to cure such delinquency within ten (10) business days after Tenant's receipt of written notice thereof from Landlord, then such delinquent Rent amount shall bear interest commencing on the eleventh (11th) business day after Tenant's receipt of such written notice from Landlord until paid at a rate equal to the lesser of (a) 8% per annum, or (b) the maximum rate allowed by applicable Law provided, however, that in the event Landlord has provided written notice of

delinquent Rent on more than two (2) occasions in the prior twelve months and has not changed ACH payment instructions or changed its address for the payment of Rent, then no additional notice shall be required.  Landlord's acceptance of any interest shall not constitute a waiver or relinquishment of any of the other rights or remedies of Landlord.

      3.4    <u>Taxes</u>.

      3.4.1    Landlord shall pay: (i) all Real Estate Taxes (as defined below) on the Project (subject to 3.4(b) below); and (ii) all personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Premises, if applicable. From and after the Commencement Date, Tenant shall pay all business taxes, accommodations, transient occupancy tax (TOT) licenses, and fees levied or imposed by any Governmental Authority upon Tenant's business operations and activities at the Premises, including without limitation, to the applicable taxes and fees related to the operation of the Permitted Use, and fees for occupational licenses and occupancy permits assessed by the City and if any such tax shall  have been paid by Landlord, Tenant shall promptly reimburse the amount thereof to Landlord upon demand, as Additional Rent.

      3.4.2    <u>Tenant's Tax Payment</u>.  If in any Subsequent Year, Real Estate Taxes shall be greater than Real Estate Taxes for the Base Tax Year, then Tenant shall pay, in addition to the Base Rent, and as Additional Rent for such Subsequent Year, an amount (hereinafter "Tenant's Tax Payment") equal to Tenant's Proportionate Share of such increases. Such Additional Rent shall be paid by Tenant notwithstanding the fact that Tenant may be exempt, in whole or in part, from the payment of any Real Estate Taxes due to Tenant's diplomatic, charitable, or otherwise tax exempt status, or for any other reason at all.

      3.4.3    <u>Tax Statement and Timing of Tax Payment</u>.

      (a)    If at any time after taxes are assessed for any Subsequent Year, Landlord shall furnish Tenant a Tax Statement and Tenant shall pay Tenant's Tax Payment within fifteen (15) days after receipt of such Tax Statement.

      (b)    At Landlord's option, Landlord may invoice Tenant and Tenant shall remit Tenant's Tax Payment for each Subsequent Year in monthly installments in an amount equal to one-twelfth (1/12) of Tenant's Tax Payment estimated by Landlord, which installments shall be due and payable as Additional Rent, and paid together with the monthly installment of Fixed Rent.  Tenant's Tax Payment for each Subsequent Year shall be due and payable as Additional Rent, together with the monthly installment of Fixed Rent, in an amount equal to one-twelfth (1/12) of Tenant's Tax Payment estimated by Landlord.  If the amount of such monthly payment exceeds the actual amount due for a Tax Year, the overpayment shall be credited to Tenant's next succeeding payment of Rent or refunded to Tenant if at the end of the Term Tenant does not owe any Rent or Additional Rent to Landlord.  If the amount paid by Tenant shall be less than the actual amount due, Tenant shall pay the difference to Landlord by the later of (i) thirty (30) days

after receipt of notice thereof from Landlord or (ii) the date that the next installment of Fixed Rent shall become due and payable. Landlord's failure to render a Tax Statement with respect to any Tax Year shall not prejudice Landlord's right thereafter to render a Tax Statement with respect to any such Tax Year nor shall the rendering of a Tax Statement prejudice Landlord's right thereafter to render a corrected Tax Statement for that Tax Year.

3.4.4    <u>Adjustments to Tenant's Tax Payment</u>.  Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the Building.  In the event that the assessed valuation for any Tax Year occurring within the Lease Term is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then (i) the Real Estate Taxes imposed upon the Building in respect of the applicable Tax Year shall be retroactively adjusted to reflect such reduction, (ii) Tenant's Tax Payment shall be adjusted accordingly, subject to adjustment for Tax Expenses as provided herein, and (iii) Tenant shall receive a credit against Tenant's Tax Payment in the amount of Tenant's Proportionate Share of such reduction as adjusted in accordance with the provisions hereof.

3.4.5    <u>Tax Refunds</u>.  If, after Tenant shall have paid Tenant's Tax Payment and Tenant's Proportionate Share of Tax Expenses with respect to any Tax Year, Landlord shall receive a refund of any portion of the Real Estate Taxes with respect to such Tax Year by final determination of legal proceedings, settlement or otherwise, Landlord shall promptly after receiving such refund pay Tenant its Proportionate Share of such refund or, at Landlord's option, credit Tenant's Proportionate Share of such refund against the next succeeding installment(s) of Rent coming due, in both cases net of the total amount of Tax Expenses incurred by Landlord to obtain such refund.

3.4.6    <u>Prorated Allocation</u>.  In the event this Lease shall expire or terminate on a day other than the last day of a Subsequent Year, Tenant's Tax Payment for such Subsequent Year shall be prorated as of the date of such expiration or termination, so that Tenant shall be required to pay only such proportion thereof as the portion of such Subsequent Year prior to such expiration or termination bears to the entire Subsequent Year.

3.4.7    <u>Tax Statement Binding</u>.  Any Tax Statement sent to Tenant shall be binding upon Tenant unless, within sixty (60) days after such statement is sent, Tenant shall send a written notice to Landlord objecting to such statement and specifying the respects in which such statement is claimed to be incorrect.  Pending the determination of such dispute Tenant shall pay all amounts of the Additional Rent shown on such statement, and such payment and acceptance shall be without prejudice to Tenant's position.

3.4.8    <u>No Rent Reduction</u>.  In no event shall the Rent (exclusive of the adjustments described in this Article 3) be reduced by virtue of any decrease in Real Estate Taxes.

3.4.9    <u>Survival</u>.  The expiration or termination of this Lease during any Tax Year for any part or all of which there is Additional Rent payable under this Article 3 shall

8

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F51455595D

not affect the rights or obligations of the parties hereto respecting such Tax Year, and any statement relating to Tenant's Tax Payment with respect to such Tax Year may be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination.  Any payments due under such statement shall be payable within twenty (20) days after such statement is sent to Tenant.

3.4.10  Definitions.

(a)  "<u>Base Tax Year</u>" shall mean the twelve (12) month period from July 1, 2022 through June 30, 2023.

(b)  "<u>Real Estate Taxes</u>" shall mean all real estate taxes, sewer rents, water frontage charges, business improvement district and other assessments, special or otherwise, levied, assessed or imposed by the City of New York or any other taxing authority upon or with respect to the Project, development, subterranean or air rights or otherwise in connection with the real property located at and known as 39-35 27th Street, Long Island City, or such other tax lots that may be subsequently redesignated including, without limitation, in connection with any future subdivision, combination or condominium) and all taxes assessed or imposed with respect to the rentals payable hereunder other than general income, gross receipts and excess profits taxes (except that general income, gross receipts and excess profits taxes shall be included if covered by the provisions of the following sentence).  Real Estate Taxes shall also include any taxes, charges or assessments levied, assessed or imposed by any taxing authority in addition to or in lieu of the present method of real estate taxation, provided such additional or substitute taxes, charges and assessments are computed as if the Project were the sole property of Landlord subject to said additional or substitute tax, charge or assessment including, but not limited to, any occupancy, gross receipts, rental, income, franchise, transit or other tax taking into account to any benefits obtained under any ICAP or any other tax incentive programs and the cost incurred by Landlord to bring an application or proceeding seeking a reduction in Real Estate Taxes or assessed valuation for any Tax Year.  Real Estate Taxes shall exclude penalties for late payment, transfer tax, unincorporated business, franchise, capital stock, excise, corporate, succession, estate, inheritance, capital, levy or income, profit or revenue tax to the extent same are not in lieu of the present method of taxation.  With respect to any Tax Year, all Tax Expenses shall be considered as part of the Real Estate Taxes for such Tax Year.  Tenant hereby waives any right to institute or join in tax certiorari proceedings or other similar proceedings contesting the amount or validity of any Real Estate Taxes.

(c)  "<u>Subsequent Year</u>" shall mean each Tax Year commencing within the Term of this Lease that shall be subsequent to the Base Tax Year.

(d)  "<u>Tax Expenses</u>" shall mean all expenses (including but not limited to customary and usual attorneys' fees, expert and other witnesses' fees and disbursements) incurred by Landlord in connection with any application or proceeding to reduce the assessed valuation of the Building for each Tax Year with respect to Real

9

Estate Taxes or otherwise in contesting the validity or amount of any Real Estate Taxes or in obtaining a refund of Real Estate Taxes.

        (e)    "<u>Tax Statement</u>" shall mean a statement setting forth the amount payable by Tenant for a specified Subsequent Year pursuant to Article 3.

        (f)    "<u>Tax Year</u>" shall mean each 12-month period commencing July 1st and ending June 30th or any portion of which occurs during the Term of this Lease.

    3.5    <u>Surety Bond</u>.  On or before the Commencement Date, Tenant shall deliver to Landlord the Bond in the form substantially similar to **<u>Exhibit J</u>** attached hereto in the Surety Bond Amount which shall secure Tenant's payment obligations hereunder.  During the continuation of an Event of Default (as defined below), Landlord may, but shall not be obligated to, make a claim against the Bond for recovery of any accrued unpaid lease payment obligations of Tenant.  If there is no uncured Event of Default by Tenant, the Bond shall be cancelled by the Bond provider sixty (60) days after the Expiration Date or the Termination Date (as applicable). For the avoidance of doubt, Landlord acknowledges that a Bond will not cover any recovery associated with liquidated damages or acceleration of any payments that may exist under the terms of this Lease.

    3.6    <u>Intentionally Omitted</u>.

    3.7    <u>Rent Relief.</u>  At any time after the first anniversary of the Initial Term, Tenant shall have the right to elect to receive 1 months of Fixed Rent (but not Additional Rent) abatement to be applied at Tenant's election with not less than 30 days' prior written notice.

    3.8    <u>Corporate Guaranty</u>. On or before the Commencement Date, Tenant shall deliver to Landlord a guaranty made by Sonder Holdings Inc., a Delaware corporation, in the form attached hereto as **<u>Exhibit K</u>** (the "**Guaranty**") guaranteeing the full and prompt payment obligations of Tenant under this Lease.  The total liability of guarantor under the Guaranty shall not exceed, at any time, in the  aggregate, Two Million Dollars ($2,000,000) in the first year of the Lease (the "**Guaranty Cap**"), which Guaranty Cap shall be reduced each anniversary of the Commencement Date of the Lease by 1/2 of the initial Guaranty Cap until the fifth anniversary of the Commencement Date, at which point the Guaranty Cap is reduced to zero.  The Guaranty will expire and terminate on the earlier of: (a) the effective date of any transfer of this Lease by Tenant to a third party assignee (except sublessees in the ordinary course of Tenant's business) as may be permitted under the terms of this Lease, (b) when the Guaranteed Obligations (as defined in the Guaranty) have been fully performed, and (c) after Guarantor (as defined in the Guaranty) has made payment of the Guaranteed Obligations (as defined in the Guaranty) in an amount up to the Guaranty Cap (as defined in the Guaranty).

    3.9    <u>FF&E Capital</u>.  Landlord shall provide to Tenant a credit towards rent in the amount equal to FF&E Capital Amount ("**<u>FF&E Capital</u>**") to be used by Tenant in its sole discretion for the preparation of the Premises for the Permitted Use, including, without limitation, purchasing and installing furniture, decor, household items, in-unit tech, painting and

wallpaper. The timing of the delivery of the FF&E Capital shall not be subject to change notwithstanding any amendments to the Overall Project Schedule. The FF&E Capital amount shall be applied in equal installments of $50,000 each towards Base Rent payable during each of the first four (4) months following the Rent Commencement Date.

3.10     <u>Refurbishment Allowance</u>.     Provided that neither Landlord nor Tenant have exercised the early termination provision pursuant to Section 2.4 above, at any time after the fifth anniversary of the Commencement Date, Landlord shall provide to Tenant a cash allowance in the amount of the Refurbishment Allowance to be used in Tenant's sole discretion. Landlord shall provide the Refurbishment Allowance to Tenant within thirty (30) days following Tenant's written request therefor.  Tenant may, instead, elect to offset Rent by the amount of Refurbishment Allowance by delivering written notice of such election to Landlord.

3.11     <u>Landlord's FF&E</u>.     Commencing on the Commencement Date, Tenant shall have the right to utilize Landlord's FF&E, free of charge, during the Term. Tenant shall have the right to remove, replace and dispose of any such Landlord's FF&E in its sole discretion during the Term, and any such Landlord's FF&E removed or replaced or disposed of by Tenant shall be automatically removed from the definition of "Landlord's FF&E" in this Lease. Landlord shall not remove Landlord's FF&E during the Term.  On the Expiration Date or the Termination Date, as applicable, Tenant shall return Landlord's FF&E remaining in the Premises to Landlord in their as-is condition but Tenant agrees that it shall repair any FF&E damaged by the negligence or willful misconduct of Tenant or its agents, contractors, employees or invitees during the Term, normal wear and tear excepted.  For the avoidance of doubt, Tenant shall have the right at any time and from time to time to replace items of Landlord's FF&E at Tenant's sole cost, which replacement items shall be considered Tenant's Property and the sole property of Tenant.

### Article 4.       USE; PERMITTED USE APPROVAL; BUSINESS LICENSE

4.1     <u>Use</u>.     Tenant shall use the Premises only for the Permitted Use.

4.2     <u>Permitted Use Approval</u>.       Subject to Tenant's cooperation, Landlord agrees that it will maintain in effect at all times during the Term all Permitted Use Approval and will not take any action to modify any Permitted Use Approval in any manner that might jeopardize or result in the suspension, expiration, or termination of any Permitted Use Approval. In the event that Landlord fails to maintain the Permitted Use Approval in effect through no fault of Tenant, then, notwithstanding any contrary provision contained herein, Base Rent shall abate from the date of suspension, expiration or termination thereof on a per diem basis until such Permitted Use Approval is obtained or renewed, and in the event the Permitted Use Approval is suspended, expired or terminated due to Landlord's negligence or willful misconduct, or otherwise in Landlord's reasonable control to prevent such suspension, expiration of termination, Landlord shall also pay Tenant an amount equal to the product of (i) Seasonal Abatement, and (ii) the number of Canceled Bookings. If the Permitted Use Approval is not obtained or renewed within ninety (90) days following the suspension, expiration or termination thereof, Tenant shall have the right to terminate this Lease at any time thereafter by delivering written notice to

<center>11</center>

Landlord, in which event Landlord shall perform Landlord's Post-Termination Obligations. Upon the effectiveness of such termination, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease arising from and after the effective date of such termination, except for Landlord's Post-Termination Obligations (which shall be satisfied within ten (10) days of termination of this Lease) and any other obligations which expressly survive the termination of this Lease.

4.3    <u>Business License</u>.    Prior to Tenant commencing operations in the Premises, to the extent required under the applicable Laws, and to the extent that Landlord has delivered the Premises to Tenant with all of the Final Completion Conditions satisfied, Tenant shall, at Tenant's sole cost and expense, commence and exercise diligent efforts to obtain any Business License at Tenant's sole cost and expense.    Landlord shall fully cooperate with Tenant as reasonably necessary to obtain the Business License, at no cost and expense to Landlord. Once obtained, except to the extent Landlord is required to do so as required by Laws, Landlord agrees it shall use commercially reasonable efforts to not commit any act or omission which would jeopardize or result in the suspension, expiration, or termination of the Business License.

## Article 5.    TENANT'S WORK

5.1    <u>Landlord's Consent</u>.    Tenant shall not perform any Tenant's Work without Landlord's prior written consent in each instance (which consent shall not be unreasonably withheld, conditioned, or delayed) to the extent that such Tenant's Work (a) affects any part of the Project outside the Premises, (b) materially and adversely affects any structural element of the Building, (c) materially and adversely affects any Building System, or (d) requires any permits or an amendment of the certificate of occupancy for the Premises or the Building or triggers additional code compliance by Landlord. Tenant's Work shall be performed by contractors or subcontractors approved by Landlord.    All other Tenant's Work may be performed without Landlord's consent, and shall be performed, at Tenant's expense, in a good and workmanlike manner and in compliance with this Lease and applicable Laws.

5.2    <u>Landlord's Review and Approval</u>. A. Prior to performing any Tenant's Work which requires Landlord's consent pursuant to this Article 5, Tenant shall (a) deliver to Landlord copies of Tenant's Plans, (b) obtain approval from Landlord of Tenant's Plans (which approval shall be given in accordance with the provisions of Section 5.1), (c) obtain any required authorizations and/or Permits from the Governmental Authority for Tenant's Work, and (d) deliver to Landlord certificates (in commercially reasonable and customary form, reasonably approved by Landlord) of (i) worker's compensation insurance covering all persons to be employed by Tenant for the performance of Tenant's Work, and all contractors and subcontractors performing any Tenant's Work, and (ii) commercial general liability insurance, including Landlord and Landlord's Mortgagee, if any, as an additional insured.    Within ten (10) days following Landlord's receipt of the proposed Tenant's Plans, Landlord shall review and approve (which approval shall not be unreasonably withheld, conditioned or delayed) or disapprove the proposed Tenant's Plans, provided that such disapproval shall state, in reasonable detail, the basis therefor.    If Landlord disapproves of Tenant's Plans, Tenant shall make such

12

changes as are reasonably necessary and shall resubmit the same to Landlord for approval, and Landlord shall have forty five days from receipt of any revised Tenant's Plans to approve or disapprove the same in the same manner, and such procedure shall continue until Tenant's Plans are approved.   In the event Landlord does not respond to Tenant's submission within the aforementioned time periods, Tenant shall send Landlord a second request for approval containing the following language in bold print: "THIS IS A SECOND REQUEST FOR APPROVAL OF THE PROPOSED PLANS AND SPECIFICATIONS. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN (30) DAYS, LANDLORD'S APPROVAL SHALL BE DEEMED GRANTED PURSUANT TO THE PROVISIONS OF THE LEASE." If Landlord shall again fail to respond within such  thirty (30) days after receipt of such second request, Landlord's approval of such Tenant's Plans shall be deemed granted.  At Tenant's request, Landlord shall join in applications for any authorizations and/or Permits required by any Governmental Authority in connection with Tenant's Work (to which Landlord has consented, if such consent is required pursuant to this Article 5), and otherwise cooperate with Tenant in connection with Tenant's Work. Tenant shall reimburse Landlord for the out-of-pocket reasonable costs and expenses incurred by Landlord in connection with reviewing and amending (if necessary) such Tenant's Work as Additional Rent. In the event Tenant's Work does not require any Permits from any Governmental Authority, such costs shall not exceed $2,000.00 per instance without Tenant's prior written approval.

       5.2.1    All repairs, replacements, and reconstruction (including, without limitation, all Tenant's Work) made by or on behalf of Tenant or any of Tenant's agents shall be made and performed (i) at Tenant's cost and expense and at such time and in such manner as Landlord may designate, (ii) by contractors or mechanics approved by Landlord, (iii) in such manner so as to be at least equal in quality of materials and workmanship to the original work or installation, (iv)  in accordance with such reasonable requirements as Landlord may impose with respect to insurance and bonds to be obtained by Tenant in connection with the proposed work, (v) in accordance with the rules and regulations for the Building adopted by Landlord, from time to time, and in accordance with all applicable Laws or Governmental Authorities having jurisdiction over the Premises, (vi)  so as not to interfere with the use and enjoyment of the Building by Landlord, other tenants of the Building or any other persons, and (vii) in compliance with such other reasonable requirements as Landlord  may from time to time promulgate.

       5.2.2    In connection with its performance of Tenant's Work and any alterations, Tenant covenants and agrees as follows:

       (a)    No alteration shall at any time be made that shall impair the structural soundness or diminish the value of the Building.

       (b)    At the time Tenant requests Landlord's written consent to any alteration, Tenant shall deliver to Landlord detailed plans and specifications therefor. Subject to the proviso set for in Section 5.2 above, Tenant shall pay to Landlord any fees or expenses incurred by Landlord including, without limitation, the cost of Landlord's architects, lawyers and engineers in connection with Landlord's submitting such plans

<center>13</center>

and specifications, if it so chooses, to an architect or engineer selected by Landlord for review or examination and/or for supervision during performance of alterations. Landlord's approval of any plans or specifications does not relieve Tenant from the responsibility for the legal sufficiency and technical competency thereof.

(c)     Before commencement of any alterations, Tenant, at its expense, shall obtain the necessary consents, authorizations and licenses from all federal, state and/or municipal authorities having jurisdiction over such work.

(d)     Before the commencement of any alterations that have an estimated cost in excess of $50,000.00, Tenant at its own expense, shall deliver to Landlord a security company performance and completion bond in a company acceptable to Landlord in an amount equal to the estimated costs of such work plus twenty-five percent (25%), guaranteeing the completion of such work free and clear of all liens, encumbrances, security agreements, chattels, mortgages, conditional bills of sale and according to the plans and specifications therefor.

(e)     Before the commencement of any Tenant's Work, Tenant at its own cost and expense, shall deliver to Landlord an architect's statement stating that the alterations comply with the requirements of the Americans with Disabilities Act.

(f)     All work done in connection with any change or alteration shall be diligently prosecuted to its completion, done in a good and workmanlike manner, free of mechanics liens, pursuant to the plans or drawings prepared by a licensed architect previously submitted to Landlord.  Furthermore, all work done must be in compliance with the building and zoning laws, and with all other Laws, and Tenant shall procure and deliver to Landlord certificates of occupancy and all other certificates required by law.

(g)     During the course of Tenant's Work and Alterations pursuant to this Article 5, in addition to any insurance that may be required under this Lease, Tenant's contractor(s) shall provide and maintain in full force and effect during the Term of this Lease, all warranty periods and other periods as specified herein, insurance policies providing coverages as reasonably requested by Landlord.

(h)     Tenant agrees to indemnify and save Landlord harmless from and against any and all bills for labor performed and equipment, fixtures and materials furnished to Tenant and applicable sales taxes thereon as required by New York law and from and against any and all liens, bills or claims therefor or against the Premises or the Building and from and against all losses, damages, costs, expenses, suits and claims whatsoever in connection with Tenant's Work.  The cost of alterations shall be paid for in cash or its equivalent, so that the Premises and the Building shall at all times be free of liens for labor and materials supplied or claimed to have been supplied.

(i)     If the performance of Tenant's Work shall materially interfere with the comfort and/or convenience of other tenants in the Building or shall cause damage to

14

DocuSign Envelope ID: 1C8AF899-43A8-4053-AB48-52F51455595D

or otherwise interfere with the occupancy of adjacent buildings, Tenant shall upon Landlord's demand remedy or remove the condition or conditions complained of.  Tenant further covenants and agrees to indemnify and save Landlord harmless from and against any and all claims, losses, damages, costs, expenses, suits and demands whatsoever made or asserted against Landlord by reason of the foregoing.

(j)     After Tenant's Work has been completed and do the extent required under applicable Law, Tenant shall obtain and deliver to Landlord a "write-off" or a "letter of completion" or such other documentation satisfactory to Landlord from the applicable municipal authority evidencing that such alteration is complete and in accordance with all legal requirements and shall thereafter obtain and deliver to Landlord a change in the Certificate of Occupancy or Certificate of Completion if required by reason of the Tenant's Work.  Nothing herein shall be deemed to limit Landlord's right, if permitted under applicable law, to file or post notices of non-responsibility in the appropriate filing office or in or on the Premises.

(k)     Tenant shall cause its contractors, subcontractors, materialmen and all others performing work, or providing goods, materials and/or services to Tenant or the Premises, to work and co-exist in harmony with others performing work in, or occupying portions of, the Building.  Notwithstanding anything contained in this Lease to the contrary, if any contractors or tradespeople employed or utilized by Tenant, or any suppliers of services to Tenant, shall cause (or if their presence at the Building shall otherwise result) in any actual or threatened work stoppage, picketing, labor disruption or other dispute at the Building (whether or not Landlord's consent or approval was required for Tenant's use of such contractor, tradesperson and/or supplier), then, Tenant shall, upon written notice from Landlord (which notice may be delivered to Tenant by hand at the Premises notwithstanding any provision contained in this Lease to the contrary), immediately cease use of such contractor, tradesperson or supplier, as the case may be, and otherwise immediately resolve the dispute or condition that gave rise to such actual or threatened work stoppage, picketing or labor disruption.  If Tenant shall fail to so comply with the foregoing provisions of this Section immediately upon written notice from Landlord, then, such failure shall be deemed to be a material breach of Tenant's obligations under this Lease and Landlord shall have the right, in addition to any other rights and remedies that Landlord may be afforded at law or in equity, to terminate this Lease upon ten (10) days' written notice to Tenant, without regard to any grace periods contained in this Lease.

5.3     <u>Mechanic's Lien</u>.  If, as a result of Tenant's Work, a mechanic's lien is filed against any part of the Premises or Tenant's Work, and no action of Landlord caused the creation of such lien, then Tenant shall, at Tenant's expense, cause it to be released (by bond or otherwise) within thirty (30) days after Tenant receives notice of the filing thereof.

5.4     <u>Roof</u>.  Tenant shall have the right to place on the roof or other portions of the Building one or more satellite dishes, antennas, security cameras or other similar devices

(collectively, "Rooftop Equipment") and to replace, remove, and repair any such device(s), for the purpose of receiving and sending radio, internet, television, computer, telephone, or other communication signals, and for safety and security purposes. The installation, operation, maintenance, repairs and removal of such Rooftop Equipment shall be subject to and conditioned upon the following:

5.4.1    The installation of the Rooftop Equipment in, on and about the Building, including without limitation, any coring required in connection therewith, shall be done at Tenant's sole cost and expense in accordance with the provisions of this Lease (including, without limitation, Article 5 hereof) and shall be subject to the prior written approval of Landlord in each instance (which approval shall not be unreasonably withheld, delayed or conditioned), which approval shall be subject to, among other things, Landlord's review and approval of the plans, drawings and specifications depicting the Rooftop Equipment and the proposed location thereof and Tenant's payment of all costs and expenses incurred in connection with Landlord's review and supervision of such installation.  Prior to commencing such installation, Tenant shall provide Landlord with (i) copies of all required governmental and quasi-governmental permits, licenses and authorizations which Tenant shall obtain at its own expense and which Tenant shall maintain at all times during the installation of the Rooftop Equipment; and (ii) a certificate of insurance evidencing any other insurance reasonably required by Landlord for the installation and operation of the Rooftop Equipment in such amounts and of such types as Landlord may reasonably require.  Landlord may withhold approval if, in Landlord's sole judgment, the installation or operation of the Rooftop Equipment may damage the structural integrity of the Building.  The Rooftop Equipment installed on the roof of the Building shall be identified with permanently marked, weather-proof tags at the following locations: (w) each dish bracket; (x) at the transmission line building entry point, (y) at the interior wall feed through or any other exit point; and (z) at any transmitter combiner, duplexer, or multi-fed receive port. Notwithstanding anything to the contrary contained herein, upon Tenant's request, Landlord shall cooperate with Tenant in all reasonable respects to the Rooftop Equipment; provided, however, that Landlord shall do so without liability or cost to Landlord.

5.4.2    The Rooftop Equipment, and the attachment of the same to the Building must be structurally sound with respect to weight, wind forces, structural integrity of the Building and all other considerations.  Within ten (10) business days following Landlord's reasonable request therefor, Tenant shall, at Tenant's expense, cause an analysis of the roof and the structural integrity of the Building to be performed by engineers reasonably designated by Landlord (provided its costs, fees and charges are market rate and their services are otherwise provided on market terms).  If Tenant fails to do so within ten (10) days after notice, Landlord may hire contractors or consultants, at Tenant's reasonable expense, or use Landlord's own building staff to verify and guarantee roof and structural integrity.  Tenant acknowledges that Landlord shall have no liability arising out of Landlord's review and/or approval of any such analysis.  If the structural engineer shall reasonably deem it advisable that there be a structural reinforcement of the roof or the Building in connection with such installation, Landlord shall perform same at Tenant's sole but reasonable cost and expense and Tenant shall not perform any

16

such installation prior to the completion of any such structural reinforcement. Any other alterations, additions or reinforcements to the Building necessary to accommodate work shown by the plans shall, in each instance, require the prior written approval of Landlord (which approval shall not be unreasonably withheld, delayed or conditioned). Tenant shall not otherwise alter or affect the structure of the Building. With respect to the rooftop area, Tenant must maintain the waterproof integrity of the Building and the roof thereof and, except as prescribed by the plans approved by Landlord, no penetrations of the roof or exterior walls of the Building will be permitted without Landlord's prior written consent. The contractors performing the installation of the Rooftop Equipment and/or performing any work on or to the roof of the Building shall be reasonably approved or designated by Landlord prior to the commencement of any work (provided its costs, fees and charges are market rate and their services are otherwise provided on market terms). In addition, in the event Landlord grants its consent to any penetration of the roof or exterior walls of the Building, Tenant agrees to use Landlord's designated roofing company to perform such work (provided its costs, fees and charges are market rate and their services are otherwise provided on market terms).

        5.4.3     Tenant warrants and represents that the installation, use, maintenance, operation, repair and removal of the Rooftop Equipment on the roof or the operation thereof shall not cause unreasonable interference with any telecommunications, mechanical or other systems either located at or servicing the Building (whether belonging to or utilized by Landlord or any other tenant or occupant of the Building) or located at or servicing any building, premises or location in the vicinity of the Building, limited, however to that permissible under applicable F.C.C. regulations to the extent that such regulations apply.

        5.4.4     Tenant shall maintain and keep in full force and effect throughout the Term all licenses, permits, consents and other approvals (collectively, "Permits") necessary or required in connection with the installation, use, ownership, operation and maintenance of the Rooftop Equipment, the use of the rooftop area and the performance of any other work on the rooftop area or in any other part of the Building (including, without limitation, any licenses required by the FCC) and Tenant shall pay all fees, charges and other expenses in connection therewith. Tenant shall promptly inform Landlord of its failure to obtain any Permits or of any legal or regulatory development of which Tenant becomes aware that would prohibit the operation of the Rooftop Equipment. Tenant shall also have the sole and exclusive responsibility for complying with all applicable tests required by Federal, state and local laws and ordinances. Notwithstanding anything to the contrary contained herein, upon Tenant's request, Landlord shall cooperate with Tenant in all reasonable respects to tenant obtaining any the Permits; provided, however, that Landlord shall do so without liability or cost to Landlord.

        5.4.5     Tenant shall promptly repair any damage caused to the roof or any other portion of the Building by reason of or arising out of such installation, use, operation, maintenance and repair of the Rooftop Equipment (using a contractor reasonably approved or designated by Landlord (provided its costs, fees and charges are market rate and their services

<center>17</center>

are otherwise provided on market terms)), including, without limitation, any repair or restoration of the roof necessitated, or in any way caused, thereby.

5.4.6 Tenant shall not permit the Rooftop Equipment to be used by, or for the benefit of, any third party.

5.4.7 Tenant covenants and agrees that the installation, operation, use, maintenance, repair and removal of the Rooftop Equipment will be at its sole risk. Tenant agrees to indemnify and defend Landlord and Landlord's managing agent against all claims, actions, damages, liabilities and expenses of any nature whatsoever, including reasonable attorney's fees and disbursements in connection with the loss of life, personal injury, damage to property or business or any other loss or injury, or as a result of any litigation arising out of the installation, operation, use, maintenance, repair or removal of the Rooftop Equipment.

5.4.8 At the expiration or sooner termination of this Lease, or upon termination of the operation of the Equipment, or the revocation of the license granted pursuant to this Article, Tenant shall remove the Rooftop Equipment from the Building at Tenant's sole cost and expense and repair the resulting damage to the Building and restore the roof and the Building to the condition which existed prior to any such installation, wear and tear and damage by casualty excepted. If Tenant does not remove the Rooftop Equipment when so required and restore the roof and other parts of the Building, as herein provided, Tenant hereby authorizes Landlord to remove and dispose of the Equipment and restore the roof and other parts of the Building, and to charge Tenant for all reasonable costs and expenses incurred in connection therewith. In addition, licensor reserves the right to require Licensee to cut, disconnect and cap components of the Rooftop Equipment located within the risers of the Building and seal the same off in a safe and lawful manner.

5.4.9 Tenant shall, at Tenant's cost and expense, be solely responsible to arrange to obtain any electrical current necessary in connection with the use, operation and maintenance of the Equipment.

5.4.10 Tenant hereby expressly acknowledges (i) that this Article grants a license only and that Tenant has no interest or estate in the rooftop area or any other part of the Building, (ii) that its use of the designated riser is not exclusive and (iii) Landlord hereby reserves the right to grant, renew or extend similar licenses to other parties.

## Article 6. SERVICES; UTILITIES

6.1 <u>Services</u>. Landlord shall, at its sole cost and expense, provide to the Building those services designated as "Landlord" (collectively, the "**Landlord's Services**") on the Schedule of Services attached hereto as **<u>Exhibit G</u>** in a manner consistent with the operation, quality and condition of Upper Upscale hotels in Long Island City and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers and industry practice. In addition, Landlord shall provide passenger [and freight] elevator service and access to the Premises and the Common Areas for Tenant, its guests and

18

invitees, 24 hours a day, 7 days a week, subject to the terms and conditions of this Lease and shall cooperate with Tenant to allow Tenant to provide reasonable security to its guests, including security camera systems, additional locks and physical security.  To the extent any third party contractors are hired by Landlord to provide any of the Landlord's Services, all such service contracts between the contractors and Landlord shall provide that (a) the contractors thereunder will carry general liability insurance to a commercially reasonable and industry standard limit, and Tenant shall be added as an additional insured to the contractor's liability policies; (b) the contractors shall provide a copy of their insurance to Tenant before entering the Premises; and (c) the contractors will indemnify Tenant to the same extent Landlord is indemnified under the service contracts.  Tenant shall have the right to request and review copies of the applicable service contracts to verify the foregoing.  Tenant shall, at its sole cost and expense, provide those services designated as "Tenant" on the Schedule of Services attached hereto as **Exhibit G** in a manner consistent with the operation, quality and condition of Upper Upscale hotels in Long Island City and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers and industry practice.

6.2     Service Interruption.  In the event Landlord fails to commence to cure a Service Interruption within five (5) business days after the earlier of Landlord's receipt of Tenant's notice thereof or Landlord obtaining actual knowledge of the Service Interruption and/or fails to diligently pursue the cure of the Service Interruption to completion, Tenant may, at its option, carry out the cure of such Service Interruption and deduct all reasonable and actual expenses incurred by Tenant in performing such cure plus a ten percent (10%) overhead charge from the future Rent payment coming due.

6.3     Utilities and Infrastructure.  Landlord shall make available throughout the Term the following utility connections and infrastructure to the Project, including the Premises (collectively, "**Utilities**"): hot and cold water, electricity, municipal gas, wastewater system for both sewage and stormwater, adequate Building Systems (including comfortable levels of heating, ventilation, and air conditioning in each of the Rooms and the Premises), Building-wide high-speed fiber optic internet, elevators, and any other utility connections, services and infrastructure typically provided in an Upper Upscale hotel.

6.4     Utility Cost.   Tenant shall pay directly to applicable utility providers, the cost of electricity, gas, water, sewer and internet service used in the Premises and which are supplied and separately metered or sub-metered to the Premises.  Prior to the Commencement Date, Landlord, at its sole cost, shall install meters or sub-meters to separate the cost of electricity, gas, water, sewer and internet service used in the Premises from the remainder of the Project.

6.5     Utilities Interruption. In the event any portion of the Premises is unsuitable for operation of Tenant's business due to an Utilities Interruption which is in the control of Landlord to remedy and is not caused by the negligence or willful misconduct of a Tenant Party, and Tenant ceases the operation of its business with respect to the Premises or any portion thereof for twenty-four (24) hours or longer following Tenant's notice of an Utilities

Interruption to Landlord, then Tenant shall be entitled to receive an abatement of Base Rent in proportion to the Premises so affected or for the amount of reimbursements or discounts in the amount of 25% of their Room rate or more that Tenant provided its guests as a result of such Utilities Interruption, as applicable, for the duration of the Utilities Interruption until such Utilities Interruption is fully remedied. In addition, in the event such Utilities Interruption was caused by Landlord's negligence or willful misconduct, or otherwise in Landlord's reasonable control to prevent, then Tenant shall be entitled to receive Seasonal Abatement in proportion to the Premises so affected, for the duration of the Utilities Interruption until such Utilities Interruption is fully remedied.

## Article 7.    REPAIRS, MAINTENANCE, REPLACEMENT

7.1    <u>Landlord's Repairs</u>.  Except to the extent that such repairs, maintenance or replacements are Tenant's responsibility hereunder, in **Exhibit G-2**, or are caused by Tenant's or its' invitees actions, omissions or beach hereof, Landlord shall, at its sole cost and expense, be responsible for structural repairs and structural maintenance (including preventative maintenance) in safe and good working order, and replace, and in a manner consistent with the operation, quality and condition of an Upper Upscale hotel in the City and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers and industry practice, only the following unless otherwise set forth in **Exhibit G-2**: building exterior, exterior windows, curtain walls, structural elements of the Building, the Common Areas, and all Building Systems (collectively, "**Landlord's Repairs**"). Landlord's Repairs are more specifically described as "Landlord's Repairs" in the Repair and Maintenance Responsibility Matrix attached hereto as **Exhibit G-2** ("**Responsibility Matrix**").  Except in connection with Landlord's Repairs or in the exercise of Landlord's self-help remedies as set forth herein, Landlord shall not construct or alter any portion of the Premises or the Common Areas on or after the Commencement Date without Tenant's prior written consent which shall not be unreasonably withheld, delayed or conditioned in each instance.  Tenant shall be responsible for making any repairs and/or replacements to the Premises that Landlord is responsible for under this Article to the extent the need for same is caused by the acts, omissions, or negligence or willful misconduct of Tenant or its agents, representatives, invitees, employees or contractors.  Landlord shall also be responsible for making any repairs and/or replacements to the Premises that Tenant is responsible for under Section 7.4 below to the extent the need for same is caused by the gross negligence or willful misconduct of Landlord or its agents, representatives, employees or contractors.  Landlord shall perform such repair, maintenance or replacement work (a) using commercially reasonable efforts to prevent and/or minimize interference with the conduct of Tenant's business in the Premises and to prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord if damaged, at Landlord's sole cost and expense), and (b) in compliance with Article 14 below.

7.2    <u>Failure to Make a Landlord's Repair</u>.  If a need for a Landlord's Repair arises, Tenant shall notify Landlord after Tenant obtains actual knowledge thereof.  Landlord shall promptly commence a Landlord's Repair no later than forty-eight (48) hours after the

earlier of Landlord's receipt of Tenant's notice thereof or Landlord obtaining actual knowledge of the need for such repair, and shall thereafter diligently pursue such Landlord's Repair to completion. Subject to Section 7.3 below, in the event Landlord fails to commence a Landlord's Repair within forty-eight (48) hours after the earlier of Landlord's receipt of Tenant's notice thereof or Landlord obtaining actual knowledge of the need for such repair and/or fails to diligently pursue any such Landlord's Repair to completion, Tenant may, at its option, carry out such Landlord's Repair and deduct all reasonable and actual expenses incurred by Tenant in performing such repair plus a ten percent (10%) overhead charge from the future Rent payment coming due. In the event Tenant reasonably determines the Premises or any portion thereof is unsuitable for operation of its business due to any matter or condition that constitutes a Landlord's Repair (not caused by the negligence or willful misconduct of a Tenant Party) and (a) ceases the operation of its business for more than forty-eight (48) hours in any portion of the Premises, or (b) provides reimbursements or discounts to its guests in the amount of 25% or more of their Room rate as a result of such Landlord's Repair, then Tenant shall be entitled to receive an abatement of Base Rent in proportion to the area of the Premises so affected for the duration of cessation of Tenant's operation of its business in such affected portion of the Premises, or in the amount of the discounts or reimbursements so given as a result of such Landlord's Repair.

7.3     <u>Urgent Landlord's Repairs</u>. In the event of an urgent Landlord's Repair (reasonably determined by Tenant) that materially prevents Tenant from conducting its business in the Premises, Tenant may carry out such Landlord's Repair, provided that Landlord fails to commence Landlord's Repair within forty eight (48) hours after written notice by Tenant (which may be by email), and (2) thereafter, Landlord fails to diligently prosecute such repair until completion, and (3) Tenant provides paid receipts to Landlord detailing the cost of the work performed by Tenant ("Tenant's Costs"). Within ten (10) business days after Landlord's receipt of the paid receipts mentioned in this Section 7.3, Landlord, at its sole election shall either:

        (A)     Reimburse Tenant for the amount of Tenant's Cost;

        (B)     Give Tenant a rent credit for the amount of Tenant's Cost, which credit shall be applied (until exhausted) against not more than one hundred percent (100%) of the monthly Excess owing under the Lease (if any) and ten percent (10%) of the monthly Fixed Rent owing under the Lease until fully recovered; or

        (C)     Give Tenant a written notice ("Dispute Notice") that Landlord disputes ("Dispute") either or both of (A) Landlord's obligation to reimburse Tenant for such cost, or (B) the amount of Tenant's Cost. If Landlord gives the Dispute Notice, then the Dispute shall be resolved by binding arbitration in the State of New York in accordance with the rules of the American Arbitration Association.

If Tenant's action, in accordance with this Paragraph, affects the Building's electrical, plumbing, HVAC or mechanical systems, or the structural integrity of the Building, Tenant shall use only

<div align="center">21</div>

those contractors used by Landlord in the Building that work on the Building systems or structure, unless such contractors are unwilling or unable to perform such work, in which event, Tenant may utilize the services of another qualified, licensed, and insured contractor subject to Landlord's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed).

      7.4   <u>Tenant's Repairs</u>.  Tenant shall, at its sole cost and expense, maintain and repair in good condition (subject to normal wear and tear attributable to typical hotel use) The Premises which is not Landlord's obligation to repair hereunder, including but not limited to: (a) casework, window treatments, art, furniture, furnishings and accessories installed by Tenant which are more specifically described as "Tenant's Repairs" on the Responsibility Matrix, except to the extent any damage is caused by the negligence or willful misconduct of Landlord or Landlord Parties (which shall be a Landlord's Repair), and (b) any damage caused by the negligence or willful misconduct of Tenant or Tenant Parties.   In addition, Tenant or its employees may perform minor and common domestic repair work in the Premises that does not require any material trade skills or technical knowledge. Such work may include, but is not limited to, general upkeep of furniture and fixtures, drain maintenance, and spot cleaning of walls, carpet and upholstery.

      7.4.1   Tenant, at its sole cost and expense, shall also keep the interior of the Premises, and FF&E located therein, clean and in good repair and condition.  Tenant shall maintain, operate and repair, at its sole cost and expense Tenant's Work.  Tenant shall repair any damage to the Premises caused by the fault or negligence of Tenant or the Tenant Parties; and damage to the Premises that, due to the Permitted Use, exceeds the reasonable wear and tear attributable to normal hotel use. In the event Tenant fails to comply with its obligations hereunder within fifteen (15) days written notice, then Landlord shall have the right, upon a second (2nd) fifteen (15) day written notice including the following in bold face font at the top of the notice: "**SECOND NOTICE – IMMEDIATE ACTION REQUIRED**" and opportunity to cure (or, in the event of an bona fide emergency involving imminent harm to persons or property, one (1) such notice as is reasonably practicable under the circumstances) but not the obligation to perform such repairs, provided that Landlord shall coordinate the timing of such entry with Tenant and shall not enter any Room that is occupied by Tenant's subtenants or guests, and charge Tenant the reasonable, out of pocket costs incurred by Landlord as Additional Rent, and Tenant shall pay same within thirty (30) days of being billed for same. Tenant waives the benefit of any applicable law purporting to allocate Tenant's responsibility for repairs other than as set forth in this Lease or affording Tenant any right to make repairs at the expense of Landlord or to terminate this Lease on the basis of any necessary repairs.  Notwithstanding anything to the contrary contained herein, Tenant shall be responsible for the repair and maintenance of all parts of the Premises other than those that are Landlord's responsibility as provided in Section 7.4 above. Tenant shall also be responsible for providing janitorial service within the Premises. Tenant shall at all times keep the Premises in a clean condition,  free of odors and rodents and shall employ the services of an exterminator on a regular basis if required to keep the demised premises free of rodents and bugs. Landlord shall have the right, from time to time, within regular business hours, and with coordination with a representative of Tenant who may be

<div align="center">22</div>

present during the duration of any inspection, to inspect the demised premises at any time during business hours to determine whether Tenant is complying with the terms of this paragraph. If Tenant is not complying with said terms, Landlord shall have the right of injunctive relief in addition to any and all other remedies available to Landlord.

7.4.2    Tenant shall not place a load upon any floor in the Premises or in the Building exceeding the lesser of fifty (50) pounds per square foot "live load" or the limit allowed by applicable law. Tenant shall not move any safe, heavy machinery, heavy equipment, business machines, freight, bulky matter or fixtures into or out of the Building without Landlord's prior consent, and shall make payment to Landlord of Landlord's reasonable, out-of-pocket costs in connection therewith. If such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling, Tenant shall employ only persons holding a master rigger's license to do such work. All work in connection therewith shall comply with all legal and insurance requirements and the rules and regulations for the Building adopted by Landlord, as may be amended by Landlord from time to time, and shall be done at any time, provided that if such work is reasonably likely to materially interfere with the operation of the Building or unreasonably interfere with the use and occupancy of the Building by other tenants, then such work shall be done during such hours as Landlord may reasonably designate. Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient in Landlord's reasonable judgment to absorb and prevent vibration, noise and annoyance.

7.4.3    HVAC Maintenance Contract.  As part of Tenant's obligation to provide regular maintenance for the HVAC serving the Premises, Tenant shall enter into an annual contract with an air conditioning repair firm approved by Landlord and fully licensed to repair air conditioning units in New York, which firm shall regularly service the units and perform emergency and extraordinary repairs thereto.  Upon request, Tenant shall provide to Landlord a copy of such annual contract and shall, upon receipt, forward to Landlord any and all notices from such contractor in connection therewith.  Nothing herein shall limit Tenant's obligation to maintain the air conditioning units in good condition and repair throughout the Term.

7.4.4    Violations.  In the event any violation from the Department of Buildings, the Environmental Control Board, or any other governmental/municipal, administrative or legal agency is placed against Landlord, the Premises or the Building as a result of Tenant's use of the Premises for any use other than the Permitted Use, Tenant's Alterations or Tenant's acts or omissions and such violation (i) impedes Landlord's ability to perform its obligations under any other lease for space in the Building, or (ii) impedes the ability of Landlord, the Condominium (if applicable) or any other tenant of the Building to obtain permits from the New York City Department of Buildings or any other governmental/municipal agency, or (iii) impedes Landlord's, the Condominium's (if applicable) or any other tenant's ability to obtain a temporary or permanent certificate of occupancy, then in addition to Tenant's obligation

23

to cure such violation and pay any and all fines, penalties and interest related thereto, Tenant shall be obligated to reimburse Landlord as Additional Rent, within ten (10) days of Landlord's demand therefor, any and all expenses incurred by Landlord due to such violation, including, without limitation, loss of rent from other tenants or potential tenants of the Building, provided that Landlord provides not less than thirty (30) days' prior written notice of the violation and the loss Landlord expects to result from such violation.

## Article 8.    COMPLIANCE WITH LAWS

8.1    <u>Legal Compliance</u>.  Landlord covenants, represents and warrants to Tenant that the Premises and the Project will be in compliance with all applicable Laws, including, but not limited to, all applicable zoning laws, building codes, ordinances, statutes, and the ADA (for transient/hotel use) and other similar federal, state and local Laws and regulations as of the Commencement Date.  Landlord covenants, represents and warrants to Tenant that the Premises includes 5 ADA mobility accessible Rooms (4 accessible Rooms with ADA tubs and 1 accessible Rooms with roll-in showers), and 9 Rooms with ADA communication features, and the Common Areas shall be in compliance with the ADA applicable to hotels.  During the Term, Landlord shall, at Landlord's expense, comply with all Laws applicable to the Project (except to the extent such compliance is Tenant's obligation under this Section 8.1), and, Tenant shall, at Tenant's expense, subject to the provisions of this Lease, comply with all Laws applicable to (i) Tenant's operation of its business in the Premises, (ii) the installation by Tenant of Tenant's Property, or (iii) the performance of Tenant's Work at the Premises during the Term.

8.2    <u>Hazardous Materials</u>.  Landlord represents and warrants to Tenant that (a) Landlord has no actual knowledge of the presence of any Hazardous Materials on the Project in violation of any Environmental Laws, and (b) as of the Commencement Date, the Premises and Project will be in compliance with all Environmental Laws and free of contamination by Hazardous Materials in violation of the Environmental Laws.  If any Hazardous Materials are discovered in or on the Premises or the Project at any time during the Term which were present as of the Commencement Date or which were caused by  Landlord or any employee, agent or contractor of Landlord, Landlord shall promptly notify Tenant thereof and cause the same to be inspected and remediated, at its sole cost and expense, in accordance with all Laws.  To the extent Tenant is unable to use the Premises (or any portion thereof) for the conduct of Tenant's normal business operations, or if Tenant is deprived of access to the Premises (or any portion thereof) as a result of such inspection and/or remediation, the Fixed Rent shall abate in proportion to the portion of the Premises that in Tenant's reasonable determination, Tenant is unable to use as a result thereof.  During the Term, Tenant shall, at its sole cost and expense, (i) comply with Environmental Laws relating solely to Tenant's use and occupancy of the Premises, and (ii) not cause the release of any Hazardous Materials in violation of Environmental Laws in the Premises.  Landlord shall indemnify, defend and hold harmless Tenant and Tenant Parties from and against all Losses arising from or attributable to (x) any breach by Landlord of any of its warranties, representations or covenants in this Section 8.2, (y) any Hazardous Materials that exist on the Project as of the Commencement Date and any Hazardous Materials that are discovered in or on the Premises or the Project at any time during the Term which are brought

Long Island City - 39-25 27th Street – Lease

thereon Landlord, and (z) any violation of Environmental Laws related to the Project that is caused by Landlord. Tenant shall indemnify, defend and hold harmless Landlord and Landlord Parties from and against all Losses arising from or attributable to any breach by Tenant of any of its warranties, representations or covenants in this Section 8.2. No earlier than ninety (90) days, and no later than thirty (30) days prior to the Commencement Date, Landlord and Tenant shall cooperate to obtain a water testing report based on a scope of work approved by Tenant. Landlord shall pay for the cost of such water testing report, and Landlord shall be responsible for the cost of any remediation required as a result of such testing so that such remediation complies with all Environmental Laws. During the Term, Landlord and Tenant shall work together to prepare a water management plan for the Project which shall be prepared in accordance with the American Industrial Hygiene Association guidelines[1].

### Article 9.        SUBORDINATION; ESTOPPEL CERTIFICATES

9.1      Subordination.  The lien of this Lease is subject and subordinate to the lien of any Mortgage, provided that such subordination is expressly contingent on Tenant receiving a fully executed SNDA from each Mortgagee in accordance with this Section 9.1.  On or prior to the Effective Date, Landlord shall (a) obtain from a Mortgagee a SNDA in favor of Tenant in such commercially reasonable form as is then used by the holder of such Mortgagee and is reasonably acceptable to Tenant, which shall provide, inter alia, that so long as no continuing Event of Default exists, neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises and to conduct its business thereon, shall be interfered with or disturbed by Landlord or anyone claiming by, through or under Landlord, including Mortgagee or (b) fully satisfy the lien of any such Mortgage. The lien of any Mortgage shall not cover Tenant's property located in or on the Premises, including, without limitation, Tenant's Property.

9.2      Estoppel Certificates.  Each of Landlord and Tenant shall, without charge to the other, within thirty (30) days following receipt of a request from the other party, sign and deliver to the requesting party, or any other person designated by that party, a written statement certifying (a) that this Lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications); (b) the date to which the Rent has been paid; (c) whether or not, to its actual knowledge, there is then an Event of Default or any event has occurred which, with the serving of notice or the passage of time, or both, would give rise to an Event of Default, and if so, setting forth the specific nature of same; and (d) to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any estoppel certificate delivered pursuant to this Section 9.2 may be relied upon by the requesting party or any other person designated by the other party and named in such certificate.

9.3      Tenant Lender.  In the event Tenant secures financing in which Tenant grants to Tenant Lender a security interest in the leasehold estate under this Lease (which Tenant shall be permitted to do without obtaining further consent from Landlord provided such security interest is deemed to be subordinate to the security interest of the Landlord's mortgagee),

---

[1] Copy of the guidelines is available here: <u>AIHA Legionella Guideline.pdf</u>

Long Island City - 39-25 27th Street – Lease

Landlord agrees to the following: (a) provided Tenant Lender notifies Landlord of same in writing prior to entering the Premises, Tenant Lender shall have the right to do any act or thing required to be performed by Tenant under this Lease, and Landlord shall accept any such act or thing performed by Tenant Lender as if such act or thing was done by Tenant itself; and (b) Landlord will provide a copy of any notice of default sent to Tenant concurrently to Tenant Lender, and if Landlord shall become entitled to terminate this Lease due to an uncured Event of Default by Tenant, Landlord shall not terminate this Lease unless it has first given written notice to Tenant Lender of its intent to terminate this Lease and has given Tenant Lender the same number of days as Landlord gave to Tenant to cure the Event of Default to prevent such termination of this Lease; provided, however, that if such Event of Default (excluding any payment default) cannot reasonably be cured within such thirty (30) day period, then Tenant Lender shall have such additional period of time as is reasonably required to cure such Event of Default if Tenant Lender, with due diligence and in good faith, commences the cure of the same within the thirty (30) day period and thereafter diligently prosecutes the curing of such Event of Default.

## Article 10.    INSURANCE

10.1    Tenant shall, at Tenant's expense, maintain at all times during the Term the following minimum coverage:

10.1.1    Commercial General Liability covering Tenant against liability for bodily injury, personal and advertising injury and property damage, and the use and occupation by the Tenant, on an occurrence basis, with a combined single limit of $1,000,000 per occurrence and $2,000,000 aggregate. Coverage shall include premises liability, products/completed operations liability, and contractual liability including coverage for insured contracts;

10.1.2    Umbrella Liability Insurance to be excess and follow-form over the Commercial General Liability with limits of liability of $15,000,000;

10.1.3    Personal property coverage provided under a Special Form or "All Risks" policy in an amount of the full replacement cost value of the Tenant's Property (which shall include Tenant's Work);

10.1.4    Statutory Workers Compensation Coverage with Employers Liability as required by applicable Laws;

10.1.5    "All Risk" or "Special Form" business income/rent/extra expense coverage in an amount to cover the loss of twelve (12) months of gross profits and continuing expenses; and

10.1.6    Host Liquor Liability Insurance (to the extent Tenant serves alcoholic beverages to its guests) subject to a limit of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

26

10.2    Tenant's insurance policies shall: (a) be written on an occurrence basis with insurance companies maintaining a minimum A.M. Best rating of A VIII, and (b) as respects to all liability policies, Tenant shall ensure that (i) Landlord is added as an additional insured for any claim arising from the Tenant's use and operations at the Project; and (ii) waiver of subrogation language and a primary wording endorsement are included in its insurance policies.

10.3    Upon Landlord's written request, Tenant shall deliver to Landlord copies of certificates evidencing the insurance required by this Lease to be maintained by Tenant on or before the Commencement Date (and with respect to any insurance required pursuant to this Article 10 before the commencement of any Tenant's Work) and at least fifteen (15) days within the expiration of any such insurance. Tenant may carry any required insurance under a blanket policy if such policy complies with the requirements of this Lease.

10.4    Landlord shall, at its sole cost and expense, obtain and maintain the following:

10.4.1    Commercial general liability insurance covering damages that Landlord will be required to pay for any bodily injury, personal injury or material damage to a third party, with respect to the ownership and operation of the Project and the Premises by the Landlord, its employees, agents, contractors or the personnel for which Landlord is legally liable and contractual liability including coverage for insured contracts, on an occurrence basis and with a limit of $15,000,000 per occurrence, which can be met by a combination of primary and follow form umbrella/excess policies, and

10.4.2    Insurance against all risks of loss or damage to the Building (except usual exclusions in a standard "All Risk" policy) and all FF&E owned by Landlord located on the Project including water damage with a replacement cost endorsement, in an amount equal to the full replacement cost of the Building, plus the cost of clearing.

10.5    Landlord shall further ensure that, as respects to all liability policies, (i) Tenant is added as an additional insured for any claim arising from the Landlord's ownership of and operations at the Project; and (ii) a waiver of subrogation and a primary and noncontributory wording or endorsements are included in its insurance policies. Upon written request therefore, Landlord shall deliver to Tenant certificates evidencing the insurance required herein on or before the Commencement Date, and within fifteen (15) days of the expiration of any such insurance.

10.6    Notwithstanding any contrary provision of this Lease, Tenant and Landlord mutually agree to look first to the applicable insurance coverage in effect (or should be in effect under any policy required to be maintained under this Lease) in the event of any losses, regardless of the cause of any such losses.  Notwithstanding any other provisions of this Lease, Landlord and Tenant each releases the other party, and on behalf of itself and its insurers, waives its right to recovery against the other for loss or damage to the waiving party and its property to the extent that such loss or damage is insured against, or required to be insured against, under

27

any insurance policy required in this Article 10. For the avoidance of doubt, the parties intend and hereby agree, that the risk of loss or damage to property or income shall be borne by the parties' insurance carriers. Landlord and Tenant each agrees to furnish to each insurance company which has or will issue such policies notice of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to prevent the invalidation of said coverage by said waivers. This waiver shall not be effective to relieve any party failing to maintain the insurance required by this Lease. The provisions of this Section 10.6 will survive the expiration or earlier termination of this Lease.

## Article 11.    CASUALTY

11.1    If all or any portion of the Premises, the Building or the Project is damaged by Casualty, then Tenant shall give prompt notice of such Casualty to Landlord.  In the event of a Casualty as mentioned herein and this Lease is not terminated pursuant to this Section 11.1 or Section 11.2 below, Landlord shall, at Landlord's sole expense, promptly perform Restoration to the extent of the insurance proceeds received, excluding any damage to Tenant's Work, Onboarding Work or Tenant's Property, and Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent safe to do so and reasonably required by Landlord in connection with the Restoration. From the date of the Casualty until the date on which Landlord's Restoration is substantially complete, the Fixed Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have access or which Tenant reasonably determines is unsuitable for the operation of Tenant's normal business.  If Landlord undertakes but fails to complete the Restoration within three hundred and sixty-five (365) days after the date of such Casualty for any reason other than a Tenant Delay or Force Majeure Event, then Tenant may terminate this Lease (without payment of any penalty, damages or termination fee to Landlord) by delivering written notice to Landlord within thirty (30) days after the expiration of such three hundred and sixty-five (365) day period, but before the Restoration has been completed by Landlord.

11.2    Notwithstanding anything to the contrary set forth herein, if (a) a Mortgagee will not release to Landlord the amount of any insurance proceeds due or received from a Casualty for any reason, or (b) the time required to complete the Restoration exceeds three hundred and sixty-five (365) days (as estimated by a reputable third-party contractor selected by Landlord), (c) Tenant does not have access to all or any portion the Premises, or all or any portion of the Premises are unsuitable for the operation of Tenant's normal business due to Casualty for more than three hundred and sixty-five (365) days, or (d) if the Premises is materially affected by Casualty during the last twelve (12) months of the Term or any Renewal Term, each of Landlord and Tenant shall have the right, by written notice to the other party within thirty (30) days following the occurrence of the event set forth in (a), (b), (c) or (d) herein, to terminate this Lease (without payment of any penalty, damages or termination fee), and such termination shall be effective as of the date stated in such written notice, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant.  A total destruction of the Building shall automatically terminate this Lease.

28

11.3    This Section 11 constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Law shall have no application to a fire or other casualty.

11.4    Notwithstanding any provision in this Lease to the contrary, in the event that any law (which includes, but is not limited to, any ordinance, building code, zoning, rule, regulation, municipal policy or approval, or regulatory approval) prevents Tenant from using the Premises (or any portion thereof) for the Permitted Use following any damage or destruction to the Premises, then the Rent payable by Tenant shall be reduced in the proportion to the rentable area of the portion of the Premises that Tenant is prevented from using. However, in the event that (1) Tenant is prevented from conducting the Permitted Use in more than fifty percent (50%) of the Rooms comprising the Premises, or (2) the entire Premises cannot be used for the Permitted Use, then Tenant shall have the right to terminate this Lease upon thirty (30) days' advance written notice to Landlord. Effective as of the termination date, both Landlord and Tenant shall be freed and discharged of all further obligations under this Lease, except for those obligations which by their provisions specifically survive the expiration or earlier termination of the Lease or Renewal Term, as applicable.

### Article 12.    CONDEMNATION

12.1    If as a result of a Taking, (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant, is taken; (b) a portion of the Building or the Project is taken, resulting in Tenant no longer having reasonable access to or use of the Premises or a portion thereof; (c) all or substantially all of the Building or the Project is taken; or (d) a portion of the Building or the Project is taken resulting in Landlord's determination to demolish the Building, then the Term shall expire on the earlier of taking of possession by the condemning authority, the date of vesting of title pursuant to such Taking, or the date on which the Premises is no longer reasonably usable by Tenant for its normal business. In such event, the Rent shall be prorated as of the date of termination, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant.

12.2    If less than all of the Premises is taken, and Tenant reasonably determines that thirty three (33%) or more of the Rooms are not usable for the Permitted Use (thereby making the Premises unsuitable for the operation of Tenant's normal business) or otherwise materially interferes with Tenant's ability to conduct its normal business, in whole or in part, at the Premises, Tenant may terminate this Lease (without payment of any termination fee, damages or penalty to Landlord) upon the earlier of (a) thirty (30) days' prior written notice to Landlord, (b) the date on which the taking of possession by the condemning authority occurs or the date of vesting of title pursuant to such Taking, and (c) the date on which the Premises is no longer reasonably usable by Tenant for its normal business.

12.3    In the event of any such taking of all or any part of the Project, Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby assigns to

29

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F51455595D

Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof; provided, however, that nothing contained herein shall preclude Tenant from intervening in any such condemnation proceeding to claim or receive from the condemning authority any compensation to which Tenant may otherwise be lawfully entitled in such case in respect of Tenant's Property, for moving to a new location, or reimbursement for tenant improvements, provided the same do not include any value of the leasehold estate vested by this Lease in Tenant.

12.4    If a Taking does not result in the termination of this Lease, (a) Landlord shall, at Landlord's sole cost and expense, as soon as practicable, restore that part of the Premises, the Building or the Project not taken, so that the Premises, the Building and/or the Project (as applicable) are restored to a condition substantially similar to the condition of the Premises, the Building and/or the Project (as applicable) prior to such Taking (including restoring the Premises to the extent necessary to form a complete and fully functioning space but excluding any Tenant's Work, Onboarding Work or restoration of Tenant's Property), and (b) from and after the date of Taking, the Fixed Rent shall be reduced permanently in the same proportion as the area of the Premises, if any, which was taken, as well as any equitable adjustment to the extent portions of the Project outside of the Premises (as applicable) are taken and materially impact Tenant's use and enjoyment of the Premises.

## Article 13.    ASSIGNMENT AND SUBLETTING

13.1    Except as provided in this Article 13, Tenant shall not, without Landlord's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) perform a Transfer.  Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may market and advertise Tenant's services and rental of Rooms within the Premises on online platforms, including, without limitation, Airbnb, HomeAway, VRBO, Expedia.com and Booking.com, and may enter into various sublease or license agreements of any duration concerning the Rooms, without having to provide Landlord notice of its intention to sublease or license and without having to obtain Landlord's consent to sublease or license, and Landlord hereby agrees to such subleases or licenses.  For the avoidance of doubt, the use and occupancy of the Premises by Tenant's guests or customers in accordance with the Permitted Use shall not be subject to the restrictions and prohibitions set forth in this Article 13.

13.2    If Tenant shall at any time or times during the Term desire to assign this Lease, Tenant shall give Landlord notice of Tenant's terms of the proposed Transfer and the desired effective date of such Transfer, accompanied by (a) a conformed or photostatic copy of the proposed assignment or sublease, (b) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises, and (c) current financial information with respect to the proposed assignee or subtenant, including, without limitation, its most recent financial statements. Tenant shall reimburse Landlord for the actual and reasonable third-party costs that Landlord incurs in connection with the Transfer, including reasonable attorney's fees, not to exceed, in the aggregate, Two Thousand and 00/100 Dollars ($2,000.00).

13.3    Landlord shall approve or disapprove of the proposed Transfer within thirty (30) days after Landlord's receipt of the documentation required under Section 13.2 above; provided, however, that if Landlord disapproves of such proposed Transfer, Landlord shall give a reasonably detailed explanation for its disapproval.  If Landlord fails to respond to Tenant within such 30-day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO A PROPOSED [ASSIGNMENT] OR [SUBLETTING]. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN TEN (10) DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED SUCH TRANSFER.**"  If Landlord fails to provide a response to Tenant's second request within such ten (10)-day period, Landlord will be deemed to have approved the proposed Transfer.

Notwithstanding anything to the contrary contained in this Lease, no notice to or consent from Landlord shall be required for any Transfer (a) to a corporation or other legal entity into or with which Tenant (or Tenant's direct or indirect parent company) is merged or consolidated, (b) to an entity to which all or substantially all of Tenant's assets are transferred, provided that any such merger, consolidation, transfer or other transaction is not principally for the purpose of transferring the leasehold estate created hereby, (c) to an Affiliate, or (d) in connection with either a bona fide financing for the benefit of Tenant or an initial public offering of Tenant's stock on a nationally-recognized stock exchange (and, following any such public offering, the sale or transfer of any such shares).  Furthermore, notwithstanding anything to the contrary set forth herein, if Tenant delivers to Landlord reasonable documentation showing that any assignee either permitted herein or consented to by Landlord, or such assignee's guarantor, has equal or greater net worth as Tenant as of the Effective Date and such assignee has assumed in writing the obligations of Tenant under this Lease first accruing after the date of assignment, Tenant shall be released from all liability accruing under this Lease from and after the date of such assignment. Specifically, Landlord consents to the business combination of Tenant and Gores Metropoulos II, Inc. (Nasdaq: GMII), a publicly traded, special purpose acquisition company (SPAC). As used herein, the term "net worth" shall mean an entity's equity, as reported in such entity's annual financial statements (prepared in accordance with generally accepted accounting principles and audited by a nationally recognized accounting firm or other independent accounting firm reasonably acceptable to Landlord), less the intangible assets of such entity, including but not limited to, copyrights, trademarks, trade names, licenses, patents, franchises, goodwill, operating rights and deferred financing costs.

13.4    Any assignment or transfer of this Lease shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord whereby the assignee shall assume the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee shall agree that the provisions in this Article 13, shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers.

31

13.5    Notwithstanding any of the foregoing, in no event shall any assignment or transfer of this Lease release Tenant or its Guarantor from any obligations or liability accruing prior to the date of such assignment or transfer.

13.6    If Landlord shall recover or come into possession of the Premises before the date herein fixed for the termination of this Lease, Landlord shall have the right, at its option, to take over any and all subleases or sublettings of the Premises or any part thereof made by Tenant and to succeed to all the rights of said subleases and sublettings or such of them as it may elect to take over.  Tenant hereby expressly assigns and transfers to Landlord such of the subleases and sublettings as Landlord may elect to take over at the time of such recovery of possession, such assignment and transfer not to be effective until the termination of this Lease or re-entry by Landlord hereunder or if Landlord shall otherwise succeed to Tenant's estate in the Premises, at which time Tenant shall upon request of Landlord, execute, acknowledge and deliver to Landlord such further instruments of assignment and transfer as may be necessary to vest in Landlord the then existing subleases and sublettings.  Every subletting hereunder is subject to the condition and by its acceptance of and entry into a sublease, each subtenant thereunder shall be deemed conclusively to have thereby agreed from and after the termination of this Lease or re-entry by Landlord hereunder of or if Landlord shall otherwise succeed to Tenant's estate in the Premises, that such subtenant shall waive any right to surrender possession or to terminate the sublease and, at Landlord's election, such subtenant shall be bound to Landlord for the balance of the term of such sublease and shall attorn to and recognize Landlord, as its Landlord, under all of the then executory terms of such sublease, except that Landlord shall not (i)  be liable for any previous act, omission or negligence of Tenant under such sublease, (ii) be subject to any counterclaim, defense or offset not expressly provided for in such sublease, which theretofore accrued to such subtenant against Tenant, (iii)  be bound by any previous modification or amendment of such sublease or by any previous prepayment of more than one (1) month's rent and Additional Rent, which shall be payable as provided in the sublease, or (iv) be obligated to perform any work in the subleased space or the Building or to prepare them for occupancy beyond Landlord's obligations under this Lease, and the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment.  Each subtenant or licensee of Tenant shall be deemed automatically upon and as a condition of occupying or using the Premises or any part thereof, to have given a waiver of the type described in and to the extent and upon the conditions set forth in this Article 13.

13.7    Landlord shall have the right to transfer and/or sell the Project and its obligations and liabilities under this Lease in its sole discretion.  In the event of a transfer or sale of the Project by Landlord after the Final Completion Date, the transferee or assignee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer or assignment.

**Article 14.    LANDLORD ENTRY; CONSTRUCTION DURING THE TERM**

14.1    Landlord shall have the right to enter the Premises, provided that (a) except in Emergencies (in which case Landlord shall provide notice as soon as reasonably

32

practicable in consideration of the circumstances), Landlord shall provide Tenant with at least forty-eight (48) hours' prior notice of its entry, (b) Landlord shall coordinate the timing of such entry with Tenant and shall not enter any Room that is occupied by Tenant's subtenants or guests, (c) in exercising its rights under this Section 14.1, Landlord shall use commercially reasonable efforts to refrain from any acts which may unreasonably interfere with Tenant's or Authorized Parties' use or occupancy of the Premises or access thereto and the rights and privacy of the Authorized Parties, and (d) Landlord and its representatives, at Tenant's option, shall be accompanied by a representative of Tenant and shall comply with the reasonable directions of such representative regarding the rights and privacy of the Authorized Parties. Landlord shall use commercially reasonable efforts to exercise Landlord's rights under this Section 14.1 (x) to avoid interference with the conduct of Tenant's business in the Premises and (y) prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord at its expense if damaged during Landlord's entry). Any entry into the Premises in accordance with Section 14 shall not constitute an eviction (whether actual or constructive) of Tenant, in whole or in part, or breach of the covenant of quiet enjoyment, shall not be grounds for any abatement of rent, and shall not impose any liability on Landlord to Tenant by reason of inconvenience or injury to Tenant's business or to the Premises.

14.2    Notwithstanding anything to the contrary in this Lease, to the extent commercially practicable, Landlord shall not, except for short term closures for maintenance, repairs or replacements (subject to Landlord providing no less than twenty-four (24) hours advance written notice thereof to Tenant) or Emergencies or to comply with Laws (in which case Landlord shall provide notice as soon as reasonably practicable in consideration of the circumstance), take or permit any of the following actions: (a) close or alter any portion of the entranceways, exits, elevators or other accessways to and from the Premises, particularly accessible routes and options, or (b) close or alter any portion of the Common Areas adjacent to the Premises. Notwithstanding the foregoing, Landlord shall, at all times, use commercially reasonable efforts to provide adequate access to the Premises (e.g., some other alternate form of adequate access) to the Authorized Parties. Tenant shall permit Landlord to erect and maintain pipes, ducts and conduits in and through the Premises, provided that same are located within the existing walls, below the floor or above the ceiling of the Premises. Landlord shall have the right at any time, without the same constituting an actual or constructive eviction, and without incurring any liability to Tenant, to change the name or number by which the Building is known. The Premises shall not include (i) the exterior walls of the Building, (ii) the demising walls of the Premises (except for the interior face thereof), (iii) set-backs, balconies, terraces and roofs that are adjacent to the Premises, except to the extent expressly set forth herein, (iv) the windows and the portions of all window sills outside same, and (v) space that is now or hereafter used for Building systems or other purposes associated with the operation, repair, management or maintenance of the Project, including, without limitation, shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, mechanical rooms (except for mechanical rooms that exclusively serve the Premises), service closets and areas above any hung ceiling, and Landlord hereby reserves all rights to such parts of the Building (the areas described in clauses (iii) and (v) above

33

together with any mechanical rooms that exclusively serve the Premises being collectively referred to herein as the "Reserved Areas").

14.3    In the event Landlord or any Landlord Party performs, or permits to be performed, any construction, alteration, repair, replacement or maintenance to any portion of the Building, (a) Landlord or Landlord Party shall use commercially reasonable efforts to prevent unreasonable interference with operations or occupancy of the Premises and Common Areas by the Authorized Parties, including, without limitation, preventing any interruption to HVAC, power, water and elevator service, provided, however, that Landlord shall have no obligation to employ contractors or labor at overtime or premium pay rates in connection with Landlord's access as contemplated by this Article 14; (b) Landlord shall take proper security measures to prevent any unauthorized workers from accessing the Premises or the Common Areas; (c) Landlord shall take commercially reasonable safety precautions around the area of the Building where the work is being performed for the occupants of the Building in compliance with all Laws, including, without limitation, properly securing such area from the rest of the Building, enclosing the perimeters with fences and protective sheeting and posting clearly visible signs; (d) use commercially reasonable efforts so that any work that creates noise that can be heard from the Premises should be limited to 9am - 6pm; (e) to the extent commercially practicable, no debris or construction materials shall be left at the end of each day on any portions of the Premises or the Common Areas (such as doorways, stairs, elevators or corridors) used to access the Premises; (f) Landlord shall use reasonable efforts to avoid settling of or dispersion of dust onto the Premises and the Common Areas; (g) all construction equipment and materials shall be located so as to minimize interference with operations or occupancy of the Premises and Common Areas by the Authorized Parties, and (h) Landlord shall promptly (i) repair any damage to the Premises (including Tenant's Work and Tenant's Property) or the Common Areas, (ii) remove any trash and construction waste, (iii) clean any dust, dirt and debris caused by such work, and (iv) use commercially reasonable measures to mitigate any odor and off-gassing caused by such work.  For the avoidance of doubt, except for any Landlord repair or other work required under this Lease, Landlord shall not be permitted to perform any work in the Premises without Tenant's prior written consent unless such work is expressly permitted in this Lease.

### Article 15.    QUIET ENJOYMENT

15.1    Landlord covenants and agrees that Tenant, so long as no Event of Default is continuing, shall lawfully, peaceably and quietly hold, occupy and enjoy the Premises during the Term without hindrance or molestation by Landlord or by any person or persons claiming by, through or under Landlord.

15.2    With respect to any noise or vibration caused outside of the Building that is substantially likely to disturb a guest in the Premises, Landlord shall use commercially reasonable efforts to cooperate with Tenant to mitigate such noise or vibration.

### Article 16.    INTELLECTUAL PROPERTY

34

16.1    Tenant shall have the sole and exclusive right to create and modify Tenant Building Name during the Term. Landlord acknowledges that the Brand Name is a valuable property of Tenant.  Tenant Building Name is the exclusive property of Tenant and its affiliates. No default of Tenant or any provision of this Lease confers upon Landlord, or its successors or assigns, the right to use Tenant Building Name for any purpose.

16.2    Landlord acknowledges that Tenant has a proprietary interest in all Proprietary Materials (whether or not subject to any registration or application for registration), which will be under the exclusive control of Tenant and its affiliates.  Landlord shall keep such Proprietary Materials confidential pursuant to that certain non-disclosure agreement, dated [_____], by and between Landlord and Tenant. Notwithstanding the foregoing, Tenant acknowledges that Landlord intends, in the normal course of its business, to use pictures of the Premises in its advertising materials in connection with the Premises and/or the Building subject to such reasonable consent by Tenant. Notwithstanding the foregoing, following the earlier of the Rent Commencement Date or the date that Tenant announces to the public its tenancy or prospective tenancy in the Project, Landlord shall be granted a limited license to use, display, or show Tenant's trade logo and photographs or renderings of the exterior of the Premises (including pictures of Tenant's signs), on the Project's site plans, brochures marketing space for lease in the Project, and on Landlord's website in connection with marketing the Project, so long as Tenant is not given undue prominence in such materials.

16.3    Tenant shall have the exclusive right to use, without charge from Landlord, all signage, inventory, websites, internet addresses, apps and social media handles, with respect to the Premises and are owned by Landlord from and after the Effective Date until the Expiration Date or the Termination Date (as applicable), and Landlord represents that it has the right to grant such license to Tenant.

## Article 17.    CONDITION OF THE PREMISES

17.1    Except as expressly set forth herein, Tenant warrants and represents that it has inspected the Premises, is fully familiar with the physical condition and state of repair thereof and all other matters relating to this Lease, agrees to accept the Premises "as is", in its present state and condition, subject to reasonable use, wear, tear and natural deterioration, without any reduction, set-off, or abatement of Rent and without any charge to Landlord whatsoever for any change in such state and condition by reason thereof subsequent to the date of this Lease.

## Article 18.    SIGNAGE

18.1    Subject to compliance with applicable Laws and Landlord's approval (which approval shall be limited to size, color and location of such signage and shall not be unreasonably withheld, conditioned or delayed), Tenant shall have the right to install Tenant's signage on the exterior of the Building, in accordance with Tenant's signage standards.  Landlord shall respond to a request for such approval within ten (10) business days after Tenant's submission thereof, provided, however, that if Landlord disapproves of such proposed signage,

35

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F31455505D

Landlord shall give a reasonably detailed explanation for its disapproval. If Landlord fails to respond to Tenant within such 10-business day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO PROPOSED SIGNAGE. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED OF SUCH SIGNAGE.**" If Landlord fails to provide a response to Tenant's second request within such five (5)-day period, Landlord will be deemed to have approved the proposed signage. Notwithstanding the foregoing, Tenant may, without Landlord's consent, but subject to any requirements of any applicable Laws, affix, install or place (a) any signs or other means of advertisement within the Premises that may not be seen from outside of the Building, such as signage in the lobby and wayfinding signage throughout the Premises, and (b) any signage (for identification and directional purposes) on its entry door and in the elevator lobby on each floor of the Premises. In the event Tenant decides to change Tenant Building Name during the Term, then Tenant shall be permitted to change such signage to reflect the change of Tenant Building Name without the consent of Landlord, provided such replaced signage is substantially similar to the signage previously approved by Landlord.

### Article 19.    SURRENDER; HOLD OVER

19.1    <u>Surrender</u>. On the Expiration Date or the Termination Date, as applicable, (a) Tenant (and all other occupants) shall vacate and surrender the Premises broom clean and in good condition and repair, normal wear and tear typical for the Permitted Use, damage from Casualty, damage from Landlord's failure to perform Landlord's repair and maintenance obligations, and damage for which Tenant is not responsible under this Lease excepted, and (b) except as otherwise set forth in this Lease, Tenant shall remove from the Premises Tenant's Property which may be removed without damage to the Premises or the Building and shall repair any damage to the Premises caused by the installation or removal of Tenant's Property. Tenant's Property which is not removed by Tenant by the Expiration Date shall, after written notice from Landlord to Tenant, be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord or disposed of at Tenant's sole cost and expense. All of Tenant's Work which is attached to, or built into, the Premises at the commencement of or during the Term shall be and remain a part of the Premises and be deemed the property of Landlord, unless Landlord, by notice to Tenant no later than twenty (20) days prior to the Expiration Date or date of earlier termination of this Lease, elects to relinquish Landlord's rights thereto and to have such Tenant's Work removed by Tenant, in which event, the same shall be removed from the Premises by Tenant, prior to the expiration or earlier termination of this Lease, at Tenant's expense.

19.2    <u>Holdover</u>. If, without Landlord's consent, any portion of the Premises is not vacated and surrendered in accordance with this Lease on or before the Expiration Date or the Termination Date, as applicable, Tenant shall be liable to Landlord, in an amount equal to (i) for the first thirty days of such hold over tenancy, one hundred fifty percent (150%) of the Fixed Rent applicable to the month immediately preceding the Termination Date, for each day that Tenant holds over in the portion of the Premises that Tenant has failed to vacate on a pro rata

36

basis, and (ii) thereafter, two hundred percent (200%) of the Rent applicable to the month immediately preceding the Termination Date, for each day that Tenant holds over in the portion of the Premises that Tenant has failed to vacate on a pro rata basis. If Tenant, with Landlord's consent, remains in possession of the Premises after the Expiration Date or the Termination Date, as applicable, such possession by Tenant shall be deemed to be a month-to-month tenancy terminable on thirty (30) days' written notice given at any time by Landlord or Tenant. All provisions of this Lease except for those pertaining to the Term shall apply to any such hold over tenancy. In no event, however, shall this Section 19.2 be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date or the Termination Date, as applicable. If Tenant shall hold-over or remain in possession of any portion of the Premises beyond the Expiration Date of this Lease, notwithstanding the acceptance of any Rent paid by Tenant pursuant to this Lease, Tenant shall be subject not only to summary proceeding and all damages related thereto, but also to any damages arising out of lost opportunities (and/or new leases) by Landlord to re-let the Premises (or any part thereof) if Tenant shall hold over or remain in possession of any portion of the Premises more than thirty (30) days beyond the Expiration Date of this Lease, provided however that Landlord provides Tenant with not less than sixty (60) days prior written notice of the circumstances and potential damages of any such lost opportunities. All damages to Landlord by reason of such holding over by Tenant may be the subject of a separate action and need not be asserted by Landlord in any summary proceedings against Tenant.

## Article 20.    DEFAULT

20.1    <u>Tenant Event of Default</u>.  The occurrence of any of the following shall constitute a default and breach of this Lease by Tenant (hereafter an "**Event of Default**"):

20.1.1  If Tenant fails to pay any installment of Rent as and when due, where such failure continues for more than ten (10) business days after receipt of written notice thereof by Landlord to Tenant; provided, however, that if in any given twelve (12) month period Landlord shall have previously delivered to Tenant two (2) prior notices that the payment of any installment of Rent is overdue and Landlord has not changed the ACH or wire instructions or address for the payment of Rent, any further late payment of Rent in such twelve (12) month period shall constitute an Event of Default without obligation of Landlord to provide any such notice that the payment thereof is overdue; or

20.1.2  If Tenant fails to perform any of Tenant's non-monetary obligations under this Lease for a period of thirty (30) days after receipt of written notice thereof from Landlord; provided that it shall not be an Event of Default if Tenant commences such performance within said thirty (30)-day period and thereafter diligently prosecutes such cure to completion; or

20.1.3  If (a) Tenant makes a general assignment or general arrangement for the benefit of creditors; (b) a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against Tenant and is not dismissed within ninety (90) days after the filing or entry of such petition; (c) a trustee or receiver is appointed to take possession of

37

substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within sixty (60) days; or (d) substantially all of Tenant's (i) assets located at the Premises or (ii) interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within sixty (60) days; or

20.1.4   If the guarantor guarantying any obligations of Tenant under this Lease defaults under the terms of such guaranty after receipt of written notice and expiration of any applicable cure period provided under such guaranty; or

20.1.5   If Tenant shall vacate or abandon any portion of the Premises or fail to conduct business in the Premises for greater than thirty (30) consecutive days except as a result of a casualty pursuant to Article 11, in connection with a condemnation pursuant to Article 12, or as may be reasonably necessary to complete approved alterations pursuant to Section 5; or

20.1.6   Tenant shall fail to deliver a subordination instrument or estoppel in the manner required under the Lease within three (3) days after Landlord sends a second notice to Tenant stating that Tenant's obligation to deliver same is overdue.

20.2   <u>Landlord Default</u>.   In the event Landlord breaches any of the representations or warranties contained in this Lease, or fails to keep, observe or perform any of its obligations or covenants contained herein, and such breach (i) materially and adversely affects Tenant's ability to operate for the Permitted Use from more than fifty percent (50%) of the Rooms comprising the Premises and (ii) is not cured within thirty (30) days after written notice thereof (or such longer period as is reasonable to cure said default, if said default cannot reasonably be cured within thirty (30) days, provided that Landlord promptly commences to cure within such thirty (30) day period and diligently prosecutes such cure to completion), Tenant, in addition to any rights it has at law or equity, shall have the right to terminate this Lease upon notice to Landlord.

### Article 21.    LANDLORD REMEDIES.

21.1    Upon the occurrence and continuance of any Event of Default by Tenant, Landlord shall have, subject to the provisions set forth in this Article 21, the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and non-exclusive:

21.1.1   Landlord may, at its election, terminate this Lease or terminate Tenant's right to possession only, without terminating the Lease. Upon any termination of this Lease, or upon any termination of Tenant's right to possession without termination of the Lease, Tenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to Landlord, and Tenant hereby grants to Landlord full and free license to enter into and upon the Premises in such event with process of law (or without process of law if legally permitted to do so) and to dispose Tenant and repossess the Premises and to expel or remove Tenant and any others who may be occupying or within the Premises and, subject to applicable Law, to remove any and all property therefrom, without being deemed in any manner guilty of

38

trespass, eviction or forcible entry or detainer, and without incurring any liability for any damage resulting therefrom, Tenant hereby waiving any right to claim damage for such reentry and expulsion, and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law;

      21.1.2  Upon terminating this Lease, Landlord shall be immediately entitled to recover as damages, (i) all unpaid and delinquent Rent, and other sums due and payable by Tenant on the date of termination, plus the sum of (ii) an amount equal to total Rent that would have come due for the residue of the stated Term less the fair market rental value of the Premises, discounted to present value at the lower of a per annum rate equal to Prime Rate plus four percent (4%) or at a per annum rate eight percent (8%) (iii) the unamortized portion (amortized evenly over the Lease Term (exclusive of options) using an interest rate of the lower of a per annum rate equal to Prime Rate plus four percent (4%) or at a per annum rate eight percent (8%), but in no event at a rate higher than that permitted by applicable Law) of all brokerage commissions and other inducements paid in connection with this Lease by Landlord, plus (iv) Landlord's costs, charges and expenses, including court costs and reasonable attorneys' fees, incurred in enforcing Tenant's or Guarantor's obligations under this Lease or incurred by Landlord in any litigation, negotiation or transactions in which Landlord becomes involved concerning Tenant's Default. As used herein attorneys' fees shall be and mean the reasonable hourly rate charged by the attorneys (and their staff) selected by Landlord multiplied by the actual number of hours reasonably expended by such attorneys on such matters (subdivisions (i)-(iv) above are, collectively, the "<u>Recoverable Amounts</u>");

      21.1.3  Landlord may, at Landlord's option but in all events subject to then applicable Law, enter into the Premises, remove Tenant's signs and other evidences of tenancy, and take and hold possession thereof without such entry and possession terminating the Lease or releasing Tenant, in whole or in part, from any obligation, including Tenant's obligation to pay the Rent, hereunder for the full Term. Landlord will not be deemed in any manner guilty of trespass, eviction or forcible entry and detainer. Any and all property which may be removed from the Premises by Landlord pursuant to the authority of this Lease or of law, to which Tenant is or may be entitled, may be handled, removed and stored, as the case may be, by or at the direction of Landlord at the risk, cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not retaken by Tenant from storage within thirty (30) days after removal from the Premises shall, at Landlord's option, conclusively be presumed to have been conveyed by Tenant to Landlord under this Lease as by a bill of sale;

      21.1.4  Upon any termination of this Lease, Landlord may relet the Premises or any part thereof for such rent and upon such terms as Landlord in its reasonable business discretion shall determine (including the right to relet the Premises for a greater or lesser term than that remaining under this Lease, the right to relet the Premises as a part of a larger area, and the right to change the character or use made of the Premises) and Landlord shall

<div align="center">39</div>

not be required to observe any instructions given by Tenant about such reletting. Further, upon a Default, Tenant shall, upon demand, pay the cost thereof, together with Landlord's expenses of reletting including, without limitation, any tenant improvements or broker's commission incurred by Landlord (unless such new lease extends beyond the expiration date of the Lease Term). If the consideration collected by Landlord upon any such reletting plus any sums previously collected from Tenant are not sufficient to pay the full amount of all Recoverable Amounts, Tenant shall pay to Landlord the amount of such deficiency upon demand and Tenant agrees that Landlord may file suit to recover any sums falling due under this section from time to time and nothing contained in this Lease shall be deemed to require Landlord to postpone suit to the date when the Term would have expired, nor limit or preclude recovery by Landlord of any sums or damages to which, in addition to the damages particularly provided in this <u>Section 21</u>, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant;

21.1.5    Landlord may, at Landlord's option, enter into and upon the Premises, with process of law (or without process of law if legally permitted to do so), to repair or replace anything for which Tenant is responsible hereunder and correct the same, without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and without incurring any liability for any damage resulting therefrom and Tenant agrees to reimburse Landlord, on demand, as Additional Rent, for any expenses which Landlord may incur in so attempting to effect Tenant 's compliance with Tenant's obligations under this Lease.

21.1.6    Pursuit of any of the remedies herein provided (all such remedies being cumulative), shall not constitute a forfeiture or waiver of any Rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms provisions and covenants herein contained. Landlord's acceptance of the payment of rental or other payments hereunder after the occurrence of an Event of Default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing. Forbearance by Landlord to enforce one or more of the remedies herein provided shall not be deemed a waiver of such remedies.

21.1.7    Tenant waives and surrenders all right and privilege that it might have under or by reason of any present or future law to redeem the Premises or to have a continuance of this Lease for the Term hereof after Tenant is dispossessed or ejected therefrom by process of law or under the terms of this Lease in connection with a Default.  Tenant also waives the provisions of any law relating to notice and/or delay in levy of execution in case of any eviction or dispossession for nonpayment of Rent, or of any successor or other law of like import.    Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matters whatsoever arising out of or in any way connected with this Lease or Tenant's use or occupancy of the Premises.

21.2    No failure by Landlord or by Tenant to insist upon the performance of any of the terms of this Lease or to exercise any right or remedy upon an Event of Default, and no acceptance by Landlord of full or partial Rent from Tenant or any third party during the continuance of any Event of Default, shall constitute a waiver of any such Event of Default or of

40

any of the terms of this Lease.  None of the terms of this Lease to be kept, observed or performed by Landlord or by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and/or by Tenant, as the case may be.  No waiver of any breach shall affect or alter this Lease, but each of the terms of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach of this Lease.

21.3    Upon the occurrence and continuance of an Event of Default, Landlord shall use good faith and commercially reasonable efforts to mitigate its damages, including, without limitation, using commercially reasonable efforts to lease the Premises or any part thereof.

## Article 22.    BROKER

Each of Tenant and Landlord represents to the other party that it has not dealt with any broker in connection with this Lease other than Landlord's Broker. Each party shall indemnify, defend and hold the other party harmless from and against any claims for any brokerage commissions or other compensation which are made by any broker alleging to have dealt with Tenant or Landlord (as applicable) in connection with this Lease other than Landlord's Broker. Landlord shall pay Landlord's Broker any commissions due to Landlord's Broker in connection with this Lease pursuant to a separate agreement.

## Article 1.    REPRESENTATIONS AND WARRANTIES

22.1    Landlord hereby makes the following representations and warranties to Tenant, upon which Landlord acknowledges and agrees Tenant is entitled to rely, which representations and warranties shall be true and correct as of the Effective Date and as of the Commencement Date:

22.1.1    (a) Landlord is duly formed, validly existing and in good standing in the jurisdiction of its formation or organization, as applicable; (b) Landlord has the full power and authority to execute and deliver this Lease and to perform all obligations of Landlord hereunder and has obtained all consents required to do so (including consent of any Mortgagee), and the execution and delivery by the individual executing the Lease on behalf of Landlord has been duly and validly authorized by all necessary action by Landlord; and (c) Landlord is the owner of fee simple title to the Project, subject to mortgage(s) of records, and other than the mortgage(s) of record, free and clear of any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, warrant, purchase right or option, right of first refusal or similar right, lease, contract, easement or other encumbrance or restriction other than any Mortgage previously disclosed to Tenant, which would preclude or otherwise adversely affect Tenant's Permitted Use or other rights or benefits under this Lease, and (d) Landlord has good and valid title to Landlord's FF&E, which shall be free and clear of all liens and encumbrances as of the Commencement Date.

22.1.2    Neither the execution of this Lease nor the performance of Landlord's obligations hereunder by Landlord or any Landlord Party will (a) conflict with or

<div align="center">41</div>

DocuSign Envelope ID: 1C8AF899-43A8-4053-AB48-52F5145559BD

result in a breach of the terms, conditions, and provisions of or constitute a default, or result in the termination of any agreement or instrument (other than those instruments or agreements to be terminated on or before the Commencement Date) to which Landlord is a party or by which Landlord may be bound, (b) violate any restrictions to which Landlord is subject, or (c) constitute a violation of applicable Laws.

22.1.3  (a) Landlord has not received any written notice of a violation of any applicable Laws with respect to the Project which has not been cured or dismissed; (b) no administrative proceeding, investigation or inquiry is pending or, to Landlord's knowledge, without a duty to investigate, threatened with respect to any violation of applicable Laws with respect to the Project; and (c) to Landlord's knowledge, without a duty to investigate, there is no existing violation of any applicable Laws with respect to the Project.

22.1.4  (a) No litigation, arbitration, administrative or other adjudicatory proceeding or legal action is pending or, to Landlord's knowledge, threatened, with respect to the Project; (b) Landlord has not received any court filing, formal written charge, complaint, claim or written request for arbitration, mediation, administrative hearing/proceeding or similar legal or quasi-legal proceeding with respect to the Project, which has not been resolved, settled or dismissed; (c) no injunction, decree, order, writ or judgment is outstanding with respect to the Project; and (d) no claim which may result in any of the foregoing has been threatened in writing.

22.1.5  Landlord has not made any general assignment for the benefit of creditors, become insolvent or filed a petition for voluntary bankruptcy or filed a petition or answer seeking reorganization or an arrangement or composition, extension or readjustment of its indebtedness or consented, in any creditors' proceeding, to the appointment of a receiver or trustee of Landlord or the Project or any part thereof of either of them or been named in an involuntary bankruptcy proceeding, and to Landlord's knowledge, no such actions are contemplated or have been threatened.

22.1.6  To Landlord's actual knowledge, without a duty to investigate, there exist no structural or other material defects or damage in and to the Project (including, without limitation, the Building Systems), whether latent or otherwise.

22.1.7  There are no ongoing alterations or improvement projects at the Project that have commenced on or before the date hereof that will not be completed prior to the Commencement Date.

22.1.8  To Landlord's knowledge, all floor plans, architectural and mechanical drawings of the Premises and/or Project provided to Tenant are in all material respects true, correct and complete.

22.1.9  Landlord has made available to Tenant true, correct and complete copies of all Licenses and Permits.  To Landlord's knowledge, the Licenses and Permits

42

comprise all of the licenses, permits and similar authorizations required by the Governmental Authority for the use and occupancy of the Project and lodging activities on the Project.

22.1.10  To Landlord's actual knowledge, without a duty to investigate, there exists no indoor mold growth, Legionella or any other types of waterborne contaminants in the Building Systems, and Landlord has no knowledge of any such growth or contaminants in the Project's history. To Landlord's knowledge, the Project is presently maintained and has been maintained in such a manner as to prevent excess humidity, or accumulation of moisture that may promote the growth of molds or other fungi and other microorganisms, and the water systems are maintained to prevent the growth of Legionella bacteria.

22.1.11 Landlord does not have any employees who perform services for the hotel operations at the Project (the "**Employees**").  To Landlord's actual knowledge, on or after the Commencement Date, there will be no facts or circumstances that could result in any liability to Tenant with respect to any of the Employees with respect to their employment with Landlord or Hotel Manager.

22.1.12 During the period of Landlord's ownership of the Project, there has not been any Labor Activities or a Labor Dispute at the Project. Neither Landlord nor any entity affiliated or related in any way to Landlord that it may be deemed a joint employer or single employer with Landlord under applicable Law ("**Related Party**") is a party to, or assumed any obligations of any Labor Agreement that may obligate Tenant in any way to employ the Employees or any other employees or cause Tenant in any way to be subject to a Labor Dispute or any Labor Activities at the Project during the Term. During the 10-year period prior to the Effective Date, there has not been any Labor Activities or a Labor Dispute at the Project. Neither Landlord nor any entity affiliated or related in any way to Landlord, as the phrase "affiliated and related entities, successors and assigns" is used in the IWA, Division A Contract, or GRIWA, or as interpreted by the Impartial Chairperson, or that may be deemed a joint employer or single employer with Landlord under applicable Law ("**Related Party**") is a party to, or assumed any obligations of: (i) the Division A Contract, GRIWA, IWA, or other Labor Agreement with the Union; or (ii) any Labor Agreement with any Labor Organization that may obligate Tenant in any way to employ the Employees or any other employees or cause Tenant in any way to be subject to a Labor Dispute or any Labor Activities at the Project during the Term.

22.2     Tenant hereby represents and warrants to Landlord that (a) Tenant is duly incorporated, validly existing and in good standing in the jurisdiction of its incorporation; (b) Tenant has the full power and authority to execute and deliver this Lease, and the execution and delivery by the individual executing the Lease on behalf of Tenant has been duly and validly authorized by all necessary action by Tenant, (c) neither the execution of this Lease nor the performance of Tenant's obligations hereunder by Tenant or any Tenant Party will (i) conflict with or result in a breach of the terms, conditions, and provisions of or constitute a default, or result in the termination of any agreement or instrument (other than those instruments or agreements to be terminated on or before the Commencement Date) to which Tenant is a party or by which Tenant may be bound, (ii) violate any restrictions to which Tenant is subject, or (iii)

constitute a violation of applicable Laws, (d) there is no litigation, arbitration, administrative or other adjudicatory proceeding or legal action is pending or, to Tenant's knowledge, threatened which would impair Tenant's ability to perform its obligations under this Lease.

## Article 23.    LANDLORD COVENANTS

23.1    Landlord shall retain all Retained Liabilities.

23.2    Commencing on the Effective Date and until the Termination Date or the Expiration Date, as applicable, Landlord shall not enter into any agreement (including any covenant, condition or restriction and/or any condominium documents) that may materially adversely affect Tenant's use of the Premises for the Permitted Use without the Tenant's prior written consent not to be unreasonably withheld, conditioned or delayed in each instance.

23.3    During the Term, Landlord shall maintain in good standing and renew all Licenses and Permits prior to their expiration.

23.4    During the Term, unless prior written consent is obtained from Tenant in its sole discretion, Landlord shall not use or permit any portion of the Project to be used for any purpose other than for a garage for the storage of passenger vehicles or for general storage. Landlord shall use good faith efforts to ensure the Project, including the Excluded Premises, is operated and maintained at all times to a high-quality aesthetic and operational standard at least on par with that of the Premises.  Landlord shall enforce the terms of the leases with the tenants of the Project, including the Excluded Premises, to protect Tenant's quiet enjoyment and occupancy of the Premises.

23.5    From the Effective Date and until the Commencement Date, Landlord shall (and cause Hotel Manager to) operate the business at the Project in the ordinary course of business, including, without limitation, maintaining the inventories of Landlord's FF&E at levels maintained in the ordinary course of business and maintaining Landlord's FF&E in the same condition as they existed as of the Effective Date (reasonable wear and tear excepted). Landlord shall not (and cause Hotel Manager not to) trade, substitute, transfer, dispose of or remove any Landlord's FF&E except consumable inventory in the ordinary course of business.

23.6    Landlord further covenants that commencing on the Effective Date and continuing throughout the Term, neither Landlord nor any Related Party shall, without Tenant's prior written authorization, enter into or assume any obligations of: (x) the Division A Contract, GRIWA, IWA, or other Labor Agreement with the Union; or (y) any Labor Agreement with any Labor Organization that may cause Tenant in any way to be subject to a Labor Dispute or any Labor Activities at the Project during the Term. Any violation of the foregoing covenants shall be deemed a material interference with Tenant's ability to operate the Project. In such event, Tenant shall have the right in its sole and absolute discretion to terminate this Lease upon notice to Landlord, effective retroactively to the date such violation occurred, and Tenant shall be

entitled to an award of actual and consequential damages arising from or related to the violation of Landlord or any Related Party.

        23.7    Commencing on the Effective Date, Landlord shall cease making any Bookings scheduled to occur on or after the Estimated Commencement Date. Any Bookings scheduled to occur for the period on or after the Estimated Commencement Date shall be cancelled by Landlord at its sole cost and expense prior to the Estimated Commencement Date. For the avoidance of doubt, Tenant shall have no liability for any Bookings that occurs on or after the Estimated Commencement Date. On or before the Effective Date and on the date that is fourteen (14) days prior to the Commencement Date, Landlord shall provide to Tenant all information necessary to honor Bookings that are scheduled to occur on or after the Commencement Date (both "definitive" (meaning that such Bookings include the agreed rooms and rate and other charges and that the requisite rooms are blocked in the hotel's sales system) and "tentative") that are listed on **Exhibit H** attached hereto, which includes guest names and contact information (email address or phone number), number of guests, dates of stay, booking rates, payment information, reservation ID, channel, amount of any deposits, status of payment (prepaid or unpaid), cancellation terms, commission rate, commission amount, resort fee (if applicable). Landlord covenants, represents and warrants to Tenant that Landlord's transfer to Tenant of the information listed on **Exhibit H** and related Bookings data complies with relevant Privacy Laws. Tenant shall have the right to offset against the next installment of the Rent due the amount of any prepaid reservations, advance room deposits, and any other form of deposits for Bookings scheduled to occur on or after the Commencement Date which Tenant elects to assume as of the Commencement Date, except to the extent any such deposits or pre-paid amounts are transferred to Tenant on the Commencement Date. Tenant shall also have the right to offset against the next installment of the Rent due the face value (or to the extent no face value is provided, in an amount to be mutually agreed to by the parties on or prior to the Commencement Date) of any gift certificates, vouchers, coupons, trade credits, trade outs, barter arrangement, loyalty redemption Bookings or other discounted or free services or accommodations that are scheduled or otherwise available to be made on or after the Commencement Date which Tenant elects to assume as of the Commencement Date, except to the extent the face value thereof are transferred to Tenant on the Commencement Date. In addition, Tenant and Landlord (acting reasonably and in good faith) shall reconcile between themselves all items to be adjusted for which figures are not available and/or cannot be definitely calculated accurately as of the Commencement Date within sixty (60) days following the Commencement Date, including, without limitation, any room revenue generated through any online travel agencies (collectively, the "**OTA(s)**") for the month the Commencement Date occurs. Notwithstanding anything to the contrary set forth in this Lease, on or prior to the Commencement Date, Landlord shall cancel, at its sole cost and expense, (i) any Bookings made through the OTAs other than Bookings.com, Expedia, VRBO or Airbnb that are scheduled to occur on or after the Commencement Date, and (ii) any Bookings Tenant elects not to assume, and Landlord shall fully pay any unpaid OTA invoices and bills on or prior to the Commencement Date.

<div align="center">45</div>

23.8    Landlord shall (and cause Hotel Manager to) permit Tenant to continuously extract any future Bookings data via an electronic download from the sales system commencing on the date that is thirty (30) days prior to the Commencement Date, and Landlord shall (and cause Hotel Manager to) fully cooperate with Tenant in connection therewith.

23.9    Commencing on the Effective Date, Landlord shall (and cause Hotel Manager to) provide Tenant with access to all of the OTA accounts (including Google My Business account) in order for Tenant to extract any future Bookings data via an electronic download from the OTA systems, and Landlord shall (and cause Hotel Manager to) fully cooperate with Tenant in connection therewith.

23.10    Subject to Tenant's review and approval (which shall not be unreasonably withheld, conditioned or delayed), Landlord shall, on or before the Commencement Date, send a notice to all the booking account managers of the OTAs (including Google My Business) regarding Landlord's transfer of the OTA listings to Tenant.  As of the Commencement Date, Landlord shall (and cause Hotel Manager to), at Landlord's sole cost and expense, terminate any agreement relating to the Project between Landlord (or Hotel Manager) and any OTAs with which Tenant does not have a relationship with, unless Tenant instructs Landlord otherwise.

23.11    On the Commencement Date, Landlord shall cause the delivery to Tenant of all of the keys or combination(s) to the safe(s) at the Project.  On the Commencement Date, Landlord shall (and cause Hotel Manager to) prepare a written inventory of all baggage, boxes and similar items checked in or left in the care of Landlord and/or Hotel Manager at the Project, and Landlord shall deliver to Tenant the keys to any secured area which such baggage and other items are stored.

23.12    Subject to Tenant's review and approval (which shall not be unreasonably withheld, conditioned or delayed), Landlord shall, on or before the Commencement Date, send an announcement to all guests and customers at the Project, and all persons who have Bookings on or after the Commencement Date, informing such persons of the change in operation of the business at the Project and the change in brand name, in form and substance reasonably acceptable to Tenant.

23.13    On or before the Commencement Date, Landlord shall, at its sole cost and expense, terminate any hotel management agreement, hotel operating agreement and/or franchise agreement encumbering the Project and provide evidence of such termination in writing to Tenant.  Landlord shall (and cause Hotel Manager to): (a) fully cooperate with Tenant following the Effective Date to effectuate a smooth transition of management and operation of the business at the Project to Tenant and to minimize any potential disturbance of the guests, (b) assign and transfer to Tenant, subject to applicable Laws, all books and records maintained by Landlord and Hotel Manager (except for any books and records that constitute Hotel Manager's proprietary information) and turnover to Tenant all other files and correspondence pertaining to the management and operation of the business at the Project in the possession of Landlord and Hotel Manager (including, without limitation, any corporate account and group booking records and

46

contacts), and (c) facilitate the orderly transfer of all records and data contained in any software maintained by Landlord and Hotel Manager that are necessary for the transfer of Bookings.

23.14 On or before the Commencement Date, Landlord shall grant Tenant sole and exclusive control of and the right (a) to operate (including the right, at Tenant's discretion, to link same to sonder.com) the websites, domain names, internet addresses, apps and social media handles, all business listings, including, not limited to, Google My Business, Yelp, Bing and any and all reservation platforms, and all accounts on advertising platforms, including, but not limited to Google (hotel ads and vacation rental), TripAdvisor and Facebook Business Manager, with respect to the Premises and facilitate such transfer of control, including, without limitation, unlocking domain names, providing transfer codes to Tenant, and taking any other reasonable steps requested by Tenant to effectuate such transfer and (b) to use the existing name of the building, "Dutch House", in connection with the promotion, marketing and sales of Tenant's business at the Premises.

23.15 With respect to any computer hardware, telecommunications and information technology systems, and computer software used at the Project and in connection with the lodging activities at the Project, including, without limitation, PMS system and access system (collectively, the "**IT System**"), no later than sixty (60) days prior to the Estimated Commencement Date, Landlord shall deliver to Tenant a list and description of the IT System then in effect with a certificate representing and warranting that such list and description are true, accurate and complete, and that no defaults exist thereunder, and no circumstances exist which with the passage of time would constitute a default. Concurrently therewith, Landlord shall provide Tenant with a contact name and contact information of the applicable licensor, vendor or supplier of the IT Systems and provide credentials (i.e., log-in details) or create an account for Tenant on each IT System that maintains Booking details. To the extent any such IT System is assignable, and Tenant notifies Landlord of its desire to assume any of the IT System, Landlord shall request consent from the vendors to the extent required.

23.16 On the Commencement Date, Landlord shall retain: (a) all amounts charged to the open accounts of any guests or customers at the Project for the use or occupancy of any Rooms or other facilities at the Project, and any restaurant, bar or banquet services at or for the Project, or any other goods or services provided by or on behalf of Landlord at the Project ("**Guest Ledger**") for all room nights up to (but not including) the night immediately before the Commencement Date less the third party collection costs for such Guest Ledger charges (such as fees retained by credit card companies, bank or other similar collection companies, travel agent commissions, and other third party commissions), and (b) one half (½) of all amounts charged to the Guest Ledger for the room night immediately before the Commencement Date less the third party collection costs for such Guest Ledger charges (such as fees retained by credit card companies, bank or other similar collection companies, travel agent commissions, and other third party commissions), and Tenant shall be entitled to retain all deposits made and amounts collected with respect to the Guest Ledger.

47

23.17   All utility services to be paid by Tenant under this Lease shall be prorated as of the Commencement Date between Landlord and Tenant.   The parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Commencement Date.  If readings cannot be obtained as of the Commencement Date, the cost of such utilities shall be prorated between Landlord and Tenant by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Commencement Date, the parties shall re-prorate the amount for such utilities and pay or receive credit (as applicable) any deficiency in the original proration to each party to which such deficiency is owed promptly upon receipt of the actual bill for the relevant billing period.  For the avoidance of doubt, if any bills, invoices or similar, for utilities, Hotel Contracts, OTAs or otherwise, related to the period prior to the Commencement Date remain unpaid as of the Commencement Date, Tenant shall have the right, but not the obligation, to pay such bill, invoice or otherwise and deduct the amount of such payment from the next installment of Rent due.

23.18   No later than sixty (60) days prior to the Estimated Commencement Date, Landlord shall deliver to Tenant a list of and copy of each Hotel Contract (as hereinafter defined) then in effect with a certificate representing and warranting that the copies are true, accurate and complete copies of such Hotel Contracts, and that there are no defaults exist thereunder, and no circumstances which with the passage of time would constitute a default.  On or before thirty (30) days prior to the Estimated Commencement Date, Tenant shall inform Landlord in writing which Hotel Contracts it desires to assume as of the Commencement Date.  Prior to the Commencement Date, Landlord shall, at its sole cost and expense, terminate any Hotel Contract which Tenant does not expressly elect to assume. With respect to any Hotel Contracts Tenant elects to assume, Landlord shall assign such contract to Tenant on the Commencement Date pursuant to an assignment and assumption agreement in a form reasonably acceptable to Landlord and Tenant.  Any amounts prepaid, accrued or due and payable under any Hotel Contracts assumed by Tenant shall be prorated between Landlord and Tenant as of the Commencement Date, and (a) if such amounts have been previously paid by Landlord, the prorated amount for the period after the Commencement Date shall be paid by Tenant with the next installment of the Rent due; or (b) if such amounts remain outstanding, Tenant shall have the right to offset the Rent for such amount with the next installment of the Rent due.

## Article 24.      INDEMNIFICATION

24.1   Subject to the terms of Article 10, Tenant shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Landlord Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from, (a) any breach by Tenant of its representations, warranties and/or covenants contained in this Lease, (b) any gross negligence or willful misconduct of Tenant or Tenant Parties; (c) any breach of this Lease by Tenant or any Tenant Parties; (d)  any other act of omission of Tenant Parties in the Project, and (e) any and all claims, action, complaints, allegations or suits instituted against Tenant, its subtenants or its assignees, or against Landlord, its agents, employees or affiliates, by any person or entity, including, without limitation, customers, contractors, agents or employees of other tenants, licensees, concessionaires, or

48

agents or employees of Tenant, in connection with loss of life, bodily injury, personal injury, emotional or mental injury or distress, and/or damage to property occurring in, on or about, or arising out of Tenant's use of the Premises and/or the Premises, its entranceways or its adjacent sidewalks or loading areas, and in addition, with respect to Tenant's contractors, occurring anywhere on or about the Premises, regardless of whether caused in whole or in part by any negligent or intentional act or omission of Tenant, its subtenants, assignees, agents, employees, licensees, concessionaires, customers and/or invitees, contractors, or any other person or entity; provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of Landlord and/or Landlord Parties. Tenant, upon notice of any such action or proceeding by a Landlord Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Landlord Party).

24.2    Tenant's indemnification of each Landlord Party, with respect to any claim, action, complaint, allegation or suit instituted against any of the Landlord Parties by an employee of Tenant or Tenant's agent, shall apply fully as set forth hereinabove and without defense or setoff pursuant to any Workers' Compensation laws.  This indemnification provision shall be interpreted to be enforced to the full extent permitted by law. Tenant specifically acknowledges that the indemnity undertaking herein shall apply to any and all claims in connection with or arising out of Tenant's sale of liquors, if expressly permitted herein. If applicable, Tenant shall not be permitted to sell such liquors until Tenant provides Landlord with proof that Tenant, at its sole cost and expense, has obtained any necessary licenses or permits required by any and all state or local governmental or administrative authorities to sell such liquors on the Premises.  Tenant hereby understands, acknowledges and appreciates the responsibility associated with selling such liquors from the Premises, and to the extent expressly permitted by this Lease, agrees that its employees and agents shall comply with all local, state and federal laws related to the sale of such liquors.

24.3    Subject to the terms of Article 10, Landlord shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Tenant Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from (a) any breach by Landlord of its representations, warranties and/or covenants contained in this Lease, (b) any gross negligence or willful misconduct of Landlord or Landlord Parties, (c) the Retained Liabilities, and (d) Tenant's continuing use of the name "Dutch House" in connection with Tenant's operation of the Premises, and (e) any accident, injury or damage occurring in the Common Areas or Excluded Premises unless caused by the negligence or willful misconduct of Tenant Parties (including, but not limited to, any guest of Tenant in any portion of the Premises); provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of any Tenant Party. Landlord, upon notice of any such action or proceeding by a Tenant Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Tenant Party).

24.4    Notwithstanding any contrary provision of this Article 25, Tenant and Landlord agree to look first to the applicable insurance coverage in effect (or that should be in effect under any policy required to be maintained under this Lease) in the event of any Losses,

regardless of the cause of any such Losses.  The parties' indemnification obligations under this Article 25 shall survive the expiration or termination of this Lease. If any provision of this Article 25 were to be held invalid in its current form by the law of any jurisdiction under which it is construed, then such provision shall be amended to the minimum extent necessary to comply with such law, and the provision shall be deemed to have always existed in such amended form in such jurisdiction.

## Article 25.    NOTICES

25.1    Except as may be provided in this Lease, all notices, demands, requests and other communications given or required to be given by either party to the other under this Lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its respective Notice Address set forth under Basic Lease Information, or at such other place as either party from time to time may designate in writing to the other party, or via email provided that a paper copy shall follow via one of the additional notice methods listed above.  Any notice or other communication sent as provided in this Article 26 shall be effective (a) on the date received (or rejected) if sent overnight courier service, (b) five (5) business days after mailing by registered or certified mail, or (c) on the day sent if emailing or the next business day if the email is sent after 5pm (local time for the Premises). Any notices hereunder shall for all purposes be deemed to have been sent by Landlord or Tenant, as applicable, if sent by such respective party's attorney.

## Article 26.    MISCELLANEOUS

26.1    This Lease shall be governed by the Laws of the State, and the parties irrevocably submit to the exclusive jurisdiction of the State and federal district courts of competent jurisdiction in the State with respect to all matters relating to this Lease.

26.2    Subject to the provisions of this Lease, this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns.

26.3    This Lease may not be modified, changed, altered or amended, in whole or in part, except in a writing signed by both Landlord and Tenant.

26.4    This Lease and any exhibits, schedules and addenda referred to herein, constitute the final and complete expression of the parties' agreements with respect to the leasing of the Premises.  Each party agrees that it has not relied upon or regarded as binding any prior negotiations, representations, or understandings with respect to the leasing of the Premises, whether oral or written, except as expressly set forth herein and all prior negotiations,

representations and understandings with respect to the leasing of the Premises are superseded and replaced by this Lease.

26.5    Notwithstanding any provision of this Lease, or any applicable Laws, to the contrary, or the execution of this Lease by Tenant, this Lease shall not bind or benefit Landlord or Tenant, unless and until this Lease is signed and delivered by both Landlord and Tenant.

26.6    If the Commencement Date, Rent Commencement Date, or the date the Onboarding Access Period commences falls on a day that is a Saturday, Sunday or legal holiday in the State, such date shall be automatically extended to the business day immediately following such Saturday, Sunday or legal holiday.

26.7    At the request of either party, Landlord and Tenant shall execute a memorandum of lease on the form attached hereto as **Exhibit E**, which may be recorded in the county in which the Project is located.

26.8    The parties shall hold in confidence and shall not disclose to third parties the terms of this Lease, and Landlord shall hold in confidence and not to disclose to third parties any other Proprietary Materials, except that each party hereto may disclose such information to its officers, directors, partners, members, employees, representatives, agents, brokers, lenders, prospective lenders, investors, prospective investors, attorneys, accountants and advisors who have signed a commercially reasonable non-disclosure agreement, prior to any disclosure to such party.

26.9    Neither party shall not make any public announcement respecting this Lease, the terms herein or any of the transactions contemplated hereunder without the prior written approval of the other party, which shall not be unreasonably withheld, delayed or conditioned, provided that Tenant may list the Premises on its website or on online platforms or announce the addition of the Premises to Tenant's platform via email to its distribution list without the approval of Landlord.  Any such public announcement shall be subject to the other party's review and approval of the form and substance thereof prior to such public announcement, or as required under applicable Laws, in which case no such review and approval by such party shall be required.

26.10   Upon Tenant's request for existing photographs of the Project, Landlord shall provide such materials in its possession or control to Tenant. For any such photographs delivered to Tenant, Landlord hereby grants to Tenant, its subsidiaries, licensees and its successors and assigns, a royalty-free, non-exclusive, worldwide license to reproduce, modify, distribute, and create derivative works of the Works, for the purpose of advertising and promotion of the Premises in any media or format, including online listings and other promotional materials. Landlord hereby waives any and all moral rights or droit rights or any rights to similar effect that it may have in such photographs.  Landlord represents and warrants to Tenant that (a) it is the owner of such photographs or has sufficient rights to grant the license granted herein; (b) such photographs do not infringe on the rights of any third party, including,

but not limited to, copyright rights; and (c) Landlord is not aware of any threats or claims that such photographs infringe on such rights of any third party.

26.11    Any Schedules, Exhibits and Addenda attached to this Lease are a part of this Lease.

26.12    The captions in this Lease are for reference only and do not define, limit or enlarge the scope of this Lease or the intent of any term. All Article and Section references in this Lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease.

26.13    If any provision of this Lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by Laws.

26.14    If either party hereto is comprised of two or more persons, the liability of those persons under this Lease shall be joint and several.  Wherever appropriate in this Lease, personal pronouns shall be considered to include other genders and the singular to include the plural.

26.15    This Lease may be executed in one or more counterparts.  The parties contemplate that they may be executing counterparts of this Lease by facsimile, PDF or other electronic means and agree and intend that a signature by facsimile, PDF or other electronic means shall bind the party so signing with the same effect as though the signature were an original signature.

26.16    For the avoidance of doubt, whenever Tenant is entitled to an abatement of Rent based on the portion of the Premises that is not usable by Tenant, subject to the terms and conditions of this Lease, the percentage or Rent abated shall be based on the total number of Rooms not able to be used by Tenant (in whole or in part) as a result of the specific event causing the abatement divided by the total number of Rooms in the Premises.

26.17    Landlord and Tenant each hereby certifies that it is in compliance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (the "**Patriot Act**") and the Executive Order 13224 (the "**Executive Order**") and, in particular, Landlord and Tenant acknowledge that (a) it is prohibited from doing any business with any persons who commit, threaten to commit, or support terrorism; (b) Landlord and Tenant, each for themselves and their respective officers and directors, are not persons who commit, threaten to commit, or support terrorism; and (c) Landlord and Tenant shall take commercially diligent steps to ensure that it shall comply with the Patriot Act and Executive Order during the Term.  Landlord and Tenant shall indemnify and hold the other and its agents harmless from and against any Losses arising from its respective breach of the foregoing

sentence.   The indemnification and hold harmless above shall survive the termination of this Lease.

       26.18   Landlord and Tenant each hereby certifies that it is, and will remain, in compliance with all applicable trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control ("**OFAC**").   Specifically, Landlord and Tenant represent that Landlord and Tenant including (a) any of its directors, officers, employees, or affiliates, or (b) any agents or other persons or entities acting on behalf of any of the foregoing, are not, and are not owned or controlled by, a person listed on the "Specially Designated Nationals and Blocked Persons" list ("**SDN List**") maintained by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") or any similar list maintained by the United Nations, the European Union or any other applicable U.S. governmental authority or local authority.   Landlord and Tenant shall indemnify and hold the other and its agents harmless from and against any Losses arising from its respective breach of the foregoing sentence.    The indemnification and hold harmless above shall survive the termination of this Lease.

       26.19   A Force Majeure Event shall extend the due date for a party's performance of an obligation under this Lease for the reasonable duration of such Force Majeure Event. Specifically, for any Force Majeure Event that materially and adversely impacts Tenant's financial returns (as reasonably determined by Tenant): (a) if the Commencement Date has not occurred, at Tenant's election, the Commencement Date shall be extended day-for-day, and (b) if the Commencement Date has occurred, Tenant shall receive a day-for-day abatement of Rent, provided however that in no event shall such abatement exceed one hundred and eighty (180) days.   In the event a change in Laws (or an interpretation thereof) or a new Law results in an increase in Tenant's operating costs and/or capital investment costs, Tenant shall pay for the first $175,000 of such increased costs for each calendar year of the Term in which the resulting increase is incurred and Landlord, if Landlord does not terminate this Lease as set forth below, shall pay for such costs in excess of $175,000 for each calendar year of the Term in which the resulting increase is incurred (the "**Excess Amount**").   If such costs payable by Landlord would exceed $175,000, Landlord shall have the right to terminate this Lease upon one hundred (100) days' prior written notice to Tenant.   If Landlord elects to pay for the Excess Amount, the annual Base Rent shall automatically be reduced by the Excess Amount commencing on the date the change in Laws or new Laws comes into effect.   If Landlord fails to notify Tenant of its election to either reduce the annual Base Rent by the Excess Amount or terminate the Lease within the thirty (30) days following Tenant's notice to Landlord of the circumstances of and amount of the Excess Amount, Tenant shall have the option to terminate the Lease, by delivering at least ninety (90) days' prior written notice to Landlord, as of the date such change in Laws or new Laws comes into effect, without payment of any penalty, damages or termination fee to Landlord.

       26.19.1 The provisions of this Section 26.19 shall only be applicable provided the delayed party complies with the following requirements:

<div align="center">53</div>

(a)      when the delayed party has knowledge of the existence of such occurrence, it shall send reasonably prompt written notice thereof to the other party at the beginning and the end of the Force Majeure Event; and

(b)      the delayed party shall take commercially reasonable steps to attempt to remove, resolve or otherwise eliminate such occurrence while keeping the other party advised in writing with respect thereto, and shall commence performance of its obligations hereunder immediately upon such removal, resolution, or elimination."

26.19.2 Except as expressly set forth herein, in no event shall a Force Majeure Event be construed to: (i) excuse or delay the performance of a monetary obligation by either party, including, without limitation, Tenant's obligation to pay Base Rent and Additional Rent hereunder, (ii) excuse either parties' inability to obtain financing, (iii) act to delay the commencement of consequential damages in Section 19, (iv) cause an actual or constructive eviction, or (v) extend the Lease term.

26.20    The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation.

26.21    Notwithstanding any provision of this Lease to the contrary (including, without limitation, any indemnification provision), in no event shall Landlord, Tenant or any of their members, partners, directors, officers, shareholders, employees, advisors or agents be responsible for any consequential, punitive, exemplary, or special damages, except to the extent of any consequential, punitive, exemplary, or special damages arising from Landlord's breach of its confidentiality obligations under this Lease.

26.22    Dispute Resolution.

26.22.1 Arbitration.  Any arbitration proceeding instituted pursuant to this Lease shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Expedited Procedures set forth therein (regardless of the amount in controversy).  Judgment on the award may be entered in any court of competent jurisdiction.

26.22.2 Limitation of Landlord's Liability.  The covenants and agreements on the part of Landlord to be performed under this Lease shall be binding upon Landlord herein named only for so long as Landlord retains an interest in the Building and shall not survive the transfer of its interest in the Building (provided that nothing herein contained shall relieve Landlord from any liability hereunder accrued prior to the date of such transfer), and in the event of such transfer such covenants and agreements shall thereafter be binding upon each transferee of such interest, but only with respect to the period beginning with the date of such transfer and ending with the date of subsequent transfer of such interest. Notwithstanding any other provision in this Lease to the contrary, Tenant shall look solely to Landlord's interest in the Building for

54

the recovery of any judgment against Landlord and in no circumstances shall Landlord or any partner, member, manager, shareholder, officer or director be personally liable nor shall Tenant have recourse to any other assets of Landlord for satisfaction of any claim Tenant may have against Landlord.

26.22.3 . Consent.   In the event that it is provided in this Lease that the exercise of any right by, or performance of any obligation of, Tenant shall be subject to the consent or approval of Landlord, and that the consent or approval of Landlord shall not be unreasonably withheld or delayed, then in any case in which Landlord shall withhold or delay its consent, such determination by Landlord shall be conclusive upon Tenant, unless Tenant shall, within thirty (30) days after Notice from Landlord of its determination, elect to have this matter submitted for determination to a Court of competent jurisdiction or for expedited arbitration pursuant to the rules of the American Arbitration Association, which such submission shall be the sole remedy of Tenant for any such withholding of consent or approval by Landlord.  In the event that any matter shall be submitted by Tenant pursuant to the provisions of this Section, the sole issue shall be the determination as to whether the withholding of consent or approval by Landlord shall have been reasonable or unreasonable, and in the event that a determination shall be made that the withholding of consent or approval by Landlord was unreasonable, then the decision shall annul such withholding of consent or approval, such annulment being the sole remedy of Tenant; it being the intention of the parties hereto (as to which they are conclusively bound) that in no event shall any such withholding or delay of consent or approval by Landlord, or any decision with respect thereto: (i) impose any financial liability upon or result in any damages being recoverable from Landlord other than the recovery of Tenant's reasonable attorney fees; and/or (ii) create any right cognizable or remedy enforceable in favor of Tenant and against Landlord in law or equity or under any special statutory proceeding or at all; provided, however, that any such decision may also provide for an assessment of the costs of the proceeding with respect thereto as between Landlord and Tenant.  Any consent or approval required of Landlord in any provision of this Lease may be withheld by Landlord in its sole discretion unless the provision requiring such consent or approval specifically states that Landlord shall not withhold such consent or approval unreasonably.

26.22.4 Tenant acknowledges that the continuous use of the Premises is a material inducement for Landlord to enter into this Lease with Tenant and the damage to Landlord resulting from such failure, whether due to diminished value, safety, saleability or mortgageability or adverse publicity or appearance or otherwise will be impossible to accurately measure.  Tenant therefore agrees that if Tenant shall (i) vacate, abandon or desert the Premises or (ii) cease operating or conducting its business therein in accordance with the terms of this Lease except during any Temporary Cessation (as hereinafter defined), then and in any of such events (hereinafter collectively referred to as "failure to do business"), Landlord shall have the right, at its option, to treat such failure to do business as an offer by Tenant to cancel this Lease. In the event Landlord accepts Tenant's offer to cancel this Lease, within ten (10) business days following Tenant's receipt of notice from Landlord that Landlord is accepting Tenant's offer to cancel this Lease (the "Cancellation Acceptance"), (a)  this Lease and the Term and estate hereby granted (unless the same shall have expired sooner pursuant to any of the conditions of limitation

or other provisions of this Lease or pursuant to law) shall terminate on the date set forth in the Cancellation Acceptance with the same effect as if such date were the date hereinbefore specified for the expiration for the term of this Lease, (b) the Rent and all other charges payable hereunder shall be apportioned as of the date of the cancellation, (c) neither party hereto shall have any rights, estates, liabilities or obligations under this Lease for the period accruing after the date of cancellation, except those that, by the provisions of this Lease, expressly survive the expiration or earlier termination of the Term of this Lease, and (d) at Landlord's election, Landlord and Tenant shall enter into a written agreement reflecting the cancellation of this Lease upon the terms provided for herein.  Landlord's claim that Tenant has vacated, abandoned or deserted the Premises shall not be defeated solely because Tenant may have left all or part of its stock, signage, trade fixtures or other personal property in the Premises.  As used herein, the term "Temporary Cessation" shall mean a temporary closing or temporary discontinuance of the operation of Tenant's business in the Premises as reasonably required for the following reasons: (i) to permit the performance of permitted repairs or permitted alterations in and to the Premises (which Temporary Cessation shall not exceed one hundred twenty (120) days), (ii) due to the taking by eminent domain as provided for in accordance with the terms of Article 12 hereof, (iii) due to fire or casualty as provided for and in accordance with the terms of Article 11 hereof, (iv) up to three (3) days per year to permit Tenant to inventory its equipment, (v) in connection with a "snow day" and (vi) to observe State and Federal holidays; provided that in all of the foregoing instances, Tenant shall use diligent efforts to promptly re-open its retail business in the Premises. No closing shall relieve Tenant from the obligation to pay Rent accruing under this Lease, except as expressly otherwise set forth in this Lease.

26.22.5 <u>Jurisdiction</u>.  Any dispute, claim, or controversy between Landlord and Tenant (and/or their officers, directors, employees, agents, or subsidiary or affiliated entities) arising out of or related to this Lease which cannot be resolved through a mediation in accordance with Section 27.22.2 above shall be adjudicated in the State or federal courts sitting in the county in which the Project is located except as expressly set forth herein.

26.22.6 <u>JURY TRIAL WAIVER</u>.  THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH THEY (AND/OR THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ARE PARTIES THAT ARISES OUT OF OR RELATES TO THIS LEASE.

## Article 27.        PCA CONTINGENCY

27.1        <u>Property Condition Assessment Contingency</u>.  Each of Landlord and Tenant acknowledges and agrees a Property Condition Assessment, including an ADA survey (collectively, the "**PCA**") for the Project has been ordered by Tenant. Within ten (10) business days following Tenant's receipt of the PCA, Tenant shall prepare a list of material deficiencies identified in the PCA (collectively, the "**PCA Work**") and deliver such list to Landlord. Landlord shall complete the PCA Work to the reasonable satisfaction of Tenant with licensed contractors and in accordance with all applicable Laws prior to the Scheduled Final Completion Date, and the completion of such work shall be deemed a part of the Final Completion

Condition.  If Tenant fails to timely terminate this Lease as set forth herein, then Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this Section 28.1.

[*Signatures commence on the following page*]

57

IN WITNESS WHEREOF, Landlord and Tenant, acting herein through duly authorized individuals, have executed this Lease as of the date first above written.

**LANDLORD:**

SELA 27 STREET LLC,
a New York limited liability company

By: _____

Name: Gal Sela

Title: owner

**TENANT:**

SONDER HOSPITALITY USA INC.,
a Delaware corporation

By: _____

Name: Rikesh Patel

Title: Managing Director, Americas

## APPENDIX A

## DEFINITIONS

In addition to terms defined in the Basic Lease Information and in the body of this Lease, the following terms shall have the following meanings:

a)     **ADA:**  The Americans with Disabilities Act (42 USC 12181 et seq., as amended from time to time.

b)     **Additional Rent:**  Defined in Section 3.1.

c)     **Affiliate:**  An entity which controls, is controlled by, or is under common control with Tenant.

d)     **Authorized Parties:**   Tenant and its employees, agents, representatives, contractors, guests, customers, subtenants, and licensees.

e)     **Bond:**  Any surety bond delivered by Tenant to Landlord as required pursuant to the terms of this Lease.

f)     **Bookings**:  Any agreements and/or reservations for the use or occupancy of the Rooms or any other space within the Premises.

g)     **Brand Name:**  Tenant's name and any other name containing "Sonder" used by Tenant.

h)     **Broker:**  Collectively, Tenant Broker and Landlord Broker.

i)     **Building Systems**:   Collectively, all building systems including, without limitation, all structural systems, all building assemblies and components, all risers, landscape, sitework, stormwater, plumbing, mechanical systems & heating, ventilation and air-conditioning systems, electrical systems, elevators, boilers, utility lines, meters, fire and life-safety systems including the fire alarm, sprinkler main and fire escape.

j)     **Business License:**  Any operating permits, certificates or licenses, business registrations, and/or other approvals specifically required by applicable Laws to be obtained by Tenant to operate the Permitted Use in or at the Premises.

k)     **Canceled Booking:**  at Tenant's election, either (a)  a night between the suspension, expiration or termination of the Permitted Use Approval or Business License, as applicable, and the issuance or renewal of the Permitted Use Approval or Business License, as applicable, that a Room was actually reserved for occupancy by a guest and the reservation was made prior to the suspension, expiration or termination, or (b) the number of reservations for the Project during the preceding calendar year for the same period of time between the suspension,

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F51455595D

expiration or termination of the Permitted Use Approval or Business License, as applicable, and the issuance or renewal of the Permitted Use Approval or Business License, as applicable.

l) **Casualty:** Fire, flood, windstorm, earthquake, casualty, riots, civil unrest, or any other event beyond either party's reasonable control) making all or a portion of the Premises untenantable.

m) **City:** The city in which the Premises is located.

n) **Commencement Date Certificate:** Defined in Section 2.1.

o) **Common Areas**: All sidewalks, access roads, driveways, landscaped areas, parking areas, truck service ways, loading docks, interior and exterior corridors (except for the corridors where the Rooms are located), courts, stairs, ramps, elevators, escalators, common restrooms, elevator landings, patios, and all other areas located on or serving the Project from time to time and made available for the common and joint use and benefit of Landlord, Tenant and any other tenants or invitees of the Project, excluding the Excluded Premises.

p) **Comparable Properties:** Those properties listed on **Exhibit F** attached hereto.

q) **Deep-Cleaned:** Collectively, (i) all carpet in the Premises and the Common Areas are shampooed, (ii) all hard floors in the Premises and the Common Areas are steam-cleaned, (iii) all walls and baseboards in the Premises and the Common Areas are wiped down, (iv) all doors and furniture, high-touch surfaces are disinfected in the Premises and the Common Areas, (v) the Premises and the Common Areas are dusted, swept and mopped, (vi) any appliances in the Premises are cleaned and wiped out, and (vii) all garbage in the Premises and the Common Areas are properly disposed of.

r) **Division A Contract:** Union's collective bargaining agreement commonly referred to as the Division A Contract, which expires on June 30, 2027, and includes any successor agreement.

s) **Early Termination Date:** Defined in Section 2.4.

t) **Emergency**: Any event, condition or occurrence that threatens imminent (a) damage or harm to persons or property, (b) violation of applicable Laws, or (c) imposition of fines or penalties.

u) **Employment Laws:** Collectively, all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, permits, judgments, orders and decrees affecting labor union activities, civil rights or employment in the United States, including, without limitation, the Civil Rights Act of 1870, 42 U.S.C. 1981, the Civil Rights Acts of 1871, 42 U.S.C. 1983 the Fair Labor Standards Act, 29 U.S.C. 201, et seq., the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., as

amended, the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, et seq., the Rehabilitation Act, 29 U.S.C. 701, et seq., the Worker Adjustment and Retraining Notification Act of 1988, the Americans With Disabilities Act of 1990, 29 U.S.C. 706, 42 U.S.C. 12101, et seq., the Employee Retirement Income Security Act of 1974, 29 U.S.C. 301, et seq., the Equal Pay Act, 29 U.S.C. 201, et seq., the National Labor Relations Act, 29 U.S.C. 151, et seq., and any regulations promulgated pursuant to such statutes (collectively, as amended from time to time, and together with any similar laws now or hereafter enacted).

v)    **Environmental Laws**:    Any and all federal, state and local health, safety, environmental or natural resource laws, statutes, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities, having jurisdiction, and all other state, federal and local laws, regulations, rules, ordinances, and orders which govern: (i) the existence, cleanup and/or remedy of contamination on property; (ii) the emission or discharge of Hazardous Materials into the environment; (iii) the control of Hazardous Materials; (iv) the use, generation, transport, treatment, storage, disposal, removal, or recovery of Hazardous Materials; or (v) the safety and health of employees, any tenant, other user or invitee; as well as all applicable judicial and administrative and regulatory decrees, judgments or orders (including without limitation the "common law") and all applicable covenants running with the land that relate to the protection of health, safety, environment or natural resources, including, without limitation: (a) The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by The Superfund Amendments and Reauthorization Act of 1986; (b) The Resource Conservation and Recovery Act of 1976, as amended by The Used Oil Recycling Act of 1980; (c) The Solid Waste Disposal Act Amendment of 1980; (d) The Hazardous and Solid Waste Amendments of 1984; (e) The Hazardous Materials Transportation Act; (f) The Clean Water Act; (g) The Clean Air Act; (h) The Toxic Substances Control Act; (i) The Safe Drinking Water Act; (j) The Occupational Safety and Health Act; (k) The Federal Water Pollution Control Act; (l) The Federal Insecticide, Fungicide and Rodenticide Act; (m) The Georgia Hazardous Waste Management Act; and (n) The Georgia Hazardous Site Response Act.

w)    **Event of Default**:  Defined in Section 20.1.

x)    **Executive Order:** Defined in Section 27.17.

y)    **FF&E:** Furniture, fixtures and equipment.

z)    **FF&E Capital:** Defined in Section 3.9.

aa)    **Final Completion Condition:** Collectively, (i) Landlord has delivered to Tenant vacant and exclusive possession of the Premises (except for Landlord's FF&E and any hotel occupancies assumed by Tenant); (ii) the Premises and Common Areas

are in structurally sound and watertight condition, Deep-Cleaned, free from Hazardous Materials, indoor mold growth and pests, and free from any non-compliance with applicable Laws (including, without limitation, ADA, local building code requirements, ordinances and Laws applicable to the Permitted Use) with all signage removed and any damage caused by such removal repaired; (iii) intentionally omitted; (iv) with all PCA Work completed; (v) final payment applications from contractors performing Landlord's Work have been approved by Landlord; (vi) all approvals required for the use and occupancy of the Premises for the Permitted Use, including, without limitation, receipt of an unconditional certificate of occupancy or local equivalent, and the Permitted Use Approval, have been issued by the Governmental Authority and are in full force and effect; (vii) the Premises and Common Areas are ready for Tenant's Onboarding Access Period to commence, including, but not limited to, Tenant having access to and throughout the Premises and Common Areas; (viii) Landlord has delivered to Tenant a SNDA in accordance with Section 9.1 of this Lease or fully satisfied any Mortgage upon the Property which pre-dates the Effective Date of this Lease; (ix) Landlord has delivered to Tenant a copy of the most recent fire safety plan; and (x) the date Landlord's representations set forth in Section 23.1 of this Lease are true and correct.

bb)    **Substantial Completion:** The term "substantial completion" or "substantially completed" or words of similar import shall mean the date when the PCA Work in the Premises then remaining to be done, if any, consists of minor "punchlist items" and shall have reached that stage of completion such that Tenant could either use or occupy the Premises or Tenant could then proceed to commence its Onboarding Work without unreasonable interference by reason of those items still required to complete the PCA Work, not including any of the PCA Work that relates to work outside of the Premises (including, without limitation any work to the lobby or the façade of the Building).  Further, taking of possession of the Premises by Tenant or the commencement of construction by Tenant following Tenant's receipt of notice from Landlord of substantial completion of the PCA Work in respect thereof, or otherwise, shall be conclusive evidence that substantial completion was, in fact, achieved.  Within three (3) days after the date that Tenant accepts possession of the Premises, Tenant shall advise Landlord of any "punchlist" items remaining to be completed.  Landlord shall have sixty (60) days from the date that Tenant notifies Landlord of any additional punchlist items to complete such punchlist items.

cc)    **Final Completion Date:** The date Landlord delivers the Premises to Tenant with all of the Final Completion Conditions satisfied.

dd)    **Fixed Rent**: $121,265.00 per month.

ee)    **Force Majeure Event**: Any force majeure event beyond Landlord's or Tenant's reasonable control, including, without limitation, acts of God, Casualty, strikes or labor troubles, riots and civil unrest, accident, acts of war, terrorism, bioterrorism

(i.e., the release or threatened release of an airborne agent that may adversely affect the Premises or its occupants), governmental preemption in connection with an emergency, Laws, governmental delay, conditions of supply and demand which have been or are affected by war, terrorism, bioterrorism or other emergency, declaration by the World Health Organization of a pandemic, any applicable Laws imposing travel, quarantine, or shelter-in-place or similar restrictions, or any applicable Laws precluding, restricting, or impeding (or has the effect of precluding, restricting or impeding) Tenant's operation of the Premises (or preparation thereof) for the Permitted Use, or any other cause whatsoever, whether similar or dissimilar to the foregoing.

ff)    **Governmental Authority**: Any government or authority having jurisdiction, whether federal, state, county, municipal, local or other, and any department, agency, entity or other body exercising executive, legislative, regulatory or administrative functions of government, including, without limitation, (a) the federal authorities of the United States of America, and the authorities of the State and the City, and (b) judicial and quasi-judicial authorities of any of the foregoing.

gg)    **GRIWA**: Union's collective bargaining agreement commonly referred to as the Greater Regional Industry Wide Agreement, which expires on March 31, 2023, and includes any successor agreement.

hh)    **Hazardous Materials**: Collectively, any element or substance, (i) the presence of which requires investigation, reporting, removal or remediation under any Environmental Law, (ii) that is or becomes defined as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous substance," or other type of pollutant or contaminant under any applicable Environmental Law, (iii) that is toxic, reactive, explosive, corrosive, flammable, radioactive, carcinogenic, mutagenic, teratogenic, or otherwise hazardous and is or becomes regulated by any applicable Environmental Law, (iv) that is or contains oil, gasoline, diesel fuel, aviation fuel, or other petroleum hydrocarbons, products or derivatives, other than petroleum, crude oil, and petroleum products to the extent contained within regularly operated motor vehicles, (v) that is or contains PCBs, asbestos, radon or urea formaldehyde, (vi) that is fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including but not limited to, mold (including, without limitation, penicillium/aspergillus and stachybotrys chartarum), and Legionella (legionella pneumophila), (viii) the presence of which causes or threatens to cause a nuisance upon the Project or to adjacent property or poses or threatens to pose a hazard to the health or safety of any person, to plant or animal life, or to the environment, including, but not limited to sewage sludge, industrial slag, solvents and/or any other similar substances or materials.

ii)    **Hotel Contracts**: all service contracts, maintenance contracts, licensing agreements, equipment leases and other contracts or agreements and any

amendments thereto, with respect to the ownership, maintenance, operation, provisioning or equipping of the Project.

jj)    **IWA**: Union's collective bargaining agreement commonly referred to as the Industry Wide Agreement, which expires on March 31, 2026, and includes any successor agreement.

kk)    **Labor Agreement**: a collective bargaining agreement, contract, labor agreement, memorandum of understanding, memorandum of agreement, or other legal instrument to which a Labor Organization is a party.

ll)    **Labor Activities**: efforts by a Labor Organization to organize or gain representation rights of employees, or efforts by employees to form, join, or assist a Labor Organization, including but not limited to seeking to obtain a showing of interest, filing a petition for an election conducted by the National Labor Relations Board, or efforts to obtain an agreement for card-check, neutrality, accretion, or an after-acquired facility recognition obligation.

mm)    **Labor Dispute:** As defined in the National Labor Relations Act, 29 U.S.C. § 152(9).

nn)    **Labor Organization**: As defined in the National Labor Relations Act, 29 U.S.C. § 152(5).

oo)    **Landlord:** Defined in Recitals.

pp)    **Landlord Party, and collectively, Landlord Parties:** Landlord and its directors, trustees, members, partners, officers, agents, representatives, property managers, contractors, and employees.

qq)    **Landlord's FF&E**: Furniture, fixture, equipment, appliances and any other personal property of Landlord located on or used in the operation of the Project, as itemized in **Exhibit L** attached hereto.

rr)    **Landlord's Repair(s):** Defined in Section 7.1.

ss)    **Landlord's Services:** Defined in Section 6.1.

tt)    **Laws**: All present and future laws, statutes, rules, regulations, orders, ordinances, judgments, notices, determinations, directives, guidelines, policies, restrictions, curfews, and other requirements of any Governmental Authority having jurisdiction, including, without limitation, Environmental Laws, Privacy Laws, fire and life safety regulations and seismic standards set forth by any Governmental Authority, and requirements of any Governmental Authority pertaining to accessibility, special needs and/or disability matters, including, but not limited to, the ADA or any equivalent state or local law or ordinance.

uu)     **Lease:** Defined in the Recitals.

vv)     **Lease Year**: A twelve (12) month period beginning on the Commencement Date or on each anniversary of the Commencement Date, provided, however, that if the Commencement Date does not fall on the first day of a calendar month, then the first Lease Year shall begin on the Commencement Date and end on the last day of the month containing the first anniversary of the Commencement Date, and each succeeding Lease Year shall begin on the day following the last day of the prior Lease Year.

ww)     **Licenses and Permits:**    Collectively, all licenses, permits, authorizations, approvals, registrations and certificates for the Project and lodging activities therein issued or required to be issued by any Governmental Authority, including, without limitation the certificate of occupancy for hotel use, elevator permit, boiler permit and pool permit.  For the avoidance of doubt, Licenses and Permits do not include the Business License.

xx)     **Losses**:  Any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements).

yy)     **Mortgage:**  Any existing or future mortgage or deed of trust on the Building, including any modification, extension, supplement, consolidation and replacement thereof.

zz)     **Mortgagee:**  The holder of any Mortgage.

aaa)    **Onboarding Work:**  Painting, applying wallpaper, bringing in, arranging and building furniture, placing and installing Tenant's Property as is necessary to prepare the Premises for Tenant's business.

bbb)    **Other Rent:** All sums, other than the Fixed Rent, payable by Tenant to Landlord under this Lease.  All Other Rent shall be separately invoiced by Landlord.

ccc)    **Patriot Act:** Defined in Section 27.17.

ddd)    **PCA Work:** Defined in Section 28.1.

eee)    **Permitted Use**:  Operation of a hotel and any related uses (including operation of a short-term/extended stay rentals together with all uses incidentally or customarily related thereto, all as permitted by applicable Laws and for no other purpose.  To the extent permitted by Laws, service animals and emotional support animals shall be permitted on the Project and the Premises.  Except as otherwise provided in this Lease, Tenant, at its expense, shall obtain and at all times maintain and comply in all material respects with the terms and conditions of all

licenses and permits required for the lawful conduct of the Permitted Use in the Premises.

fff)    **Permitted Use Approval:** Collectively, all permits, zoning approvals, licenses and/or other approvals necessary for the Permitted Use, including, without limitation, construction related permits and licenses, temporary or permanent certificates of occupancy for the Project for hotel use.

ggg)    **Prevailing Market Rate:** then-current RevPAR for hotels of similar age, size, condition, and location, and with similar amenities as the Premises.

hhh)    **Privacy Laws:** Any and all federal, state and local laws, statutes, rules, ordinances, codes, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities that apply to the processing of personal information or a party's representations regarding its personal information processing activities, including, without limitation, Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

iii)    **Project**:  The real property described on **Exhibit A-1** attached to this Lease and together with all improvements thereon and appurtenances thereto, and all other related areas.

jjj)    **Proprietary Materials**: All trademarks, trade names, trade secrets, distinct emblems, insignia, logos, slogans, distinguishing characteristics, copyright materials (including, without limitation, written or recorded material related to marketing), software applications and data (whether in tangible, electronic or oral form), website URLs, central reservations systems, and information in written or tangible form that is indicated as being confidential or that from its nature or content would be understood by a reasonable person to be confidential, relating to Tenant or any of its affiliates, the business or affairs of Tenant or any of its affiliates, or any hotel or any rental property which Tenant or any of its affiliates owns or operates and manages (including all intellectual property connected with the Premises and developed or created by Tenant, or its affiliates, employees or agents) and including, without limitation, (i) Brand Name and Tenant Name, Tenant trade names and trademarks, (ii) operational manuals (including, without limitation, accounting, financial administration, personnel administration and policies and procedures manuals), (iii) corporate records of Tenant, (iv) software and other management programs developed by or on behalf of Tenant, notwithstanding any modification or alteration made for application at the Premises, (v) the operating and design standards of any hotel or rental property leased or operated by Tenant or any of its Affiliates and any materials relating thereto, (vi) business and marketing plans developed by Tenant, (vii) revenue management and forecasting data developed by Tenant and (viii) research, product plans, products, services, equipment, customers, markets, software, inventions, discoveries, ideas, processes, designs, drawings, hardware, formulations,

specifications, product configuration information, prototypes, samples, data sets, equipment and all of Tenant's financial information, including finance documents.

kkk)    **Punchlist Items**:  Minor details of construction and mechanical adjustments that do not interfere with Tenant's onboarding, use or operation of the Premises.

lll)    **Rent:**  Collectively, Fixed Rent and all Other Rent.

mmm)    **Rent Commencement Date:**  The date that is the day following the expiration of the Rent Abatement Period.

nnn)    **Restoration:**  Repairing and restoring the Premises, the Building and/or the Project (as applicable) to substantially the same condition that existed prior to a Casualty or Taking excluding any damage to Tenant's Work, Onboarding Work or Tenant's Property.

ooo)    **Retained Liabilities:**  Collectively, all liabilities and obligations in connection with any Losses to the extent resulting from events or occurrences prior to the Commencement Date or  arising out of or related to ownership or operation of the Premises or Project prior to the Commencement Date.

ppp)    **Revenue:**  All revenues received during Tenant's fiscal year from the letting of the Rooms including without limitation, the total amount of all sales of merchandise and/or services of all business conducted in, at, or from any part of the Premises, whether the same be for cash, barter, credit, check, charge account, gift or merchandise certificates purchased, or other disposition of value regardless of collection, in the event of sale upon credit or charge account and whether made by Tenant, subtenants, concessionaires, licensees or assignees of Tenant, including sales to employees, less expenses for (i) booking and/or distribution channel fees (e.g., AirBnb, Expedia, Kayak, Travelocity), commissions, referral and broker fees, (ii) transient occupancy taxes or regulatory fees, sales taxes, value-added taxes, business taxes or other accommodation and use taxes or regulatory fees (federal, state, and municipal sales, excise and use taxes collected or required to be charged to or collected from guests or as part of the sales price of any accommodations, amounts assessed by tax authorities retroactively and/or recovery of taxes retroactively and amounts assessed by tax authorities prior to Tenant recognizing revenue for the transaction for which the taxes are assessed), any portion of real estate taxes reimbursed by Tenant to Landlord pursuant to Section 3.4 above, (iii) credit card charges, discounts, commissions and fees, (iv) refunds or credits to Tenant's guests, (v) losses from non-payment of guests, provided Tenant shall use reasonable efforts within the retail trade to collect such non-payment, (vi) turnover/housekeeping costs, and (vii) the Refurbishment Allowance.  Revenue shall be calculated on an annual basis in accordance with United States Generally Accepted Accounting Principles (US GAAP).

The value of each sale shall be the actual total sales price charged the customer and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received. Revenue includes orders or sales that originate in, at or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, made via the internet or e-mail, telecopied or telegraphed, that are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated or automatic vending devices on the Premises. There shall be no deduction or exclusion from Revenue except as specifically permitted herein. Any deposit not refunded shall be included in Revenue

qqq) **Revenue Share Rent:** 40% of Revenue

rrr) **Room(s):** Each individual guest rooms comprising a part of the Premises.

sss) **Seasonal Abatement**: $140/Room.

ttt) **Service Interruption:** an interruption to or material reduction of, failure to perform any, or any matter or condition that constitutes an interruption to, Landlord's Services.

uuu) **SNDA:** A subordination, non-disturbance and attornment agreement.

vvv) **State:** New York.

www) **Taking:** A taking by condemnation, eminent domain or similar legal action of a Governmental Authority.

xxx) **Tenant:** Defined in the Recitals.

yyy) **Tenant Building Name**: Collectively, the Brand Name (whether used alone or with other words), and all other names, logos or designs owned by Tenant or its Affiliates and used in operation of the Premises, together with the goodwill appurtenant thereto, which may or may not include the existing name of the Building as of the Effective Date.

zzz) **Tenant Lender:** Any lender from which Tenant obtains financing.

aaaa) **Tenant Party, and collectively, Tenant Parties**: Tenant, and its directors, trustees, members, partners, officers, agents, representatives and employees or of any such one or more permitted subtenants, licensees or concessionaires.

bbbb) **Tenant's Plans:** Plans and specifications for Tenant's Work in form reasonably satisfactory to Landlord.

cccc)  **Tenant's Property:** Tenant's trade fixtures, equipment and personal property.

dddd)  **Tenant's Work:** Alterations or improvements to the Premises, the Project or any part thereof performed by Tenant during the Term.

eeee)  **Term:** The Initial Term and any Renewal Term (if applicable).

ffff)  **Termination Date:** The date upon which the Lease is terminated by either party hereto pursuant to the express terms of the Lease.

gggg)  **Transfer:** Any assignment of this Lease or subletting of all or any part of the Premises.

hhhh)  **Union:** the New York Hotel and Motel Trades Council, AFL-CIO.

iiii)  **Upper Upscale:** A chain scale segment of "Upper Upscale" as designated by the Smith Travel Report.

jjjj)  **Utilities:** Defined in Section 6.3.

kkkk)  **Utilities Interruption:** an interruption to or material reduction of Utilities.

llll)  **Works**: Images, renderings, floorplans and other materials depicting the Project, including any high-resolution images.

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE PROJECT**

(see Attached)

# Exhibit A-1
# Dutch House

**Legal Description**

**39-35 27th Street**
**Long Island City, New York**
**Block:**        397
**Lot:**            2

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of 27th Street, distant 125.00 feet (tax map 125.15 feet) from the corner formed by the intersection of the northerly side of 40th Avenue and the easterly side of 27th Street;

THENCE RUNNING northerly along the easterly side of 27th Street, 75.00 feet (tax map 75.06 feet);

THENCE RUNNING easterly and parallel to 40th Avenue, 100.00 feet (tax map 100.11);

THENCE RUNNING southerly and parallel to the easterly side of 27th Street, 75.00 feet (tax map 75.06);

THENCE RUNNING westerly and parallel to the 40 the Avenue, 100.00 feet (tax map 100.11 feet) to the easterly side of 27th Street ant the point or place of BEGINNING.

DocuSign Envelope ID: 1C8AF899-43A9-4052-AB48-52E51455595D

**EXHIBIT A-2**

**DESCRIPTION OF THE PREMISES AND EXCLUDED PREMISES**

(see attached)

Exhibit A-2: Excluded Premises
Dutch House -39-35 27th St, Queens, NY 11101

Tenant's Premises is comprised of all areas shown here other than those specifically highlighted in yellow and labeled "Landlord's Premises". These highlighted areas shall be deemed "Excluded Premises" under the lease.



**PROJECT DIRECTORY**

OWNER:

**SELA 27 STREET LLC**
36-37 26TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING DESIGN:

**STRUCTURAL ENGINEERING TECHNOLOGIES, P.C.**
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING & ELECTRICAL ENGINEERING DESIGN:

**AUTOMATED DESIGN CONSULTANTS**
15 HAMISCRABBE HILL ROAD
CHAPPAQUA, NY 10514
914-238-1722-MALL
ADCPLLO@VERIZON.NET

CIVIL ENGINEER:

**ATLAS TECHNICAL ASSOCIATES, INC.**
60 SACKET STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-0747
F: (718) 625-0133
E-MAIL: JDENORA@NYC.RR.COM

Project:

39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block: 397  Lot: 2
DOB # 402 569 886

Title:

CELLAR FLOOR PLAN

Checked:        Date:
                9/26/2019
Signature:      Scale:
                AS NOTED
Seal:

Drawing number

A-100.04

Sheet number



A-101.04



2ND FLOOR PLAN
BLOCK 397 LOT 2

A-102.04



3RD FLOOR PLAN

A-103.04



4TH FLOOR PLAN
SCALE 3/16" = 1'-0"

BLOCK 397 LOT 2

PROJECT DIRECTORY

OWNER:

SELA 27 STREET LLC
36-37 26TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING
DESIGN:

STRUCTURAL ENGINEERING
TECHNOLOGIES, P.C.
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING &
ELECTRICAL ENGINEERING
DESIGN:

AUTOMATED DESIGN
CONSULTANTS
15 HARDSCRABBLE HILL ROAD
A:  CHAPPAQUA, NY 10514
914-238-1702E-MAIL
ADCPLLC@VERIZON.NET

CIVIL ENGINEER:

ATLAS TECHNICAL
ASSOCIATES, INC.
60 SACKETT STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-2747
F: (718) 625-0133
E-MAIL: JDENORA@NYCJRR.COM

Project:
39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block 397  Lot 2

DOB # 402 569 886

Title:
4TH FLOOR PLAN

Checked :          Date:
                   9/26/2019
Signature          Scale:
                   AS NOTED
Seal

Drawing number

A-104.04

Sheet number



5TH FLOOR PLAN

PROJECT DIRECTORY

OWNER:

SELA 27 STREET LLC
36-37 26TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING
DESIGN:

STRUCTURAL ENGINEERING
TECHNOLOGIES, P.C.
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING &
ELECTRICAL ENGINEERING
DESIGN:

AUTOMATED DESIGN
CONSULTANTS
15 HARDSCRABBLE HILL ROAD
A:   CHAPPAQUA, NY 10514
914-238-1702E-MAIL
ADCPLLC@VERIZON.NET

CIVIL ENGINEER:

ATLAS TECHNICAL
ASSOCIATES, INC.
60 SACKETT STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-0747
F: (718) 525-0133
E-MAIL: JDENORA@NYCJRR.COM

Project:
39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block: 397   Lot: 2

DOB # 402 569 886

Title:
5TH FLOOR PLAN

Checked by:
Signature:
Seal:

Date:
9/26/2019
Scale:
AS NOTED

Drawing number:
A-105.04

Sheet number:



6TH FLOOR PLAN
SCALE: 3/16" = 1'-0"

BLOCK 397 LOT 2



7TH FLOOR PLAN
SCALE: 3/16" = 1'-0"

BLOCK 397 LOT 2

PROJECT DIRECTORY

OWNER:

SELA 27 STREET LLC
36-37 26TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING
DESIGN:

STRUCTURAL ENGINEERING
TECHNOLOGIES, P.C.
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING &
ELECTRICAL ENGINEERING
DESIGN:

AUTOMATED DESIGN
CONSULTANTS
15 HARDSCRABBLE HILL ROAD
A: CHAPPAQUA, NY 10514
914-238-1702E -MAIL:
ADCPLLC@VERIZON.NET

CIVIL ENGINEER:

ATLAS TECHNICAL
ASSOCIATES, INC
60 SACKETT STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-0747
F: (718) 525-0133
E-MAIL: JOENORA@NYC.RR.COM

Project:
39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block: 397   Lot: 2
DOB # 402 569 886

Title:
7TH FLOOR PLAN

Checked :
Signature:
Seal:

Date:
9/26/2019
Scale:
AS NOTED

Drawing number:

A-107.04



8TH FLOOR PLAN
SCALE 3/16" = 1'-0"

**PROJECT DIRECTORY**

OWNER:

**SELA 27 STREET LLC**
36-37 28TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING
DESIGN:

**STRUCTURAL ENGINEERING
TECHNOLOGIES, P.C.**
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING &
ELECTRICAL ENGINEERING
DESIGN:

**AUTOMATED DESIGN
CONSULTANTS**
15 HARDSCRABBLE HILL ROAD
CHAPPAQUA, NY 10514
914-238-1702E-MAIL
ADCPLLC@VERIZON.NET

CIVIL ENGINEER:

**ATLAS TECHNICAL
ASSOCIATES, INC.**
60 SACKETT STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-0747
F: (718) 825-0133
E-MAIL: JDENORA@NYC.RR.COM

Project:
39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block: 397   Lot: 2

DOB # 402 569 886

Title:
8TH FLOOR PLAN

Checked:                    Date:
                           9/26/2019
Signature:                 Scale:
                           AS NOTED
Seal:

Drawing number
A-108.04

Sheet number



9TH FLOOR PLAN
SCALE: 3/16" = 1'-0"

BLOCK 397 LOT 2

A-109.04



ELEVATOR BULKHEAD PLAN
SCALE: 3/16" = 1'-0"

STAIR BULKHEAD PLAN
SCALE: 3/16" = 1'-0"

ROOF PLAN
SCALE: 3/16" = 1'-0"

BLOCK 397 LOT 2

PROJECT DIRECTORY

OWNER:

SELA 27 STREET LLC
36-37 26TH STREET, 2ND FL
ASTORIA, NY 11106
T: 718-784-7700

STRUCTURAL ENGINEERING
DESIGN:

STRUCTURAL ENGINEERING
TECHNOLOGIES, P.C.
40-12 28TH STREET
LONG ISLAND CITY, NY 11101
T: (718) 706-7196
F: (718) 472-4464

MECHANICAL, PLUMBING &
ELECTRICAL ENGINEERING
DESIGN:

AUTOMATED DESIGN
CONSULTANTS
15 HARRISCRABBLE HILL ROAD
CHAPPAQUA, NY 10514
914-238-1702E-MAIL:
ADCPLLOB@VERIZON.NET

CIVIL ENGINEER:

ATLAS TECHNICAL
ASSOCIATES, INC.
60 SACKETT STREET BROOKLYN, NY
11231
CONTACT: JOE DENORA
T: (718) 625-0747
F: (718) 625-0133
E-MAIL: JDENORA@NYCJRR.COM

Project:
39-35 27TH STREET
LONG ISLAND CITY,
NY 11101
Block: 397   Lot: 2

DOB # 402 569 886

Title:
ROOF, STAIR AND ELEVATOR
BULKHEAD PLAN

Checked | Date:
9/26/2019
Signature |
Seal | AS NOTED

Drawing number
A-110.04

Sheet number

| Revision No. | Date | Remarks |
|---|---|---|
| 01 | 09/17/12 | SCHEMATIC DESIGN |
| 02 | 01/31/13 | APPROVE NEW APPLICANT SET-A ETY |
| 03 | 05/16/12 | AMEND EXISTING BUILDING 78"-A ETY |
| 04 | 1/21/19 | PLANS ISSUED TO BSA |
| 05 | 9/26/19 | AMEND AS BUILT PLANS |

## Exhibit A-3

## Dutch House - Unit Mix

39-35 27th St, Queens, NY 11101

| ROOMS TOTAL | 76 | 79 |
|---|---|---|

| | Current | At Final Completion |
|---|---|---|
| DUTCH  QUEEN | 15 | 15 |
| DUTCH KING | 29 | 29 |
| CITY QUEEN | 2 | 7 |
| CITY QUEEN BALCONY | 1 | 1 |
| CITY KING | 9 | 9 |
| CITY SUITE | 2 | 0 |
| CITY SUITE WITH BALCONY | 1 | 1 |
| DUTCH QUEEN ADA accessible | 5 | 5 |
| DUTCH DOUBLE | 11 | 11 |
| DUTCH DOUBLE balcony | 1 | 1 |
| Total | 76 | 79 |

Exhibit B
Fixed Rent
Dutch House
39-35 27th St, Queens, NY 11101

## FIXED RENT

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Total Rent** | $1,455,180 | $1,488,649 | $1,522,888 | $1,557,914 | $1,593,747 |

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F51455595D

**EXHIBIT C**

**INTENTIONALLY OMITTED**

1

**EXHIBIT D**

**FORM COMMENCEMENT DATE CERTIFICATE**

<u>**COMMENCEMENT DATE CERTIFICATE**</u>

      This Commencement Date Certificate (this "**Certificate**") is entered into this _____ day of _____, 20__, by and between [_____], a [_____] ("**Landlord**") and Sonder Hospitality USA Inc., a Delaware corporation ("**Tenant**"), who declare the following:

Recitals:

A. Landlord and Tenant have entered into that certain Lease Agreement, dated _____, 20___ ("**Lease**") for the Premises located at [_____], and,

B. Landlord and Tenant now wish to set forth their agreements as to certain key dates during the Term of this Lease. Capitalized terms used but not defined herein shall have the meanings set forth in the Lease.

Agreement:

      In consideration of the mutual promises and covenants set forth in the Lease, Landlord and Tenant agree as follows:

1. The Final Completion Date occurred on _____, 20____.

2. The Commencement Date occurred on _____ ____, 20___ (the "**Commencement Date**").

3. The Rent payments shall commence _____ ____, 20___ . The Rent amounts and payment dates during the Initial Term of the Lease shall be set forth on <u>Exhibit "A"</u> attached hereto.

4. The Expiration Date of the Initial Term shall be _____, 20____, unless sooner terminated or extended in accordance with the Lease.

5. The date by which the [First Renewal Option] must be exercised is no earlier than _____ ____, 20___ and no later than _____ ____, 20___.

*[Signature Page Follows]*

Long Island City - 39-25 27th Street – Lease Exhibit D

The parties hereto have executed this Certificate as of the day and year first written above.

**LANDLORD:**

[_____],
a [_____]

By: _____ _____
    Name:_____
    Title:_____

**TENANT:**

**SONDER HOSPITALITY USA INC.**,
a Delaware corporation

By: _____ _____
    Name:_____
    Title:_____

**Exhibit "A"**

**<u>Rent Payment Schedule</u>**

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-52F51455505D

Exhibit A          Rent Payment Schedule

Dutch House

39-35 27th St, Queens, NY 11101

| Month | Base Rent - Monthly | Notes |
|---|---|---|
| 1 | 0 | *Rent Abatement* |
| 2 | 0 | *Rent Abatement* |
| 3 | $121,265 | |
| 4 | $121,265 | |
| 5 | $121,265 | |
| 6 | $121,265 | |
| 7 | $121,265 | |
| 8 | $121,265 | |
| 9 | $121,265 | |
| 10 | $121,265 | |
| 11 | $121,265 | |
| 12 | $121,265 | |
| 13 | $124,054 | |
| 14 | $124,054 | |
| 15 | $124,054 | |
| 16 | $124,054 | |
| 17 | $124,054 | |
| 18 | $124,054 | |
| 19 | $124,054 | |
| 20 | $124,054 | |
| 21 | $124,054 | |
| 22 | $124,054 | |
| 23 | $124,054 | |
| 24 | $124,054 | |
| 25 | $126,907 | |
| 26 | $126,907 | |
| 27 | $126,907 | |
| 28 | $126,907 | |
| 29 | $126,907 | |
| 30 | $126,907 | |
| 31 | $126,907 | |
| 32 | $126,907 | |
| 33 | $126,907 | |
| 34 | $126,907 | |
| 35 | $126,907 | |
| 36 | $126,907 | |
| 37 | $129,826 | |
| 38 | $129,826 | |
| 39 | $129,826 | |
| 40 | $129,826 | |

| | | |
|---|---|---|
| 41 | $129,826 | |
| 42 | $129,826 | |
| 43 | $129,826 | |
| 44 | $129,826 | |
| 45 | $129,826 | |
| 46 | $129,826 | |
| 47 | $129,826 | |
| 48 | $129,826 | |
| 49 | $132,812 | |
| 50 | $132,812 | |
| 51 | $132,812 | |
| 52 | $132,812 | |
| 53 | $132,812 | |
| 54 | $132,812 | |
| 55 | $132,812 | |
| 56 | $132,812 | |
| 57 | $132,812 | |
| 58 | $132,812 | |
| 59 | $132,812 | |
| 60 | $132,812 | *Mutual Termination Right at the End of Month 60* |
| 61 | 0 | |
| 62 | 0 | |
| 63 | $135,867 | |
| 64 | $135,867 | |
| 65 | $135,867 | |
| 66 | $135,867 | |
| 67 | $135,867 | |
| 68 | $135,867 | |
| 69 | $135,867 | |
| 70 | $135,867 | |
| 71 | $135,867 | |
| 72 | $135,867 | |
| 73 | $138,992 | |
| 74 | $138,992 | |
| 75 | $138,992 | |
| 76 | $138,992 | |
| 77 | $138,992 | |
| 78 | $138,992 | |
| 79 | $138,992 | |
| 80 | $138,992 | |
| 81 | $138,992 | |
| 82 | $138,992 | |
| 83 | $138,992 | |
| 84 | $138,992 | |
| 85 | $142,189 | |
| 86 | $142,189 | |
| 87 | $142,189 | |
| 88 | $142,189 | |
| 89 | $142,189 | |
| 90 | $142,189 | |

| | | |
|---|---|---|
| 91 | $142,189 | |
| 92 | $142,189 | |
| 93 | $142,189 | |
| 94 | $142,189 | |
| 95 | $142,189 | |
| 96 | $142,189 | |
| 97 | $145,459 | |
| 98 | $145,459 | |
| 99 | $145,459 | |
| 100 | $145,459 | |
| 101 | $145,459 | |
| 102 | $145,459 | |
| 103 | $145,459 | |
| 104 | $145,459 | |
| 105 | $145,459 | |
| 106 | $145,459 | |
| 107 | $145,459 | |
| 108 | $145,459 | |
| 109 | $148,805 | |
| 110 | $148,805 | |
| 111 | $148,805 | |
| 112 | $148,805 | |
| 113 | $148,805 | |
| 114 | $148,805 | |
| 115 | $148,805 | |
| 116 | $148,805 | |
| 117 | $148,805 | |
| 118 | $148,805 | |
| 119 | $148,805 | |
| 120 | $148,805 | |

DocuSign Envelope ID: 1C8AF899-43A8-4053-A848-E5E2145550FD

# EXHIBIT E

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "**Memorandum**") is executed as of _____, 20__, by and between [_____], a [_____] ("**Landlord**"), and **SONDER HOSPITALITY USA INC.**, a Delaware corporation ("**Tenant**").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement, dated the same date herewith (the "**Lease**"), pursuant to which Landlord leases to Tenant certain premises more fully described in the Lease (the "**Premises**") in the property located at [_____] (as described in Exhibit A attached hereto, the "**Property**"), for an initial Term of [_____] ([___]) years; and

WHEREAS, Landlord and Tenant have executed this Memorandum to provide third parties with notice of the existence of the Lease.

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, the parties to this Memorandum agree as follows:

1. <u>Recitals</u>.  The recitals above are incorporated by reference into this paragraph as if set forth in full.

2. <u>Notice of Lease</u>.  Landlord and Tenant agree that this Memorandum is intended to provide notice to third parties of the existence of the Lease.  This Memorandum is not a complete summary of the Lease, and shall not amend or modify the Lease.  In the event of a conflict between the terms of this Memorandum and the terms of the Lease, the terms of the Lease shall control.  Upon the expiration or earlier termination of the term of the Lease, this Memorandum shall automatically terminate, and Landlord shall be entitled to record a notice of termination on its own signature. Landlord shall be deemed to be Tenant's attorney-in-fact (which power of attorney shall be irrevocable and coupled with an interest) for the sole purpose of executing and recording such termination notice.

3. <u>Applicable Law</u>.  This Memorandum shall be interpreted in accordance with the laws of the State of [_____] (without regard to principles of conflicts of laws).  Neither the rule against perpetuities nor any similar law of the State of [_____] shall apply to this Memorandum or the Lease.

[remainder of page intentionally left blank]

1

DocuSign Envelope ID: 1C8AF899-43A9-4053-A848-E5E214555QFD

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date and year first above written.

**LANDLORD**:

[_____],
a [_____]

By: _____ _____
    Name:_____
    Title:_____

STATE OF                          )
COUNTY OF                 ) ss:

        I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of _____, Landlord in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

        GIVEN under my hand and notarial seal this _____ day of _____, 20__.


                            _____
                            Notary Public
My Commission Expires:

        [SIGNATURES CONTINUE ON FOLLOWING PAGE]

1

**TENANT**:

**SONDER HOSPITALITY USA INC.**,
a Delaware corporation


By:    _____
         Name:
         Title:


STATE OF   NEW YORK)
COUNTY OF                            )  ss:

   I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of **SONDER HOSPITALITY USA INC.**, the Tenant in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

   GIVEN under my hand and notarial seal this ____ day of _____, 20__.


                                        _____
                                        Notary Public
My Commission Expires:

Long Island City - 39-25 27th Street – Lease Exhibit E

## Exhibit A

### Legal Description of Property

(see attached)

3

DocuSign Envelope ID: 1C8AF899-43A9-4053-A848-E5E7145559FD

# Exhibit A-1
# Dutch House

**Legal Description**

**39-35 27th Street**
**Long Island City, New York**
**Block:**       397
**Lot:**         2

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of 27th Street, distant 125.00 feet (tax map 125.15 feet) from the corner formed by the intersection of the northerly side of 40th Avenue and the easterly side of 27th Street;

THENCE RUNNING northerly along the easterly side of 27th Street, 75.00 feet (tax map 75.06 feet);

THENCE RUNNING easterly and parallel to 40th Avenue, 100.00 feet (tax map 100.11);

THENCE RUNNING southerly and parallel to the easterly side of 27th Street, 75.00 feet (tax map 75.06);

THENCE RUNNING westerly and parallel to the 40 the Avenue, 100.00 feet (tax map 100.11 feet) to the easterly side of 27th Street ant the point or place of BEGINNING.

**EXHIBIT F**

**INTENTIONALLY DELETED**

DocuSign Envelope ID: 1C8AF899-43A9-4053-A848-F5E5145559FD

**EXHIBIT G**

**REPAIR & MAINTENANCE RESPONSIBILITY MATRIX**

(see attached)

# Responsibility Matrix

**Exhibit G**

**39-35 27th St, Queens, NY 11101**

**NOTE: Designated owner is responsible for the entirety of the below including operating and maintaining a full working and compliant system. It is also the owner's responsibility to comply with all regulations, laws, codes. Sonder is responsible for any guest caused damage.**

| Category | Frequency | Responsible Party |
|---|---|---|
| **Building and Site Structure** | | Landlord at Landlord Expense |
| **Furnishings Landlord Provided** | | Tenant at Tenant Expense |
| **Furnishings Tenant Provided** | | Tenant at Tenant Expense |
| **Elevators** | | Landlord at Landlord Expense |
| **Fire Suppression** | | Landlord at Landlord Expense |
| **Plumbing** | | Landlord at Landlord Expense |
| **Heating, Ventilating, and Air Conditioning (HVAC)** | | Landlord at Landlord Expense EXCEPT FOR THE FOLLLOWING |
| Replace HVAC Filters (in the Premises) | 4x per year | Tenant at Tenant Expense |
| **Electrical** | | Landlord at Landlord Expense EXCEPT FOR THE FOLLLOWING |
| Replacement of light bulbs for Non-Wired (Plug-in) Lighting (in the Premise | As necessary | Tenant at Tenant Expense |
| Replacement of light bulbs for Hard Wired Lighting | As necessary | Tenant at Tenant Expense |
| **Data Infrastructure (Phone Cables, WI-Fi Cables, Data Distribution System)** | | Landlord at Landlord Expense |
| **Electronic Safety and Security** | | Landlord at Landlord Expense EXCEPT FOR THE FOLLLOWING |
| Battery replacement of unit door access control (Door handle/lock) | 1x per year | Tenant at Tenant Expense |
| Video Surveillance | | Tenant at Tenant Expense |
| Security Detection, Alarm, and Monitoring | | Tenant at Tenant Expense |
| Life Safety (Fire Alarm Panel) | | Landlord at Landlord Expense |
| **Services** | | Landlord at Landlord Expense EXCEPT FOR THE FOLLLOWING |
| Cleaning Service (in the Premises) | As necessary | Tenant at Tenant Expense |
| Cleaning Service (outside the Premises) | As necessary | Tenant at Tenant Expense (Snow and Ice Removal) |
| 30% of daily cost difference between an Fire Life Saftey ("FLS") certified hourly employee and non-FLS certified Sonder hourly employee for 3 - eight hour shifts per day, 365 days/year | $400/month + 2.0% escalations per year | Landlord at Landlord Expense |
| Trash Removal | As necessary | Tenant at Tenant Expense |
| Recycling | As necessary | Tenant at Tenant Expense |
| Pest Control | As necessary | Tenant at Tenant Expense |
| Bed Bugs | As necessary | Tenant at Tenant Expense |
| Exterior Window Cleaning | 1x per year - Estimated at $4,600/yr. | Landlord at Tenant Expense |
| Landscaping | As necessary | Tenant at Tenant Expense |
| Snow and Ice Removal | As necessary | Tenant at Tenant Expense |
| | | |
| | | |
| | | |
| Notes: | | |
| Landlord at Landlord expense: LL performs the work and pays for it | | |
| Landlord at Tenant expense: LL performs the work, and Sonder pays | | |
| Tenant at Landlord expense:  Sonder performs the work, and LL pays | | |
| Tenant at Tenant expense: Tenant performs the work and pays for it | | |
| * Executing Tenant at Tenant expense does NOT negate LL's general obligation to repair, maintain and replace building systems | | |

## PCA Work

**Landlord's Work**

Dutch House

39-35 27th St, Queens, NY 11101

| | | |
|---|---|---|
| 1 | Owner to complete construction and deliever the Premises to Tenant in  Final Completion Condition. |
| 2 | Owner to obtain TCO Prior to delivery of Premises to Tenant. |
| 3 | Landlord must complete the Facade work required by Local Law 11 by no later than end of Year 2 of the lease. |
| 4 | Tenant will conduct punch list walk through of the premises prior to Handover. Minor outstanding punchlist items may be complete during Tenant's onboarding period. |
| 5 | Address all "Sonder Comments" in the Limited Accessibility Compliance Review (pages 7 - 15) prior to handover.* |

\*Limited Accessibility Compliance Review has been provided to Landlord under seperate cover and can also be found at the following link:

https://drive.google.com/drive/u/0/folders/1hpAnMdY1uTPXSKoAXuaKH590w9Mpo0-E

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | | Project No. | 21-344237.2 |
|---|---|---|---|---|
| Project Address | 39-35 27th Street Long Island City, New York | | Date | November 15, 2021 |

## 5.0 - COMMON USE  RESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 5- 1 | **Water Closet / Toilet Compartments - 604.3:** Clearance around the water closet are 60" perpendicular from the sidewall and 56" min measured perpendicular from the rear wall or 59" depending on mounting style. | **Common Restroom** | **Sink obstructs the required clearance around the toilet.** | Reconfigure toilet room to provide 60" clearance from side wall to the end of the sink. | | Sonder Comment 11/11/21<br><br>Leave as is. | 1 | Allow | 20000 | $20,000 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| **Project Name** | Dutch House | | | | **Project No.** | | | 21-344237.2 | | |
| **Project Address** | 39-35 27th Street Long Island City, New York | | | | **Date** | | | November 15, 2021 | | |

## 6.0 - ACCESS TO OTHER ITEMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|-----|---------------|----------|--------------|----------------|-------------|--------|------|-----------|-------|
| 6- 1 | No significant issues observed or reported. | | | | | | | | |
| | | | | | 6.0 - ACCESS TO OTHER ITEMS | Subtotal | | | $0 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | | | | Project No. | 21-344237.2 |
| Project Address | 39-35 27th Street Long Island City, New York | | | | Date | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 7- 1 | **Number of Rooms with Mobility Features -224.1-224.5:** A compliant number of room with mobility features are provided. Guestrooms are dispersed among the various classes of sleeping accommodation available to patrons of the place of transient lodging. | **Mobility Guestrooms** | **A compliant number of guestrooms have been provided; however, they are all provided with roll-in shower.  Per the 2010 ADA Standards, four rooms are required to be _without_ roll in showers and one is required to be with roll-in shower.** **Guestrooms were not adequately dispersed across the different unit types. Only double bed guestrooms were provided.** | Convert four mobility bathroom showers as bathtubs or transfer type shower (non-roll in). Disperse guestrooms among various classes of sleeping accommodations. |  Sonder Comment 11/11/21 Since the furniture is movable, swap a queen with a double double somewhere in the property to resolve dispersement.  Discuss with Sonder if not possible. Confirm all showers have fixed, folding shower seats.  Install in roll in showers that do not have it. Update 12.11.21 Sonder's team will make this change. | | 4 | Allow | 0 | Cost included in Item 7-10 |

**PARTNER**

DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | Project No. | 21-344237.2 |
|---|---|---|---|
| Project Address | 39-35 27th Street Long Island City, New York | Date | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 2 | **Number of Rooms with Communication Features - 224.3:** A compliant number of rooms with communication features are provided Not more than 10% of guest rooms required to provide mobility features complying with 806.2 are used to satisfy the min number of guest rooms required to provide communication features complying with 806. | Communication Guestrooms | A compliant number of guestrooms with communication features is not provided.  Currently, a total of five  guestrooms are equipped with communication features; however, they were not provided with notification devices for phone or doorbell/knock.  Phones were not installed. Current communication guestrooms were also the same as the mobility guestrooms.  Based on the total number of guestrooms, 9 rooms should be equipped with mobility features. | Modify 9 guestrooms to be equipped with communication features and distribute among the various room types as required by the 2010 ADA Standards.  Ensure only 10% overlap with mobility guestrooms. This should include an emergency alarms if provided in the facility, and notification devices for incoming calls and door knock or bell. Telephones shall have volume controls compatible with the telephone system and served by an electrical outlet located within 48" of the telephone to facilitate the use of a TTY. | Sonder Comment 11/11/21<br><br>Provide 8 communication kits for use in rooms when needed by Sonder guests.  Full renovations are not required, the kits are typically $500-$750 dollars are come in a case to easily use when guests need it.<br><br>Update 12.11.21<br>Sonder will purchase with Landlord reimbursement | 9 | EA | 1500 | $13,500 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | | Project No. | 21-344237.2 |
|---|---|---|---|---|
| Project Address | 39-35 27th Street Long Island City, New York | | Date | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 3 | **Doors Maneuvering Clearances - 404.2.4:** Door landing has compliant maneuvering clearance, matching one of the images. Landings slopes within this maneuvering clearance are 2% max within the maneuvering clearance extending at a compliant distance on each side of the door depending on the approach. | **Mobility Guestroom Bathroom Doors 102, 202, 302, 402, 502:** | **Bathroom door maneuvering clearance measured only 45" on the pull side for hinge approach.** | Relocate shelving system to provide a minimum of 54" maneuvering clearance for hinge approach on the pull side. | Sonder Comment 11/11/21 Relocate shelving as noted. Clarify to Sonder if there is not space to do this to strategize an alternate solution. | 5 | EA | 0 | Maint. |
| 7- 4 | **Forward and Side Reach - 308:** Unobstructed forward and side reach is between 15" min. and 48" max AFF. Obstructed side reach is 46" max AFF and obstructed forward reach is 44" AFF. Obstructed reach is between 10" and 24" horizontally and no greater than 34" AFF. | **Mobility Guestrooms 102, 202, 302, 402, 502:** | **Hanging rod was mounted too high.** | Install hanging rod that is 48" max above the floor. | Sonder Comment 11/11/21 Provide secondary hanging rod at 48" in affected rooms. | 5 | EA | 200 | $1,000 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | | Project No. | 21-344237.2 |
|---|---|---|---|---|
| Project Address | 39-35 27th Street Long Island City, New York | | Date | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 5 | **Forward and Side Reach - 308:** Unobstructed forward and side reach is between 15" min. and 48" max AFF. Obstructed side reach is 46" max AFF and obstructed forward reach is 44" AFF. Obstructed reach is between 10" and 24" horizontally and no greater than 34" AFF. | **Mobility Guestrooms 102, 202, 302, 402, 502:** | **Light switches were mounted 50-1/2" above the floor.** | Lower light switch so the operable part is 48" max. | Sonder Comment 11/11/21 Leave as is. | 5 | EA | 250 | $1,250 |
| 7- 6 | **Forward and Side Reach - 308:** Unobstructed forward and side reach is between 15" min. and 48" max AFF. Obstructed side reach is 46" max AFF and obstructed forward reach is 44" AFF. Obstructed reach is between 10" and 24" horizontally and no greater than 34" AFF. | **Mobility Guestrooms 102, 202, 302, 402, 502:** | **Towel bar and hooks were mounted 55" above the floor.  Towel hooks were mounted** | Lower towel bar to 48" max AFF. | Sonder Comment 11/11/21 Provide two additional robe hooks on back of bathroom door in these rooms at 48". | 10 | EA | 100 | $1,000 |
| 7- 7 | **Built in Elements - 902 - Work Surfaces:** Work surfaces shall have a compliant forward approach and knee clearance at a height between 28" and 34" AFF. | **Mobility Guestrooms 102, 202, 302, 402, 502:** | **Desk is not provided with compliant knee and toe clearance due to the base obstruction.** | Replace workstations with those that have compliant knee clearance. | Sonder Comment 11/11/21 Sonder can source desks for less than what is noted here. Reimburse Sonder for desk costs in these rooms. | 5 | EA | 500 | $2,500 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| Project Name | Dutch House | | Project No. | 21-344237.2 |
|---|---|---|---|---|
| Project Address | 39-35 27th Street Long Island City, New York | | Date | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 8 | **Access to Beds - 806.2.3:** At least one sleeping area must be provided with a 30″ by 48-inch clear floor space on both sides of a bed and approached by a 36″ wide path for parallel approach to the side of the bed. Where a single clear floor space complying positioned for parallel approach is provided between two beds, a clear floor or ground space shall not be required on both sides of a bed.<br><br>A 36″ wide min. accessible route to accessible spaces in the guestroom. | **Mobility Guestrooms 102, 202, 302, 402, 502:** | **A 36″ accessible route was not provided through the guestroom.**<br><br>**Only 29″ clear width is provided at the left side of bed and only 20″ clearance at right side of bed** | Reconfigure furniture in the room to provide 36″ clear route throughout the guestroom along with a 30x48″ clear floor space next to each side of the bed. A 60″ turning space or T turn should also be provided within the room. Cost included is for furniture which will likely need replacement, and work should be coordinated with Item 1-1 dispersion requirements. If larger guestrooms are provided within the building, suggest dedicating those rooms as mobility rooms. | Sonder Comment 11/11/21<br><br>The desk is causing most of the issue it seems. The alternate desk solution noted in 7-7 should be located outside this area if possible. Relocate bed to provide clearance as noted. No renovation required. | 5 | Allow | 2000 | $10,000 |
| 7- 9 | **Restroom Mirror - 603.3:** Mirrors are mounted 40″ to the reflective surface. | **Mobility Guestroom Bathroom Doors 102, 202, 302, 402, 502:** | **Mirrors were too high, measured 48″ above the floor.** | Lower mirrors so the bottom of the reflective surface is 40″ max above the floor. | Sonder Comment 11/11/21<br><br>Provide full length mirrors elsewhere in room, Sonder can source, reimbursed by LL. | 5 | EA | 100 | $500 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| | | | |
|---|---|---|---|
| **Project Name** | Dutch House | **Project No.** | 21-344237.2 |
| **Project Address** | 39-35 27th Street Long Island City, New York | **Date** | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 10 | **Water Closet / Toilet Compartments - 604.3:** Clearance around the water closet are 60" perpendicular from the sidewall and 56" min measured perpendicular from the rear wall or 59" depending on mounting style. | **Mobility Guestroom Bathroom 102, 202, 302, 402, 502:** | **Clearance around the toilet is obstructed by the lavatory.** | Reconfigure toilet room to provide 60" wide clearance perpendicular to the sidewalk and 56" (59") in front of the toilet. | Sonder Comment 11/11/21 Leave as is. | 5 | Allow | 20000 | $100,000 |
| 7- 11 | **Grab bars Size - 609:** Grab bars with circular cross sections shall have an outside diameter of 1-1/4" min and 2" max. Grab bars are mounted on the back wall and side walls depending on configuration at a height between 33 and 36" AFF measured to the top of the gripping surface | **Mobility Guestroom Bathroom 102, 202, 302, 402, 502:** | **Rear grab bar was too small measured 24" in diameter. It was also mounted too close to the toilet.** | Replace grab bars with 36" long grab bar and ensure 1-1/2" space from the toilet below. | Sonder Comment 11/11/21 Leave as is. | 5 | EA | 0 | Cost included in Item 7-10 |
| 7- 12 | **Toilet Flush Control - 604.6:** Flush controls shall be hand operated or automatic. Hand operated flush controls shall comply with 309. Flush controls shall be located on the open side of the water closet except in ambulatory accessible compartments. | **Mobility Guestroom Bathroom 102, 202, 302, 402, 502:** | **Flush control was located on the closed side of the toilet.** | Replace toilet with one that has flush control on the transfer (open) side of the toilet. | Sonder Comment 11/11/21 Leave as is. | 5 | EA | 0 | Cost included in Item 7-10 |



DocuSign Envelope ID: 1C8AF899-43A8-4052-AB48-E5F5145550FD

# LIMITED Non-Compliant Findings and Cost Table

| | | | |
|---|---|---|---|
| **Project Name** | Dutch House | **Project No.** | 21-344237.2 |
| **Project Address** | 39-35 27th Street Long Island City, New York | **Date** | November 15, 2021 |

## 7.0 - GUESTROOMS

| No. | ADA Standards | Location | Observations | Recommendation | Photographs | Quant. | Unit | Unit Cost | Total |
|---|---|---|---|---|---|---|---|---|---|
| 7- 13 | **Shower Spray Unit and Water - 607.6.** A shower spray unit with a hose 59" long min that can be used both as a fixed-position shower head and as a hand-held shower is provided. The shower spray unit has an on/off control with a non-positive shut-off. If an adjustable-height shower head on a vertical bar is used, the bar is installed so as not to obstruct the use of grab bars. | **Mobility Guestroom Bathroom** **102, 202, 302, 402, 502:** | **Removable shower head is not provided.** | Install removable shower head with on/off controls and non-positive shut-off. ensure the hose is 59" min in length. | Sonder Comment 11/11/21 Provide removable shower heads at length noted. | 5 | EA | 0 | Cost included in Item 7-10 |
| 7- 14 | **Shower Controls Roll In - 608.5: Roll-In Shower** Controls are located above the grab bar but no higher than 48" above the shower floor. Where a seat is provided, the controls, faucets, and shower spray unit shall be installed on the back wall adjacent to the seat wall and shall be located 27" max from the seat wall. | **Mobility Guestroom Bathroom** **102, 202, 302, 402, 502:** | **A shower seat is provided and controls were mounted on the side wall rather than the rear wall.** | Relocate controls to the back wall and locate them 27" max from the seat wall. | Sonder Comment 11/11/21 Leave as is. | 5 | EA | 0 | Cost included in Item 7-10 |
| | | | | | **7.0 - GUESTROOMS** | **Subtotal** | | | **$129,750** |



# EXHIBIT H

## BOOKING DETAILS

| Attribute | Required pre-migration? | Example | Notes |
|---|---|---|---|
| External ID | ✅ | 283191854 | booking confirmation code as notified to guest from OTAs |
| | | | Please note that this has to be unique. In case of split booking where there's multiple rooms being occupied by the same reservation, only keep the first booking's external id as original (the one for which we are recording payment) and append "-1", "-2" to the subsequent bookings |
| Name | ✅ | Alberto Bosino | guest name |
| Check in date | ✅ | 2020-04-08 | |
| Check out date | ✅ | 2020-04-11 | |
| Paid | ✅ | TRUE/FALSE | Indicate whether or not the guest has already paid the existing hotel/OTA for the quoted amount in full |
| Reservation channel | ✅ | Booking | Booking, Expedia, Agoda, HotelBeds. Please ensure that Booking.com is indicated as Booking and Expedia as Expedia |
| Commission | ✅ | $41.49 | Amount to be paid/already paid to OTA |
| Paid amount | ✅ | $268.00 | $0.00 if not paid. If any are partially paid, need to be indicated to Tech/Product in advance. |
| Quoted amount | ✅ | $268.00 | Total amount that the guest has been quoted (should be inclusive of tax & commission) |
| Taxes | ✅ | $37.48 | All tax combined (federal, state, etc) |
| Phone number | | 1 562 450 4282 | Should include country code. This is crucial if we want to support pre-arrival payment. |
| Expedia room type ID | | 201718566 | Ideally a) of the OTA Sonder listing room type id of the subject hotel OR b) of similar Sonder listing room type id c) or what the original (non-Sonder) listing's room type had been |
| Expedia hotel ID | | 13172607 | similar to Expedia room type ID |

| Split reservation | ✅ | TRUE/FALSE | Used for multiple rooms booked under the same External ID, only first of which should be FALSE and the rest TRUE. The first reservation will be considered as the original reservation on which payment models will be associated with in our system. |
| Channel MOR | ✅ | TRUE/FALSE | Indicate whether or not the original channel is the merchant of record |
| VCC | ✅ | TRUE/FALSE | Indicate whether or not the original channel is providing vcc for payment to be charged to |
| CC | | 4242424242424242 | vcc card number |
| Expiration | | 06/23 | vcc card expiration |
| Zipcode | | 90034 | vcc card billing zip |
| Unit | | King, DD, DDB

OR

SFO - POLK706 - 309 | Unit group key (classification of the unit into groups for which we can interchangeably allocate bookings) if we are utilizing automated unit allocation

Internal Ref of Unit for the booking to be allocated to if done manually |

DocuSign Envelope ID: 1C8AF899-43A9-4053-A848-E5E5145559FD

# EXHIBIT I

# INTENTIONALLY DELETED

**EXHIBIT J**

**FORM OF BOND**

# LEASE BOND

_____**Insurance Company**

Bond No. _____

KNOW ALL BY THESE PRESENTS, that we SONDER HOSPITALITY USA INC., as Principal, and _____INSURANCE COMPANY, a corporation organized and existing under the laws of the State of_____, authorized to do business in the State of_____, as Surety, are held and firmly bound unto _____,          as          Obligee, in the penal sum of:_____($_____.), lawful money of the United States of America, to be paid to the said Obligee, or their successors or assignees, for which payment well and truly to be made, we, and each of us do hereby bind ourselves, and each of our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into a certain lease with the Obligee for the premises located at _____, all as per the terms and conditions of said lease, and is required by said Obligee to give this Lease Bond as financial security for any accrued unpaid Lease obligations of the Principal to the Obligee.

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall comply with the terms of the lease and save harmless the Obligee from any loss or damage, then this obligation is void, otherwise to remain in full force and effect.

Provided, however, that this Lease Bond is executed by the said Principal and the said Surety and accepted by the said Obligee upon the following express conditions:

1.    The liability of the Surety on this Lease Bond shall not exceed the sum of _____ ($_____.) in the aggregate.

2.    In the event of any default of the Principal herein, the Surety shall be given written notice by the Obligee of such default within Twenty (20) days after such default by certified mail to the Surety at its office at:

    [INSERT ADDRESS HERE]

3.    Within thirty (30) days of Surety's receipt of a default under this Lease Bond, Surety shall pay to the Obligee the amount of such default.

DocuSign Envelope ID: 1C8AF899-43A8-4053-AB48-F5E5145559FD

4.      It is further understood that this Lease Bond may be canceled at any time by the Surety upon giving ninety (90) days' notice by certified mail, to the Obligee in which event the liability of the Surety shall terminate at the expiration of ninety (90) days except to any liability that may have arrived prior to the expiration of the ninety (90) days.

5.      No action or suit or proceeding either at law or in equity shall be maintained against the Surety unless such action, suit or proceeding is commenced within three (3) months after the termination of this bond.

This Lease Bond is to be effective _____

Signed and Sealed this day of _____, 202_.

SONDER HOSPITALITY USA INC. (Principal)          INSURANCE COMPANY (Surety)

By:_____          By:_____

Name:_____          Name:_____

Title:_____          Title:_____

Long Island City - 39-25 27th Street – Lease Exhibit J

DocuSign Envelope ID: 1C8AF899-43A8-4053-AB48-E5E7145550FD

# EXHIBIT K

# FORM OF GUARANTY

THIS GUARANTY (this "**Guaranty**") is made is made and entered into as of [_____ __, 2021] (the "Effective Date") by Sonder Holdings Inc., a Delaware corporation ("**Guarantor**"), in favor of [_____, a _____] ("**Landlord**").

## R E C I T A L S

A.  Landlord and Sonder Hospitality USA, Inc., a Delaware corporation ("**Tenant**") entered into that certain Lease Agreement, dated as of [_____ __, 2021] (as amended from time to time, the "**Lease**") with respect to 79 units at the building located at 39-35 27th Street, Long Island City, New York, as more particularly described in the Lease (the "**Premises**").

B.  Guarantor has a direct or indirect interest in Tenant and, as such, will receive substantial benefit from Landlord leasing the Premises to Tenant.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the covenants and obligations contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby covenants, guarantees and agrees as follows:

1.    Incorporation of Defined Terms.  All terms not otherwise defined in this Guaranty shall have the meaning as set forth in the Lease.

2.    Guaranty. Guarantor hereby guarantees to Landlord the full, faithful and prompt payment of the obligations imposed on Tenant by the terms of the Lease, including, but not limited to, the payment of any and all Rent payable by Tenant under the Lease (the "**Guaranteed Obligation**"). Guarantor hereby covenants and agrees that it is liable for the Guaranteed Obligation as a primary obligor.  Notwithstanding the foregoing, the total liability of Guarantor under this Guaranty shall not exceed, exclusive of Landlord's attorney's fees in connection with removing Tenant or any Tenant occupants from the Premises, at any time, in the aggregate, Two Million and No/100 U.S. Dollars (U.S. $2,000,000) in the first year of the Lease (the "**Guaranty Cap**"), which Guaranty Cap shall be reduced each anniversary of the Commencement Date of the Lease by 1/2 of the initial Guaranty Cap until the 5th anniversary of the Commencement Date, at which point the Guaranty Cap is reduced to zero.

3.    Covenants. If Tenant defaults in the payment of any Guaranteed Obligation, Guarantor will, within thirty (30) days after written notice from Landlord specifying such default: (a) pay such Guaranteed Obligation to Landlord and any arrears thereof, and (b) pay Landlord all actual, out-of-pocket damages, costs and expenses that may arise in consequence of such default by Tenant under the Lease (including, without limitation, all reasonable attorneys' fees incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty) to the Landlord's address set forth below, provided however, that the sum of such payments shall not exceed the applicable Guaranty Cap.  This Guaranty is a continuing guaranty of payment and not of mere collection.  Guarantor further agrees that Landlord shall not be required to enforce first

DocuSign Envelope ID: 1C8AE699-43A5-4053-AB48-F5E7145559FD

against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against Guarantor.  The liability of Guarantor shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Federal Bankruptcy Code, or any similar law or statute of the United States or any State thereof, including the rejection or disaffirmance of the Lease in any such proceeding.

      4.    <u>Unconditional Guaranty</u>.  This Guaranty will remain in full force and effect without regard to any circumstances or conditions, including:

    a.    any defense or set-off, counterclaim or termination whatsoever by reason of the invalidity, illegality, or unenforceability of the Lease or otherwise, or the failure of Landlord to assert any claim or demand, or to enforce the Lease or any right or remedy available to Landlord under the Lease, against Tenant under the Lease or any other agreement. Notwithstanding the foregoing, Guarantor shall have the benefit of, and does not waive, any and all defenses afforded to Tenant pursuant to the Lease or at law, such as the defense of payment;

    b.    any extension or renewal of the Lease or any other agreement, provided, however, that Guarantor is provided written notice of such extension or renewal;

    c.    any rescission, waiver, amendment, or modification of the Lease, provided however, that Guarantor is provided written notice of any material rescission, waiver, amendment or modification;

    d.    the release of any security held by Landlord under the Lease;

    e.    any bankruptcy or similar proceeding involving Landlord or Tenant; or

    f.    failure of Landlord to exercise any right or remedy against any other guarantor of the Lease.

      5.    <u>Jury Trial Waiver</u>.  To the extent permitted by law, the parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Guaranty.

      6.    <u>Governing Law</u>.  This Guaranty shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be wholly performed within the State of New York.  Guarantor hereby consents to the jurisdiction of any competent court within New York County, New York, in Landlord's discretion, including, without limitation, the Federal Courts of the United States.

      7.    <u>Severability</u>.  If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty will not be affected thereby, and each provision of this Guaranty will be valid and enforceable to the fullest extent permitted by law. Landlord's delay in exercising, or the failure to exercise, any right under this Guaranty will not waive such right or any other right of Landlord. All remedies of Landlord by reason of this Guaranty are separate and cumulative and no single remedy, whether or not exercised by Landlord, will exclude any other remedy of Landlord or limit or prejudice any other legal or equitable remedy which Landlord may have.

8.    Termination.  This Guaranty and Guarantor's liability under this Guaranty shall expire and terminate on the earlier of (a) when all Guaranteed Obligations have been fully performed; or (b) any expiration or earlier termination of the Lease, except when such earlier termination results from a Tenant's default under the Lease.

9.    Notices. All notices and other communications hereunder (each, a **"Notice"**) shall be in writing and addressed to the parties at the addresses set forth below (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred upon receipt; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred upon receipt or rejection of delivery; or (c) electronic transmission (facsimile or email) provided that the transmission is completed no later than 5:00 p.m. EST on a business day and the original also is sent via overnight courier, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

If to Guarantor:

Sonder Holdings Inc.
101 15th Street
San Francisco, CA 94103
Attention:  Office of the General Counsel

If to Landlord:

36-37 36th Street, Second Floor
Astoria, New York 11101
Attention:  Gal Sela

With  a copy to:
Mavrides Moyal Packman & Sadkin LLP
276 Fifth Avenue, Suite 404
New York, NY 10001, Attention: Dean Mavrides, Esq.

10.    Headings.  The headings in this Guaranty have been inserted for reference only and in no way define, limit, or enlarge the scope or meaning of this Guaranty or any provision hereof.

11.    Modifications.  Any modification, amendment, supplement, or other change to this Guaranty must be in writing and signed by both parties.

12.    Successors and Assigns. This Guaranty shall be binding upon Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Landlord and Landlord's successors and assigns.

13.    Authority. Guarantor represents and warrants that it is duly authorized to enter into this Guaranty and perform its respective obligations hereunder without the consent or approval of any other person or party.

14.    <u>Counterparts</u>.  This Guaranty shall be considered properly executed if executed and transmitted by facsimile or other means of electronic transmission to Landlord and such signature shall be deemed an original, shall be effective upon receipt, may be admitted in evidence and shall fully bind Guarantor.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has duly authorized and caused this Guaranty to be executed as follows:

**GUARANTOR:**

Sonder Holdings Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

STATE OF   NEW YORK        )
COUNTY OF _____ ) ss:

I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of **SONDER HOLDINGS INC.**, the Tenant in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

GIVEN under my hand and notarial seal this ____ day of _____, 20__.

_____
Notary Public

My Commission Expires:

DocuSign Envelope ID: 1C8AF699-43A8-4053-AB48-F5E5145550FD

**EXHIBIT L**

**LANDLORD'S FF&E**

## FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement (the "Amendment") is made as of March 31, 2025, by and between ISSTA 27th Street LLC ("Landlord") and Sonder Hospitality USA Inc. ("Tenant", collectively referred to as the "Parties"). This Amendment modifies and supplements the Lease Agreement dated November 24, 2021, between the Parties (the "Lease").

WHEREAS, the Parties entered into the Lease for the premises located at 39-35 27th Street, Long Island City, New York (the "Premises");

WHEREAS, the Parties desire to amend certain provisions of the Lease as set forth below;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Defined Terms and Recitals.  Capitalized terms used and not otherwise defined in this Amendment shall have the meanings given to them in the Lease. The recitals set forth above are hereby incorporated herein by this reference.

2.    Revenue.

a.    The definition of "Revenue Share Rent" in Appendix A(qqq) of the Lease shall be revised to state "33% of Revenue."

b.    The definition of "Revenue" in Appendix A(ppp) of the Lease shall be amended to read as follows:

"All revenues received during Tenant's fiscal year from the letting of the Rooms including without limitation, the total amount of all sales of merchandise and/or services of all business conducted in, at, or from any part of the Premises, whether the same be for cash, barter, credit, check, charge account, gift or merchandise certificates purchased, or other disposition of value regardless of collection, in the event of sale upon credit or charge account and whether made by Tenant, subtenants, concessionaires, licensees or assignees of Tenant, including sales to employees, less expenses (the "**Deductions**") for (i) transient occupancy taxes or regulatory fees, sales taxes, value-added taxes, business taxes or other accommodation and use taxes or regulatory fees (federal, state, and municipal sales, excise and use taxes collected or required to be charged to or collected from guests or as part of the sales price of any accommodations, amounts assessed by tax authorities retroactively and/or recovery of taxes retroactively and amounts assessed by tax authorities prior to Tenant recognizing revenue for the transaction for which the taxes are assessed), any portion of real estate taxes reimbursed by Tenant to Landlord pursuant to Section 3.4 above, (ii) refunds or credits to Tenant's guests, (iii) intentionally omitted (iv) losses from non-payment of guests, provided Tenant shall use reasonable efforts within the retail trade to collect such non-payment, and (v) the Refurbishment Allowance. Revenue shall be calculated on an annual basis in accordance with United States Generally Accepted Accounting Principles (US GAAP).

10

The value of each sale shall be the actual total sales price charged the customer and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received. Revenue includes orders or sales that originate in, at or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, made via the internet or e-mail, telecopied or telegraphed, that are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated or automatic vending devices on the Premises. There shall be no deduction or exclusion from Revenue except as specifically permitted herein. Any deposit not refunded shall be included in Revenue."

    c.    The revised definition of "Revenue" shall be effective commencing in Q4 2024. In addition, Landlord acknowledges it has been paid in full for Q3 2024, and Tenant shall pay Landlord the sum of $77,046 plus $29,018 (which amount represents the unpaid portion of the 2023 and Q2 2024 Revenue Share Rent, based on the applicable definitions in effect before this Amendment, after deducting 50% of Tenant's expenses for (1) Cleaning-Leasing; (2) Laundry; and (3) Consumables), for the sum total of $106,064.00 ("Catch Up Payment"). The Catch Up Payment shall be an additional payment obligation that is separate and apart from the payment of Rent under the Lease, and paid (a) in equal monthly installments in the amount of $1,964.14 beginning January 1, 2025 and continuing through June 1, 2029, and (b) concurrently with Tenant's monthly Fixed Rent payments. For the avoidance of doubt, the Catch Up Payment shall not be considered an expense in calculating Revenue under the Lease.

    d.    Tenant shall provide a quarterly Revenue Statement in the form attached hereto as <u>Exhibit A</u>. Within 14 days of a request from Landlord, Tenant shall provide backup transactional data for any quarterly Revenue Statement, in a form similar to the "JOU Detail" tab of prior Revenue Statements, such as the Q2 2023 Revenue Statement.

In calculating Revenue under the Lease, Tenant may deduct only those categories of expenses set forth in Exhibit A (the "Categories"). In the event that Tenant changes its revenue reporting system on a company-wide basis, and to the extent that any such system changes require Tenant to report the Categories in a different manner, Landlord and Tenant shall work together in good faith to confirm that Tenant is continuing to deduct only the Categories, and continues to account for the Categories in a commercially reasonable manner. Tenant is not entitled to change the substance of the Categories.

    3.    Early Termination Date. Section 2.3 of the Lease Agreement shall be amended as follows: "Either party shall have the right to terminate this Lease by providing prior written notice to the other party on or before January 1, 2029, with such termination to be effective as of June 30, 2029 (the **"Early Termination Date"**)." All references in the Lease Agreement to the end of the Lease Term, or to the "fifth anniversary of the Commencement Date", or the "Early Termination Date" shall be revised to refer to June 30, 2029.

4.      Except as expressly modified herein, all terms and conditions of the Lease shall remain in full force and effect. In the event of a conflict between this Amendment and the Lease, the terms of this Amendment shall govern.

5.      This Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Signatures transmitted electronically or by facsimile shall be deemed valid and binding.

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date first written above.

**LANDLORD:**
ISSTA 27th Street LLC
By: _____
Name: ___Shimon Siboni___
Title: ___Ceo___
Date: ___April 6, 2025___

**TENANT:**
Sonder Hospitality USA Inc.
By: _____
Name: ___Jason Epstein___
Title: ___Managing Director___
Date: ___April 3, 2025___

12

Exhibit A



## The Dutch Revenue Share Statement

**To:**
Gal Sela
36-37 36th Street
Second Floor
Astoria, New York
11106

101 15th St
San Francisco, CA 94103
www.sonder.com

**Location Details:**
Sonder Location ID: **NYC - 27TH39**
Address: **39-35 27th Street**
**Long Island City, New**
**11101**

| | | Revenue Share: | | 33% |
|---|---|---|---|---|
| | | | | 1/21/2025 |
| | Month 1 | Month 2 | Month 3 | Total |
| **Revenue Received** | | | | |
| Deductions | | | | |
| **Net Revenue** | | | | |
| **Landlord Rev Share** | | | | |
| **Less: Min Rent Paid to LL** | | | | |

| Payment Due to LL | |
|---|---|
| | |

All Payments made by ACH/EFT

Questions? Please contact:
Lease-Accounting-All@sonder.com

13

docxMonday, March 31, 2025

| Accountnumber | Account Name | Revenue Period | | | |
|---|---|---|---|---|---|
| | | Month 1 | Month 2 | Month 3 | Grand Total |
| 41310 | Cleaning Revenue – STR – Leasing | | | | |
| 41320 | Incidental Revenue – STR – Leasing | | | | |
| 41330 | Base fee – STR – Leasing | | | | |
| 41380 | Member Discounts – STR – Leasing | | | | |
| 41381 | Length of Stay Discounts – STR – Leasing | | | | |
| 41382 | Hospitality Discounts – STR – Leasing | | | | |
| 41383 | Price Match – STR – Leasing | | | | |
| 41390 | Customer Satisfaction Refund – STR – Leasing | | | | |
| 41386 | Revenue Allowance – STR – Leasing | | | | |
| 41391 | Room Upgrade Revenue | | | | |
| 48105 | Cancellation Fee Revenue | | | | |
| 59055 | Promotional Discounts | | | | |
| | | | | | |

| | | | | |
|---|---|---|---|---|
| Revenue | | | | |
| Deductions | | | | |
| Total | | | | |

14

## **EXHIBIT 2**

# ISSTA 27th Street LLC
## 36-37 36th Street
## Astoria, NY 11106

November 3, 2025

### _VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)_

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

## NOTICE OF TENANT DEFAULT AND DEMAND TO CURE

RE:     Notice to Tenant under the Lease Agreement (the "Lease") dated as of November 24, 2021 and as amended as of March 32, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("Original Landlord"), and SONDER HOSPITALITY USA INC. (the "Tenant"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "Premises") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("Building").  ISSTA 27th Street LLC ("Landlord") is the successor to Original Landlord.

November 3, 2025
Page 2

**PLEASE TAKE NOTICE**, that capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

**PLEASE TAKE FURTHER NOTICE**, that Tenant has failed to pay Fixed Rent as required under Section 3.1 of the Lease and section (dd) of the Lease in the amount of $121,265.00 for the month of November 2025. If Tenant fails to cure this default within ten (10) business days hereof, such default shall be deemed an Event of Default.

**PLEASE TAKE FURTHER NOTICE**, that pursuant to Section 3.3 of the Lease, the full amount of Tenant's default under its rental payment obligations described herein shall bear interest commencing on the eleventh (11th) day after Tenant's receipt of this Notice of Default and Demand to Cure until paid at a rate equal to the lesser of (a) 8% per annum, or (b) the maximum rate allowed by applicable Law.

**PLEASE TAKE FURTHER NOTICE**, that pursuant to Section 21.1.5 of the Lease, Tenant shall reimburse Landlord, as Additional Rent, for attorneys' fees and costs incurred by Landlord to effect Tenant's compliance with the terms of the Lease, including Tenant's default described herein, which fees and costs will be transmitted under separate cover.

**PLEASE TAKE FURTHER NOTICE**, that this Notice of Default and Demand to Cure is sent with a full reservation of all rights and remedies available to Landlord under the Lease and both at law and in equity.

_____/s/ *Eliran Aner*_____
Authorized Representative

# EXHIBIT 3

<div align="center">

**ISSTA 27th Street LLC**
**36-37 36th Street**
**Astoria, NY 11106**

</div>

<div align="center">

November 10, 2025

</div>

<u>***VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)***</u>

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

<div align="center">

<u>**NOTICE**</u>

</div>

RE:    Notice to Tenant under the Lease Agreement (the "<u>Lease</u>") dated as of November 24, 2021 and as amended as of March 31, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("<u>Original Landlord</u>"), and SONDER HOSPITALITY USA INC. (the "<u>Tenant</u>"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "<u>Premises</u>") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("<u>Building</u>").  ISSTA 27th Street LLC ("<u>Landlord</u>") is the successor to Original Landlord.

November 10, 2025
Page 2

     **PLEASE TAKE NOTICE**, that capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

     **PLEASE TAKE FURTHER NOTICE**, that Tenant has failed to pay Q3 2025 Revenue Share Rent in the amount of $26,395.

     **PLEASE TAKE FURTHER NOTICE**, that Tenant is liable for default interest, attorneys' fees and costs incurred by Landlord in connection herewith. This Notice is sent with a full reservation of all rights and remedies available to Landlord at law and in equity.

          /s/ *Eliran Aner*
          Authorized Representative

# **EXHIBIT 4**

<div align="center">

**ISSTA 27th Street LLC**
**36-37 36th Street**
**Astoria, NY 11106**

</div>

<div align="center">

November 10, 2025

</div>

**<u>*VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)*</u>**

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

<div align="center">

**<u>NOTICE OF TERMINATION</u>**

</div>

RE:    Notice to Tenant under the Lease Agreement (the "<u>Lease</u>") dated as of November 24, 2021 and as amended as of March 31, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("<u>Original Landlord</u>"), and SONDER HOSPITALITY USA INC. (the "<u>Tenant</u>"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "<u>Premises</u>") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("<u>Building</u>").  ISSTA 27th Street LLC ("<u>Landlord</u>") is the successor to Original Landlord.

November 10, 2025
Page 2

**PLEASE TAKE NOTICE**, that Sonder has repudiated and committed incurable breaches of the Lease by, among other things, ceasing business operations in the United States, requesting guests of the Building to vacate as of November 10, 2025, and defaulting under its licensing agreement with Marriot International resulting in Marriot terminating said agreement.

**PLEASE TAKE FURTHER NOTICE**, that as a result of the aforementioned reputation and incurable breaches of the Lease by Sonder, the Lease is terminated in its entirety effective immediately.

**PLEASE TAKE FURTHER NOTICE**, that Sonder is required to secure and vacate the Premises and deliver possession thereof to Landlord immediately.  Immediate demand is made for proof that the Premises is secured and vacant. Absent receipt of such proof within one day hereof, Landlord reserves the right to enter the Premises for the purpose of securing the Premises until possession thereof is delivered to Landlord.

**PLEASE TAKE FURTHER NOTICE** that Tenant shall immediately pay all unpaid and delinquent Rent and other sums due payable by Tenant as of the date hereof, and Tenant is liable for any and all other damages provided under the Lease or in equity, including the damages set forth in Article 21 of the Lease, default interest, and attorneys' fees and costs.

**PLEASE TAKE FURTHER NOTICE**, that this Notice of Termination is sent with a full reservation of all rights and remedies available at law and in equity. Capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

_____/s/ *Eliran Aner*_____
Authorized Representative

## **EXHIBIT 5**

<div align="center">

**ISSTA 27th Street LLC**
**36-37 36th Street**
**Astoria, NY 11106**

</div>

<div align="center">

November 10, 2025

</div>

***VIA CERTIFIED MAIL***

RLI Insurance Company
9025 Lindbergh
Peoria, IL 60615

Copy: relegalnotices@sonder.com

<div align="center">

**NOTICE OF TENANT'S BREACH AND DEMAND FOR PAYMENT**

</div>

RE:   Lease Bond (Bond No. CMS0336167) (the "Lease Bond") (**Exhibit A**)

ISSTA 27th Street LLC ("Owner"), successor-in-interest to SELA 27 Street LLC ("SELA") with respect to the lease agreement dated as of November 24, 2021 and as amended as of March 31, 2025 between SELA and Sonder Hospitality USA Inc. ("Tenant") for the premises at 39-35 27th Street, Long Island City, New York (the "Lease"), provides notice to RLI Insurance Company ("Surety"), pursuant to the Lease Bond, of Tenant's breaches of the Lease.

Among other things, Tenant breached the Lease by ceasing all business operations in the United States and demanding that hotel guests vacate the leased premises as of November 10, 2025, for failure to pay Fixed Rent in the amount of $121,265.00 for the month of November 2025, and failure to pay Q3 2025 Revenue Share Rent in the amount of $26,395, as more fully described in Owner's Notices Tenant annexed hereto as **Exhibit B**.

Owner demands that Surety to pay to Owner the amount of $363,795.00, plus interest, as required under the Lease Bond within thirty days hereof. This Notice of Tenant's Default is sent with a full reservation of all rights and remedies available to Owner under the Lease, the Lease Bond, at law and in equity.

<div style="margin-left: 40%;">

_____/s/ *Eliran Aner*_____
Authorized Representative

</div>

SGR/81294305.1

# EXHIBIT A

# LEASE BOND

RLI Insurance Company

**Bond No. CMS0336167**

KNOW ALL BY THESE PRESENTS, that we SONDER HOSPITALITY USA INC., as Principal, and RLI INSURANCE COMPANY, a corporation organized and existing under the laws of the State of Illinois ,authorized to do business in the State of New York , as Surety, are held and firmly bound unto SELA 27 STREET LLC, a New York limited liability company , as Obligee, in the penal sum of: Three Hundred and Sixty-Three Thousand, Seven Hundred and Ninety-Five 00/100 Dollars ($363,795.00), lawful money of the United States of America, to be paid to the said Obligee, or their successors or assignees, for which payment well and trulyto be made, we, and each of us do hereby bind ourselves, and each of our heirs, executors, administrators,successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into a certain lease with the Obligee for The 9-story building and one (1) floor of cellar space that is part of the Project commonly known as Dutch House located at 39-35 27th Street, Long Island City, New York 11101, for the "Premises" as described per the terms and conditions of said lease, and is required by said Obligee to give this Lease Bond as financial security for any accrued unpaid Lease obligations of the Principal to the Obligee.

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall comply with the termsof the lease and save harmless the Obligee from any loss or damage, then this obligation is void, otherwiseto remain in full force and effect.

Provided, however, that this Lease Bond is executed by the said Principal and the said Surety and acceptedby the said Obligee upon the following express conditions:

1.  The liability of the Surety on this Lease Bond shall not exceed the sum of Three Hundred and Sixty-Three Thousand, Seven Hundred and Ninety-Five 00/100 Dollars ($363,795.00), in the aggregate.

2.  In the event of any default of the Principal herein, the Surety shall be given written notice by the Obligee of such default within Twenty (20) days after such default by certified mail to the Surety at its office at:

    RLI Insurance Company
    9025 Lindbergh
    Peoria, IL 60615

3.  Within thirty (30) days of Surety's receipt of a default under this Lease Bond, Surety shall pay to the Obligee the amount of such default.

4.  It is further understood that this Lease Bond may be canceled at any time by the Surety upon giving ninety (90) days' notice by certified mail, to the Obligee in which event the liability of the Surety shall terminate at the expiration of ninety (90) days except to any liability that may have arrived prior to the expiration of the ninety (90) days.

5.  No action, suit or proceeding either at law or in equity shall be maintained against the Surety unless such action, suit or proceeding is commenced within three (3) months after the termination of this bond.

This Lease Bond is to be effective <u>July, 7th 2022</u>

Signed and Sealed this 7th day of July,  2022.

SONDER HOSPITALITY USA INC.
   (Principal)

By: _____

Name: _____

Title _____

RLI INSURANCE COMPANY
(Surety)

By: _____

Attorney-in-fact: Michael J. Friedrich

# POWER OF ATTORNEY

## RLI Insurance Company
## Contractors Bonding and Insurance Company

9025 N. Lindbergh Dr. Peoria, IL 61615
Phone: 800-645-2402

*Know All Men by These Presents:*

That this Power of Attorney is not valid or in effect unless attached to the bond which it authorizes executed, but may be detached by the approving officer if desired.

That **RLI Insurance Company** and/or **Contractors Bonding and Insurance Company**, each an Illinois corporation, (separately and together, the "Company") do hereby make, constitute and appoint:

Michael J. Friedrich

in the City of _____Chicago_____, State of _____Illinois_____ its true and lawful Agent(s) and Attorney(s) in Fact, with full power and authority hereby conferred, to sign, execute, acknowledge and deliver for and on its behalf as Surety, in general, any and all bonds and undertakings in an amount not to exceed _____**Twenty Five Million**_____ Dollars (__$25,000,000.00__) for any single obligation.

The acknowledgement and execution of such bond by the said Attorney in Fact shall be as binding upon the Company as if such bond had been executed and acknowledged by the regularly elected officers of the Company.

**RLI Insurance Company** and/or **Contractors Bonding and Insurance Company**, as applicable, have each further certified that the following is a true and exact copy of a Resolution adopted by the Board of Directors of each such corporation, and is now in force, to-wit:

"All bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation shall be executed in the corporate name of the Company by the President, Secretary, any Assistant Secretary, Treasurer, or any Vice President, or by such other officers as the Board of Directors may authorize. The President, any Vice President, Secretary, any Assistant Secretary, or the Treasurer may appoint Attorneys in Fact or Agents who shall have authority to issue bonds, policies or undertakings in the name of the Company. The corporate seal is not necessary for the validity of any bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation. The signature of any such officer and the corporate seal may be printed by facsimile."

IN WITNESS WHEREOF, the **RLI Insurance Company** and/or **Contractors Bonding and Insurance Company**, as applicable, have caused these presents to be executed by its respective _____Vice President_____ with its corporate seal affixed this __19th__ day of ____June____, _2019_.

RLI Insurance Company
Contractors Bonding and Insurance Company

By: _____B.H W.D'_____
Barton W. Davis                              Vice President

State of Illinois } SS
County of Peoria }

On this __19th__ day of __June__, __2019__, before me, a Notary Public, personally appeared __Barton W. Davis__, who being by me duly sworn, acknowledged that he signed the above Power of Attorney as the aforesaid officer of the **RLI Insurance Company** and/or **Contractors Bonding and Insurance Company** and acknowledged said instrument to be the voluntary act and deed of said corporation.

By: ____Gretchen L. Johnigk____
Gretchen L. Johnigk                         Notary Public

GRETCHEN L JOHNIGK
"OFFICIAL SEAL"
My Commission Expires
May 26, 2020

### CERTIFICATE

I, the undersigned officer of **RLI Insurance Company** and/or **Contractors Bonding and Insurance Company**, do hereby certify that the attached Power of Attorney is in full force and effect and is irrevocable; and furthermore, that the Resolution of the Company as set forth in the Power of Attorney, is now in force. In testimony whereof, I have hereunto set my hand and the seal of the **RLI Insurance Company** and/or **Contractors Bonding and Insurance Company** this __1st__ day of __July__, __2022__.

RLI Insurance Company
Contractors Bonding and Insurance Company

By: ____Jean M. Stephenson____
Jean M. Stephenson                         Corporate Secretary

*12D1984020212*

A0058817

# EXHIBIT B

# ISSTA 27th Street LLC
## 36-37 36th Street
## Astoria, NY 11106

November 3, 2025

<u>***VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)***</u>

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

## <u>NOTICE OF TENANT DEFAULT AND DEMAND TO CURE</u>

RE:    Notice to Tenant under the Lease Agreement (the "<u>Lease</u>") dated as of November 24, 2021 and as amended as of March 32, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("<u>Original Landlord</u>"), and SONDER HOSPITALITY USA INC. (the "<u>Tenant</u>"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "<u>Premises</u>") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("<u>Building</u>").  ISSTA 27th Street LLC ("<u>Landlord</u>") is the successor to Original Landlord.

November 3, 2025
Page 2

      **PLEASE TAKE NOTICE**, that capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

      **PLEASE TAKE FURTHER NOTICE**, that Tenant has failed to pay Fixed Rent as required under Section 3.1 of the Lease and section (dd) of the Lease in the amount of $121,265.00 for the month of November 2025. If Tenant fails to cure this default within ten (10) business days hereof, such default shall be deemed an Event of Default.

      **PLEASE TAKE FURTHER NOTICE**, that pursuant to Section 3.3 of the Lease, the full amount of Tenant's default under its rental payment obligations described herein shall bear interest commencing on the eleventh (11th) day after Tenant's receipt of this Notice of Default and Demand to Cure until paid at a rate equal to the lesser of (a) 8% per annum, or (b) the maximum rate allowed by applicable Law.

      **PLEASE TAKE FURTHER NOTICE**, that pursuant to Section 21.1.5 of the Lease, Tenant shall reimburse Landlord, as Additional Rent, for attorneys' fees and costs incurred by Landlord to effect Tenant's compliance with the terms of the Lease, including Tenant's default described herein, which fees and costs will be transmitted under separate cover.

      **PLEASE TAKE FURTHER NOTICE**, that this Notice of Default and Demand to Cure is sent with a full reservation of all rights and remedies available to Landlord under the Lease and both at law and in equity.

                          /s/ *Eliran Aner*
                         Authorized Representative

# ISSTA 27th Street LLC
## 36-37 36th Street
## Astoria, NY 11106

November 10, 2025

<u>***VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)***</u>

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

## NOTICE OF TERMINATION

RE:    Notice to Tenant under the Lease Agreement (the "<u>Lease</u>") dated as of November 24, 2021 and as amended as of March 31, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("<u>Original Landlord</u>"), and SONDER HOSPITALITY USA INC. (the "<u>Tenant</u>"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "<u>Premises</u>") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("<u>Building</u>").  ISSTA 27th Street LLC ("<u>Landlord</u>") is the successor to Original Landlord.

November 10, 2025
Page 2

      **PLEASE TAKE NOTICE**, that Sonder has repudiated and committed incurable breaches of the Lease by, among other things, ceasing business operations in the United States, requesting guests of the Building to vacate as of November 10, 2025, and defaulting under its licensing agreement with Marriot International resulting in Marriot terminating said agreement.

      **PLEASE TAKE FURTHER NOTICE**, that as a result of the aforementioned reputation and incurable breaches of the Lease by Sonder, the Lease is terminated in its entirety effective immediately.

      **PLEASE TAKE FURTHER NOTICE**, that Sonder is required to secure and vacate the Premises and deliver possession thereof to Landlord immediately.  Immediate demand is made for proof that the Premises is secured and vacant. Absent receipt of such proof within one day hereof, Landlord reserves the right to enter the Premises for the purpose of securing the Premises until possession thereof is delivered to Landlord.

      **PLEASE TAKE FURTHER NOTICE** that Tenant shall immediately pay all unpaid and delinquent Rent and other sums due payable by Tenant as of the date hereof, and Tenant is liable for any and all other damages provided under the Lease or in equity, including the damages set forth in Article 21 of the Lease, default interest, and attorneys' fees and costs.

      **PLEASE TAKE FURTHER NOTICE**, that this Notice of Termination is sent with a full reservation of all rights and remedies available at law and in equity. Capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

                            */s/ Eliran Aner*
                         Authorized Representative

# ISSTA 27th Street LLC
## 36-37 36th Street
## Astoria, NY 11106

November 10, 2025

### *VIA E-MAIL AND FEDERAL EXPRESS (For overnight delivery)*

Sonder Hospitality USA Inc.
39-35 27th Street
Long Island City, New York 11101
Attention: General Manager

Sonder Hospitality USA Inc.
447 Sutter St Ste 405 #542
San Francisco, CA 94108

Copy:
Sonder Hospitality USA Inc.
101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

Copy: relegalnotices@sonder.com

## NOTICE

RE:    Notice to Tenant under the Lease Agreement (the "Lease") dated as of November 24, 2021 and as amended as of March 31, 2025 made between Landlord's predecessor-in-interest SELA 27 STREET LLC ("Original Landlord"), and SONDER HOSPITALITY USA INC. (the "Tenant"), for certain premises as more particularly set forth in the Lease including, but not limited to the Rooms at the Project, consisting of 79 Rooms (comprised of certain room types as shown on Exhibit A-3 attached to the Lease) located on floors 1 to 9 of the Building as well as the corridors in which the Rooms are located (including and any and all fixtures, improvements and personal property owned by Original Landlord and located thereon at any time during the Term), and a lobby/welcome desk area, all storage space/housekeeping closets within the Building, all employee offices and break rooms within the Building, the garden/patio at the rear of the Building, all roof decks  (if any), and guest lounge/co-working and accessory spaces located on the ground floor of the Building  (all as shown on Exhibit A-4 of the Lease) (the "Premises") in the building known as 39-35 27th Street, Long Island City, New York, 11101 ("Building").  ISSTA 27th Street LLC ("Landlord") is the successor to Original Landlord.

November 10, 2025
Page 2

      **PLEASE TAKE NOTICE**, that capitalized terms not otherwise defined herein shall have the meaning ascribed to same in the Lease.

      **PLEASE TAKE FURTHER NOTICE**, that Tenant has failed to pay Q3 2025 Revenue Share Rent in the amount of $26,395.

      **PLEASE TAKE FURTHER NOTICE**, that Tenant is liable for default interest, attorneys' fees and costs incurred by Landlord in connection herewith. This Notice is sent with a full reservation of all rights and remedies available to Landlord at law and in equity.

        /s/ *Eliran Aner*
      Authorized Representative